UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

SANDIPKUMAR TANDEL,                    No. 2:09-cv-00842-MCE-GGH
                                       (Consolidated with Case
          Plaintiff,                   No. 2:11-cv-00353-MCE-GGH)

     v.

COUNTY OF SACRAMENTO, et al.,
                                       MEMORANDUM AND ORDER
          Defendants.

----oo0oo----

     Plaintiff Sandipkumar Tandel ("Plaintiff") seeks redress for
several federal and state law claims alleging that the County of
Sacramento ("County"), Sheriff of Sacramento County, John
McGinness ("McGinness"), Chief of Sacramento County Jail
Correctional Health Services, Ann Marie Boylan ("Boylan"),
Medical Director of Sacramento County Jail Correctional Health
Services, Asa Hambly, M.D. ("Hambly"), Chris Smith, M.D.
("Smith"), Hank Carl, R.N. ("Carl"), Sergeant Tracie Keillor
("Keillor"), and Officer Pablito Gaddis ("Gaddis") violated
Plaintiff's civil rights during Plaintiff's detention at the
Sacramento County Main Jail.

1

Plaintiff further claims that said Defendants committed certain state-law violations.  In his Second Amended Complaint ("SAC"), Plaintiff seeks compensatory and punitive damages, attorneys' fees and costs, and declaratory and injunctive relief.  Presently before the Court are the Motion to Dismiss of Defendants County, McGinness, Boylan, Hambly, Carl, Keillor and Gaddis (collectively "County Defendants").  (See County Defs.' Mot. to Dismiss Pl.'s Second Am. Compl. ["CDMTD"], filed July 22, 2011 [ECF No. 44].), and the Motion to Dismiss of Defendant Smith filed pursuant to Federal Rule of Civil Procedure 12(b)(6).  (See Def. Smith's Mot. to Dismiss Pl.'s Second Am. Compl. ["SMTD"], filed July 27, 2011 [ECF No. 45].)  For the reasons set forth below, Defendants' motions are granted in part and denied in part.[1]

## BACKGROUND[2]

On February 7, 2007, Plaintiff was arrested and incarcerated at the Sacramento County Main Jail ("the Jail") as a pre-trial detainee.  Plaintiff alleges that, because of his dark skin color, he was housed with the African-American inmates.  On April 27, 2007, Plaintiff suffered a head injury as a result of a racial altercation at the Jail.

///

///

---

[1] Because oral argument will not be of material assistance, the Court ordered this mater submitted on the briefing.  E.D. Cal. R. 230(g).

[2] The following facts are taken from Plaintiff's Second Amended Complaint ("SAC"), filed July 11, 2011 [ECF No. 43].

Plaintiff was sent to the Emergency Room at the Doctor's Center in Sacramento, where Dr. Gray, M.D., treated Plaintiff's injury by cleaning and suturing the wound and vaccinating Plaintiff for tetanus.  The same day, Dr. Gray sent Plaintiff back to the Jail with instructions to remove the sutures in five days, leaving the wound open to air and keeping the wound clean.  Upon Plaintiff's return to the Jail, he was seen by the Jail's medical personnel who evaluated Plaintiff, noted the treatment and vaccination, and referred the matter to a doctor.  Plaintiff informed Jail medical personnel that he had a headache.  Plaintiff alleges that Defendant Hambly reviewed Plaintiff's chart on April 30, 2007.

After returning to the Jail, Plaintiff was placed into Administrative Segregation, where he remained for approximately two weeks.  Plaintiff alleges that during his stay in the Administrative Segregation: (1) he repeatedly requested, but was denied, showers and items required for regular hygiene and for keeping his wound clean, and medical products for proper wound care; (2) he requested, but was denied, the removal of his sutures after five days; and (3) he requested, but was denied, a steady flow of clean water in the sink in his cell rather than a dripping faucet with brown water.

Plaintiff goes on to allege that the unit where he was housed was an indirect supervision unit and that, if he wanted to communicate with the staff, he had to push the call button in his cell.  Plaintiff claims that many of his calls went unanswered and that when the calls were answered, he was told, "We are working on it" and to "stop using the call button," and finally to "stop complaining."

3

Eventually, the Jail staff stopped answering Plaintiff's calls altogether.  Plaintiff alleges that, without running water in his cell and regular showers, he could not keep his wound clean as prescribed by Dr. Gray.

On or about May 12, 2007, Plaintiff was moved to a regular cell and immediately requested medical care.  Defendant Carl allegedly saw Plaintiff on May 13, 2007.  Plaintiff informed Carl that he had been suffering from headaches for the past four days. Carl consulted with Defendant Dr. Smith who ordered the stitches removed and gave Motrin to Plaintiff.

On or about May 14, 2007, Plaintiff again sought medical attention, complaining of headaches, sensitivity to light and nasal drip.  Plaintiff was examined by a nurse, Jim Austin, and was returned to his cell.  On or about May 17, 2007, Plaintiff collapsed while taking a shower when he lost control of his legs. Defendant Officer Gaddis responded to Plaintiff's request for help but allegedly failed to use the radio to properly alert medical and custody staff of the emergency.  According to Plaintiff, Gaddis also failed to file an incident or casualty report following the incident, in violation of Jail policy.  On May 17, 2007, Defendant Sergeant Keillor was the supervising officer on duty.

When Plaintiff was wheeled in a wheelchair for evaluation, he told Defendant Carl, "My legs don't work."  Plaintiff alleges that Carl failed to conduct an adequate medical assessment of a patient presenting with an apparent spinal cord injury or neurological disorder.  Carl ordered Plaintiff returned to his cell without arranging for any medical follow-up.

4

1   Plaintiff alleges that, upon returning to his cell, he was dumped
2   out of the wheelchair and left on the floor of his cell.

3       On May 18, 2007, Plaintiff had a sudden and acute loss of
4   vision in his left eye and started noticing that he was not able
5   to move his lower extremities.  He was also suffering from
6   urinary retention and constipation.  He repeatedly rang the
7   emergency bell to summon help and informed the officers on duty
8   that his legs did not work, that he could not urinate and that he
9   was going blind, but was told to stop using the call button and
10  that "these things would not kill him."

11      On May 20, 2007, at 11:44 a.m., Defendant Carl saw Plaintiff
12  and referred him to see Defendant Dr. Smith.  Dr. Smith saw
13  Plaintiff at 12:30 p.m. but allegedly "failed to take any
14  appropriate medical action."  At 9:45 p.m., Dr. Horowitz
15  evaluated Plaintiff and noted that Plaintiff had been on the
16  floor of his cell for three days.  Plaintiff claimed to be
17  suffering from vision loss, an inability to control his
18  extremities, get up to "void or defecate," and other neurological
19  impairments.  Dr. Horowitz sent Plaintiff to a local emergency
20  room where he was found to have an expansive lesion in the spine
21  and brain involvement.

22      On May 21, 2007, Plaintiff was admitted to the University of
23  California, Davis, Medical Center ("UCD").  Upon admission,
24  Plaintiff was found to have bilateral lower extremity
25  paraparesis, vision loss, occasional shakes to upper extremities,
26  and an inability to eat or drink on his own.

27  ///

28  ///

Because Plaintiff's medical history allegedly did not accompany him to the hospital, the UCD treating physicians were unaware of the treatment already rendered to Plaintiff, including the Tetanus vaccination.  By May 24, 2007, Plaintiff could not open his eyes or speak.  On May 26, 2012, Plaintiff was diagnosed with Acute Disseminated Encephalomyelitis ("ADEM").  ADEM is a neurological disorder characterized by inflammation of the brain and spinal cord caused by damage to the myelin sheath. Vaccination for tetanus is allegedly a known cause of ADEM. Plaintiff alleges that, due to the lengthy delay in diagnosis and treatment, he was rendered paralyzed and near death.  While Plaintiff's condition improved with treatment, he still remains dependent for his activities in daily living and must use a catheter and diaper.  Plaintiff alleges ongoing serious bouts of depression and emotional distress.

## STANDARD

On a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6),[3] all allegations of material fact must be accepted as true and construed in the light most favorable to the nonmoving party.  Cahill v. Liberty Mut. Ins. Co., 80 F.3d 336, 337-38 (9th Cir. 1996).  The Court must also assume that "general allegations embrace those specific facts that are necessary to support a claim."  Smith v. Pacific Props. & Dev. Corp., 358 F.3d 1097, 1106 (9th Cir. 2004).

---

[3] All further references to "Rule" or "Rules" are to the Federal Rules of Civil Procedure unless otherwise noted.

Rule 8(a)(2) "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant a fair notice of what the [. . .] claim is and the grounds upon which it rests.'" <u>Bell. Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007) (quoting <u>Conley v. Gibson</u>, 355 U.S. 41, 47 (1957)).  A complaint attacked by a Rule 12(b)(6) motion to dismiss does not require detailed factual allegations. <u>Id.</u>  However, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." <u>Id.</u> (internal citations and quotations omitted).  A court is not required to accept as true a "legal conclusion couched as a factual allegation." <u>Ashcroft v. Iqbal</u>,129 S. Ct. 1937, 1950 (2009) (quoting <u>Twombly</u>, 550 U.S. at 555).  The Court also is not required "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." <u>In re Gilead Sciences Sec. Litig.</u>, 536 F.3d 1049, 1055 (9th Cir. 2008).  "Factual allegations must be enough to raise a right to relief above the speculative level." <u>Twombly</u>, 550 U.S. at 555 (citing 5 Charles Alan Wright & Arthur R. Miller, <u>Federal Practice and Procedure</u> § 1216 (3d ed. 2004) (stating that the pleading must contain something more than a "statement of facts that merely creates a suspicion [of] a legally cognizable right of action.")).

///

///

///

///

1    Furthermore, "Rule 8(a)(2) . . . . requires a 'showing,'
2    rather than a blanket assertion, of entitlement to relief."
3    Twombly, 550 U.S. at 556 n.3 (internal citations and quotations
4    omitted). "Without some factual allegation in the complaint, it
5    is hard to see how a claimant could satisfy the requirements of
6    providing not only 'fair notice' of the nature of the claim, but
7    also 'grounds' on which the claim rests." Id. (citing 5 Charles
8    Alan Wright & Arthur R. Miller, supra, at § 1202). A pleading
9    must contain "only enough facts to state a claim to relief that
10   is plausible on its face." Id. at 570. If the "plaintiffs . . .
11   have not nudged their claims across the line from conceivable to
12   plausible, their complaint must be dismissed." Id. However, "a
13   well-pleaded complaint may proceed even if it strikes a savvy
14   judge that actual proof of those facts is improbable, and 'that a
15   recovery is very remote and unlikely.'" Id. at 556 (quoting
16   Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)).

17   A court granting a motion to dismiss a complaint must then
18   decide whether to grant a leave to amend. Leave to amend should
19   be "freely given" where there is no "undue delay, bad faith or
20   dilatory motive on the part of the movant, . . . undue prejudice
21   to the opposing party by virtue of allowance of the amendment,
22   [or] futility of the amendment . . . ." Foman v. Davis, 371 U.S.
23   178, 182 (1962); Eminence Capital, LLC v. Aspeon, Inc., 316 F.3d
24   1048, 1052 (9th Cir. 2003) (listing the Foman factors as those to
25   be considered when deciding whether to grant leave to amend).
26   Not all of these factors merit equal weight. Rather, "the
27   consideration of prejudice to the opposing party . . . carries
28   the greatest weight."

1  Eminence Capital, 316 F.3d at 1052 (citing DCD Programs, Ltd. v.

2  Leighton, 833 F. 2d 183, 185 (9th Cir. 1987)).  Dismissal without

3  leave to amend is proper only if it is clear that "the complaint

4  could not be saved by any amendment."  Intri-Plex Techs., Inc. v.

5  Crest Group, Inc., 499 F. 3d 1048, 1056 (9th Cir. 2007) (internal

6  citations and quotations omitted).

7

8                              **ANALYSIS**

9

10      The Court examines Plaintiff's claims in the following

11  order: (1) Plaintiff's § 1983 claims for failure to provide

12  appropriate medical care against all individual Defendants (First

13  Claim for Relief); (2) Plaintiff's § 1983 claim for violation of

14  the Equal Protection Clause against all individual Defendants

15  (Sixth Claim for Relief); (3) Plaintiff's § 1983 claim for

16  violation of the First Amendment against all individual

17  defendants (Eighth Claim for Relief); (4) Plaintiff's Monell

18  liability claims against Sacramento County (Second, Third,

19  Fourth, Fifth, Seventh and Ninth Claims for Relief); and

20  (5) Plaintiff's claim under the Americans with Disabilities Act

21  and Rehabilitation Act against Sacramento County (Tenth Claim for

22  Relief).[4]

23      _____

        [4] Plaintiff has expressed no opposition, and the parties
24  have agreed, to dismiss the County from Counts 1, 6 and 8 of the
    SAC.  (See Pl.'s Am. Consol. Opp. To Defs.' Mot. To Dismiss,
25  filed August 26, 2011 [ECF No. 59], at 29:23-25.)  The parties
    have also agreed to the dismissal from the SAC of all individual
26  defendants when alleged to be acting in their official
    capacities.  (See id. at 29:10-23.) Finally, the parties have
27  agreed to the dismissal of Counts 11, 12 and 13 of the SAC in
    their entirety.  (See id. at 30:4-8.)  Based on the parties'
28  agreement, this Court dismisses the County from Counts 1, 6 and 8
                                              (continued...)

I.   First Claim for Relief: Claims Brought Pursuant to
     42 U.S.C. § 1983 for Violations of the Fourteenth
     Amendment to the United States Constitution for Failure
     to Provide Appropriate Medical Care against Defendants
     McGinness, Boylan, Hambly, Smith, Carl, Keillor and
     Gaddis in Their Individual Capacities

     Plaintiff's first claim arises under 42 U.S.C. § 1983.   The
SAC alleges that all individual Defendants failed to provide
appropriate medical care to Plaintiff, and that Plaintiff
suffered and continues to suffer personal injury and emotional
distress and incurred damages as a result of such failure.  (SAC
¶¶ 50-52.)  Defendants argue that Plaintiff's first claim should
be dismissed because Plaintiff groups all the Defendants together
and fails to plead specific allegations as to how each Defendant
violated Plaintiff's constitutional rights in failing to provide
adequate medical care.  (CDMTD at 8:1-3; SMTD at 6:12-14,
7:9-11).

///
///
///
///
///
///
///

_____

(...continued)
of the SAC, dismisses all individual defendants when alleged to
be acting in their official capacities from the SAC, and
dismisses Counts 11, 12 and 13 of the SAC.

1  To the extent that Plaintiff alleges supervisory responsibility
2  of some Defendants, Defendants argue that Plaintiff failed to
3  state a claim because he failed to allege: (1) personal
4  participation by supervisory Defendants in the alleged violation
5  of Plaintiff's rights, and/or (2) that a supervisory Defendant
6  directed any actions which caused violations of Plaintiff's
7  rights, and/or (3) that any supervisory Defendant was aware of
8  widespread abuse and, with deliberate indifference, failed to
9  act.  (CDMTD at 9:8-12).

10      Under 42 U.S.C. § 1983, an individual may sue "[e]very
11  person, who, under color of [law] subjects" him "to the
12  deprivation of any rights, privileges, or immunities secured by
13  the Constitution and laws."  Individual capacity suits "seek to
14  impose individual liability upon a government officer for actions
15  taken under color of state law."  Hafer v. Melo, 502 U.S. 21, 25
16  (1991).  Government officials may not be held liable for the
17  unconstitutional conduct of their subordinates under a theory of
18  respondeat superior.  Iqbal, 129 S. Ct. at 1948.  Rather, an
19  individual may be liable for deprivation of constitutional rights
20  "within the meaning of section 1983, if he does an affirmative
21  act, participates in another's affirmative acts, or omits to
22  perform an act which he is legally required to do that causes the
23  deprivation of which complaint is made."  Preschooler II v. Clark
24  County Sch. Bd. of Trs., 479 F.3d 1175, 1183 (9th Cir. 2007).
25  Thus, a plaintiff cannot demonstrate that an individual officer
26  is liable "without a showing of individual participation in the
27  unlawful conduct."  Jones v. Williams, 297 F.3d 930, 935 (9th
28  Cir. 2002).

1  Plaintiff must "establish the 'integral participation' of the
2  officers in the alleged constitutional violation," id., which
3  requires "some fundamental involvement in the conduct that
4  allegedly caused the violation." Blankenhorn v. City of Orange,
5  485 F.3d 463, 481 n.12 (9th Cir. 2007).

6  Government officials acting as supervisors may be liable
7  under § 1983 under certain circumstances. "[W]hen a supervisor
8  is found liable based on deliberate indifference, the supervisor
9  is being held liable for his or her own culpable action or
10 inaction, not held vicariously liable for the culpable action or
11 inaction of his or her subordinate." Starr v. Baca, 652 F.3d
12 1202, 1207 (9th Cir. 2011). A defendant may be held liable as a
13 supervisor under § 1983 if there exists "either (1) his or her
14 personal involvement in the constitutional deprivation; or (2) a
15 sufficient causal connection between the supervisor's wrongful
16 conduct and the constitutional violation." Hansen v. Black,
17 885 F.2d 642, 646 (9th Cir. 1989); Starr, 652 F.3d at 1207.

18 A supervisor's physical presence is not required for
19 supervisory liability. Starr, 652 F.3d at 1205. Rather, the
20 requisite causal connection between a supervisor's wrongful
21 conduct and the violation of the prisoner's Constitutional rights
22 can be established in a number of ways. The plaintiff may show
23 that the supervisor set in motion a series of acts by others, or
24 knowingly refused to terminate a series of acts by others, which
25 the supervisor knew or reasonably should have known would cause
26 others to inflict a constitutional injury. Dubner v. City &
27 County of S.F., 266 F.3d 959, 968 (9th Cir. 2001); Larez v. City
28 of L.A., 946 F.2d 630, 646 (9th Cir. 1991).

1    Similarly, a supervisor's own culpable action or inaction in the
2    training, supervision, or control of his subordinates may
3    establish supervisory liability.  Starr, 652 F.3d at 1208; Larez,
4    946 F.2d at 646.  Finally, a supervisor's acquiescence in the
5    alleged constitutional deprivation, or conduct showing deliberate
6    indifference toward the possibility that deficient performance of
7    the task may violate the rights of others, may establish the
8    requisite causal connection.  Starr, 652 F.3d at 1208; Menotti v.
9    City of Seattle, 409 F.3d 1113, 1149 (9th Cir. 2005).

10       As opposed to prisoner claims under the Eighth Amendment, a
11   pretrial detainee is entitled to be free of cruel and unusual
12   punishment under the Due Process Clause of the Fourteenth
13   Amendment.  Bell v. Wolfish, 441 U.S. 520, 537 n. 16 (1979);
14   Simmons v. Navajo County, Ariz., 609 F.3d 1011, 1017 (9th Cir.
15   2010).  The Due Process Clause requires that "persons in custody
16   have the established right to not have officials remain
17   deliberately indifferent to their serious medical needs."
18   Gibson v. County of Washoe, Nev., 290 F.3d 1175, 1187 (9th Cir.
19   2002) (quoting Carnell v. Grimm, 74 F.3d 977, 979 (9th Cir.
20   1996)).  A pretrial detainee's due process right in this regard
21   is violated when a jailer fails to promptly and reasonably
22   procure competent medical aid when the pretrial detainee suffers
23   a serious illness or injury while confined.  Estelle v. Gamble,
24   429 U.S. 97, 104-105 (1976).  Deliberate indifference can be
25   "manifested by prison doctors in their response to the prisoner's
26   needs or by prison guards in intentionally denying or delaying
27   access to medical care or intentionally interfering with the
28   treatment once prescribed."  Id.

13

In order to establish a plausible claim for failure to provide
medical treatment, Plaintiff must plead sufficient facts to
permit the Court to infer that (1) Plaintiff had a "serious
medical need," and that (2) individual Defendants were
"deliberately indifferent" to that need. Jett v. Penner,
439 F.3d 1091, 1096 (9th Cir. 2006); Cf. Farmer v. Brennan,
511 U.S. 825, 834, 837 (1994).

Plaintiff can satisfy the "serious medical need" prong by
demonstrating that "failure to treat [his] condition could result
in further significant injury or the unnecessary and wonton
infliction of pain." Jett, 439 F.3d at 1096 (internal citations
and quotations omitted); Clement v. Gomez, 298 F.3d 898, 904
(9th Cir. 2002). Examples of such serious medical needs include
"[t]he existence of an injury that a reasonable doctor or patient
would find important and worthy of comment or treatment, the
presence of a medical condition that significantly affects an
individual's daily activities, or the existence of chronic and
substantial pain." Lopez v. Smith, 203 F.3d 1122, 1131 (9th Cir.
2000). The Court finds that Plaintiff has alleged sufficient
facts to make a plausible showing that his medical need was
serious. Plaintiff suffered a head injury which required
sutures, was suffering from persistent headaches, sensitivity to
light, loss of vision, inability to move his lower extremities,
and urinary retention and constipation. (See SAC ¶¶ 23, 24, 27,
28, 31, 32.) The Court recognizes that such symptoms not only
affected Plaintiff's daily activities but, also, that a
reasonable doctor would find such symptoms noteworthy.
///

14

1    The next issue for the Court is whether individual
2    Defendants were deliberately indifferent to Plaintiff's serious
3    medical need.  The Supreme Court, in Farmer, explained in detail
4    the contours of the "deliberate indifference" standard.
5    Specifically, individual Defendants are not liable under the
6    Fourteenth Amendment for their part in allegedly denying
7    necessary medical care unless they knew "of and disregard[ed] an
8    excessive risk to [Plaintiff's] health and safety." Farmer,
9    511 U.S. at 837; Gibson, 290 F.3d at 1187-88.  Deliberate
10   indifference contains both an objective and subjective component:
11   "the official must both be aware of facts from which the
12   inference could be drawn that a substantial risk of serious harm
13   exists, and he must also draw that inference." Farmer, 511 U.S.
14   at 837.  "If a person should have been aware of the risk, but was
15   not," then the standard of deliberate indifference is not
16   satisfied "no matter how severe the risk." Gibson, 290 F.3d at
17   1188 (citing Jeffers v. Gomez, 267 F.3d 895, 914 (9th Cir.
18   2001)). Plaintiff "need not show that a prison official acted or
19   failed to act believing that harm actually would befall on
20   inmate; it is enough that the official acted or failed to act
21   despite his knowledge of a substantial risk of serious harm."
22   Farmer, 511 U.S. at 842.

23   Important for purposes of the motions at issue, "[w]hether a
24   prison official had the requisite knowledge of a substantial risk
25   is a question of fact subject to demonstration in the usual ways,
26   including inference from circumstantial evidence, . . . and a
27   fact finder may conclude that a prison official knew of a
28   substantial risk from the very fact that the risk was obvious."

1  Id. (emphasis added) (internal citations omitted); see also

2  Lolli v. County of Orange, 351 F.3d 410, 421 (9th Cir. 2003)

3  ("Much like recklessness in criminal law, deliberate indifference

4  to medical needs may be shown by circumstantial evidence when the

5  facts are sufficient to demonstrate that a defendant actually

6  knew of a risk of harm.").

7      "The indifference to medical needs must be substantial; a

8  constitutional violation is not established by negligence or 'an

9  inadvertent failure to provide adequate medical care.'"

10 Anderson v. County of Kern, 45 F.3d 1310, 1316 (9th Cir. 1995)

11 (quoting Estelle, 429 U.S. at 105-06).  Generally, defendants are

12 "deliberately indifferent to a prisoner's serious medical needs

13 when they deny, delay, or intentionally interfere with medical

14 treatment."  Hallett v. Morgan, 296 F.3d 732, 744 (9th Cir.

15 2002); Lolli, 351 F.3d at 419.  However, "[i]solated incidents of

16 neglect do not constitute deliberate indifference."  Bowell v.

17 Cal. Substance Abuse Treatment Facility at Concord,

18 No. 1:10-cv-02336, 2011 WL 2224817, at *3 (E.D. Cal. June 7,

19 2011) (citing Jett, 439 F.3d at 1096).  Further, a mere delay in

20 receiving medical treatment, without more, does not constitute

21 "deliberate indifference," unless the plaintiff can show that the

22 delay caused serious harm to the plaintiff.  Wood v. Housewright,

23 900 F.2d 1332, 1335 (9th Cir. 1990).

24 ///

25 ///

26 ///

27 ///

28 ///

In the SAC, Plaintiff makes a general allegation that all individual defendants violated Plaintiff's constitutionally protected rights by: (1) failing to provide Plaintiff with necessary medical treatment; (2) failing to monitor Plaintiff once he reported signs of a serious neurological disorder; (3) failing to transport Plaintiff to a hospital or appropriate diagnostic facility upon learning that he has suffered from a serious medical condition; (4) failing to maintain appropriate medical records and history; (5) failing to supply the outside care provider with Plaintiff's accurate medical history upon transport.  (SAC ¶ 51.)  While these general allegations create a context for Plaintiff's allegations against individual Defendants, they are not sufficient to state a claim as to each Defendant without specific allegations demonstrating each Defendant's participation in the alleged constitutional deprivation.  See Jones, 297 F.3d at 935.

*(1) Defendant McGinness*

The only facts in the SAC alleged specifically against McGinness are as follows: (1) McGinness "was, at all relevant times, employed by the County as the Sacramento County Sheriff," and (2) McGinness "was, at all relevant times, acting within the scope of his employment and/or agency with the County."  (SAC ¶ 8.)

///

///

///

As was discussed earlier, to sustain a § 1983 claim for individual liability, Plaintiff must establish the "personal involvement" of each defendant, including supervisors, in a constitutional deprivation or a "causal connection" between each defendant's wrongful conduct and the deprivation.  Hansen, 885 F.2d at 646.  Plaintiff's allegations that McGinness was employed as the County Sheriff and that he was acting within the scope of his employment are insufficient to demonstrate either his "personal involvement" in the alleged constitutional deprivation or the "causal connection" between McGinness' actions or omissions and the deprivation.

In his opposition to Defendants' motions to dismiss, Plaintiff relies on Redman v. County of San Diego, 942 F.2d 1435 (9th Cir. 1990), and Starr, 652 F.3d 1202, in asserting that, under California law, the Sheriff is required by statute to take charge of and keep the county jail and the prisoners in it, and is answerable for the prisoner's safekeeping. (Pl.'s Opp. at 14:14-15:21.)  Inactions of the person "answerable for the prison's safekeeping," Plaintiff argues, is sufficient to state a claim for supervisory liability for deliberate indifference. (Id.)  County Defendants contend that, in both Redman and Starr, plaintiffs alleged specific facts as to how the Sheriff was liable as a supervisor and how the Sheriff's actions or inactions caused the plaintiff's constitutional deprivation.  (County Defs.' Reply to Pl.'s Opp., filed August 30, 2011 [ECF No. 60], at 5:13-19).

///

///

1   Defendants further contend that Plaintiff here, unlike plaintiffs

2   in Redman and Starr, failed to make any specific allegations to

3   demonstrate McGinness' supervisory liability. (Id. at 5:8-19.)

4   The Court agrees with County Defendants.

5        In Redman, a plaintiff specifically alleged that the Sheriff

6   was ultimately in charge of the facility's operations, that the

7   Sheriff knew that the facility was not a proper place to detain

8   the plaintiff and posed a risk of harm to the plaintiff but

9   placed the plaintiff there anyway. Redman, 942 F.2d at 1446-47.

10  In Starr, the plaintiff similarly alleged that the Sheriff knew

11  of the unconstitutional activities in the jail, including that

12  his subordinates were engaging in some culpable actions. Starr,

13  652 F.3d at 1208.  In fact, the plaintiff's complaint in Starr

14  contained numerous specific factual allegations demonstrating the

15  Sheriff's knowledge of unconstitutional acts at the jail and the

16  Sheriff's failure to terminate those acts, including that the

17  U.S. Department of Justice gave the Sheriff clear written notice

18  of a pattern of constitutional violations at the jail, that the

19  Sheriff received "weekly reports from his subordinates

20  responsible for reporting deaths and injuries in the jails," that

21  the Sheriff personally signed a Memorandum of Understanding that

22  required him to address and correct the violations at the Jail,

23  and that the Sheriff was personally made aware of numerous

24  concrete instances of constitutional deprivations at the jail.

25  Starr, 652 F.3d at 1209-12.  Here, on the other hand, Plaintiff's

26  SAC does not contain any factual allegations demonstrating that

27  McGinness was aware of Plaintiff's constitutional deprivations or

28  of any other wrongful acts by Jail personnel.

19

1  Thus, nothing in the SAC plausibly suggests that McGinness

2  "acquiesced" in the wrongful conduct of his subordinates.

3      Accordingly, Plaintiff has not pleaded sufficient facts to

4  support the inference that McGinness was deliberately indifferent

5  to Plaintiff's medical needs.  The Court dismisses Defendant

6  McGinness from Plaintiff's first claim with leave to amend.

7

8      *(2) Defendant Boylan*

9

10     Plaintiff's allegations against Boylan are similarly limited

11  to statements that Boylan (1) was, at all relevant times,

12  employed by the County as the Chief of the Sacramento County Jail

13  Correctional Health Services ["CHS"], and (2) was at all relevant

14  times acting within the scope of her employment and/or agency

15  with the County.  (SAC ¶ 9.)  Plaintiff has not alleged that

16  Boylan participated in or directed alleged violations, or knew of

17  the violations and failed to act.  In his opposition, Plaintiff

18  argues that it is reasonable to infer that Boylan, because of her

19  position as the CHS Chief for the Jail, was responsible for and

20  knew of the pervasive deficiencies in the Jail's delivery of

21  medical care.  (Pl.'s Opp. at 15.)  The Court finds Plaintiff's

22  contention unavailing.

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

1    Nowhere in the SAC does Plaintiff allege that Boylan, as a

2    supervisor, knew or reasonably should have known of any

3    "pervasive deficiencies" in the provision of medical care at the

4    Jail and refused to cure these deficiencies, or that Boylan's own

5    culpable action or inaction in the training, supervision, or

6    control of her subordinates were the cause of the alleged

7    constitutional deprivation, or that Boylan acquiesced in the

8    alleged constitutional deprivation.  A mere recitation of the

9    defendant's official title is not sufficient, by itself, to infer

10   that the defendant should be individually liable for Plaintiff's

11   constitutional deprivations.  Accordingly, Defendants' Motion to

12   Dismiss Plaintiff's first claim against Defendant Boylan is

13   granted with leave to amend.

14

15       *(3) Defendant Hambly*

16

17       In addition to allegations that Hambly was, at all relevant

18   times, employed as Interim Medical Director of the Jail CHS, and

19   that he was acting within the scope of his employment, the SAC

20   states that Hambly was also a physician employed by the County to

21   provide medical treatment to inmates at the Jail, and that he was

22   responsible for providing treatment to Plaintiff.  (SAC

23   ¶¶ 10-11.)  However, absent from the SAC are any allegations of

24   personal contact between Plaintiff and Hambly, or any

25   demonstration of Hambly's other personal participation in the

26   alleged constitutional deprivation.

27   ///

28   ///

21

1    The only indication of Hambly's knowledge about Plaintiff is a

2    statement in the SAC that, on Plaintiff's information and belief,

3    Hambly reviewed Plaintiff's chart on Aril 30, 2007 (two days

4    after Plaintiff returned to the Jail after his head surgery).

5    (Id. ¶ 24.)   Plaintiff claims that this allegation is sufficient

6    to demonstrate that Hambly had direct knowledge of Plaintiff's

7    medical condition as one of Plaintiff's treating physicians, and

8    that "acquiescence" or "culpable indifference" are sufficient to

9    show that Hambly, as a supervisor, personally participated in the

10   alleged constitutional violation.  (Pl.'s Opp. at 15:7-9,

11   15:27-28.)   The Court disagrees.   Nowhere in the SAC does

12   Plaintiff allege that Hambly, as Plaintiff's treating physician,

13   personally denied, delayed, or intentionally interfered with

14   Plaintiff's medical treatment.  See Hallett, 296 F.3d at 744;

15   Lolli, 351 F.3d at 419.  An allegation that Hambly reviewed

16   Plaintiff's medical chart two days after the surgery is plainly

17   insufficient to demonstrate that Hambly was deliberately

18   indifferent to Plaintiff's serious medical needs.

19        Similarly absent from the SAC are any allegations of

20   Hambly's supervisory liability.  As the Court explained earlier,

21   a statement that a defendant was employed in a supervisory

22   capacity and acted within the scope of his employment is not

23   sufficient, by itself, to infer that the defendant should be

24   personally liable for Plaintiff's constitutional deprivations.

25   ///

26   ///

27   ///

28   ///

22

Plaintiff's general allegations that all medical defendants failed to provide Plaintiff with necessary medical treatment, failed to monitor him, delayed transporting him to an outside medical facility, and failed to maintain appropriate medical records are also insufficient to state a claim of deliberate indifference against Hambly without further demonstration that Hambly either personally participated or "acquiesced" in those wrongful acts.  Accordingly, Defendants' Motion to Dismiss Plaintiffs' first claim against Defendant Hambly is granted with leave to amend.

(4) *Defendant Smith*

Plaintiff alleges that Smith was the physician responsible for providing treatment to Plaintiff.  (SAC ¶ 11.)  Plaintiff further alleges that Smith treated Plaintiff on two occasions. On May 13, 2007, in response to Plaintiff's complaints about persistent headaches, Smith ordered Plaintiff's stitches removed and gave Plaintiff Motrin for pain.  (Id. ¶¶ 26,27.)  On May 20, 2007, after Plaintiff told the officers that "his legs did not work, that he could not urinate, and that he was going blind," Smith allegedly saw Plaintiff but "failed to take any appropriate medical action."  (Id. ¶¶ 31,32.)  Plaintiff further alleges that later that day he was seen by another doctor, Dr. Horowitz, who determined that Plaintiff "had been on the floor of his cell for three days" and that Plaintiff "had been suffering from vision loss, an inability to control his extremities, get up to 'void or defecate,' and obvious other neurological impairments."

23

1  (Id. ¶ 32.)  Dr. Horowitz sent Plaintiff to an emergency room,

2  where MRI scans revealed an expansive lesion of Plaintiff's spine

3  and brain involvement.  (Id. ¶ 33.)  Subsequently, Plaintiff was

4  admitted to UCD, where he was eventually diagnosed with a rare

5  neurological disorder, ADEM.  (Id. ¶¶ 34-36.)  Plaintiff alleges

6  that, because of the delays in his diagnosis and treatment, "he

7  had been rendered paralyzed and near death."  (Id. ¶ 36.)

8      Defendant Smith argues that Plaintiff's first claim for

9  relief fails to set forth specific facts or, alternatively, that

10  it fails to state facts sufficient to constitute a claim under

11  § 1983.  (SMTD at 5-8.)  In particular, Defendant Smith contends

12  that Plaintiff's only specific allegations against Smith in ¶¶ 27

13  and 32 of the SAC lack specific details or factual circumstances

14  as to what the alleged act or omission by Smith caused

15  Plaintiff's constitutional deprivation. (Id. at 6:12-7:3.)  Smith

16  further argues that "[n]othing in Plaintiff's sparse allegations

17  can be interpreted to show that Dr. Smith provided (or failed to

18  provide) treatment which resulted in deliberate indifference to

19  Plaintiff's rights."  (Id. at 8:14-15.)  The Court disagrees.

20      In reviewing the sufficiency of the complaint under Rule

21  12(b)(6), the Court must assume that "general allegations embrace

22  those specific facts that are necessary to support a claim."

23  Smith, 358 F.3d at 1106.  Also, in deciding whether a complaint

24  survives a Rule 12(b)(6) motion to dismiss, the Court takes into

25  consideration not only specific factual allegations, but also

26  "reasonable inferences" from the complaint's "factual content."

27  ///

28  ///

24

1  <u>Moss v. United States Secret Serv.</u>, 572 F.3d 962, 969 (9th Cir.

2  2009).  The Court finds that, based on the general and specific

3  factual allegations in the SAC and reasonable inferences, it is

4  plausible that Dr. Smith knew of and was deliberately indifferent

5  to Plaintiff's serious medical condition.  Plaintiff allegedly

6  had serious medical symptoms at the time of his treatment by

7  Smith on May 20, including vision loss, inability to control his

8  legs, persistent headaches, inability to urinate and

9  constipation.  Smith's alleged failure to do anything to

10 alleviate Plaintiff's serious medical symptoms, coupled with

11 Dr. Horowitz's determination that Plaintiff was indeed suffering

12 from serious impairments and required an emergency medical

13 assistance, permit the Court to reasonably infer that Smith

14 plausibly denied, delayed, or intentionally interfered with

15 Plaintiff's medical treatment.  <u>See</u> <u>Hallett</u>, 296 F.3d at 744.

16 Plaintiff's allegations of his medical symptoms and the fact that

17 Plaintiff informed the treating medical staff about those

18 symptoms plausibly demonstrate that "the course of treatment

19 [Smith] chose was medically unacceptable under the circumstances

20 ... and ... that [he] chose this course in conscious disregard of

21 an excessive risk to plaintiff's health."  <u>See</u> <u>Jackson v.</u>

22 <u>McIntosh</u>, 90 F.3d 330, 332 (9th Cir. 1986).

23      In sum, the Court concludes that, at this point in the

24 litigation, without substantial discovery, and where the Court

25 must draw all inferences in favor of Plaintiff, the SAC contains

26 sufficient allegations for the Court to infer that Defendant

27 Smith's deliberate indifference to Plaintiff's serious medical

28 needs resulted in Plaintiff's constitutional deprivation.

25

1     *(5) Defendant Carl*

2

3     Plaintiff alleges that Carl was employed as a nurse at the

4 Jail, and that he was Plaintiff's medical provider during the

5 relevant time period. (SAC ¶ 13.) Carl allegedly saw Plaintiff

6 on three occasions. On May 13, 2007, Carl saw Plaintiff when

7 Plaintiff complained about persistent headaches. Carl consulted

8 with Dr. Smith, who ordered Plaintiff's stitches to be removed

9 and pain medication to be administered. (Id. ¶¶ 26,27.) On

10 May 17, 2007, after Plaintiff collapsed in the shower, Plaintiff

11 again saw Carl and complained that his legs did not work. (Id.

12 ¶ 29.) Plaintiff alleges that Carl "failed to conduct an

13 adequate medical assessment of a patient presenting with an

14 apparent spinal chord [sic] injury and/or neurological disorder."

15 (Id. ¶ 30.) Plaintiff further alleges that Carl ordered

16 Plaintiff to be returned to his cell, without arranging for any

17 medical follow-up. (Id.) On May 20, 2007, after Plaintiff

18 started complaining about vision loss, urinary retention and

19 constipation, in addition to inability to move his lower

20 extremities and persistent headaches, Carl again saw Plaintiff

21 and referred Plaintiff to see Dr. Smith. (Id. ¶ 32.)

22     Plaintiff's allegations against Carl do not rise to the

23 level of deliberate indifference. On the contrary, Plaintiff's

24 allegations demonstrate that each time Carl saw Plaintiff, he

25 evaluated Plaintiff's complaints and twice referred Plaintiff to

26 a doctor.

27 ///

28 ///

1  While Plaintiff's allegations concerning the incident on May 17
2  permit the Court to infer that Carl might have been negligent in
3  sending Plaintiff back to the cell, nothing in the SAC suggests
4  that Carl knew "of a substantial risk of serious harm," but chose
5  to disregard it.  See Gibson, 290 F.3d at 1187-88.  Plaintiff's
6  own allegation that, on May 17, Carl "failed to conduct an
7  adequate medical assessment" supports the inference of
8  negligence, not deliberate indifference.  Because one isolated
9  incident of neglect does not demonstrate "deliberate
10 indifference," see Jett, 439 F.3d at 1096, the Court dismisses
11 Defendant Carl from the SAC's first claim with leave to amend.
12
13     *(6) Defendant Gaddis*
14
15     Plaintiff alleges that Officer Gaddis at all relevant times
16 was employed as custodial staff at the jail.  (SAC ¶ 14.)
17 Plaintiff specifically alleges that Gaddis responded when
18 Plaintiff fell in the shower on May 17, 2007, but "failed to use
19 the radio properly to alert medical staff od [sic] the emergebncy
20 [sic], and failed to file an incident or casualty report
21 following the incident, violating jail policies, acting with
22 deliberate indifference to [Plaintiff's] medical needs and
23 delaying [Plaintiff's] access to necessary medical care."  (Id.
24 ¶ 29.)  Plaintiff further alleges that he was "eventually wheeled
25 in a wheelchair to the nurse for evaluation."  (Id.)  The Court
26 finds these allegations insufficient to state a claim of
27 deliberate indifference against Officer Gaddis.
28 ///

27

The only plausible allegation that can lead to the inference of deliberate indifference on the part of Officer Gaddis is that he delayed alerting the medical staff of Plaintiff's medical needs. However, the SAC fails to allege how significant the delay was and how the delay harmed Plaintiff. See Hertig v. Cambra, No. 1:04-cv-5633, 2009 WL 62126, at *4(E.D. Cal. Jan. 8, 2009) (citing Shapley v. Nevada Bd. of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir. 1985)) ("[A] delay in receiving medical care, without more, is insufficient to state a claim against a jailor for deliberate indifference unless the plaintiff can show that the delay in treatment harmed him.").

Moreover, "[t]o have acted with deliberate indifference, . . . the officers also must have inferred . . . that [the plaintiff] was at serious risk of harm" if he did not receive immediate medical attention. Lolli, 351 F.3d at 420. The SAC fails to provide any evidence that Gaddis knew that Plaintiff was at serious risk of harm if he did not receive immediate medical attention. Finally, Gaddis' failure "to use the radio properly" and to file the incident report at best amounts to negligence, and does not rise to the level of deliberate indifference to Plaintiff's serious medical needs. Accordingly, Plaintiff's first claim against Defendant Gaddis is dismissed with leave to amend.

///
///
///
///
///

1      *(7) Defendant Keillor*

2

3          Plaintiff alleges that Sergeant Keillor was employed at all

4    relevant times as supervisory custodial staff at the Jail, and

5    that Sergeant Keillor was responsible for supervising custodial

6    staff at the Jail.  (SAC ¶ 15.)  The SAC's only other specific

7    allegation against Keillor is that he was the supervising officer

8    on duty on May 17, 2007, when Plaintiff fell in the shower, and

9    that he "failed to ensure the unit was properly staffed and

10   failed to ensure custody staff was properly trained in responding

11   to medical emergencies."  (Id. ¶ 29.)

12         As Keillor's alleged liability is based on his supervisory

13   status, Plaintiff must demonstrate Keillor's "'own culpable

14   action or inaction in the training, supervision, or control of

15   his subordinates,' 'his acquiescence in the constitutional

16   deprivations of which the complaint is made,' or 'conduct that

17   showed a reckless or callous indifference of others.'"  Starr,

18   652 F.3d at 1205-06 (quoting Larez, 946 F.2d at 646).  A

19   conclusory allegation that Keillor "failed to ensure the unit was

20   properly staffed and failed to ensure custody staff was properly

21   trained in responding to medical emergencies," without any

22   specific factual allegations, does not plausibly suggest an

23   entitlement to relief and is not entitled to the presumption of

24   truth.  See Iqbal, 556 U.S. at 1949-50.  Plaintiff fails to

25   allege any facts suggesting that Keillor knew of the alleged

26   constitutional violations and failed to act to prevent them.

27   ///

28   ///

1   Thus, the SAC does not plead sufficient facts to support the

2   inference that Defendant Keillor was deliberately indifferent to

3   Plaintiff's medical needs.

4       Additionally, there can be no showing that supervisory

5   defendants should be held liable under § 1983 without a showing

6   that their subordinates violated Plaintiff's constitutional

7   rights.  Jackson v. City of Bremerton, 268 F.3d 646, 653 (9th

8   Cir. 2001).  Thus, Plaintiff cannot demonstrate that Keillor, as

9   a supervisor, was deliberately indifferent to Plaintiff's serious

10  medical needs without first demonstrating that Keillor's

11  subordinate, Defendant Gaddis, committed a constitutional

12  violation.  Accordingly, the Court dismisses Defendant Keillor

13  from Plaintiff's first claim with leave to amend.

14

15      II.   Sixth Claim for Relief: Violation of the Equal

16            Protection Clause of the Fourteenth Amendment Against

17            Defendants McGinness, Boylan, Hambly, Smith, Carl,

18            Keillor and Gaddis in Their Individual Capacities

19

20      Plaintiff alleges in Count 6 that Defendants' acts alleged

21  in the SAC "were motivated by racial animus and that Plaintiff

22  . . . was treated differently from similarly situated non-Indian

23  inmates," and that Plaintiff suffered and continues to suffer

24  damages for the deprivation of his constitutional rights.  (SAC

25  ¶¶ 77-78.)

26  ///

27  ///

28  ///

1    Plaintiff's factual allegations relevant to his racial

2    discrimination claim are: (1) Plaintiff was housed with the

3    African-American inmates at the Jail because of his very dark

4    skin color (Id. ¶ 23); (2) On April 27, 2007, Plaintiff suffered

5    a head injury as a result of a racial alteration between African

6    American inmates and non-black inmates (Id.); and (3) The Jail

7    "has a history of repeated acts of discrimination against inmates

8    based on their race or national origin" (Id. ¶ 41).

9        Defendants argue that Plaintiff's racial discrimination

10   claim against individual Defendants should be dismissed because

11   Plaintiff failed to establish how each Defendant violated

12   Plaintiff's constitutional rights by acting with an intent or

13   purpose to discriminate based on race.  (CDMTD at 8:14-19; SMTD

14   at 9:16-18.)  Defendants further argue that Plaintiff failed to

15   identify another similarly situated group which was treated

16   differently and the actual differing treatment itself.  (CDMTD at

17   8:19-21; SMTD at 9:14-16.)  Defendants also contend that, to the

18   extent that Plaintiff bases his allegations on the supervisory

19   liability of some Defendants, Plaintiff failed to allege that

20   those Defendants personally participated in the wrongful conduct,

21   or directed such a conduct, or were aware of such a conduct and

22   failed to act.  (CDMTD at 10:8-12.)  The Court finds Defendants'

23   contentions persuasive.

24       To state a claim under § 1983 for a violation of the Equal

25   Protection Clause of the Fourteenth Amendment, a plaintiff must

26   demonstrate that each defendant acted with an "intent or purpose

27   to discriminate against the plaintiff based upon membership in a

28   protected class."

1   Lee v. City of L.A., 250 F.3d 668, 689 (9th Cir. 2001); see also

2   Monteiro v. Temple Union High School Dist., 158 F.3d 1022, 1026

3   (9th Cir. 1998) ("[Section] 1983 claims based on Equal Protection

4   violations must plead intentional unlawful discrimination or

5   allege facts that are at least susceptible of an inference of

6   discriminatory intent."). Plaintiff does not plead any facts

7   demonstrating that any of the named Defendants had an "intent or

8   purpose to discriminate." Instead of pleading facts to support

9   his claim of racial discrimination, Plaintiff pleads a legal

10  conclusion: "Plaintiff is informed and believes . . . that

11  Defendants' aforementioned acts were motivated by racial animus."

12  (SAC ¶ 77.) Such a legal conclusion is not entitled to be

13  accepted as true and does not plausibly suggest an entitlement to

14  relief. See Iqbal, 556 U.S. at 1949-50.

15        Plaintiff's allegation that the Jail has a history of

16  discrimination is similarly insufficient to demonstrate that any

17  of the individual Defendants acted with a discriminatory intent.

18  The allegation that Plaintiff's housing assignment was

19  discriminatory also does not bear on the individual Defendants'

20  intent as Plaintiff does not allege that any of the individual

21  Defendants took any role in determining Plaintiff's housing

22  arrangements. As to the supervisory Defendants, the SAC fails to

23  allege that these Defendants knew of and "acquiesced" in the

24  alleged racial discrimination by their subordinates. See Starr,

25  652 F.3d at 1207. Further, Plaintiff fails to allege any facts

26  demonstrating that he was treated differently from a similarly

27  situated group of inmates. Accordingly, the Court dismisses

28  Plaintiff's sixth claim for relief with leave to amend.

III. <u>Eighth Claim for Relief: Violation of the First
Amendment Against Defendants McGinness, Boylan, Hambly,
Smith, Carl, Keillor and Gaddis in Their Individual
Capacities</u>

Plaintiff alleges that Defendants' acts "were in retaliation for Plaintiff's . . . protest of the deplorable conditions under which he and similarly situated inmates were being held" at the Jail, and that he suffered damages as a result of this constitutional deprivation. (SAC ¶¶ 85-86.) The SAC also alleges that the Jail has "a history of retaliation against inmates for their requests for medical attention, basic hygiene needs, or even food." (<u>Id.</u> ¶ 41.) Defendants contend that Plaintiff (1) failed to address all the elements of the retaliation claim, (2) failed to allege what adverse action was taken, (3) failed to allege that the adverse action chilled his First Amendment rights, and (4) failed to allege that the adverse action did not serve a legitimate penological purpose. (CDMTD at 13:25-14:2.) Defendants further argue that Plaintiff failed to allege any personal involvement as to any of the individual Defendants in the alleged retaliatory actions. (<u>Id.</u> at 14:9-11; SMTD at 10:11-18.)

///
///
///
///
///
///

33

1    In his opposition, Plaintiff contends that the SAC's factual
2    allegations that the custodial staff at the Jail warned him to
3    "stop using the call button" and "stop complaining," and that
4    Defendants took his wheelchair away, making it impossible for
5    Plaintiff to get to the intercom to request care constitute
6    sufficient circumstantial evidence allowing to infer Defendants'
7    intent to chill Plaintiff's First Amendment rights.  (Pl's Opp.
8    at 25:27-26:5.)  Plaintiff further argues that "[t]he repeated
9    warnings from the guards would chill an inmate of ordinary
10   resilience, and when coupled with the brutality of being dumped
11   onto the cell floor and denied a wheelchair to get up, and the
12   use of the intercom to call for help . . . would silence an
13   inmate in ordinary circumstances."  (<u>Id.</u> at 26:5-9.)  The Court
14   finds Plaintiff's arguments unpersuasive.

15   A bare allegation of retaliation is insufficient to support
16   a plausible claim for relief.  <u>See Iqbal</u>, 129 S. Ct. at 1949-50.
17   In order to state a claim for retaliation, Plaintiff must
18   demonstrate that: (1) the Jail officials took an adverse action
19   against him; (2) the adverse action was taken because Plaintiff
20   engaged in the protected conduct; (3) the adverse action chilled
21   Plaintiff's First Amendment rights; and (4) the adverse action
22   did not serve a legitimate penological purpose, such as
23   preserving institutional order and discipline.  <u>Rhodes v.</u>
24   <u>Robinson</u>, 408 F.3d 559, 568 (9th Cir. 2005); <u>Barnett v. Centoni</u>,
25   31 F.3d 813, 815-16 (9th Cir. 1994).  "Speech can be chilled even
26   when not completely silenced."  <u>Rhodes</u>, 408 F.3d at 568.
27   ///
28   ///

1    "[T]he proper First Amendment inquiry asks 'whether an official's

2    acts would chill *or* silence a person of ordinary firmness from

3    future First Amendment activities.'" Id. at 568-69 (quoting

4    Mendocino Envtl. Ctr. v. Mendocino County, 192 F.3d 1283, 1300

5    (9th Cir.)) (emphasis in the original).

6         The Court finds that Plaintiff failed to state a viable

7    claim of retaliation against the named Defendants.  Even assuming

8    as true Plaintiff's allegations that some members of the

9    custodial staff ordered him "to stop using the call button," "to

10   stop complaining," and took Plaintiff's wheelchair away, the SAC

11   is silent as to the identities of those wrongdoers.  Plaintiff

12   does not plead that any of the named defendants personally

13   participated in the alleged retaliatory actions.  As to the

14   supervisory defendants, Plaintiff again fails to demonstrate that

15   those Defendants knew of and "acquiesced" in the alleged

16   retaliatory conduct of their subordinates.  See Starr, 652 F.3d

17   at 1207.  The general allegation that the Jail has a history of

18   retaliation against inmates is not sufficient to state a claim as

19   to individually named Defendants without some further showing

20   that those Defendants personally, or as supervisors, participated

21   in the wrongful conduct.

22        Furthermore, even with respect to the unnamed Doe

23   Defendants, the SAC does not contain any allegations

24   demonstrating that the allegedly adverse action of Jail personnel

25   chilled Plaintiff's First Amendment rights, or that the alleged

26   adverse action did not serve a legitimate penological purpose.

27   See Rhodes, 408 F.3d at 568.  Accordingly, the Court dismisses

28   Plaintiff's eighth claim with leave to amend.

1          IV.   <u>Second, Third, Fourth, Fifth, Seventh and Ninth Claims</u>

2                <u>for Relief: Monell Liability Against Sacramento County</u>

3

4          Plaintiff claims that, at all relevant times, the County

5     (1) "maintained a policy or a de facto unconstitutional informal

6     custom or practice of permitting, ignoring and condoning [Jail

7     personnel] to delay in providing adequate medical assistance for

8     the protection of the health of inmates, failing to properly

9     observe and treat inmates" (SAC ¶ 55) (Count 2); (2) "maintained

10    the policy, custom of practice of under-staffing the Main Jail

11    with custody and medical personnel" (<u>Id.</u> ¶ 59) (Count 3);

12    (3) "maintained a policy, custom or practice of staffing the Main

13    Jail with personnel who were not sufficiently trained" (<u>Id.</u> ¶ 65)

14    (Count 4); (4) "maintained a policy, custom, or practice of

15    understaffing the Main Jail with supervisory personnel and

16    failing to properly supervise the custodial and medical staff at

17    the Main Jail" (<u>Id.</u> ¶ 71) (Count 5); (5) "maintained a policy,

18    custom or practices of treating and retaliating against inmates

19    of color differently than similarly situated non-Indian inmates

20    at the Main Jail" (<u>Id.</u> ¶ 80) (Count 7); and (6) "maintained a

21    policy, custom or practice of retaliating against inmates who

22    complained about deplorable and unlawful conditions of

23    confinement at the Main Jail" (<u>Id.</u> ¶ 88) (Count 9).  Plaintiff

24    also alleges that the County was, at all relevant times,

25    responsible for the policies, customs and procedures at the Jail.

26    (<u>Id.</u> ¶ 7.)

27    ///

28    ///

36

1    County Defendants contend that Plaintiff failed to state a
2    Monell claim because he did not demonstrate how each policy,
3    custom or practice was deficient; how each policy, custom or
4    practice caused Plaintiff's harm; and how the deficiency involved
5    was obvious and the constitutional injury was likely to occur.
6    (CDMTD at 10:8-11, 14:3-6.)

7        In order to be subject to suit under § 1983, the alleged
8    offender must be a "person" acting under color of state law.
9    Will v. Mich. Dep't of State Police, 491 U.S. 58, 60 (1989).
10   Local governments, including counties, qualify as "persons"
11   within the meaning of § 1983.  Monell v. Dep't of Social Servs.,
12   436 U.S. 658, 690 (1978); Long v. County of L.A., 442 F.3d 1178,
13   1185 (9th Cir. 2006).  However, municipalities and local
14   governments cannot be vicariously liable for the conduct of their
15   employees under § 1983, but rather are only "responsible for
16   their own illegal acts."  Connick v. Thompson, 131 S. Ct. 1350,
17   1359 (2011) (quoting Pembaur v. Cincinnati, 475 U.S. 469, 479
18   (1986)) (emphasis in the original).  In other words, a
19   municipality may only be liable where it individually caused a
20   constitutional violation via "execution of a government's policy
21   or custom, whether by its lawmakers or by those whose edicts or
22   acts may fairly be said to represent official policy."  Monell,
23   436 U.S. at 694; Ulrich v. City & County of S.F., 308 F.3d 968,
24   984 (9th Cir. 2002).  A recent decision from this district
25   summarized the Ninth Circuit standard of municipal liability
26   under § 1983 in the following way:

27   ///

28   ///

37

> Municipal liability may be premised on: (1) conduct pursuant to an expressly adopted official policy; (2) a longstanding practice or custom which constitutes the "standard operating procedure" of the local government entity; (3) a decision of a decision-making official who was, as a matter of state law, a final policymaking authority whose edicts or acts may fairly be said to represent official policy in the area of decision; or (4) an official with final policymaking authority either delegating that authority to, or ratifying the decision of, a subordinate.

Young v. City of Visalia, 687 F. Supp. 2d 1141, 1147 (E.D. Cal. 2009) (citing Price v. Sery, 513 F.3d 962, 966 (9th Cir. 2008); Lytle v. Carl, 382 F.3d 978, 982 (9th Cir. 2004); Ulrich, 308 F.3d at 984-85, Trevino v. Gates, 99 F.3d 911, 918 (9th Cir. 1996)).

A "policy," for purposes of municipal liability under § 1983, is a "deliberate choice to follow a course of action . . . made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." Fogel v. Collins, 531 F.3d 824, 834 (9th Cir. 2008). A "custom" is a "widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well-established as to constitute a custom or usage with the force of law." City of St. Louis v. Praprotnik, 485 U.S. 112, 127 (1988); L.A. Police Protective League v. Gates, 907 F.2d 879, 890 (9th Cir. 1990) (internal quotation marks omitted).

///

///

///

///

///

1    A negligent policy does not violate the Constitution;
2    rather, in order to amount to "deliberate indifference," the need
3    for more or different action is "obvious, and the inadequacy [of
4    the current procedure] so likely to result in the violation of
5    constitutional rights, that the policymakers . . . can reasonably
6    be said to have been deliberately indifferent to the need." City
7    of Canton v. Harris, 489 U.S. 378, 390 (1989); Mortimer v. Baca,
8    594 F.3d 714, 722 (9th Cir. 2010).  Because Monell held that a
9    local government is not liable under § 1983 on the basis of the
10   doctrine of respondeat superior, "a plaintiff must show the
11   municipality's deliberate indifference led to its omission and
12   that the omission caused the employee to commit the
13   constitutional violation." Gibson, 290 F.3d at 1186.  Moreover,
14   "[t]o prove deliberate indifference, the plaintiff must show that
15   the municipality was on actual or constructive notice that its
16   omission would likely result in a constitutional violation." Id.
17   (citing Farmer, 511 U.S. at 841).

18   Generally, "[l]iability for improper custom may not be
19   predicated on isolated or sporadic incidents; it must be founded
20   upon practices of sufficient duration, frequency and consistency
21   that the conduct has become a traditional method of carrying out
22   policy." Trevino, 99 F.3d at 918.  However, in rare
23   circumstances, a court can find a municipality liable under
24   § 1983 based on the so-called "single-incident" theory. Connick,
25   131 S. Ct. at 1361.  Specifically, a particular "showing of
26   'obviousness' can substitute for the pattern of violations
27   ordinarily necessary to establish municipal liability."
28   ///

39

1  Id.  However, the Supreme Court emphasized that it is only "'in a
2  narrow range of circumstances' [that] a pattern of similar
3  violations might not be necessary to show deliberate
4  indifference."  Id. (quoting Bd. of County Comm'rs of Bryan
5  County v. Brown, 520 U.S. 397, 409 (1997)).

6       Besides demonstrating that one of the methods of
7  establishing municipal liability applies, a plaintiff must also
8  show that the challenged municipal conduct was both the cause in
9  fact and the proximate cause of the constitutional deprivation.
10  Trevino, 99 F.3d at 918.  In other words, Plaintiff bears the
11  burden of demonstrating that the County's policy or custom was a
12  "moving force" of the constitutional deprivation and that
13  Plaintiff's injury would have been avoided had the County had a
14  constitutionally proper policy.  Gibson, 290 F.3d at 1196.

15       A pre-Iqbal Ninth Circuit decision held that "a claim of
16  municipal liability under section 1983 is sufficient to withstand
17  a motion to dismiss even if the claim is based on nothing more
18  than a bare allegation that the individual officers' conduct
19  conformed to official policy, custom, or practice."  Whitaker v.
20  Garcetti, 486 F.3d 572, 581 (9th Cir. 2007).  However, the
21  Supreme Court in Iqbal made it clear that conclusory,
22  "threadbare" allegations merely reciting the elements of a cause
23  of action cannot defeat the Rule 12(b)(6) motion to dismiss.
24  Iqbal, 129 S. Ct. at 1949-50.  "In light of Iqbal, it would seem
25  that the prior Ninth Circuit pleading standard for Monell claims
26  (i.e. 'bare allegations') is no longer viable."  Young,
27  687 F. Supp. 2d at 1149.
28  ///

1   Thus, a Monell claim against the County requires more than

2   "labels and conclusions" or "a formulaic recitation of the

3   elements of a cause of action.'"   See Iqbal, 129 S. Ct. at 1949

4   (quoting Twombly, 550 U.S. at 555).

5

6        *(1)   Plaintiff's Second Claim for Relief: Policy of Delaying*

7             *Medical Assistance to Inmates and Failure to Properly*

8             *Observe and Treat Inmates*

9

10       Plaintiff alleges that the acts of individual Defendants in

11  being deliberately indifferent to Plaintiff's serious medical

12  needs and safety were the direct and proximate cause of customs,

13  practices and policies of the County.  (SAC ¶ 54).  Plaintiff

14  claims that the Defendants, including the County, "failed to

15  promulgate appropriate policies, guidelines and procedures and

16  have failed to rectify improper practices/customs with regard to

17  the medical treatment and/or health and safety" of the Jail

18  inmates.  (Id. ¶ 46.)

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

1    Specifically, Plaintiff alleges that the County maintained the
2    following policies, customs, or practices, which fell below any
3    acceptable standard of care: (1) Failure to provide follow-up
4    care and to monitor inmates with known medical needs; (2) Failure
5    to provide medical care to inmates with serious medical needs;
6    (3) Failure to have medical examinations conducted by qualified
7    medical personnel; (4) Failure to hospitalize inmates with acute
8    medical conditions; (5) Failure to maintain adequate medical
9    records; (6) Failure to provide medical records and a complete
10   medical history to outside hospitals rendering acute care for
11   inmates; and (7) Failure of custody staff to conduct proper
12   welfare checks and alert medical to serious medical needs of
13   inmates.  (Id. ¶ 56.)  Plaintiff also alleges that the Jail "has
14   a history of failing to respond to the urgent medical need of its
15   inmates," and that the Jail "has operated for a number of years
16   without sufficient staffing of properly trained and supervised
17   custody and medical personnel."  (Id. ¶ 40.)  Defendants contend
18   that Plaintiff's second claim consists of a laundry list of
19   potential factual theories, and fails to specifically identify a
20   policy, practice, or procedure, or lack thereof, that resulted in
21   the alleged constitutional violation.  (Defs.' Reply at 7:1-5.)

22       The SAC does not contain sufficient facts to allege that the
23   County's policy regarding medical care for inmates at the Jail
24   plausibly amounts to deliberate indifference.
25   ///
26   ///
27   ///
28   ///

1  As the County cannot be vicariously liable under § 1983 for the

2  conduct of Jail personnel, Plaintiff must demonstrate that the

3  County itself caused a constitutional violation via "execution of

4  a government's policy or custom, whether by its lawmakers or by

5  those whose edicts or acts may fairly be said to represent the

6  official policy." Monell, 436 U.S. at 694; Ulrich, 308 F.3d at

7  984.  The SAC's factual allegations do not support the inference

8  that the County itself or through its entity or an official with

9  a final decision-making authority executed any of the seven

10 policies or customs identified by Plaintiff.  While some of

11 Plaintiff's allegations might be sufficient to demonstrate

12 "deliberate indifference" to his serious medical needs by certain

13 Jail employees, nothing in the SAC suggests that those employees

14 were acting pursuant to the County's policy of ignoring the

15 inmates' medical needs. On the contrary, some of Plaintiff's own

16 allegations suggest that the Jail employees were acting not in

17 conformance with, but contrary to, the established Jail policies.

18 (See, e.g., SAC ¶ 39 (alleging that Defendant Gaddis violated

19 jail policies by failing to file an incident report).)

20      Plaintiff's allegation about the Jail's "history of failing

21 to respond to the urgent medical need of its inmates" is an

22 unsupported conclusory statement.  In fact, the SAC does not

23 contain references to any other incidents of the Jail's failure

24 to respond to inmates' medical needs; instead, Plaintiff bases

25 his allegation of the Jail's policies solely on Plaintiff's own

26 experience of the alleged medical mistreatment.  The County's

27 § 1983 liability cannot be predicated on one isolated incident.

28 See Trevino, 99 F.3d at 918.

43

To survive a motion to dismiss, Plaintiff has to demonstrate the County's "practices of sufficient duration, frequency and consistency."  See id. While in narrow circumstances a court can predicate § 1983 municipal liability on a single incident of a constitutional violation, the SAC fails to demonstrate the requisite "obviousness" of Plaintiff's constitutional deprivation.  See Connick, 131 S. Ct. at 1361.

Accordingly, as currently pled, Plaintiff's third claim fails to state a claim and thus is dismissed with leave to amend.

>     *(2)   Plaintiff's Fourth Claim for Relief: Failure to*
>           *Adequately Train*

Plaintiff alleges the County maintained a policy, custom, or practice of staffing the Jail with personnel who were not sufficiently trained, and that such a policy, custom or practice was the moving force behind the violation of his constitutional rights.  (SAC ¶¶ 65-66.)  It appears that Plaintiff's fourth claim is limited to the County's failure to train custody personnel, and does not implicate the medical personnel at the Jail.  (See id. ¶¶ 66-67.)

///
///
///
///
///
///
///

44

Specifically, Plaintiff alleges that the County "failed to properly train <u>custody</u> personnel, including but not limited to training and monitoring inmates, detecting the need for medical care, responding to requests for medical care, proper policies and procedures for transportation of acute inmates to appropriate medical facilities, maintaining constitutional[ly] adequate medical charts and histories, ensuring that inmates requiring acute medical care are accompanied to the treating facility with a complete medical history, and providing necessary medical care to inmates with serious medical needs." (<u>Id.</u> ¶ 67.)

A municipality's failure to train its employees may create a § 1983 liability where the "failure to train amounts to deliberate indifference to the rights of persons with whom the [employees] come into contact." <u>City of Canton</u>, 489 U.S. at 388; <u>Lee</u>, 250 F.3d at 681. "The issue is whether the training program is adequate and, if it is not, whether such inadequate training can justifiably be said to represent the municipal policy." <u>Long</u>, 442 F.3d at 1186. A plaintiff alleging a failure to train must show that "(1) he was deprived of a constitutional right, (2) the [municipality] had a training policy that 'amounts to deliberate indifference to the [constitutional] rights of the persons' with whom [its employees] are likely to come into contact'; and (3) his constitutional injury would have been avoided had the [municipality] properly trained those officers." <u>Blankenhorn v. City of Orange</u>, 485 F.3d 463, 484 (9th Cir. 2007).

///

///

///

45

1    "Only where a municipality's failure to train its employees
2    in a relevant respect evidences a 'deliberate indifference' to
3    the rights of its inhabitants can such a shortcoming be properly
4    thought as a . . . 'policy or custom' that is actionable under
5    § 1983." City of Canton, 489 U.S. at 389; Long, 511 F.3d at 907.
6    A municipality is "deliberately indifferent" when the need for
7    more or different action "is so obvious, and the inadequacy [of
8    the current procedure] so likely to result in the violation of
9    constitutional rights, that the policymakers . . . can reasonably
10   be said to have been deliberately indifferent to the need." City
11   of Canton, 489 U.S. at 390; Lee, 250 F.3d at 682.  "Unlike the
12   deliberate indifference standard used to determine if a violation
13   of a detainee's right to receive medical care took place, th[e]
14   standard [for failure to train] does not contain a subjective
15   component." Gibson, 290 F.3d at 1195 (citing Farmer, 511 U.S. at
16   841) (emphasis added).  "As a result, there is no need for [the
17   plaintiff] to prove that the County policymakers actually knew
18   that their omissions would likely result in a constitutional
19   violation." Id.  For example,"[a] 'pattern of tortious conduct,'
20   despite the existence of a training program, or 'highly
21   predictable' constitutional violations due to a 'failure to equip
22   law enforcement officers with specific tools to handle
23   situations' are circumstances in which liability for failure to
24   train may be imposed." Young, 687 F. Supp. 2d at 1148 (citing
25   Board of County Comm'rs, 520 U.S. at 407-10; Long, 442 F.3d at
26   1186-87).
27   ///
28   ///

46

1    Generally, "[e]vidence of the failure to train a single
2  officer is insufficient to establish a municipality's deliberate
3  policy." Blankenhorn, 485 F.3d at 484.  "That a particular
4  officer may be unsatisfactorily trained will not alone suffice to
5  fasten liability of the [municipality], for the officer's
6  shortcomings may have resulted from factors other than a faulty
7  training program." City of Canton, 489 U.S. at 390-91.
8  Moreover, "adequately trained officers may occasionally make
9  mistakes; the fact that they do says little about the training
10  program or the legal basis for holding the [municipality]
11  liable." Id. at 391.  Accordingly, "absent evidence of a
12  'program-wide inadequacy in training,' any shortfall in a single
13  officer's training 'can only be classified as negligence on the
14  part of the municipal defendant – a much lower standard of fault
15  than deliberate indifference.'" Blankenhorn, 485 F.3d at 484-85
16  (quoting Alexander v. City & County of S.F., 29 F.3d 1355, 1367
17  (9th Cir. 1994)).  However, the Supreme Court recently affirmed
18  the validity of the so-called "single-incident" theory in failure
19  to train cases. Connick, 131 S. Ct. at 1360.  As this Court
20  discussed earlier, in "a narrow range of circumstances," a
21  particular "showing of 'obviousness' can substitute for the
22  pattern of violations ordinarily necessary to establish municipal
23  liability." Id. at 1361.
24    In this case, the Court finds that, based on the allegations
25  in the SAC, it is plausible that the County maintained a policy,
26  custom, or practice of staffing the Jail with inadequately
27  trained custody personnel.
28  ///

47

Plaintiff has made sufficient factual allegations to demonstrate that the County plausibly failed to train Jail custody personnel adequately.  In particular, Plaintiff alleges: (1) Plaintiff's repeated requests for showers and items required for regular hygiene and to keep his wound clean were repeatedly ignored by the custodial officers for two weeks (SAC ¶ 25); (2) Jail personnel did not provide Plaintiff with any medical products for proper wound care for two weeks after the initial treatment by Dr. Gray (Id.); (3) Plaintiff's repeated complaints about the lack of clean running water in his cell were similarly ignored for two weeks (Id.); (4) After Plaintiff collapsed in the shower and was improperly evaluated by Defendant Carl, Defendant Doe officer dumped Plaintiff out of his wheelchair and left him on the floor of his cell (Id. ¶ 30); (5) After Plaintiff suffered sudden and acute vision loss in his left eye and noticed that he could not move his lower extremities on May 18, 2007, Plaintiff had been ringing the emergency bell repeatedly for two days to summon help, but was told by the custodial officers that "these things would not kill him and to stop using the call button" (Id. ¶ 31); and (6) When Plaintiff was transported to UCD, Plaintiff's medical history did not accompany him, which led to lengthy delays in diagnosis and treatment (Id. ¶¶ 34,35).

///
///
///
///
///
///

48

1    These factual allegations are sufficient to plausibly

2    demonstrate that the County failed to train its custodial

3    personnel in "monitoring inmates," "detecting the need for

4    medical care" "responding to requests for medical care," and

5    "ensuring that inmates requiring acute medical care are

6    accompanied to the treating facility with a complete medical

7    history." (See id. ¶ 67.)

8        Accordingly, the Court finds that Plaintiff sufficiently

9    alleged what County's training practices were inadequate and how

10   those practices caused Plaintiff's harm.  See Young, 687

11   F. Supp. 2d at 1149.  The Court declines to dismiss Plaintiff's

12   fourth claim for relief against the County for failure to

13   adequately train.

14

15       (3)  Plaintiff's Third Claim for Relief: Failure to

16            Adequately Staff, and Fifth Claim for Relief: Failure

17            to Supervise

18

19       The Court considers the Third and Fifth claims for relief

20   together because Plaintiff's allegations to support these claims

21   substantially overlap.  Plaintiff claims that the County

22   maintained the policy, custom or practice of understaffing the

23   Jail with custody and medical personnel (SAC ¶ 59), understaffing

24   the Jail with supervisory personnel and failing to properly

25   supervise the custodial and medical staff at the Jail (Id. ¶ 71).

26   Plaintiff also alleges that the Jail "has operated for a number

27   of years without sufficient staffing of properly trained and

28   supervised custody and medical personnel."  (Id. ¶ 40.)

49

1    "In order to comply with their duty not to engage in acts
2    evidencing deliberate indifference to inmates' medical . . .
3    needs, jails must provide medical staff who are 'competent to
4    deal with prisoners' problems.'"  Gibson, 290 F.3d at 1187
5    (citing Hoptowit v. Ray, 682 F.2d 1237, 1253 (9th Cir. 1982)).
6    However, to demonstrate that the County had a policy or custom of
7    understaffing and failure to supervise, Plaintiff must provide
8    "more than labels and conclusions."  See Twombly, 550 U.S. at
9    555. Yet, Plaintiff's allegations about the County's policy of
10   understaffing and failure to adequately supervise amount to just
11   that -- legal conclusion which are not entitled to be taken as
12   true and are not sufficient to support Plaintiff's claims for
13   relief.  The allegation regarding the Jail's history of
14   understaffing is a conclusory statement not supported by any
15   evidence in the SAC.  The SAC does not contain any factual
16   allegations that the Jail did not have enough medical, custody or
17   supervisory personnel to provide adequate medical care to
18   Plaintiff.  The gravamen of Plaintiff's allegations is the
19   inadequacy of medical care that he received while detained at the
20   Jail, not the understaffing of the Jail.

21   Nor does the SAC contain any factual allegations allowing
22   the Court to infer that either the County's lawmakers or "those
23   whose edicts or acts may fairly be said to represent" the
24   County's official policy created or endorsed the policy of
25   understaffing of the Jail with medical, custody or supervisory
26   personnel.  See Monell, 436 U.S. at 694; Ulrich v. City & County
27   of S.F., 308 F.3d 968, 984 (9th Cir. 2002).
28   ///

1   Accordingly, Plaintiff's Third and Fifth claims for relief
2   against the County are dismissed with leave to amend.

3

4           *(4)   Plaintiff's Seventh Claim for Relief: Policy of*
5                  *Discrimination against Inmates of Color*

6

7           Plaintiff alleges that the County maintained a policy,
8   custom or practice of treating and retaliating against inmates of
9   color differently than similarly situated non-Indian inmates at
10  the Jail.  (SAC ¶ 80.)  Plaintiff also alleges that the Jail "has
11  a history of repeated acts of discrimination against inmates
12  based on their race and national origin."  (Id. ¶ 41.)
13          Labeling an action "discriminatory," without more, is a
14  legal conclusion, which is not sufficient to state a cognizable
15  claim.  Iqbal, 129 S. Ct. at 1949.  The SAC is devoid of any
16  evidence of the alleged "repeated acts of discrimination."  The
17  only factual allegation relevant to Plaintiff's allegation of the
18  history of discrimination" is that Plaintiff was housed with the
19  African-American inmates at the Jail as a result on his dark skin
20  color.  (SAC ¶ 23.)  This allegation alone is hardly sufficient
21  to demonstrate the Jail's "history" of discrimination against
22  Indian inmates.  Moreover, the SAC lacks any factual allegations
23  demonstrating that the County, by its own actions or by the
24  actions of its officials, maintained an official or de facto
25  policy of racial discrimination.  Accordingly, Plaintiff's
26  seventh claim for relief against the County is dismissed with
27  leave to amend.
28  ///

51

1      *(5)   Plaintiff's Ninth Claim for Relief: Policy of*
2             *Retaliating Against Inmates for Protesting*
3             *Unconstitutional and Unlawful Jail Conditions*
4

5            Plaintiff alleges that the County maintained a policy,
6      custom or practice of retaliating against inmates who complained
7      about deplorable and unlawful conditions of confinement at the
8      Jail.  (SAC ¶ 88.)  Plaintiff also alleges that the Jail has "a
9      history of retaliation against inmates for their requests for
10     medical attention, basic hygiene needs, or even food."  (Id.
11     ¶ 41.)  The Court's analysis of Plaintiff's seventh claim for
12     relief against the County is equally applicable to Plaintiff's
13     ninth claim for relief in that Plaintiff's allegations lack any
14     factual support for the Jail's "history of retaliation" or the
15     County's retaliatory policies or customs.  Accordingly,
16     Plaintiff's ninth claim for relief against the County is
17     dismissed with leave to amend.
18     ///
19     ///
20     ///
21     ///
22     ///
23     ///
24     ///
25     ///
26     ///
27     ///
28     ///

1   V.    <u>Tenth Claim for Relief: Violation of the Americans with</u>

2         <u>Disabilities Act and Rehabilitation Act Against the County</u>

3

4         Plaintiff alleges that he was a qualified individual under

5   the Americans with Disabilities Act ("ADA") and the

6   Rehabilitation Act ("RA").  (SAC ¶ 93.)  Plaintiff further

7   alleges that the County violated the ADA by (1) creating and

8   maintaining a jail without sufficient staffing levels to provide

9   responsible care to disabled persons in need; and (2) failing to

10  provide wheelchairs or other types of accommodations to those

11  people suffering from the inability to ambulate, thereby

12  providing a lesser quality of care and service that is different,

13  separate, and worse than the service provided to other

14  individuals.  (<u>Id.</u> ¶ 100.)  Plaintiff claims that, because of his

15  disability, he was denied the benefits of the services, programs

16  and activities of the County, mental care, treatment, follow-up

17  and supervision.  (<u>Id.</u> ¶ 102.)  County Defendants contend that

18  (1) Plaintiff was not a "qualified individual" during his

19  incarceration; and (2) Plaintiff's allegations of inadequate

20  medical care are insufficient to state a claim under either the

21  ADA or RA.  (CDMTD at 15:14-16:8.)

22       "When a plaintiff brings a direct suit under either the [RA]

23  or Title II of the ADA against a municipality (including a

24  county), the public entity is liable for the vicarious acts of

25  its employees."  <u>Duvall v. County of Kitsap</u>, 260 F.3d 1124, 1141

26  (9th Cir. 2001).

27  ///

28  ///

To establish a violation of § 504 of the RA, Plaintiff must show that (1) he is handicapped within the meaning of the RA; (2) he is otherwise qualified for the benefit or services sought; (3) he was denied the benefit or services solely by reason of his handicap; and (4) the program providing the benefit or services receives federal financial assistance. Lovell v. Chandler, 303 F.3d 1039, 1052 (9th Cir. 2002).

To establish a violation of Title II of the ADA, Plaintiff must show that (1) he is a qualified individual with a disability; (2) he is otherwise qualified to participate in or receive the benefit of some public entity's services, programs, or activities; (3) he was excluded from participation in or otherwise discriminated against with regard to a public entity's services, programs or activities; and (4) such exclusion or discrimination was by reason of his disability. O'Guinn v. Lovelock Correctional Center, 502 F.3d 1056, 1060 (9th Cir. 2007). "The ADA's broad language brings within its scope 'anything a public entity does,'" including "programs or services provided at jails, prisons, and any other 'custodial and correctional institution.'" Lee, 250 F.3d at 691(quoting Yeskey v. Pennsylvania Dep't of Corr., 118 F.3d 168, 171 & n.5 (3d Cir. 1997)).

To demonstrate that he is a "qualified individual with a disability," Plaintiff has to show that, at the time of the alleged events, he had a physical or mental impairment that substantially limited Plaintiff's one or more major life activities, or a record of such an impairment, or being regarded as having such an impairment. 42 U.S.C.A. § 12102(1).

1    Plaintiff bases his allegations of being a "qualified individual"
2    on his medical impairments associated with his "paraparesis and a
3    neurological condition, which prevented him from walking and
4    standing, and therefore resulted in his limited and/or
5    substantially limited ability to care for himself and control his
6    mental, medical or physical health conditions."  (SAC ¶ 93.)
7    Although the ADA includes walking, standing, and caring for
8    oneself as examples of "major life activities," 42 U.S.C.A.
9    § 12102(2), the existence of disabilities under the ADA and RA is
10   an individualized inquiry and should be determined on a
11   case-by-case basis.  <u>Albertson's, Inc. v. Kirkingburg</u>, 527 U.S.
12   555, 566 (1999); <u>Thornton v. McClatchy Newspapers, Inc.</u>, 261 F.3d
13   789, 794 (9th Cir. 2001).  In addition to alleging that some of
14   his major life activities were limited, Plaintiff has to
15   demonstrate that the limitation was substantial.  42 U.S.C.A.
16   § 12102(1).
17   ///
18   ///
19   ///
20   ///
21   ///
22   ///
23   ///
24   ///
25   ///
26   ///
27   ///
28   ///

1   The SAC's factual allegations relevant to Plaintiff's claim
2   of inability to walk and stand are as follows: (1) on May 17,
3   2007, Plaintiff collapsed while taking a shower when he lost
4   control of his legs, but he managed to drag himself to summon
5   help (SAC ¶ 29); (2) On May 18, 2007, Plaintiff "started
6   noticing" his inability to move his lower extremities (Id. ¶ 31);
7   (3) On May 18, 2007, Plaintiff had to pull himself up the wall to
8   ring the emergency bell in the cell to summon help because he was
9   unable to leave the cell; he told the officers that his legs did
10  not work (Id. ¶ 31); (4) On May 20, 2007, Defendant Carl reported
11  that Plaintiff "was 'again man down' in his cell saying 'my legs
12  don't work'" (Id. ¶ 32); (5) On May 20, 2007, Dr. Horowitz
13  determined that Plaintiff had been on the floor of his cell for
14  three days, and that Plaintiff was suffering from an inability to
15  control his extremities (Id.).  Thus, the SAC contains sufficient
16  factual allegations to demonstrate that Plaintiff's walking and
17  standing abilities had been seriously impaired for four days
18  before Plaintiff was transported to UCD for diagnosis and
19  treatment.  Considering the legislative directive to construe the
20  definition of "disability" in favor of broad coverage of
21  individuals and to the maximum extent permitted by the terms of
22  the ADA, 42 U.S.C.A. § 12102(4)(a), the Court concludes that
23  Plaintiff has made s plausible showing that he was a "qualified
24  individual with a disability" at the time of the alleged events.

25  Defendants contend that, even if Plaintiff is a "qualified
26  individual," Plaintiff's allegations amount merely to an
27  inadequate treatment for disability and not to a discriminatory
28  treatment because of the disability.

(CDMTD at 15:21-22.)  Defendants are correct in that the
inadequate treatment or lack of medical treatment for Plaintiff's
medical conditions does not provide a basis for a liability under
the ADA or RA.  See, e.g., Bryant v. Madigan, 84 F.3d 246, 249
(7th Cir. 1996)("The ADA does not create a remedy for medical
malpractice."); Burger v. Bloomberg, 418 F.3d 882, 883 (8th Cir.
2005) (medical treatment decisions are not a basis for ADA or RA
claims); Fitzgerald v. Corr. Corp. of Am., 403 F.3d 1134, 1144
(10th Cir. 2005) (concluding that medical decisions are not
ordinarily within the scope of the ADA); Luna v. Cal. Health Care
Servs., No. 1:10-CV-02076, 2011 WL 6936399, at *5 (E.D. Cal.
2011) ("Plaintiff's allegations of inadequate medical care do not
state a claim under the ADA.").  The Ninth Circuit has also
explained, in an unpublished opinion, that "[i]nadequate medical
care does not provide a basis for an ADA claim unless medical
services are withheld *by a reason of* a disability." Marlor v.
Madison County, Idaho, 50 Fed. Appx. 872, 873 (9th Cir. 2002)
(emphasis in the original).

Aside from Plaintiff's claims of inadequacy of and delays in
his medical treatment, Plaintiff alleges no facts to show that he
was denied any of the Jail's "benefits of the services, programs,
or activities."  The County does not violate the ADA and RA by
"simply failing to attend to the medical needs of its disabled
prisoners." See Bryant, 84 F.3d at 249.  Plaintiff's assertions
of the Jail's understaffing with competent caretakers and the
Jail's failure to provide non-ambulatory inmates with wheelchairs
are merely camouflaged claims of inadequate medical care provided
to Plaintiff at the Jail.

Although Plaintiff alleges that the County failed to provide wheelchairs to "people suffering from the inability to ambulate," the SAC does not contain any facts demonstrating that the County failed to provide a wheelchair to any other inmate.  Accordingly, Plaintiff's allegations are not sufficient to state a claim of "discrimination" under the ADA and RA.

Even if the Court were to conclude that Plaintiff's claims of the Jail understaffing with "responsible" caretakers and the Jail's failure to provide non-ambulatory inmates with wheelchairs rise to the level of "discrimination" for the ADA and RA purposes, Plaintiff fails to make any factual allegations as to what benefits or services he would have been entitled to absent his disability.  Moreover, Plaintiff "offered no comparison with other inmates' medical care to demonstrate that he was denied access to medical supplies or treated differently *by reason* of his disability." See Marlor, 50 Fed. Appx. at 873.

Accordingly, the Court dismisses Plaintiff's tenth claim for relief with leave to amend.

**CONCLUSION**

For the reasons stated above, Defendants' motions are granted in part and denied in part, consistent with the foregoing, as follows:

///

///

///

///

1     1. County Defendants' motion to dismiss Plaintiff's First
2 Claim under § 1983 for failure to provide adequate medical care
3 is GRANTED with leave to amend as to the County, McGinness,
4 Boylan, Hambly, Carl, Keillor and Gaddis, in their official and
5 individual capacities.

6     2.  Defendant Smith's motion to dismiss Plaintiff's First
7 Claim under § 1983 for failure to provide adequate medical care
8 is DENIED as to Smith in his individual capacity, and GRANTED as
9 to Smith in his official capacity with leave to amend.

10     3.  Defendants' motions to dismiss Plaintiff's Second,
11 Third, Fifth, Seventh, and Ninth Claims under § 1983 are GRANTED
12 with leave to amend as to the County, McGinness, Boylan, Hambly,
13 Keillor and Gaddis in their official capacities.

14     4.  Defendants' motions to dismiss Plaintiff's Fourth Claim
15 under § 1983 for failure to train are DENIED as to the County,
16 but GRANTED with leave to amend as to McGinness, Boylan, Hambly,
17 Keillor and Gaddis in their official capacities.

18     5. Defendants' motions to dismiss Plaintiff's Sixth Claim
19 under § 1983 for violation of the Equal Protection Clause of the
20 Fourteenth Amendment are GRANTED with leave to amend as to the
21 County, McGinness, Boylan, Hambly, Smith, Carl, Keillor and
22 Gaddis, in their official and individual capacities.

23     6. Defendants' motions to dismiss Plaintiff's Eighth Claim
24 under § 1983 for violation of the First Amendment are GRANTED
25 with leave to amend as to the County, McGinness, Boylan, Hambly,
26 Smith, Carl, Keillor and Gaddis, in their official and individual
27 capacities.

28 ///

7.   County Defendants' motion to dismiss Plaintiff's Tenth Claim under the ADA and RA is GRANTED with leave to amend.

8.   Defendants' motions to dismiss Plaintiff's Eleventh, Twelfth and Thirteenth Claims are GRANTED with leave to amend.

Any amended pleading consistent with the terms of this Memorandum and Order must be filed not later than twenty (20) days following the date the Memorandum and Order is signed.

IT IS SO ORDERED.


Dated: February 17, 2012

_____
MORRISON C. ENGLAND, JR.
UNITED STATES DISTRICT JUDGE

60