1  GERI LYNN GREEN SBN 127709
Law Offices of Geri Lynn Green, LC
2  155 Montgomery Street Suite 901
San Francisco, CA 94104
3  Telephone No.: (415) 982-2600
Facsimile No.: (415) 358-4562
4  Email: greenlaw700@gmail.com
5  Email: gerilynngreen@gmail.com

6  DENNISE S. HENDERSON SBN 208640
Law Office of Dennise S. Henderson
7  1903 Twenty First Street
Sacramento, CA  95811
8  Telephone No.: 916-456-2027
Facsimile No.: 916-456-2035
9  Email: dennisehenderson@comcast.net

10  Attorney for Plaintiff
SANDIPKUMAR TANDEL

11

12                IN THE UNITED STATES DISTRICT COURT

13             FOR THE EASTERN DISTRICT OF CALIFORNIA

14  SANDIPKUMAR TANDEL,                    Case No: 2:11-CV-353-MCE-GGH

15              Plaintiff,

16       v.                               **SECOND *AMENDED* COMPLAINT FOR
                                          VIOLATION OF CIVIL RIGHTS,
                                          AMERICANS WITH DISABILITY ACT,**
17                                        **AND COMMON LAW CLAIMS**
18  COUNTY OF SACRAMENTO, JOHN            **[42 U.S.C. § 1983]**
MCGINNESS, Sheriff, MICHAEL IWASA,
Undersheriff and Jail Captain, ANN MARIE
19  BOYLAN, Chief of CORRECTIONAL         **DEMAND FOR JURY TRIAL**
HEALTH SERVICES, ASA HAMBLY MD,
20  as Medical Director of Sacramento County Jail,
MICHAEL SOTAK, MD; as Medical Director
of Sacramento County Jail, SHELLY
21  JORDAN, Director of Nursing;  SUSAN
KRONER RN, AGNES R. FELICANO NP,
22  JAMES AUSTIN, NP; RICHARD L. BAUER.
MD, GREGORY SOKOLOV MD, KEELIN
23  GARVEY MD, GLAYOL SAHBA, MD,
CHRIS SMITH MD, HANK CARL RN,
24  SERGEANT TRACIE KIELLOR, DEPUTY
PABLITO GADDIS, DEPUTY WILSON,
25  DEPUTY JACOBY, DEPUTY MEDEIROS
and DEFENDANT DOES Custody Personnel
26  1-20, Medical Personnel 21-40; Supervising
Custody Personnel 41-60; and Supervising
27  Medical Personnel 61-80

28              Defendants.

SECOND *AMENDED* COMPLAINT FOR VIOLATION OF CIVIL RIGHTS, AMERICANS WITH DISABILITY ACT, AND COMMON LAW
CLAIMS [42 U.S.C. § 1983] DEMAND FOR JURY TRIAL
1

## I.    INTRODUCTION

1.      This case arises out of two separate incidents, one in 2007 and the other in 2010. The case involves two different detentions of SANDIPKUMAR TANDEL ("TANDEL") at the Sacramento County's Main Jail.  During each detention, the detention in 2007 and the detention in 2010, TANDEL was denied medical treatment for his known serious medical needs and obvious symptoms of neurological Central Nervous System disorders resulting in severe spinal cord injury manifesting with, among other symptoms, severe and chronic pain, spinal cord atrophy, permanent paralysis from the nipples down, neurogenic bladder and bowels, and optical damage.

2.      After his release from custody in 2007 TANDEL filed suit in Case No. 2:09-CV-0842 MCE GGH, on March 26, 2009 alleging the constitutional violations, violations of the American's with Disabilities Act.

3.      Thereafter while litigation was ongoing, TANDEL was again detained in the Sacramento Main Jail on March 23, 2010. Surprisingly, again, Mr. Tandel was denied necessary medical treatment.

4.      TANDEL filed suit related to the events surrounding his 2010 detention in Case No. 2:11-cv-00353-JAM -JFM on February 07, 2011.  These two cases were consolidated and this Court requested that Plaintiff file one Complaint combining both incidents.  Plaintiff files this Second Amended Complaint in compliance with that Order (ECF 72.)


## II.    INTRADISTRICT ASSIGNMENT

5.      Pursuant to F.R.C.P. Rule 3, and Civil L.R. 120 (d), assignment to this division is proper because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in the counties served by this division.

### III.    JURISDICTION AND VENUE

6.       This action is brought pursuant to 42 U.S.C. § 1983 for violations of the Eighth and Fourteenth Amendments to the United States Constitution, the Americans with Disabilities Act and various state law pendant claims. The Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343.

Law Offices of
Geri  Lynn Green LC

SECOND *AMENDED* COMPLAINT FOR VIOLATION OF CIVIL RIGHTS, AMERICANS WITH DISABILITY ACT, AND COMMON LAW CLAIMS [42 U.S.C. § 1983] DEMAND FOR JURY TRIAL
2

7.      The claims alleged herein arose in the County of Sacramento, California. Therefore, venue in the Eastern District of California and is proper pursuant to 28 U.S.C. § 1391(b)(2).

### IV.      EXHAUSTION OF PRE-LAWSUIT STATE LAW PROCEDURES

8.      TANDEL did not timely exhaust his state law claims from the events occurring in 2007, and has not alleged any of the state law claims  that may have arisen from the 2007 detention herein.   However, Plaintiff TANDEL filed a timely administrative claim with the COUNTY OF SACRAMENTO, pursuant to Cal. Gov't Code § 910, on August 12, 2010 concerning the claims arising out of the 2010 incarceration.    The 2010 claim was confirmed received by letter on August 17, 2010.

9.      On August 12, 2010, under California Code of Civil Procedure § 364, Plaintiff TANDEL provided notice to all known medical defendants of the medical malpractice and professional negligence claims.

### V.      PARTIES

10.      Plaintiff SANDIPKUMAR TANDEL ("TANDEL") a 20-year old man of Indian descent, and was injured by the acts, omissions and deliberate indifference of Defendants during his detentions at the Sacramento Main Jail ("Main Jail") from June 17, 2006 through May 24, 2007, and again from March 23, 2010 to May 12, 2010. At all times herein TANDEL was residing in Sacramento County, California.  He is suing for violation of his First, Eighth and Fourteenth Amendment rights, as well as violation of his common law rights for injuries he incurred during both detentions.

11.      Defendant COUNTY OF SACRAMENTO ("COUNTY") is a municipal corporation duly organized and existing under the laws of the State of California with the capacity to be sued.   Under its authority, Defendant COUNTY operates and manages the Sacramento County Jail, and is, and was at all relevant times mentioned herein, responsible for the actions and/or inactions and the policies, procedures and practices/customs of the Sacramento County Sheriff's Department and its employees.[1]   During the relevant time period, Defendant COUNTY was the employer of all Individual Defendants and DOE Defendants set forth below.

---

[1] Under *Kentucky v. Graham*, 473 U.S. 159, 165-166 (1985), suing an official capacity person is the legal equivalent of suing the government entity.

SECOND *AMENDED* COMPLAINT FOR VIOLATION OF CIVIL RIGHTS, AMERICANS WITH DISABILITY ACT, AND COMMON LAW CLAIMS [42 U.S.C. § 1983] DEMAND FOR JURY TRIAL
3

Law Offices of
Geri  Lynn Green LC

12.     SACRAMENTO COUNTY SHERIFF'S DEPARTMENT ("SCSD"), is a department of the COUNTY and operates and manages the Mail Jail.   Under its authority, Defendant SCSD is, and was at all relevant times mentioned herein, responsible for the operation of the CORRECTIONAL HEALTH SERVICES, ("CHS").   CHS administers all legally mandated health services provided to adult inmates held within the County jail system including preventative and therapeutic medical, dental and ancillary services.   SCSD is and was at all relevant times responsible for the actions and/or inactions and the policies, procedures and practices/customs of the CHS and its employees.   It is herein alleged that the COUNTY acted with deliberate indifference and reckless disregard in failing to respond to TANDEL's obvious serious medical needs through the unconstitutional policies, procedures, customs and practices identified below.

### SCSD Custodial Defendants

13.     Defendant JOHN MCGINNESS ("MCGINNESS") was at all times relevant hereto the Sacramento County Sherriff.  Plaintiff TANDEL is informed and believes and thereon alleges that Defendant MCGINNESS was the responsible party and final decision maker for the hiring, retention, screening, supervision, training, instruction, discipline, control, equipping and conduct of Defendant custody and medical staff.   He is charged with promulgating all orders, policies, protocols, practices, customs, rules, instructions and regulations of the SCSD and CHS.   As such, he was responsible for the constitutionally adequate provision of medical care to all inmates in the custody of the Sacramento County Jail.   Defendant MCGINNESS was acting under color of state law and within the course and scope of his employment as SCSD Sherriff.   Defendant MCGINNESS is sued here in his individual capacity.

14.     Defendant MICHAEL IWASA, formerly sued as Supervising Custody DOE Defendant XXVII for the events of 2007 and Supervising Custody DOE 36 for the events of 2010.[2]   IWASA was at all times herein employed by the COUNTY as The Main Jail Captain and/or Undersheriff.   Plaintiff TANDEL is informed and believes and thereon alleges that

---

[2] Plaintiff filed a complaint in Case 2:09-at-00466 naming Doe Defendants I-XXX; and filed a subsequent complaint at Case 2:11-cv-00353 naming Doe Defendants 1-50.

Defendant IWASA was second in command to the Sheriff, and/or, as the Captain of the Main Jail, and as such, was responsible for the inmates in the custody of the Sacramento County Jail.   He was responsible for hiring, retention, screening, supervision, training, instruction, discipline, control, equipping the SCSD operations at the Jail's He was a policy maker at the Jail charged with promulgating orders, policies, protocols, practices, customs, rules, instructions and regulations.  Defendant IWASA was acting under color of state law and within the course and scope of his employment and/or agency with the COUNTY and issued in his individual capacity.

15.    Sergeant TRACIE KEILLOR employed by the COUNTY at the relevant times during TANDEL's 2007 incarceration, as supervisory custodial staff at the Sacramento County Main Jail.  She was responsible for supervising the custody staff, responsible for the provision of care and treatment to TANDEL.  She failed to ensure that TANDEL had access to necessary medical treatment and failed to supervise those under her control to insure that the necessary medical care was delivered.  She is sued in her individual capacities and was at all relevant times acting within the scope of their employment and/or agency with the COUNTY and under color of authority.

16.    DEPUTY PABLITO GADDIS was employed at all relevant times by the COUNTY as custody staff.   He was responsible for ensuring inmates, including TANDEL, had access to medical care and treatment, and failed to provide TANDEL with access to necessary medical treatment. He is sued in his individual capacities and was at all relevant times acting within the scope of his employment and/or agency with the COUNTY, and were acting under color of authority.

17.    DEPUTIES MADIEROS and JACOBY, formerly sued as custody defendant Officer DOES 1 and 2 for their actions during TANDEL's 2010 incarceration (as liability was only recently determined through deposition), These deputies were responsible for ensuring inmates, including TANDEL, had access to medical care and treatment. Each of them failed to provide TANDEL with access to necessary medical treatment. They are sued in their individual capacities and were at all relevant times acting within the scope of their employment and/or agency with the COUNTY, and were acting under color of authority.

Law Offices of
Geri  Lynn Green LC

SECOND *AMENDED* COMPLAINT FOR VIOLATION OF CIVIL RIGHTS, AMERICANS WITH DISABILITY ACT, AND COMMON LAW CLAIMS [42 U.S.C. § 1983] DEMAND FOR JURY TRIAL
5

18.     DEPUTY WILSON was employed by the COUNTY as custody staff at all relevant times during TANDEL's 2010 incarceration.   WILSON was responsible for ensuring inmates, including TANDEL, had access to medical care and treatment, and failed to provide TANDEL with access to necessary medical treatment. He is sued in his individual capacities and was at all relevant times acting within the scope of his employment and/or agency with the COUNTY, and were acting under color of authority

### SCSD/CHS – Medical Defendants

19.     Defendant ANN MARIE BOYLAN was, at all relevant times, employed by the COUNTY as Chief of the Sacramento County Jail CHS.   In the Sacramento County Jails, the delivery and oversight of inmate medical and mental health services rests with the SCSD CHS Division.   As Chief, Defendant BOYLAN is responsible for ensuring appropriate resources, staffing, supervision and training for the provision of constitutionally mandated correctional medical services for the ever-increasing jail population. BOYLAN is a policy maker responsible for the making and implementation of policies to ensure the provision of constitutionally mandated medical care. BOYLAN is sued in her individual capacity.   She was at all relevant times acting within the scope of her employment and/or agency with the COUNTY and under color of authority.

20.     ASA HAMBLY, MD was employed by the COUNTY as Interim Medical Director of Sacramento County Jail CHS during TANDEL's 2007 incarceration.   MICHAEL SOTAK, MD was employed by the COUNTY as Medical Director of Sacramento County Jail CHS at all relevant times during TANDEL's 2010 incarceration.   The Medical Director of CHS is responsible for the delivery of medical services to inmates in the adult jail facilities of the SCSD. These services are provided by COUNTY employees and contractors.  Critical duties include, but are not limited to, the following: 1. Developing and maintaining updated policies and procedures appropriate to jail clinical practice;    2. Establishing and maintaining effective working relationships with internal and external department members, mental health staff, law enforcement staff, contract hospitals and a network of health care providers;  3. Directing risk management and quality assurance activities for CHS; and   4. Insure medical autonomy by proactively dealing with serious medical conditions of inmates.  The Medical Director is expected

to respond to after-hour issues and supervise the practice of the jail physicians and other staff. The Medical Director is charged under the SCSD "continuity of care" policy to review inmate medical charts upon incarceration, and to review the current mode of treatment inmates are receiving from outside treatment providers. Dr. HAMBLY and Dr. SOTOK also provided direct treatment to inmates within the Main Jail, including TANDEL. They are both sued in their individual capacities, and were at all relevant times acting within the scope of their employment and/or agency with the COUNTY and under color of authority.

21. Defendant Shelly JORDAN, formerly named as a Supervisory Medical DOE VII for the events of 2007, and Supervisory Medical DOE 41 for the events of 2010, was at all relevant times employed by the COUNTY as Director of Nursing of CHS in the Sacramento County Jail. JORDAN was at all times herein responsible for developing and implementing of the policies and procedures for all Jail nursing staff, including but not limited to the development and implementation of Standardized Nursing Procedures implemented in order to allow Registered Nurses to work beyond their licensure. JORDAN was additionally responsible for ensuring constitutionally sufficient staffing, and that the nursing staff was properly trained and supervised. She is sued in her individual capacity and was at all relevant times acting within the scope of her employment and/or agency with the COUNTY, and under color of authority.

22. CHRIS SMITH, MD was employed as a physician by the COUNTY to provide medical treatment to inmates at the Sacramento County MAIN JAIL at all relevant times during Mr. TANDEL's 2007 incarceration. SMITH was a physician responsible for providing treatment to TANDEL during the 2007 detention. He is sued in his individual capacity and was at all relevant times acting within the scope of his employment and/or agency with the COUNTY, and was acting under color of authority.

23. RICHARD L. BAUER, MD and GLAYOL SAHBA MD were employed as physicians by the COUNTY to provide medical treatment to inmates at the Sacramento County Main Jail at all relevant times during TANDEL's 2010 incarceration. These medical defendants were the physicians responsible for providing treatment to TANDEL. They are sued in their individual capacities and were at all relevant times acting within the scope of their employment and/or agency with the COUNTY and were acting under color of authority.

24.     JAMES AUSTIN, NP, was employed by the COUNTY at all relevant times as a nurse practitioner at the Main Jail during TANDEL's 2007 and 2010 incarcerations. AUSTIN was previously sued as DOE XII regarding the events of 2007, and by name in 2007.  Discovery and further investigation have revealed that AUSTIN was a responsible medical care provider during both incarcerations.  He is sued in her individual capacity and was at all relevant times acting within the scope of his employment and/or agency with the COUNTY, and was acting under color of authority.

25.     AGNES FELICANO NP was employed by the COUNTY at the relevant times during TANDEL's 2010 incarceration as a nurse practitioner at the Main Jail. She was a medical provider responsible for rendering medical care to TANDEL. She is sued in her individual capacity and was at all relevant times acting within the scope of her employment and/or agency with the COUNTY, and was acting under color of authority.

26.     HANK CARL RN, was employed by the COUNTY at a registered nurse throughout TANDEL's 2007 and 2010 incarcerations.  He was responsible for providing nursing care to TANDEL at the Sacramento Main Jail.  He is sued in his individual capacity and was at all relevant times acting within the scope of his employment and/or agency with the COUNTY, and was acting under color of authority.

27.     SUSAN KRONER RN was employed by the COUNTY at a registered nurse throughout TANDEL's 2010 incarcerations.  She was responsible for providing nursing care to TANDEL at the Sacramento Main Jail.  She is sued in her individual capacity and was at all relevant times acting within the scope of her employment and/or agency with the COUNTY, and was acting under color of authority.

**University of California at Davis Psychiatric Staff**

28.     The Regents of the University of California, University of California Davis Heath System, have contracted with the COUNTY to provide psychiatric services to inmates within the Main Jail.   GREGORY SOKOLOV MD and KEELIN GARVEY MD were agents of the COUNTY and University of California at Davis Medical Center, at all relevant times during TANDEL's 2010 incarceration, and contracted with the COUNTY to provide psychiatric services

Law Offices of
Geri  Lynn Green LC

SECOND *AMENDED* COMPLAINT FOR VIOLATION OF CIVIL RIGHTS, AMERICANS WITH DISABILITY ACT, AND COMMON LAW CLAIMS [42 U.S.C. § 1983] DEMAND FOR JURY TRIAL
8

to CHS inmates within the Main Jail.  They were the physician/psychiatrists responsible for providing treatment to TANDEL, and are sued in their individual capacities.  They were at all relevant times acting within the scope of their employment and/or agency with the COUNTY, are sued in their individual capacities, and were acting under color of authority.

### DOE Medical and Custodial Defendants

29.     Custody Defendant DOES 1-20 were responsible at all times during TANDEL's 2007 and/or 2010 incarcerations for ensuring inmates, including TANDEL, had access to medical care and treatment. Each of them failed to provide TANDEL with access to necessary medical treatment. They are sued in their individual capacities and were at all relevant times acting within the scope of their employment and/or agency with the COUNTY, and were acting under color of authority.

30.     Medical defendant DOES 21-40 were employed as physicians by the COUNTY to provide medical treatment to inmates at the Sacramento Main Jail at all relevant times during TANDEL's 2007 and/or 2010 incarcerations. These medical defendants were the primary care physicians responsible for providing treatment to TANDEL. They are sued in their individual capacities and were at all relevant times acting within the scope of their employment and/or agency with the COUNTY and were acting under color of authority.

31.     Supervisory Custodial DOES 41-60 were employed by the COUNTY at all relevant times at during TANDEL's 2007 and/or 2010 incarcerations. They were responsible for supervising the custody staff, responsible for the provision of care and treatment to TANDEL. Each of them failed to ensure that TANDEL had access to necessary medical treatment.  They are sued in their individual capacities and was at all relevant times acting within the scope of their employment and/or agency with the COUNTY and under color of authority.

32.     Supervisory Medical Defendant DOES 61-80 were employed by the COUNTY at the Sacramento County Main Jail during TANDEL's 2007 and/or 2010 incarcerations to supervise the delivery of medical treatment to inmates at the Main Jail. They are sued in their individual capacities and were at all relevant times acting within the scope of their employment and/or agency with the COUNTY and were acting under color of authority.

Law Offices of
Geri  Lynn Green LC

SECOND *AMENDED* COMPLAINT FOR VIOLATION OF CIVIL RIGHTS, AMERICANS WITH DISABILITY ACT, AND COMMON LAW CLAIMS [42 U.S.C. § 1983] DEMAND FOR JURY TRIAL
9

33.     The true names and identities of all named Defendants DOES are presently unknown to Plaintiff. Upon information and belief, defendants DOES acted with deliberate indifference as well as reckless disregard to TANDEL's serious medical needs and safety, failed and/or delayed providing medical care to TANDEL, violated TANDEL's civil rights, and/or encouraged, directed, enabled, and/or ordered other defendants to engage in such conduct. Plaintiff further alleges that DOES violated TANDEL's First, Eighth and Fourteenth Amendment rights. Defendants DOES are being sued in their respective individual capacities. Plaintiff will seek to amend this Complaint after the true names and identities of DOES are ascertained.

34.     Where reference is made in this Complaint to any act by Defendants and DOE Defendants, such allegations and references shall also be deemed to mean the acts and failures to act of each Defendant and DOE Defendants individually, jointly or severally.

## VII. ALLEGATIONS

### General Allegations

35.     The Eighth and Fourteenth Amendments impose duties on prison officials to provide humane conditions of confinement, to ensure that inmates receive adequate medical care, and to take reasonable measures to guarantee the safety of the inmates.  See Farmer v. Brennan, 511 U.S. 825, 832 (1994); *Bell v. Wolfish*, 441 U.S 520, 535 (1979).

36.     A prison official's deliberate indifference to a substantial risk of serious harm to an inmate violates the Eighth and Fourteenth Amendments. A prison official's deliberate indifference to serious medical needs violates the Eighth and Fourteenth Amendments where the official(s) acted or failed to act despite knowledge of a substantial risk of serious harm, or despite evidence that the substantial risk was obvious. See *Id* at 842.

37.     As will be shown below, each of the Defendants caused and is responsible for the unlawful conduct and resulting harm by, inter alia, personally participating in the conduct, or acting jointly and in concert with others who did so, by authorizing, acquiescing, condoning, acting, omitting or failing to take action to prevent the unlawful conduct, by promulgating or failing to promulgate policies and procedures pursuant to which the unlawful conduct occurred, by failing and refusing to initiate and maintain adequate training, supervision and staffing with deliberate indifference to Plaintiffs' rights, by failing to maintain proper and adequate policies,

Law Offices of
Geri  Lynn Green LC

SECOND *AMENDED* COMPLAINT FOR VIOLATION OF CIVIL RIGHTS, AMERICANS WITH DISABILITY ACT, AND COMMON LAW CLAIMS [42 U.S.C. § 1983] DEMAND FOR JURY TRIAL
10

procedures and protocols, and by ratifying and condoning the unlawful conduct performed by agents and officers, deputies, medical providers and employees under their direction and control.

38.     The COUNTY is a public entity and is hereby sued under Title 42 U.S.C. § 1983 for violations of the First, Eighth and/or Fourteenth Amendments of the United States Constitution, the Americans with Disabilities Act, 42 U.S.C. § 12131 (2), § 504 of the Rehabilitation Act of 1973, California state law, the California Tort Claims Act, and the Government Code for the acts and omissions of public employees, defendants and DOES, and each of them, who at the time they caused Plaintiff's SANDIPKUMAR TANDEL, injuries, and damages were duly appointed, qualified and acting officers, employees, and/or agents of COUNTY and acting within the course and scope of their employment and or agency.

**Specific Allegations**

**The 2007 Incident**

39.     SANDIPKUMAR TANDEL was born October 09, 1986 and is of Indian Descent.

40.     TANDEL was taken into custody on February 7, 2007 and detained in the Sacramento County Main Jail until his release on May 20, 2007.

41.     Prior to his arrest, TANDEL was in good health.

42.     As a result of his dark skin color, he was housed with the African-American inmates at the institution.  As a result of the Main Jail's well known over-crowded conditions and the Sheriff's failure to adequately staff the facility, there was a racial altercation between African American inmates and non-black inmates on April 27, 2007.

43.     During the alteration, TANDEL suffered a serious head injury.  On April 27, 2007, at 9:00 p.m., Supervising RN Luveria Larry-Barnes examined TANDEL and determined that he had, indeed, sustained a serious head injury requiring emergency medical care.

44.     TANDEL had sustained a laceration approximately one inch in length and ¼ inch in depth just above his right eye.

45.     Dr Horowitz, a physician performing telephone consultations with Jail Medical Staff, was consulted telephonically, and at 9:30 p.m. authorized a treatment request for emergency transport to and treatment at Doctor's Hospital including sutures to the right forehead laceration.

Law Offices of
Geri  Lynn Green LC

46.     TANDEL was transported to the Emergency Room at the Doctor's Center in Sacramento, where Dr. Richard Gray, Jr. M.D. cleaned and sutured the wound and vaccinated TANDEL for Tetanus.  Dr. Gray sent TANDEL back to the Main Jail with information about the treatment rendered and vaccination administered as well as instructions to remove the sutures in five days, leaving the wound open to air and keeping the wound clean.  TANDEL was referred for a medical evaluation the following day.

47.     TANDEL returned to the Main Jail, and in the early morning of April 28, 2007, and at 12:30 a.m. reported to medical staff that he still had a headache.  His wound was evaluated, the treatment and vaccination were noted in his chart, and on April 30, 2007, Defendant Interim Medical Director ASA F. HAMBLY, M.D. evaluated TANDEL's medical condition and provided him a small amount of Bacitracin, an antibiotic.

48.     The Sacramento County Main Jail is an indirect supervision jail.  Multiple pods of inmates are supervised by a control booth operator located outside the pod and serviced by custodial officers tasked by the control booth operator in response to requests made through an intercom system.

49.     Generally, Main Jail inmates request medical care by 1) using the call button/intercom in their cell, which alerts the control booth operator of the need for medical care.

50.     If the problem is not urgent, the inmate or detainee can sign up for sick call during recreation periods when he is allowed to wander around the pod outside of his cell.  The sick-call sign-up sheet located in the pod, and an inmate signs up for the next available Nurse's sick-call by writing their name on the sheet.  Jail medical staff collects the sign-in sheets and provides them to the medical staff.  Nurses' sick-call is generally held a few days a week for a few hours where a nurse is stationed in a nurses' station located near the pods.   If the nurse determines a physician is necessary, the nurse is to alert a physician and the patient is to be seen in the medical area known as "2M."

51.     Upon his return from the ER, TANDEL was disciplined for being involved in a fight and housed on the 8th Floor in an Administrative Segregation[3] cell for approximately two

---

[3] Minimum standards for local detention facilities set forth in CCR Tit. 15 § 1053, provide that administrative segregation shall consist of separate and secure housing but shall not involve any other deprivation of privileges than is necessary to obtain the objective of protecting the inmates and staff.

Law Offices of
Geri  Lynn Green LC

weeks.  There, TANDEL was not provided much, if any, pod time in which to sign up for Nurse's Sick Call, but did make a number of requests for medical follow-up care through the intercom system in the Administrative Segregation Unit.

52.     On April 28, 2007, although HAMBLY treated TANDEL for a  headache following a head injury, he provided no plan for follow-up medical treatment.  TANDEL used the call button to request further medical treatment and clean supplies.  TANDEL used his call button to request showers and items required for regular hygiene and to keep the wound clean.  He requested medical products for proper wound care and asked that his sutures be removed after five days. He complained that the sink in his cell did not have steady flow of clean water, it merely had a dripping faucet, and the water dripping from the faucet was brown. Without running water in his cell or regular showers he had no way to keep the wound clean as prescribed by the treating physician.

53.     The few times, TANDEL's calls were answered by the control booth operator, he was told "we are working on it", "stop using the call button", and "stop complaining".

54.     Notwithstanding the emergency room physician's written orders to "remove the sutures by May 03", and despite TANDEL's requests to be seen by medical staff, his sutures were not removed until May 13, 2007.

55.     On May 13, 2007, at 1:03 p.m., TANDEL was seen by RN HANK CARL, who reported that he continued to suffer with headaches after the injury, this one had lasted for some four days and involved eye pain.

56.     Business and Professions code §2725 (b) provides that the practice of nursing means those functions, including basic health care, that help people cope with difficulties in daily living that are associated with their actual or potential health or illness problems or the treatment thereof, and that require a substantial amount of scientific knowledge or technical skill, including all of the following: (1) Direct and indirect patient care services that ensure the safety, comfort, personal hygiene, and protection of patients; and the performance of disease prevention and restorative measures. (2) Direct and indirect patient care services, including, but not limited to,

Law Offices of

Geri  Lynn Green LC

SECOND *AMENDED* COMPLAINT FOR VIOLATION OF CIVIL RIGHTS, AMERICANS WITH DISABILITY ACT, AND COMMON LAW CLAIMS [42 U.S.C. § 1983] DEMAND FOR JURY TRIAL

13

the administration of medications and therapeutic agents, necessary to implement a treatment, disease prevention, or rehabilitative regimen ordered by and within the scope of licensure of a physician, dentist, podiatrist, or clinical psychologist, as defined by Section 1316.5 of the Health and Safety Code. (3) The performance of skin tests, immunization techniques, and the withdrawal of human blood from veins and arteries. (4) Observation of signs and symptoms of illness, reactions to treatment, general behavior, or general physical condition, and (A) determination of whether the signs, symptoms, reactions, behavior, or general appearance exhibit abnormal characteristics, and (B) implementation, based on observed abnormalities, of appropriate reporting, or referral, or standardized procedures, or changes in treatment regimen in accordance with standardized procedures, or the initiation of emergency procedures.

57.     Diagnosis and evaluation of serious medical conditions such as long term headaches post dating head trauma is beyond a Registered Nurse's licensure.  In order to conduct such an evaluation, California law requires strict adherence to Standardized Nursing Procedures ("SNP") developed by the health facility at the direction of physicians and directors.  (See California Business and Professions Code Section 2725).

58.     These Standardized Procedures For Registered Nurses ("SNP") within the Sacramento County Main Jail, are approved by the Medical Director and the Directors of Nursing, permit registered nurses to provide treatment which is usually considered outside the scope of nursing practice.

59.     The Standardized Procedures were formulated for the definitive recognition, management and/or treatment of specific identified conditions, including emergencies, affecting patients incarcerated in the Sacramento County Adult Correctional Facilities.   They were developed to be used in the Main Jail when physician care is not available.

60.     The Jail SNP specific to the evaluation, care and treatment of neurological conditions is severely deficient and its implementation during the two incidents alleged here resulted in the deprivation of necessary medical treatment for TANDEL's obvious serious neurological condition during both detentions.

61.      According to the SNP Protocol for neurological conditions specific to the evaluation of a headache, the registered nurse is directed to:

Law Offices of
Geri  Lynn Green LC

SECOND *AMENDED* COMPLAINT FOR VIOLATION OF CIVIL RIGHTS, AMERICANS WITH DISABILITY ACT, AND COMMON LAW CLAIMS [42 U.S.C. § 1983] DEMAND FOR JURY TRIAL
14

"Obtain an accurate and complete medical history regarding onset, naute and duration of symptoms, location of pain, precipitating factors, recent trauma, associated nausea, vomiting, vertigo, visual disturbances and previous episodes.  Note carefully if this is a dramatically changed headache, far more serious than usual, as this could indicate a more severe underlying organic pathology."

62.     The SNP protocol sets forth a number of objective tests the nurse is to perform and document such as: vital signs; evaluation of pupils and eyes; palpate the temporomandibular joint for tenderness, and sinus areas for sensitivity; observe the gait and stance for asymmetry, abnormality, or other visual signs of CNS damage; if the patient has a recent history of trauma, inspect for signs and symptoms that have not resolved or have since developed; assess head, neck, shoulders, cervical spine and surrounding muscles for tenderness, stiffness, or signs of trauma; check to see if hand grips are equal in strength.

63.     However, the SNP protocol neither provides guidance on the manner of testing, nor the steps to take in the event of a finding.

64.     Indeed, the SNP sets forth only the following indicators of an emergent problem requiring a call to 911:

"a. Pupil's unequal, non-reactive to light, not congruently reactive to light, pointing in different directions at rest or in motion, dilated or pinpoints pupils. b. Headache with a blood pressure of 180/120 and over. c. Repeated or projectile vomiting. d. Decreased level of consciousness or changes in level of consciousness. e. Visual changes or problems. f. Seizure activity after a head injury. Head trauma with bruising behind the ears (Battle's sign); contusions around the eyes, raccoon eyes, or any leakage of blood or fluid from ears or nose are signs suggestive of skull fracture. h. Any headache that worsens or changes character (i.e.: a dull aching that suddenly becomes unbearable and stabbing)."

65.     The SNP provides no guidance on how to properly evaluate a possible CNS disorder, or what act to take if the findings are positive.

66.     On May 13, 2007, notwithstanding TANDEL's multi-day unresolved headache with eye pain subsequent to a head trauma, CARL failed to perform all of the required tests and evaluations.  Nonetheless, without finding a reason for the long term headache and eye pain, CARL sent TANDEL back to his cell without any medical follow up treatment plan.

Law Offices of
Geri  Lynn Green LC

SECOND *AMENDED* COMPLAINT FOR VIOLATION OF CIVIL RIGHTS, AMERICANS WITH DISABILITY ACT, AND COMMON LAW CLAIMS [42 U.S.C. § 1983] DEMAND FOR JURY TRIAL
15

67.     CARL testified that he did not determine the cause of TANDEL's headaches and that he did not follow the SNP because he was unable to diagnose the reason for the headaches. He erroneously believed that he was only to use the SNPs when he had diagnosed a patient and determined that he should prescribe medication.  Since he had not determined why TANDEL was suffering from prolonged headaches and eye pain, he did not feel the need to prescribe medication and hence, he disregarded the treatment protocol and the excessive risk of harm.

68.     CARL consulted with SMITH but SMITH, did not examine TANDEL.  Based on CARL's incomplete evaluation SMITH ordered the sutures removed and a prescription for Motrin.

69.     CARL removed the sutures, finding that they looked imbedded and needed to come out.  He found them difficult to remove as they had been left in for eleven days beyond the Emergency Room physician's orders.

70.     On or about May 14, 2007, TANDEL sought medical attention again, this time he was seen by Nurse Practitioner Jim AUSTIN and reported that he continued to suffer with an unresolved post head trauma headache.  He reported at this time, an additional symptom of  sinus involvement.   Austin evaluated TANDEL without reviewing his medical chart – therefore unaware of Carl's evaluation and treatment.   Notwithstanding the previous head trauma, continuing headaches, eye pain and now sinus involvement – AUSTIN returned TANDEL to his cell without a diagnosis, providing any medical treatment for his obvious and serious progressing neurological condition, or any follow-up treatment plan.

71.      Three days later, on May 17, 2007, TANDEL collapsed while taking a shower. TANDEL had become dizzy, and lost control of his legs. Unable to walk or control his legs, he dragged himself on the shower floor.  Naked and paralyzed on the shower, TANDEL feared attack by the unsupervised inmates in the pod.  Consequently, he dragged himself to his clothing, and labored on the floor to clothe himself.  Once clothed, he banged on the shower door to summon help.

72.     GADDIS, the control booth operator in 6E on May 17, 2007, received word through the intercom system from another inmate, that TANDEL was man-down on the shower floor,

Law Offices of
Geri  Lynn Green LC

SECOND *AMENDED* COMPLAINT FOR VIOLATION OF CIVIL RIGHTS, AMERICANS WITH DISABILITY ACT, AND COMMON LAW CLAIMS [42 U.S.C. § 1983] DEMAND FOR JURY TRIAL
16

unable to get up. Nonetheless, TANDEL lay on the shower floor for up to 30 minutes waiting for help.

73.     GADDIS, believing that TANDEL was faking, failed to immediately alert custody and medical staff  of the man down emergency.   Officer Enriquez, the floor officer, had abandoned his post and gone to another floor leaving no one to respond to provide TANDEL medical care. When deputies finally arrived, TANDEL was carried down the stairs and transported by wheelchair to the medical unit for evaluation.  He was again evaluated by HANK CARL, RN.

74.     CARL having treated him four days before was aware of TANDEL's recent head injury and his subsequent complaints of headaches and eye pain and sinus involvement through previous recorded treatment.  When TANDEL presented with an unexplained loss of use of his lower extremities and collapse, the risk of a deteriorating neurological condition was obvious.

75.     The medically acceptable standard of care for a patient presenting with unresolved headaches and neurological conditions such as loss of extremities, eye pain and sinus involvement is to immediately rule out a Central Nervous System Disorder by magnetic resonance imaging and spinal fluid testing.  These types of diagnostic procedures were not available in the Main Jail.

76.     Indeed, the SNP for Neurological Conditions specifically directs the nurse to observe the gait and stance, for abnormalities that would indicate damage to the Central Nervous System. However, Registered Nurses are not trained in these evaluations as diagnosis and evaluations are purely physician functions. Furthermore, and the COUNTY did not engage in the training of its Registered Nurses in the proper evaluations to perform when diagnosing neurological conditions.

77.     Nonetheless, deteriorating Central Nervous System functions such as the obvious symptomology present here, are common symptoms of an acute neurological condition requiring immediate medical treatment.  Indeed, immediate treatment with steroids and anti-inflammatories are well – known treatments for all such CNS disorders.  The treatment, if done in a timely fashion, is able to stop permanent spinal cord damage.

Law Offices of
Geri  Lynn Green LC

78.     Reliance on registered nurses to perform these diagnostic functions of complicated and acute medical issues without appropriate training and supervision denied TANDEL necessary medical treatment for his obvious serious and emergent medical needs.

79.     Indeed, CARL, failed to engage in even the most rudimentary of the tests for CNS disorders even after being alerted to the new symptoms – loss of control of the extremities and dizziness.   Again, his examination of TANDEL consisted of a check of his vital signs, blood pressure, and lower extremity reflexes.   Despite the known risk of a Central Nervous System disorder, when CARL was unable to determine the cause of the symptoms through his inadequate and limited evaluation, he disregarded the obvious risk of harm and medically cleared TANDEL without any direction for follow up care, further testing, or referral to more qualified provider in order to determine the cause of the neurological symptoms.    TANDEL was simply returned to general population with the clear message to custody staff to disregard his future complaints as malingering.

80.     CARL's failure to respond to TANDEL's obvious serious medical needs caused him permanent spinal cord damage.

81.     As a result of CARL's failure to provide TANDEL access to proper medical care, his condition worsened.   The following morning, May 18, 2007, TANDEL suffered a sudden and acute loss of vision in his left eye.   He could not move his lower extremities.    He suffered from urinary retention and constipation, indicating a loss of spinal cord function - known indicators of neurological disease.

82.      TANDEL was consumed by panic and attempted over and over again to summon help.   He pulled himself up the wall to ring the emergency bell in the cell and his cellmate used the call button to request medical care on his behalf.   This was the only means TANDEL had of requesting help because he was unable to leave the cell.   He told the officers that his legs did not work, that he could not urinate, that he was going blind.   Since Medical had cleared him for incarceration just the day before, the officers told him again and again that these things would not kill him and to stop using the call button.

83.     On May 18, 2007, Officer GADDIS was the floor officer in 6E, and was responsible to respond to inmate requests for medical attention in TANDEL's pod.

Law Offices of
Geri  Lynn Green LC

Notwithstanding the knowledge of TANDEL's loss of use of his extremities, his lying on the cell floor unable to get up and his continued unresolved headaches and blindness, GADDIS and other officers ignored TANDEL's requests for medical care, ignored the call button which was used to request medical treatment, and admonished TANDEL for using the call button to request medical treatment. These deliberate acts and failures to act denied TANDEL access to medical treatment - resulting in a deterioration of his condition and eventual paralysis.

84.     At 7:32 am on May 19, 2007, Jail Housing logs indicate that TANDEL developed an additional symptom, in addition to headaches, sudden blindness, loss of leg function, he was now also complaining of constipation. Nursing advised him to sign up for sick call without providing any medical attention.

85.     Despite TANDEL's requests for medical treatment, and his obvious and continued decline in health, he was not provided any medical treatment until May 20, 2007.

86.     On May 20, 2007, at 11:44 a.m., TANDEL was taken to the medical unit in a wheelchair and again reported to HANK CARL RN, "my legs don't work". CARL reported that TANDEL was again "man down" in his cell with recurrent symptoms of loss of extremity function. CARL, was still unable to determine the cause of TANDEL's symptoms and sought a physician opinion.

87.     Although HANK CARL had treated TANDEL for a head injury, headaches, and eye pain, and was aware he had collapsed in the shower on May 17, 2007, CARL failed to provide a medical history or TANDEL's medical chart to Dr. SMITH.

88.     CARL neither obtained TANDEL's chart for SMITH's review, nor did he advise SMITH of the history of his own evaluations and treatment of TANDEL. Accordingly, SMITH evaluated TANDEL but was unaware of the progressive nature of TANDEL's neurological symptoms.

89.     Nonetheless, when TANDEL presented to SMITH on May 20, 2007, at 12:30 p.m., complaining of loss of leg function, sudden blindness, headaches, loss of bowel and bladder control, he was in obvious distress and need for medical intervention. SMITH failed to provide any meaningful evaluation of TANDEL's medical condition. Indeed, he did not even have TANDEL stand and walk to test his leg function. Instead of performing an evaluation of his

Law Offices of
Geri Lynn Green LC

SECOND *AMENDED* COMPLAINT FOR VIOLATION OF CIVIL RIGHTS, AMERICANS WITH DISABILITY ACT, AND COMMON LAW
CLAIMS [42 U.S.C. § 1983] DEMAND FOR JURY TRIAL
19

deteriorating neurological condition, ordering an emergency transport to the ER, for diagnostic testing and appropriate treatment, SMITH disregarded the obvious symptoms of a serious neurological condition and sent TANDEL back to his cell without providing him any medical treatment.

90.     TANDEL was returned to his cell in a wheelchair at 1:06 p.m. on May 20, 2007. The wheel chair was removed, leaving him on the floor of his cell without medical treatment, or the ability to access treatment.

91.     More than eight hours later, at 9:45 p.m., TANDEL was seen by unknown nursing personnel sitting on his cell floor unable to move or control his lower extremities.  He was taken to Main Jail medical unit. His stomach was distended due to the fact that he had been unable to void his bladder or defecate for some three days.  TANDEL's left pupil was sluggish and his right side was documented to be weaker than left side.  All clear indicators of a serious neurological condition.

92.     Dr. Evelyn Horowitz MD was a physician working as an on-call telephone physician the night of May 20th 2007.  On-call telephone physicians are employed to answer calls from nurses working at the Jail Medical Unit when during hours when there are no physicians on sight.  They provide telephone consults only.  Telephone on-call physicians do not respond to medical needs beyond approving treatments by telephone, or directing nursing staff to transport a patient to the hospital.   Dr. Horowitz testified that she recalls being phoned by a jail nurse and being told the patient was medically unstable and needed a higher level of evaluation. Specifically, she recalled that something was wrong with his vision; he had an unsteady stance; and a history of a head injury 2 weeks prior which complicated his current condition.

93.     In Dr. Horowitz' opinion, these symptoms warranted sending him out for further evaluation and she ordered him transported to the hospital for evaluation.  Sometime after 11:00 p.m., he was transported to the Emergency Room.

94.     The failure to provide necessary emergency treatment and hospitalization resulted in TANDEL's tragic and profound paralysis and disfigurement.

95.     TANDEL presented at the Emergency Room on May 20, 2007 with several days of urinary retention and constipation, lower extremity weakness, and vision loss in the left eye.   He

Law Offices of
Geri  Lynn Green LC

SECOND *AMENDED* COMPLAINT FOR VIOLATION OF CIVIL RIGHTS, AMERICANS WITH DISABILITY ACT, AND COMMON LAW CLAIMS [42 U.S.C. § 1983] DEMAND FOR JURY TRIAL
20

was given an MRI of the spine which showed an expansive lesion.  He also had a brain MRI which showed brain involvement.

96.     TANDEL was admitted to the hospital at UC Davis ("UCD") with obvious symptoms of a profound Central Nervous System disorder on May 21, 2007, including: bilateral lower extremity paraparesis with weakness in his upper extremities; visual loss; constipation, renal insufficiency and neurogenic bladder, fever and elevated white blood cell count.  Douglas Kirk, M.D. documented that he suspected a spinal cord lesion based on the symptoms presented, and consulted the Neurology Department.

97.     TANDEL's records and documents concerning his medical history did not accompany him to the hospital.  UCD staff called the Main Jail numerous times following TANDEL'S admittance, to inquire about the treatment he had received.

98.     Nonetheless, with the obvious neurological conditions and deterioration of the CNS, the physicians at UCDMC immediately commenced standard treatment procedures for CNS disorders including steroid treatment and plasma exchange.

99.     It was not until May 23, 2007, that Jail physician, Dr. Thomas Smith MD, spoke with UCD's Dr. Aly concerning Plaintiff's condition.  He was told that the infection had not yet been identified but the patient was quickly declining.

100.    It was not until faced with Dr. Aly's concern that the UCD was provided TANDEL's medical history.

101.    It is on information and belief that the failure of the COUNTY to transport TANDEL to the hospital at the onset of his neurological disorder and then the failure to provide UCD with TANDEL's medical history resulted in delay in diagnosis and treatment and irreversible damage to his spinal cord.

102.    Ultimately, UCD diagnosed TANDEL with Acute Disseminated Encephalomyelitis ("ADEM") which involves inflammation and demyelination in the brain and often involves inflammation in the spinal cord. In some instances there can be optic nerve involvement. ADEM may occur after a bacterial or viral infection (post infectious) or following an immunization (post vaccination).   ADEM is most often monophasic, although there are recurrent variants of ADEM. It can be characterized by headache or seizures and may involve vision loss.

Law Offices of
Geri  Lynn Green LC

SECOND *AMENDED* COMPLAINT FOR VIOLATION OF CIVIL RIGHTS, AMERICANS WITH DISABILITY ACT, AND COMMON LAW
CLAIMS [42 U.S.C. § 1983] DEMAND FOR JURY TRIAL
21

103.    It, like all such Central Nervous System Disorders, requires immediate treatment to prevent permanent damage to nerve cells.   Symptoms of ADEM, like many CNS disorders, include headache, delirium, lethargy, coma, seizures, stiff neck, fever, ataxia, optic neuritis, transverse myelitis, vomiting, and weight loss. Other symptoms may include monoparesis (paralysis of a single limb) or hemiplegia (paralysis on one side of the body).

104.    ADEM is one of a number of neuroimmunologic disorders of the central nervous system "CNS" (brain, spinal cord and optic nerves)4.  Each of these disorders occurs when a person experiences an inflammatory attack at some location in their central nervous system. In patients with these disorders, the immune system, which is supposed to keep a person free of infections, attacks parts of the nervous system by mistake. The inflammatory attacks are also referred to as demyelinating attacks because the immune system attacks and destroys myelin, the insulating material that surrounds nerves.  While an ADEM diagnosis is rare, Central Nervous System Disorders such as Multiple Sclerosis are not.  All Central Nervous System Disorders of this type present in substantially the same way, the systematic shut down of the Central Nervous System (CNS).  Diagnosis and treatment for all of these disorders is the same and cannot be done at the Jail where there simply are not the facilities.

105.    On March 02, 2010, TANDEL was seen at Stanford University Medical Center. Upon further testing and the additional data of his condition over the ensuing three years, TANDEL's diagnosis was ultimately adjusted to include the related neuroimmunologic disorder of the central nervous system known as, Neuromyelitis Optica ("NMO").

106.    Neuromyelitis Optica "NMO" also known as Devic's disease is similar to ADEM, requiring the same treatment protocols for CNS attacks as it also involves inflammatory attacks in the spinal cord.  However, unlike ADEM, NMO and also attacks the optic nerve and unlike ADEM, a person with NMO is at risk for multiple attacks.

107.    Magnetic Resonance Imaging (MRI) and Spinal Fluid testing are used to diagnose these disorders.

---

[4] These neuroimmunologic disorders of the central nervous system include Transverse Myelitis, Recurrent Transverse Myelitis, Neuromyelitis Optica (NMO or Devic's Disease); Acute Disseminated Encephalomyelitis (ADEM) and Optic Neuritis

Law Offices of
Geri Lynn Green LC

108.    Auto-immune disorders such as ADEM, MS, and NMO are characterized by profound episodes, or attacks, manifesting as a detectable lesion(s) on the spine or brain, and must be treated aggressively with a combination of corticosteriods, plasmaphoresis and anti-inflammatory medications in order to stop the progression of the attack and prevent permanent damage to the nerves and spinal cord.  NMO is an inflammatory disease, therefore treatment with anti-inflammatory medications has the direct tendency to reduce inflammation of the spinal cord.

109.    If an attack is allowed to go untreated, or if treatment is delayed, permanent paralysis can result, and severe damage to the upper spinal cord can lead to an inability to breathe with loss of heart function.

110.    For people who have had a demyelinating attack in their spinal cord symptoms may include, muscle weakness to paralysis, inability to breathe (due to diaphragm muscle weakness), spasticity (tightness), parasthesias (tingling), nerve pain, bowel, bladder and sexual dysfunction, fatigue, or depression. The specific nature of symptoms depends on the level of inflammatory attack in the spinal cord and the severity of the attack.   The treatments, regardless of the condition, are the same.

111.    TANDEL's ongoing care included Neurontin for pain with vicodin, to continue B12 supplements and physical therapy.

112.    As a permanent result of the failure to provide timely treatment during the attack, TANDEL suffered permanent and complete T6 paraplegia with bilateral, severe neuropathic pain, and neurogenic bladder and bowels.  He is reliant on a wheelchair, catheters and suppositories.

113.    A neurogenic bladder describes a lack of bladder control due to a brain or nerve condition, and neurogenic bowels describes a lack of bowel control due to a brain or nerve condition.

114.    Complications associated with neurogenic bladders include chronic urine leakage which can cause skin breakdown and pressure sores, kidney damage if the bladder becomes too full, causing pressure to build up in the tubes leading to the kidneys and in the kidneys themselves, and urinary tract infections.

115.    To address the serious medical condition of his neurogenic bladder, TANDEL'S care includes sterile catheters approximately 8 times per day, to safely relieve his bladder, and the

Law Offices of
Geri  Lynn Green LC

SECOND *AMENDED* COMPLAINT FOR VIOLATION OF CIVIL RIGHTS, AMERICANS WITH DISABILITY ACT, AND COMMON LAW
CLAIMS [42 U.S.C. § 1983] DEMAND FOR JURY TRIAL
23

utilization of suppositories and manipulation of his bowels to remove feces.  Ultrasound testing is used to ensure water is not retained in the kidneys.  This care was necessary per doctor orders, in order to prevent intestinal infection and kidney damage or worse.

116.   He was ordered to only use clean catheters because of the substantial risk of infection posed in the context of an auto-immune disorder.

117.   As a result, ongoing medical attention involves the prevention of future attacks, such as a combination of steroids taken by mouth and another medication taken by mouth or intravenously that suppresses the immune system in order to prevent future NMO attacks.

118.   The goals of treatment are to: Reduce symptoms; Control the autoimmune process; Maintain the body's ability to fight disease; Patients require supplements to replace a hormone or vitamin that the body is lacking. Examples include thyroid supplements, vitamins such as B12, or insulin injections.

119.   On information and belief, TANDEL used multivitamin and B12 supplements regularly prior to his 2010 incarceration – a common means used to ward off subsequent attacks.

120.   Antibiotic therapies directly reduce the immune system function thereby working to prevent an attack, and the use of B12, multivitamins and enzymes are effective at maintaining the body's overall health and ability to fight infection (without immune-response).

121.   Finally, through treatment physical therapy at UCD, TANDEL achieved strength and independence through upper body strength, allowing him to be in a manual wheelchair and transfer on his own.

122.   TANDEL's disease responded favorably to the above described medical treatment following his release from the Main Jail in 2007.  He gained back some upper body strength and did not suffer a subsequent attack.

123.   On March 26, 2009, Plaintiff filed *Tandel vs. County of Sacramento* et. al., Case No. 2:09-CV-00842-MCE-GGH ("Tandel I") alleging that the Jail had failed to provide him medical care in 2007 as set forth above. That complaint, filed against the COUNTY,

Law Offices of
Geri  Lynn Green LC

SECOND *AMENDED* COMPLAINT FOR VIOLATION OF CIVIL RIGHTS, AMERICANS WITH DISABILITY ACT, AND COMMON LAW
CLAIMS [42 U.S.C. § 1983] DEMAND FOR JURY TRIAL
24

MCGINNESS, BOYLAN, and Interim Medical Director Dr. Hambly M.D., and others[5], put the COUNTY and these individual Defendants personally on notice of TANDEL's diagnosis of ADEM, his parapheligia and bladder and bowel conditions and needs and that the JAIL was ill equipped to provide him necessary medical care and treatment.

124.    Discovery commenced and the *Tandel* I Defendants were provided TANDEL's medical records from UC Davis and Sacramento Family Medical Clinic, West Sacramento, on October 15, 2009. Those records put the *Tandel* I defendants on notice of TANDEL's medical condition - and what his medical needs were.

125.    Specifically, those records showed that TANDEL suffered from Infectious ADEM and depression, with chronic neuropathic pain.  On June 16, 2009, primary care physician Cesar Banda M.D. documented that TANDEL's chronic pain reached a 10/10 on the pain scale, and decreased to 5-6/10 with the use of Norco 10/325.

126.    On information and belief, TANDEL was able to control his pain with self-administered Norco and Ibuprofin, and would take Norco as needed - when he felt the pain coming on, or when he felt the medication wearing off.  Accordingly, was able to time his doses. He utilized massage and chiropractic care to assist with managing his pain but the timing of his pain medication was critical in reducing the pain from 10/10 to 5-6/10.

127.    The medical records also confirm he continued to be reliant on suppositories and catheters.

128.    Throughout the ensuing year, discovery continued and Plaintiff provided significant discovery to the *Tandel* I Defendants concerning TANDEL's medical condition.

---

[5] The COUNTY, Sheriff MCGINNESS, and Chief BOYLAN were served through the Sacramento Board of Supervisors Office on May 27, 2009.  Dr. Hambly was personally served on June 18, 2009.  On September 10, 2009, the COUNTY, McGINNESS and BOYLAN, as well as defendants Smith, Carl, and Hambly, answered the complaint.

SECOND *AMENDED* COMPLAINT FOR VIOLATION OF CIVIL RIGHTS, AMERICANS WITH DISABILITY ACT, AND COMMON LAW CLAIMS [42 U.S.C. § 1983] DEMAND FOR JURY TRIAL

**The 2010 Incident**

129.   Tandel I defendants noticed TANDEL's deposition for March 23, 2010. That morning, TANDEL was arrested and booked into the Sacramento Main Jail.

130.   As a result, TANDEL's attorney, Geri Lynn Green, called Defense Counsel[6] Van Longyear and Norm Prior, to report the turn of events.  Ms. Green informed Defense Counsel that TANDEL had been arrested and taken to the Sacramento County Jail. She informed them that she believed he had recently received news from his medical providers indicating that his condition had worsened, but that the records were not available yet.  She cautioned them of TANDEL's precarious medical condition and vulnerability to retaliation by jail staff aware of the lawsuit. Concerned over the effects of incarceration at the JAIL, she requested that TANDEL be held in an appropriate medical facility as he was not fit for incarceration due to his acute medical condition and needs for chronic care and treatment as well as his profound risk of relapse and/or deterioration.

131.   Prior to his 2010 detention, TANDEL's disease had been controlled with medical treatment.  Indeed, while he remained paralyzed from the nipples down, he had made significant improvement and was able to control many of the symptoms – and most importantly had *not had a subsequent attack*.

132.   TANDEL regularly suffered with chronic and extreme nerve pain as a result of the spinal cord damage he sustained during the 2007 attack.  It was somewhat controllable with appropriate medications in combination with physical therapy and massage.

133.   TANDEL suffered from osteoporosis as a result of the spinal cord damage he sustained during the 2007 attack.  He required the use of soft and supportive surfaces.

134.   Because of his neurogenic bladder and bowels he suffered as a result of the spinal cord damage he sustained during the 2007 attack, TANDEL was ordered to drink a lot of fluids and to use sterile catheters every few hours to prevent urinary tract infections (UTI) and kidney infection and damage.  As his doctors at UC DAVIS noted in documents produced to the Tandel I

---

[6] Van Longyear, of Longyear, O'Dea & Lavra, LLP, represents Defendants COUNTY, McGINNESS, BOYLAN, Carl and Hambly MD, and Norm Prior of Porter Scott, represent Defendant Chris Smith MD.

SECOND *AMENDED* COMPLAINT FOR VIOLATION OF CIVIL RIGHTS, AMERICANS WITH DISABILITY ACT, AND COMMON LAW CLAIMS [42 U.S.C. § 1983] DEMAND FOR JURY TRIAL

26

defendants, "NMO and neurogenic bladders certainly predisposed him to UTI. . . . He was instructed to drink plenty of water to flush his system and to self cath regularly to prevent urinary stasis and nidus for infection. He was instructed to use clean catheters every time."

135.    Normally, the immune system's white blood cells protect the body by attacking antigens. Auto-immune disorders are characterized by an immune system that mistakenly attacks healthy tissue, causing damage to the nerve cells.  It is therefore critical to control the immune system of a person with auto-immune disorder, as infection can spark immune function, which in turn, triggers an exacerbation of the disease.   Accordingly, he was told by his medical providers to take all steps to avoid infection.

136.    For a patient with a known neurologic condition involving CNS and auto-immune dysfunction, and neurogenic bladder and bowels, preventing urinary tract infections and kidney infections is paramount, as infection triggers the immune system response - a known trigger for disease recurrence.

137.    "Pressure sores" are areas of damaged skin caused by staying in one position for too long. Pressure on an area will begin to cut off the flow of blood to that area, blocking oxygen and vital nutrients from maintaining healthy tissue. When the tissue becomes starved for a period of time it begins to die and pressure sores form. These sores commonly form where bones are close to the skin, such as your ankles, back, elbows, heels and hips.  People are at risk when they are bedridden, use a wheelchair, or are unable to change position.

138.    Pressure sores also can lead to infection, surgery or even amputation, and in some cases the infection can reach the bones and joints, which is life-threatening[7].

139.    Moisture from bladder and bowel accidents can further weaken the skin and cause skin to break down more quickly, and lack of feeling in specific parts of the body can prevent sensing that the skin has been damaged.

---

[7] There are four stages of a pressure sore. Stage 1 - Damage is limited to the top two layers of skin, the epidermal and dermal layers. The skin is not broken and the redness does not turn white when touched. Stage 2 - Damage extends beyond the top two layers of the skin to the adipose tissue. The skin is slightly broken. The sore appears to be an abrasion, blister or small crater. Stage 3 - Damage extends through all the superficial layers of the skin, adipose tissue, down to and including the muscle. The ulcer appears as a deep crater and damage to adjacent tissue may be present. Stage 4 - Damage includes destruction of all soft tissue structures and involves bone or joint structures. Undermining of adjacent tissue and sinus tracts may be associated with these ulcers.

140.   Because of his paralysis, TANDEL required a wheelchair as was unable to move from the nipple line down.   And as with any spinal cord injury, appropriate medical care mandates that he be shifted and moved every few hours to prevent painful and dangerous pressure sores (and to reduce pain and stiffness).

141.   TANDEL needed a level of care beyond that which the Jail could provide upon his arrest in 2010.

142.   In August of 2008, the COUNTY's Hospital Care policy for the JAIL stated:  "The health care facilities at the Sacramento Main Jail and RCCC do not operate as hospitals and are not licensed for this level of care.  Arrangements through written agreements with outside health facilities licensed to provide general acute care hospital services are in place for in place for all inmates requiring such care."

143.   UC Davis was TANDEL's medical provider.   Pursuant to their contractual relationship, the JAIL had sent TANDEL to UC Davis for treatment in 2007 when he had his first attack.   TANDEL continued to receive treatment from UC Davis up until his arrest in May of 2010.

144.   In order to ascertain the current mode of treatment and maintain continuity of care, the COUNTY's "continuity of care" policy as of August, 2008, mandated that  "current modes of treatment for patients seen by outside providers, including UCD primary care center, San Joaquin General Hospital, private physicians, dentists or jail psychiatric services, will be reviewed by the Medical Director or their designee."

145.   Through TANDEL's previous incarceration during which time the COUNTY sent TANDEL to UC Davis for diagnosis and treatment, his medical chart and his own report, the medical defendants were on notice of TANDEL's neurological condition, auto-immune disorder, his medical needs and the standard of medical care he required to prevent a profound episode.

146.   UC Davis medical records were available, and under policy required to be reviewed by the JAIL medical staff responsible for providing his care.  There was no doubt that all medical providers were on notice that without this necessary care and treatment, he was at excessive risk of another an attack.

Law Offices of
Geri  Lynn Green LC

SECOND *AMENDED* COMPLAINT FOR VIOLATION OF CIVIL RIGHTS, AMERICANS WITH DISABILITY ACT, AND COMMON LAW CLAIMS [42 U.S.C. § 1983] DEMAND FOR JURY TRIAL
28

147.    Nonetheless, as demonstrated below, for the entirety of TANDEL's 2010 incarceration, TANDEL was denied access to necessary preventative medical care for such known risks as bed sores, UTI, and additional NMO attacks; treatment for his horrific chronic pain; and emergency medical care as his condition deteriorated - all in violation of his Eighth and Fourteenth Amendment rights to medical care.

148.    On information and belief, TANDEL presented at Jail Booking on March 23, 2010, at approximately 9:30 a.m., reporting that he suffered with NMO a "neurological disease".  He reported that he was in chronic pain and suffered with osteoporosis requiring the following pain management medication: Norco, Tramadol and Flosomax.  He was paralyzed from the chest down, and had a neurogenic bladder and neurogenic bowels requiring catheters and suppositories.

149.    On March 23, 2010, TANDEL was admitted to the MAIN JAIL.  The following day, CHS physician BAUER performed a medical intake documenting that TANDEL was a 23 year old male with neurologic disease, ADEM, affecting below the nipple line. He was unable to move his legs, with paraplegia secondary to his disease.  He required catheters which he self-administered, and used Tramadol[8] and Norco.[9]  Finally, he suffered osteoporosis, requiring weekly treatment with Fosamax.On May 21, 2007, a complete neurological examination was performed by John Olichney, M.D. who found TANDEL suffered papillary defect with no light perception in his right eye; severe parapareis of the lower extremities; and elevated white blood cell count.

150.    On March 23, 2010, Defendant Nurse Practitioner FELICANO ordered that TANDEL prescribed Tramadol for pain.  TANDEL was allowed only four catheters per day to self-administer, despite TANDEL's reported need for at least eight to effectively and safely relieve his bladder to prevent infection, kidney damage and bedsores.

---

[8] Tramadol is used to relieve moderate to moderately severe pain. Tramadol extended-release tablets are only used by people who are expected to need medication to relieve pain around-the-clock for a long time. Tramadol is in a class of medications called opiate agonists. It works by changing the way the body senses pain.

[9] Norco contains a combination of acetaminophen and hydrocodone.  Hydrocodone is in a group of drugs called narcotic pain relievers. Acetaminophen is a less potent pain reliever that increases the effects of hydrocodone. Acetaminophen is not an anti-inflammatory medication.  Norco is used to relieve moderate to severe pain.

Law Offices of
Geri  Lynn Green LC

151.    On information and belief, TANDEL reported that four catheters per day were grossly inadequate to safely timely relieve his bladder, he generally required eight per day. Nevertheless, TANDEL was routinely provided less than four catheters per day by his jailers.

152.    Without adequate medical supplies, TANDEL routinely urinated on himself and his clothes. The jail staff would not provide him with clean dry clothes or assist him to change his clothes leaving him to sit or lie in soiled clothes.

153.    FELICANO's and other jail staff's denial of adequate sterile catheters put TANDEL at risk of a urinary tract infection, kidney damage, bed sores and other maladies which can and did have profound effects on him.  Patients suffering with parepeligia, neurogenic or flaccid bladders are at heightened risk of infection due to the mechanics of inserting the catheter.  This risk is heightened for patients with auto-immune disorders such as ADEM, for whom infections can trigger the immune system, which in turn triggers an attack.

154.    The following day, CHS physician BAUER performed a medical intake documenting that TANDEL was a 23 year old male with neurologic disease, ADEM, affecting below the nipple line. He was unable to move his legs, with parapeligia secondary to his disease. He required catheters which he self-administered, used suppositories to control his neurogenic bowels and used Tramadol and Norco (for pain).  Finally, he suffered osteoporosis, requiring weekly treatment with Fosamax. He ordered TANDEL housed in 2M the Jail's medical unit.

155.    On information and belief when TANDEL complained to BAUER, MD about the lack of catheters, DR. BAUER advised TANDEL to reuse his catheters, similarly disregarding the excessive risks.

156.    Based on that examination, BAUER refused to order more catheters, or prescribe Norco for pain and prescribed only Milk of Magnesia - as a laxative.

157.    TANDEL was not provided Norco for pain until April 11, 2010.

158.    On March 25, 2010, TANDEL sent a kite saying "I hate being in this wheel chair. Help. Help. Help. Help. No help from medical.  I hate life."

159.    That same day, Mark Hopkins, LCSW, performed a psych assessment, wherein TANDEL informed Hopkins that: "he wanted to kill himself because 'I can't go to the bathroom. I piss on myself, shit on myself, I am tired of living like this.'  Individual has a plan on how to kill

Law Offices of
Geri  Lynn Green LC

SECOND *AMENDED* COMPLAINT FOR VIOLATION OF CIVIL RIGHTS, AMERICANS WITH DISABILITY ACT, AND COMMON LAW CLAIMS [42 U.S.C. § 1983] DEMAND FOR JURY TRIAL
30

himself that is not well developed - 'I'll slice my wrist. I'll shoot myself. And I'll bang my head.' Later in the interview he asked writer if writer could help him kill himself.  He reports a suicide attempt 2.5 years ago, and wanting to shoot himself a couple of months back, but had no access to a gun."

160.    Hopkins consulted with Drs. Roof and SOKOLOV who refused to admit TANDEL to the psyche unit due to his serious medical needs and instead, recommended that TANDEL be placed on 2M, the Jail Medical Unit, on suicide watch.

161.    Dr. SAHBA MD was the attending physician in 2M on March 25, 2010. SAHBA called Dr. SOKOLOV to inquire about placing TANDEL, a suicidal psyche patient in the medical unit.  SOKOLOV informed her that the psyche unit was not equipped to take TANDEL due to his medical condition - and need for catheters.  SOKOLOV reported to SAHBA that he had arranged this with Dr. SOTAK.

162.    SAHBA retained TANDEL on the medical unit and moved him into a different cell ordering that he be  placed on patient on mattress (no bed) secondary to suicidal until cleared."

163.    On information and belief, TANDEL was placed in a cell in the medical unit. During his stay in the cell he was nude on a mattress on the floor.

164.    It is on information and belief that he was provided suicide "blankets", which were not-flexible but flat and stiff.  As a result, he was extremely cold and unable to warm himself.

165.    TANDEL complained to SAHBA that it was difficult for him to move and that he could not reach the call button.

166.    Because of his osteoporosis, he experienced increased pain when left in one position for a period of time and when left on a hard surface.

167.    On March 26, 2010, JPS RN White, reported that TANDEL was "moving his arms up and back and twisting his body side to side fearing 'sores'.  CHS RN examined him and said there were some small reddened areas but movement was all he needed to do."

168.    On March 27, 2010 at 10:45 a.m., he was removed from suicide watch after a determination that he was no longer a danger to himself pursuant to orders by Dr. Catingub MD.

169.    At 3:05 p.m., Dr. BAUER orders TANDEL transferred from 2 Medical to 2 East when a bed comes available.

Law Offices of
Geri  Lynn Green LC

SECOND *AMENDED* COMPLAINT FOR VIOLATION OF CIVIL RIGHTS, AMERICANS WITH DISABILITY ACT, AND COMMON LAW CLAIMS [42 U.S.C. § 1983] DEMAND FOR JURY TRIAL
31

170.    On March 27, 2010, at 7:30 p.m., JPS RN White, met with TANDEL in 2M. TANDEL reported that he cannot control his bowels or bladder.  She noted: "That we discussed why he is not controlling his bowels and bladder in jail while he does at home.  He stated they don't give him a new catheter each time. L taught him about at home care for usual self-cathing people is four catheters per month. He was surprised and laughed at how he 'can and should take control of his bladder and bowel emptying here.  I encouraged him to increase upper body strength and prove he can care for himself…."

171.    SOKOLOV MD and SOTAK MD were made aware of SAHBA's decision to leave TANDEL naked on the floor of the medical unit, and did nothing to ensure TANDEL was provided adequate medical treatment.

172.    SOKOLOV, SAHBA, AND SOTAK knowingly left TANDEL to lay naked, on a mattress on the floor, unable to adequately move, unable to reach the call button, in severe pain, under-medicated, and without adequate supplies or treatment to urinate or defecate cleanly and regularly for a period of three days. This treatment was medically unacceptable under the circumstances, and in conscious disregard of the excessive risk to TANDEL's health and safety.

173.    On information and belief, due to TANDEL's inability to control his bladder and bowels, he urinated on himself numerous times requiring him to remain naked while on suicide watch.

174.    As a result of his inability to effectively move himself from side to side, TANDEL began to develop painful sores on his inner knees and buttocks. By March 26, pressure sores were noted in his medical record, but he was not provided any treatment and nursing staff did not routinely shift his body to prevent further damage or to allow the sores to heal.

175.    On April 3, 2010, TANDEL complained to a nurse (whose name is not known to Plaintiff at this time as the medical record is of such poor quality) that he has been constipated for four days.  He was advised that he was only allowed Milk of Magnesia or Dulcolax.  When TANDEL told the nurse that it didn't help before - the nurse put him on the MDCR list (sick call).

176.    On April 4, 2010, TANDEL was seen by Nurse Mencias.  There, he complained of not having a bowel movement for five days.

Law Offices of
Geri  Lynn Green LC

SECOND *AMENDED* COMPLAINT FOR VIOLATION OF CIVIL RIGHTS, AMERICANS WITH DISABILITY ACT, AND COMMON LAW
CLAIMS [42 U.S.C. § 1983] DEMAND FOR JURY TRIAL
32

177.    TANDEL required, but was denied adequate and timely suppositories and pads, and as a result would go days without having a bowel movement.

178.    On April 8, 2010, TANDEL was seen by JPS White LCSW who reported: "TANDEL had talked about how he developed bed sores since being here and does not think the nurses have been addressing it. Talked about a couple of options to deal with this.  Writer will talk with 2E nurses who may be new to him regarding the bed sores… .  still complains of chronic pain."

179.    On April 9, 2010, TANDEL complained to SAHBA of back pain, decreased urination and burning on the tip of his penis, and ongoing bedsores on his inner knees which were getting worse.  SAHBA examined the bed sores and provided a topical patch. Recognizing that the pain control was inadequate she ordered another prescription for Tramadol, a double mattress and a urine culture and a test for the sexually transmitted diseases Gonorrhea and Chlamydia.

180.    TANDEL was reliant on custody officers to alert medical personnel of his medical problems.

181.    On April 11, 2010, TANDEL was in extreme pain due in his urethra and screaming in agony.  Both TANDEL and a neighboring inmate pressed the "call button" for urgent medical care multiple times attempting to get TANDEL medical attention.  Notwithstanding his screams in agony, the only response received was from officers warning the inmates to "stop using the call button".

182.    On April 11, 2010, Deputy WILSON was the night shift floor officer on unit 2E, the JAIL Special Needs Unit designed for inmates with special medical needs.  His shift stared at 7:00 p.m. Upon commencing his shift, he was told by the day shift Deputies MEDEIROS and JACOBY that TANDEL was yelling and screaming and hitting his call button " constantly."

183.    TANDEL was not seen by any medical provided until on April 11, 2010 until 11:40 p.m.  At that time, TANDEL an unknown nurse reported that he was suffering from "severe urethral pain, patient states pain is worse than when seen by MD on 4/9." He was noted to be positive for facial grimace and guarding of his pelvic region.

184.    Dr. Ko, MD was contacted by the attending nurse and ordered one tab of Norco5 on an emergency basis and admitted TANDEL to 2M for MD evaluation the next morning.

Law Offices of
Geri  Lynn Green LC

185.    On April 12, 2010, TANDEL was not seen by a physician, or provided medication for his severe pain, or obvious medical need however Nurse Practitioner AUSTIN collected urine and ordered a urine dip.

186.    On April 13, 2010, Plaintiff provided Supplemental Disclosures to Defendants in the *Tandel* I litigation.   Contained therein were TANDEL's medical records with the NMO diagnosis and his history of treatment.

187.    On that date, Counsel for Plaintiff communicated via email to Defense Counsel that TANDEL's pain was not controlled by CHS, he was suffering from pressure sores and he was not receiving the medical treatment he required.

188.    On April 13, 2010, TANDEL was seen by BAUER M.D.

189.    During that examination, BAUER MD reported that testing confirmed a urinary tract infection (UTI) and found that TANDEL had a bed sore on his left leg. BAUER ordered Cipro, an antibiotic, for the UTI and Duoderm for his left leg until it is healed.

190.    BAUER MD also noted that TANDEL suffered "chronic pain not controlled on Tramadol. Neurontin doesn't work. Was taking Norco.  Will order."  He prescribed two tablets of Norco 5 to be taken three times a day for mylopathic pain - a pathology of the spinal cord.  For just two days beginning on April 13, and ending on 14th.

191.    TANDEL was deposed by Defense Counsel at the jail on April 14th.  During that deposition, notwithstanding the six tablets of Norco he had taken, both defense Counsel was made aware that TANDEL was in extreme pain that was not controlled by the medications being prescribed in the jail.  TANDEL was unable to participate in his deposition because of the severe, uncontrolled pain.

192.    On April 15, 2010, BAUER MD, inexplicably, reduced the Norco 5 prescription by half, from two tablets three times a day to one in the morning and two at night.

193.    Dr. BAUER was on notice that pain medication did not adequately control TANDEL's pain through his reports, his medical records and his treatment history, yet he failed to order necessary treatment, disregarding the excessive and uncontrolled pain throughout TANDEL's detention.

Law Offices of
Geri  Lynn Green LC

SECOND *AMENDED* COMPLAINT FOR VIOLATION OF CIVIL RIGHTS, AMERICANS WITH DISABILITY ACT, AND COMMON LAW
CLAIMS [42 U.S.C. § 1983] DEMAND FOR JURY TRIAL
34

194.    At 6:20 a.m., on April 22, 2010, TANDEL saw RN KRONER at Nursing Sick Call. KRONER noted that TANDEL suffered from unrelieved burning pain around his left knee, the area of his bed sore, that he described as a pain level of 9 out of 10.   He also stated that he had developed blurry vision in the left eye beginning within the last two weeks.   KRONER tested TANDEL's vision with the eye chart on the wall and noted that he was suffering from "decreased visual acuity, pain, history of ADEM." Instead of transporting TANDEL on an urgent basis to the hospital for immediate treatment for his profound CNS disorder, KRONER referred TANDEL to "MD sick call" to be seen by a doctor at some time in the future.

195.    When inflammation happens to a section of the optic nerve it is known as optic neuritis ON, causing visual disturbances.   ADEM patients suffering from optic neuritis are likely to be experiencing an NMO attack.   ON may be associated with eye pain on movement, blurred vision, double vision, problems seeing colors, visual field defects.   It causes visual loss, typically in one eye at a time, but can occasionally affect both eyes simultaneously.

196.    According to her own entries in his medical chart, KRONER was aware that TANDEL suffered from spinal cord damage associated with ADEM, a neurological disorder which attacks the spinal cord. Nonetheless, when he complained of vision loss – symptomology associated with his existing neurological condition - she failed to follow the Standardized Nursing Procedure for Neurological Conditions which states that with suspected neurological conditions "visual changes or problems is a indicator of an emergent problem (call 911)."  It further requires an assessment of the pupils for equality, roundness, reaction to light and congruent contraction. While she took his vital signs, she failed to conduct an examination of his pupils.    The SNP clearly states that blurred vision is an important indicator of an emergent neurological condition. KRONER was aware that TANDEL suffered with a Central Nervous System disorder "ADEM". She did not suspect he had a neurological condition, she knew it.   And she knew that any sign or symptom of progression of his disease was emergent.   The Standardized Nursing Procedure made clear that TANDEL, a patient known to have existing spinal cord and central nervous system damage, presented with visual changes "an indicator of an emergent problem" and it directed her to "call 911".   She failed to follow the Standardized Nursing Procedure, instead, she referred him to the Doctor Sick Call List on a Non-Urgent Basis.

Law Offices of
Geri  Lynn Green LC

SECOND *AMENDED* COMPLAINT FOR VIOLATION OF CIVIL RIGHTS, AMERICANS WITH DISABILITY ACT, AND COMMON LAW CLAIMS [42 U.S.C. § 1983] DEMAND FOR JURY TRIAL
35

197.    The medical records apparently had not been updated with the NMO diagnosis, however, the standard of care for a patient with ADEM suffering from a visual disturbance is immediate treatment to stop nerve damage.  Eye pain and/or vision disturbance with ADEM are known indicators of an emergent and extremely serious exacerbations of CNS disease, as optic nerve involvement is indicated.    Symptoms of vision disturbance indicate an excessive risk of disease recurrence, and require immediate and aggressive treatment with corticosteriods, plasmaphoresis, anti-inflammatory, as well as MRI testing to rule out or confirm the attack.

198.    Not only did the Defendants fail to update the medical records so that his providers would know of his NMO diagnosis, they took no steps to prevent a second attack.  NMO, unlike ADEM is recurrent.  Medication is necessary to prevent attacks.  Failure to update TANDEL's medical records with the NMO diagnosis denied him access to treatment to prevent a future attack.

199.    The Main Jail was not equipped or licensed to treat TANDEL's medical condition or to detect an exacerbation of the condition and they were unable to provide him with the necessary case on sight.

200.    At noon on April 23, 2010, TANDEL was seen by SAHBA who charted that TANDEL'S vision problems were worsening.  Her note reflects knowledge of the Stanford diagnosis of NMO.  She further noted that TANDEL reported sharp pain in his legs and all over his back. He also complained of penile pain. Instead of sending TANDEL to an appropriate facility for emergency diagnostics and treatment, SAHBA ordered an "in-house" neurological and ophthalmology examination - A procedure that she knew would likely take a month to be performed.  She did so notwithstanding her noted knowledge that TANDEL was suffering from "a history of ADEM".

201.    Instead of immediately transporting TANDEL whose neurological condition was obviously and quickly deteriorating to the hospital for diagnostic testing and treatment, SAHBA ordered as follows: "neuro consult - f/u (follow up) ADEM encephalomyelitis, opthalmology - in house - c/o left eye blurriness - history of ADEM."  She ordered treatment on a non-urgent basis, with the knowledge that it may take a month or longer. She also ordered another urinalysis to

Law Offices of
Geri  Lynn Green LC

SECOND *AMENDED* COMPLAINT FOR VIOLATION OF CIVIL RIGHTS, AMERICANS WITH DISABILITY ACT, AND COMMON LAW
CLAIMS [42 U.S.C. § 1983] DEMAND FOR JURY TRIAL
36

address the penile pain along with another Gonorrhea and Chlamydia test for sexually transmitted diseases, jail panel and MD sick call in two weeks.

202.    Similar to the case of William Sams, mid-June 2006, CHS Dr.  Robinson failed to send inmate Williams Sams out to an appropriate ER facility when he complained of severe abdominal pain, and instead referred him for a psyche consult.  Her failure to disprove that Sams severe abdominal pain was surgical when she could not ascertain a cause, fell, far below the community standard resulting in his death.  This is a pattern, all to similar to the instant case, where here the physician tested for sexually transmitted diseases in the face of an emergent neurological disorder.

203.    SAHBA testified that she would expect to have the in-house ophthalmology and neurological evaluation to be performed within a month's time.  Instead of transporting TANDEL to an appropriate facility for urgent treatment for his known CNS disorder which was progressing at a rapid pace SAHBA denied TANDEL access to very treatment that was necessary to halt and reverse the resulting permanent spinal cord damage.  Her decision to have him placed back in the jail without medical follow up for two weeks was deliberately indifferent to obvious serious medical need for immediate treatment.

204.    TANDEL was never provided the ophthalmology examination or seen by a neurologist while he was detained in the Main Jail.

205.    On April 27, 2010 BAUER MD saw TANDEL and determined that his pain was not controlled on Norco 5. He charted a significant rise in blood pressure but did not conduct any examination related to TANDEL's deteriorating neurological condition.  BAUER MD simply ordered a change in prescribed pain medication to morphine, 15 mg twice a day and increased his Norco 5 prescription to one tablet every four hours.

206.    On April 28, 2010, with the pain still uncontrolled, BAUER MD increased the prescription of morphine to 30 mgs twice a day. He did not take vital signs, or conduct any examination into TANDEL's deteriorating neurological condition.

207.    On April 29, 2010, TANDEL reported to BAUER MD that the pain was remained uncontrolled. He did not take vital signs, or conduct any examination into TANDEL's deteriorating neurological condition.

Law Offices of
Geri  Lynn Green LC

SECOND *AMENDED* COMPLAINT FOR VIOLATION OF CIVIL RIGHTS, AMERICANS WITH DISABILITY ACT, AND COMMON LAW CLAIMS [42 U.S.C. § 1983] DEMAND FOR JURY TRIAL
37

208.    On May 1, 2010, with the pain remaining uncontrolled, BAUER MD increased the morphine to 45 mgs twice a day. He did not take vital signs, or conduct any examination into TANDEL's deteriorating neurological condition.

209.    On May 3, 2010 Counsel for the Plaintiff, Geri Lynn Green, alerted Defense Counsel Van Longyear, that TANDEL was experiencing no relief from the horrific pain, was suffering muscle spasms, could not sleep, and was losing his vision. Plaintiff's counsel advised that according to TANDEL's treating doctor, physical therapy was required for joint pain; pain medication and muscle relaxants were required for pain and spasms; and if TANDEL suffered an attack in the jail that involved his upper spine, it was likely he would die without immediate action to assist his lung and heart function.  She explained that vision loss was an indicator of an attack of NMO and required immediate treatment to avoid permanent damage to the spinal cord.

210.    Ms. Green insisted TANDEL be placed in a hospital and to be attended to by a neurologist, as NMO was a rare and catastrophic disease that required expertise and significant care.  Counsel further informed the defendants that TANDEL's vision loss was consistent with Devic's Disease, or NMO, which attacks the eyes and spinal cord, and these symptoms should be a clear sign to all medical professionals involved in his care and treatment that TANDEL required a neurologist.

211.    Ms. Green informed Mr. Longyear that TANDEL was losing weight at a rapid pace, and the jail was not providing him sufficient urinary catheters, necessary to prevent a repeat of the urinary tract infections he had already suffered.

212.    At 11:33 a.m., on May 04, 2010, TANDEL was seen by SOTAK.  The medical records indicated TANDEL's updated diagnosis of NMO.  SOTAK reported that TANDEL suffered from continued pain, double vision and weight loss.  Notwithstanding the progressing vision impairments, and obvious indicator of an emergent NMO attack, SOTAK ordered nothing more than physical therapy.

213.    On May 05, 2010, Mr. TANDEL was deposed a second time by defense counsel in the matter of *Tandel vs. County of Sacramento* Case No. 2:09-CV-00842-MCE-GGH.   His deposition, again had to be cut short due to his suffering from horrific pain. And counsel, again,

Law Offices of
Geri Lynn Green LC

SECOND *AMENDED* COMPLAINT FOR VIOLATION OF CIVIL RIGHTS, AMERICANS WITH DISABILITY ACT, AND COMMON LAW
CLAIMS [42 U.S.C. § 1983] DEMAND FOR JURY TRIAL
38

pleaded with defense counsel to have his clients, the COUNTY, MCGINNIS and BOYLAN transport TANDEL to a hospital for proper diagnosis and treatment.

214.    The treating Medical Defendants, BAUER, SAHBA, AUSTIN and KRONER failed to refer TANDEL for physical therapy, to assist with pain management and to prevent muscle loss and weakness.  As a foreseeable result, on May 05, 2010, TANDEL reported to SOTAK that he believed that he had lost weight and muscle strength (and on this date was referred for physical therapy by SOTAK).

215.    On May 7, 2010, TANDEL saw KRONER and continued to complain of vision loss.  When he inquired to KRONER when his eye exam was scheduled, she failed to conduct an eye or neurological examination or provide any information to him.

216.    On May 9, 2010, TANDEL was seen by BAUER MD and reported that he had been suffering with headaches and pain for three days.  As a result, BAUER recommended the decrease of the Norco 5.  But failed to conduct a neurological examination or send him to an appropriate diagnostic facility.

217.    On May 10, 2010, SOTAK conducted a neurological examination and noted that TANDEL that he had been suffering with a headache for four days.  He went on to report that his "vision in right eye has been decreasing since then as well.  Can only see a blurred outline with right eye.  Can see fine with left eye. . . . does not remember original attack of NMO.  Does remember he had a headache with initial attack. . . . sitting in wheel chair holding towel over right eye. . . . pupillary defect …. Possible exacerbation or flare up of NMO.  Will send to UC Davis Medical Center emergency department."  He tested TANDEL's vision and found TANDEL had severe vision loss in his right eye scoring 20/800 right eye and his left eye at 20/50.

218.    TANDEL had his initial NMO attack at the JAIL in May 2007.  Those medical records show that he suffered severe and persistent headaches during the attack as well as vision loss.  However, SOTAK reports indicate that he did not review the medical chart from the 2007 attack while treating TANDEL.

219.    On May 10, 2010, SOTAK ordered TANDEL transferred to UC Davis.

Law Offices of
Geri  Lynn Green LC

SECOND *AMENDED* COMPLAINT FOR VIOLATION OF CIVIL RIGHTS, AMERICANS WITH DISABILITY ACT, AND COMMON LAW
CLAIMS [42 U.S.C. § 1983] DEMAND FOR JURY TRIAL
39

220.   On May 11, 2010, SOTAK noted that UC Davis reported acute right optic neuritis, the plan was still being worked on but it was anticipated that they would treat with either high dose steroids, plasmapherisis, or a combination of both.

221.   A result of the acts and omissions described herein, TANDEL suffered an excruciating attack of his disease that was left untreated and allowed to progress.

222.   UCD Medical Records describe TANDEL's history of demyelinating disease as of 7/28/2011 as follows: "demyelinating disease with symptoms that began in 2007, in which he started complaining of pain and leg weakness and gradually developed into paraplegia and confusion.   He was admitted to UCD for 2.5 months for altered mental status, paraplegia and autonomic dysfunction.   He has residual paraplegia, loss of leg sensation, generalized pain, neurogenic bladder.  His last MS exacerbation was in March of 2010 due to UTI."

223.   Medical records confirm that TANDEL has suffered only two exacerbations of his neurological disease throughout his lifetime, and both of these attacks were during detentions in the Main Jail.

224.   Due to the torturous denial of medical treatment, TANDEL suffered preventable, extreme pain and suffering for weeks.

225.   It is on information and belief that as a further result of the acts and omissions described herein, TANDEL suffered an excruciating attack of his disease that was left untreated and allowed to progress.

226.   It is alleged on information and belief that following his release from UCD in 2010, TANDEL has experienced ongoing migraine-like headaches behind his left eye approximately three to four times a week, which last 45 minutes to an hour.   The pain is extreme.

227.   TANDEL attempted to go back to school following this attack and reports difficulties concentrating and focusing at the level he achieved prior to his 2010 attack.   He alleges that the exacerbation of his disease had permanent effects on his thinking and concentration.

228.   TANDEL alleges that each of the Defendants' failed to appropriately, timely and adequately provide medical care required for his condition, and to respond when he presented with the above combination of symptoms and history of neurological immune disease, was

Law Offices of

Geri  Lynn Green LC

SECOND *AMENDED* COMPLAINT FOR VIOLATION OF CIVIL RIGHTS, AMERICANS WITH DISABILITY ACT, AND COMMON LAW CLAIMS [42 U.S.C. § 1983] DEMAND FOR JURY TRIAL

40

deliberately indifferent to his serious medical needs, in violation of the Fourteenth Amendments to the constitution, and as a result, TANDEL suffered severe and permanent injuries.

229.    The defendants' disregard of the substantial risk to TANDEL was deliberately indifferent and resulted in and/or increased the acuteness of his attacks and accelerated the recurrence of his disease, which resulted in irreversible damage to new areas of myelin, causing cumulative and permanent disfigurement and disability, and decreased TANDEL's future opportunity for rehabilitation and decreased his life expectancy.

230.    The medical unit at the Main Jail is an "ambulatory out-patient facility."   As such, the JAIL is equipped only to provide medications and close observation to inmates with stable, non-life threatening and non-debilitating conditions.  They are not equipped to handle emergent, serious or acute medical conditions. They are not equipped to handle conditions requiring diagnostic tools such as MRIs necessary to detect lesions on the spine as is necessary when detecting NMO or ADEM attacks.  They cannot provide intravenous medications.

231.    COUNTY policy requires that patients requiring health care beyond the resources available in the facility, or whose adaptation to the correctional environment is significantly impaired, should be transferred to a facility where such care is available.

232.    Because of the combination of TANDEL's impairments, paralysis, neurogenic bladder and bowels, and auto-immune disorder with high risk of recurrence, CHS staff and the Main Jail facility were not equipped to provide him adequate care, which includes diagnostic testing.

233.    Jail officials were made aware of TANDEL's medical diagnosis through the events of his previous incarceration, his lawsuit, and his presentation to the main jail.  CHS medical records indicate TANDEL's diagnosis of paraplegia due to ADEM, and reliance on self catheterization and a wheelchair.

234.    Because the Main Jail lacked the capability to conduct necessary diagnostic treatment, the failure of the defendants to order that TANDEL be sent out to a facility to detect if there were lesions on his spine and/or brain, consciously disregarded the excessive risk to his health and safety.

Law Offices of
Geri  Lynn Green LC

SECOND *AMENDED* COMPLAINT FOR VIOLATION OF CIVIL RIGHTS, AMERICANS WITH DISABILITY ACT, AND COMMON LAW CLAIMS [42 U.S.C. § 1983] DEMAND FOR JURY TRIAL
41

**MONELL AND SUPERVISORY DEFENDANTS**
**GENERAL ALLEGATIONS**

235.    The COUNTY is responsible for the actions or inactions of it's employees and/or agents with regard to the development and implementation of policies, procedures and customs.

236.    The COUNTY's Main Jail has a history, custom and practice of maintaining inadequate systems and procedures for the proper maintenance and use of inmate medical records. Medical charts are regularly not retrieved prior to medical evaluations and the COUNTY provides blank treatment sheets for the purpose of taking loose medical treatment notes, to be incorporated into the patient's medical chart.

237.    As a result, TANDEL was routinely evaluated without the presence of his chart, and his medical providers systematically failed to take into consideration the extent of his well-documented medical condition in their medical evaluations.  Jim AUSTIN evaluated TANDEL without reviewing his medical chart on May 14, 2007, and Dr. SMITH evaluated TANDEL on May 20, 2007 without reviewing his chart.

238.    When TANDEL was finally transferred to UCDMC on May 20, 2007, his medical history and chart did not accompany him, resulting in complications and delay in treatment.

239.    During TANDEL's 2010 incarceration, although he had received a revised diagnosis of NMO on March 2, 2010, his medical chart did not reflect this fact until May 4, 2010, despite the repeated submission of his medical records to defendants' counsel and despite TANDEL's own reports to the defendants.

240.    The COUNTY's Main Jail has a history of relying on Registered Nurses to perform medical evaluations beyond their licensure and without legally required Standardized Nursing Protocols. Diagnosis and evaluation of serious medical conditions such as neurological conditions is beyond a Registered Nurse's licensure.  In order to conduct such an evaluation, California law requires strict adherence to Standardized Nursing Procedures ("SNP") developed by the health facility at the direction of physicians and directors.  (See California Business and Professions Code Section 2725).   The COUNTY has a history of failing to adequately train and supervise nursing staff on the use of Standardized Nursing Procedures.

241.    In addition, the COUNTY's SNP for Neurological Conditions is constitutionally inadequate on its face as it prevents a patient with a serious Central Nervous System condition

Law Offices of
Geri Lynn Green LC

SECOND *AMENDED* COMPLAINT FOR VIOLATION OF CIVIL RIGHTS, AMERICANS WITH DISABILITY ACT, AND COMMON LAW CLAIMS [42 U.S.C. § 1983] DEMAND FOR JURY TRIAL
42

from receiving adequate medical care. The neurological SNP provides for no medical treatment for patients presenting with a neurological condition that is lesser or different than the enumerated emergent symptoms.

242.    As a result, if a Registered Nurse utilizes the procedures properly, a patient presenting with symptoms such as TANDEL's, persistent headache, loss of bladder and bowel control, vision loss and loss of lower extremity control, will receive no treatment according to the Protocol.  This is precisely what occurred in 2007, when TANDEL presented with a combination of neurological conditions, persistent headache, loss of bladder and bowel control, vision loss and loss of lower extremity control, which in combination indicate an emerging and serious neurological condition.  However, in line with the neurological SNP there was no treatment mandated and no treatment provided pursuant to the COUNTY policy.  (See Attached **Exhibit A**.)

243.    The neurological SNP similarly fails to set forth a procedure to evaluate a patient with a known Neurological Condition who is suffering from neurological symptoms.  Hence, reliance on the SNP to evaluate and diagnose TANDEL's progressing and deteriorating condition in 2010, was in violation of California law and a denial of access to qualified medical personnel.  For instance, KRONER's chart notes on April 22, 2010 reflect the failure of the SNP itself to address a known neurological condition – it merely sets forth a procedure for an unknown neurological condition.

244.    However, the neurological SNP makes clear that vision problems, with a suspected neurological condition, are emergent and require transport to an emergency room.  On April 22, 2010, KRONER RN disregarded this directive notwithstanding her awareness that TANDEL had developed blurry vision in the left eye for a period of two weeks, with documented "decreased visual acuity, pain," and "history of ADEM." Instead of transporting TANDEL on an urgent basis to the hospital for immediate treatment for his profound CNS disorder,  KRONER referred TANDEL to "MD sick call" to be seen by a doctor at some time in the future - in violation of the SNP and acceptable medical treatment standards.

245.    Accordingly, CHS, JORDAN, BOYLAN, SOTOK and HAMBLY failed to ensure that the Main Jail SNP adhered to the proper standards of care, and failed to ensure that all nurses

Law Offices of
Geri  Lynn Green LC

SECOND *AMENDED* COMPLAINT FOR VIOLATION OF CIVIL RIGHTS, AMERICANS WITH DISABILITY ACT, AND COMMON LAW CLAIMS [42 U.S.C. § 1983] DEMAND FOR JURY TRIAL
43

were properly trained and supervised on the use of SNPs – the failure to do so resulted in TANDEL's permanent injury.

246.    The COUNTY's Main Jail has a history, custom and practice of failing to transport known, acutely ill detainees in need of emergent care to appropriate facilities for diagnostic evaluations.  Similar to the case of William Sams, described below, just a year prior to the 2007 incarceration of TANDEL, where the treating physician failed to send Sams to the ER when faced with extreme and undiagnosed abdominal pain, resulting in death due to perforated duodenum, TANDEL's treating provider CARL, opted in 2007 to send him back to his cell for three days following his collapse in the shower, then SMITH on May 20, 2007 opted again to send him back to his cell despite obvious serious symptomology, resulting in a deterioration of his condition and lesions developing on his spine.

247.    In 2010, when faced with acute emergent symptoms such as progressing vision loss in the context of a known and serious neurological condition, his physician, SAHBA, ordered diagnostic testing on an non-urgent basis, again leaving him in the Main Jail without adequate medical care.

248.    The COUNTY maintains a written policy that it is the responsibility of a physician to determine whether a patient's condition is emergency or non-emergency.   However, the COUNTY relies on registered nurses to provide medical care.  As detailed below, the inmate death in Sams illustrates the substantial risk of harm created by the interplay of these policies. When inmates have acute illnesses, as did TANDEL and Sams, that a registered nurse is unable to diagnose, the nurse is not authorized to send the inmate to the hospital without physician authorization, and in essence, can either send that inmate back to their cell as occurred with TANDEL, or watch the inmate die a slow death, as with Sams.

249.    The COUNTY has a custom and practice of refusing to provide proper medication for the treatment of chronic pain.  Notwithstanding the orders of its treatment providers at UC Davis, Jail Medical personnel in 2010 refused to adequately treat TANDEL's known and extreme pain with proper pain medication, causing him torturous pain for weeks – despite his pain being manageable with acceptable medical treatment.

Law Offices of
Geri  Lynn Green LC

SECOND *AMENDED* COMPLAINT FOR VIOLATION OF CIVIL RIGHTS, AMERICANS WITH DISABILITY ACT, AND COMMON LAW CLAIMS [42 U.S.C. § 1983] DEMAND FOR JURY TRIAL
44

250.    The COUNTY has a history, policy, custom and practice of failing and refusing to provide sufficient medical supplies such as catheters and suppositories for the removal of urine and fecal matter, as required by TANDEL's condition in 2010, in order to prevent infection, kidney damage, pressure sores and disease.  This practice resulted in TANDEL developing a preventable urinary tract infection, a known and serious risk for patients with spinal cord injuries, and a known and serious indicator of disease recurrence with all demyelinating disorders.

251.    The COUNTY had a policy, custom and practice rising to the level of a de facto policy at all times during TANDEL's 2010 incarceration of refusing to provide sufficient preventative care for patients with spinal cord injuries, including routinely adjusting patients so as to avoid pressure sores and infection.    This policy resulted in TANDEL developing pressure sores during his 2010 incarceration.

252.    The COUNTY maintains no facility to treat JAIL inmates with both serious medical conditions, such as TANDEL's, and acute psychiatric conditions requiring hospitalization, such as suicidiality.  This de facto policy of failing to provide proper psychiatric care to medically ill and disabled inmates resulted in TANDEL being housed on the floor of a medical unit cell in an unsanitary and inhumane manner for three days in 2010.    This treatment escalated his deterioration.  Lying on the floor unable to move his legs or care for himself resulted in a urinary tract infection which ultimately caused a second NMO attack, extreme chronic pain and pressure sores.

253.    The COUNTY failed to ensure compliance with the requirements for the protection of the disabled by engaging in practices which prevent disabled inmates from appropriate accommodation for their disability, such as adequate access to wheelchairs, and denial of access to the psychiatric unit based on physical disability.

254.    The COUNTY's Main Jail staff has a history of failing to respond to the urgent medical needs of its' inmates, whether conveyed directly or through the intercom system.  The COUNTY's Main Jail custody staff has a history of failing to adequately monitor inmates and alert medical personnel of the serious medical needs of inmates.

Law Offices of
Geri  Lynn Green LC

SECOND *AMENDED* COMPLAINT FOR VIOLATION OF CIVIL RIGHTS, AMERICANS WITH DISABILITY ACT, AND COMMON LAW
CLAIMS [42 U.S.C. § 1983] DEMAND FOR JURY TRIAL
45

255.    TANDEL requested medical care in 2007 and was ignored, and similarly, in 2010 WILSON, JACOBY, and MEDEIROS left TANDEL screaming in agony for hours before responding to his calls for help.

256.    The COUNTY has a custom and practice rising to the level of a de facto policy of allowing custody personnel to make initial medical determinations resulting in the denial and the delay of medical treatment.  Deputy WILSON testified that he, as a floor officer in the non-medical housing pod, routinely made independent determinations as to whether an inmate's request for medical care through the emergency intercom was a valid request prior to notifying medical staff of the inmate's request.

257.    The Main Jail custody staff has a practice of intimidating inmates for complaining of conditions of confinement or requesting medical attention.  TANDEL was repeatedly ignored and told to stop using his call button by unknown officers during his 2007 and 2010 detentions. This is evidenced by the events of April 11, 2010, when TANDEL was experiencing a medical emergency, and officers ignored his use of the call button and considered him to be a behavioral issue.

258.    The COUNTY is responsible for maintaining appropriate staffing levels to ensure the safety of their inmates.

259.    The COUNTY is also responsible for maintaining appropriate levels of physician, nursing, pharmacy and mental health staff to ensure that safe and effective levels of health services are rendered.

260.    As shown below, the Main Jail has operated for a number of years without sufficient staffing of properly trained and supervised custody and medical personnel.  As a result, inmates suffer severe medical neglect, causing permanent injury to inmates, including TANDEL, and at times causing death (See the case of William Sams detailed below.)

261.    In 2007, the COUNTY's failure to adequately staff the main jail resulted in permanent and severe injuries and paralysis to TANDEL.  In 2010, this failure denied him access to appropriate preventative medical care, resulted in increased suicidiality, dangerous and painful pressure sores, a urinary tract infection, and triggered a recurrence of NMO, resulting in further nerve damage and  extreme, torturous pain.

Law Offices of
Geri  Lynn Green LC

262.    The COUNTY has a policy of failing to properly train its custody personnel, including but not limited to a failure to train on monitoring inmates, detecting the need for medical care, and appropriately responding to requests for medical care.  These failures are evidenced by custody staff making independent determinations as to the validity of inmate medical requests prior to alerting medical personnel, and custody staff ignoring inmate medical requests and warning inmates to stop using the call button.

263.    The COUNTY has a policy of failing to properly train medical personnel, including but not limited to:  The failure to order the transport of acute inmates to appropriate medical facilities without delay; the failure to follow Standardized Nursing Procedures; the failure to secure clinician assistance; the failure to secure and maintaining constitutional adequate medical charts and histories; the failure to provide adequate and necessary medical supplies; the failure to provide basic nursing care to inmates with spinal cord injuries; and the failure to provide necessary medical care to inmates with serious medical needs.

264.    **The California Medical Association Institute for Medical Quality** reviewed the correctional health care at the Main Jail in February of 2003 (which was lost in 2001).  The resulting report was provided to the County in an effort to obtain accreditation. That report recounts various serious deficiencies.  For instance, training of the nursing staff on critical clinical skills was lacking as was training on responding to emergencies such as "man down" calls. Nurses were providing care without documenting or following the proper SNPs.  When inmates were transferred to other facilities, the medical records often did not accompany the inmate due to the fact that they were difficult to locate, providing problems for the receiving facility.

265.    The reliance on SNPs was questioned as the medical system was not prepared to provide training and verification of physical assessment skills to the degree necessary for compliance with this standard.  There was also a lack of an organized system to provide ongoing monitoring of the nurses' clinical competence.  Based on the medical records reviewed by the IMQ evaluator, the clinical skills of the nursing staff varied widely.  The auditor recommended that the authorization to use such procedures be limited to those few qualified nurses.

266.    That audit report found the coordination of services and designation of responsibilities within the medical division of the jail facility "problematic."

Law Offices of
Geri  Lynn Green LC

SECOND *AMENDED* COMPLAINT FOR VIOLATION OF CIVIL RIGHTS, AMERICANS WITH DISABILITY ACT, AND COMMON LAW
CLAIMS [42 U.S.C. § 1983] DEMAND FOR JURY TRIAL
47

267.     The report documented that inmates requested medical care through posted 'sick-call' sheets in the housing pods, which were supposed to be collected on each shift and taken to medical unit.  The reviewers found that these sick-call sheets were not always collected, and were not retained to ensure if inmates received the care they requested and needed.  As a result there was no oversight into the effectiveness of the inmate's access to medical care through this method and care was delayed.

268.     The reviewer found that the health records documented sporadic care rather than a system of care, and continuity of care was sorely lacking. Medical records were difficult to locate, with loose progress notes were not incorporated into the patient's file.  Ultimately, the overall clinical picture presented was "confusing" and incomplete, as the records lacked adequate documentation by both custody and medical staff.

269.     **On December 5, 2003,  the California Corrections Standards Authority (CSA) conducted its statutorily mandated Local Detention Facility Health Inspection Report** conducted pursuant to California Health and Safety Code Section 101045, and reported that the COUNTY's Main Jail low staffing levels limited access to medical care.

270.     **On December 14, 2005, the CSA reported** a problem at the Main Jail with accessing medical records for inmates with chronic or complex medical illness, as well as insufficient quantity of custody and medical staff to provide adequate medical care.

271.     The Sacramento Bee has reported on the Main Jail's deficiencies in providing medical care.  On December 18, 2005, prior to the death of inmate Sams, Christina Jewett and Dorothy Korber published an article entitled "Questions Persist Over Jail Health Care; Amid Inmate Complaints And Mixed Official Reports, Sheriff Cites Improvement."  This article details the Main Jail's chronic problems with patients' access to care, record keeping, drug management, staff accountability had been laid out repeatedly in inspections and reports since the jail lost its medical accreditation in 2001.

272.     The article cites to an inmate named Anthony Gonzalez, who was arrested with a splinter in his finger, and despite signing up for sick call in the Main Jail he was not seen by a doctor and eventually had his finger amputated due to pervasive infection.

Law Offices of
Geri Lynn Green LC

SECOND *AMENDED* COMPLAINT FOR VIOLATION OF CIVIL RIGHTS, AMERICANS WITH DISABILITY ACT, AND COMMON LAW
CLAIMS [42 U.S.C. § 1983] DEMAND FOR JURY TRIAL
48

273.    The authors describe another incident involving Hernandez Palomino, an immigration detainee, was forcibly removed from his wheelchair on Sept. 18, 2004, after he argued with guards about his need for the device. The article refers to a jail's pre-accreditation review that notes that denying a disabled patient a wheelchair "could conflict with federal law."

274.    According to Dr. Neil Flynn, a physician at the UC Davis medical school who treats HIV/AIDS patients transferred from the jail, inmate Jackie Zachary died Sept. 9, 2003, after spending two weeks in the jail infirmary with fever, difficulty breathing, weakness and weight loss.  Flynn is quoted saying that Zachary should have been transferred to the hospital sooner, and "it is quite possible that medical care in the jail did not meet minimum standards of care and contributed greatly to his death."

275.    **The Sacramento County Grand Jury report of 2005-2006** investigated the Main Jail in response to complaints it received regarding health care delivery.  The Grand Jury conducted an investigation and reported pervasive understaffing of medical and custody staff in the Main Jail resulted in a denial of access to medical care.

276.    The Grand Jury reported a staggering 30% nurse vacancy rate, resulting in delays for inmate access to medical care.  It was reported that chronic understaffing of nurses led to an inability to consistently conduct nurse sick call, raising the likelihood that inmates who signed up for sick call could wait up to four days to be seen based on the inadequate staffing.  "Since nurse sick call is the primary way for an inmate to be seen by a jail physician, this means that inmates who need to be seen by a physician have their care delayed, possibly leading to serious harm to the inmate."

277.    The Grand Jury also found that custodial staffing was insufficient to adequately staff all sick calls.

278.    **According to a subsequent Sacramento Bee article, dated July 01, 2006**, also by Christina Jewett and Dorothy Korber, entitled "Jury Assails Jail's Health Care", Sheriff McGINNESS commented on the Grand Jury's report contained "no surprises."

279.    The COUNTY responded to the 2005-2006 Grand Jury report concurring in the findings that the chronic understaffing of nurses and custody had resulted in delayed medical treatment.

Law Offices of
Geri  Lynn Green LC

**280.   The COUNTY, in response to concerns of the Sacramento Board of Supervisors about jail operations and allegations of prisoner mistreatment, ordered an audit by Joseph A. Brann and Associates Report ("Brann Report".)**

281.    The report reveals widespread deficiencies in the Jail operations, and the 38 recommendations were presented to the COUNTY and Sheriff's Department in July of 2006. These included, in part, the following:

a)   The Main Jail medical and psychiatric facilities had not expanded to meet the increase in inmate population;

b) The Main Jail had insufficient physician and nursing staff and coverage;

c)   Compensation levels, benefit plans, and hiring and retention strategies could not support retention of effective, trained staff;

d) CHS is lacking a comprehensive continuing education and training program for nursing personnel.

e)   The jail was not equipped to perform diagnostic testing and required updated capabilities;

f)   The Jail did not have the required appropriate staffing levels for the transportation of inmates for medical runs;

g)   The Main Jail had an unusually high percentage of grievances regarding medical care;

h)   CHS lacked a necessary system to ensure all inmate medical complaints are routinely reviewed by medical staff as well as jail management staff;

i)   There was a lack of necessary, independent oversight of the jail;

j)   Custody staff training was inadequate and required expansion.

282.    The Sheriff's Department issued a responsive press release on September 24, 2006, and established an online forum through the Department's own website to allow the public to comment on McGINNESS' proposed responses to the Brann Report.  On October 02, 2006, the Sacramento Sheriff McGINNESS personally presented a draft of the Department's responses to the Brann report at a community meeting at the Sacramento Board of Supervisors' chambers.

283.    On October 31, 2006, the Sheriff's Department presented the final responses to the Sacramento Board of Supervisors, which acknowledged the difficulty it had with hiring and

retaining sufficient staff.  The October 31, 2006 Board of Supervisors' agenda indicates that McGINNESS and IWASA worked with the Brann consultants to provide the information required to complete the audit.

284.    The Sacramento Sheriff's Department presented, through Sheriff MCGINNESS, a Staffing Analysis for Corrections which confirmed what the Brann auditors had reported - a shortage of staffing in both in line level and supervisory capacities in the Main Jail.  The analysis confirmed the inmate population had increased without an increase in staffing, and high vacancy levels left the main jail functioning at a bare minimum, with reliance on overtime, creating risks to inmate safety.

285.    **According to the 2006-2007 Sacramento Grand Jury Report**, following an August tour of the Main Jail, the Grand Jurors discovered that the Sacramento County Board of Supervisors had authorized the comprehensive audit of Sheriff's Jail Operations on January 31, 2006 by Joseph Brann and Associates, and in response,  Department management had agreed with each of the 38 of the audit recommendations and described how they would comply with each recommendation in a report to the Board of Supervisors dated October 31, 2006.

286.    **On or about June 13, 2006, a Sacramento Main Jail inmate ("Sams")** complained of and presented to CHS medical staff with severe abdominal pain which was not relieved with cursory treatments.  The following events occurred:

a)  CHS physician Tamara Robinson confirmed Sams suffered severe abdominal pain and was vomiting, sweating and hyperventilating, yet cleared him to return to his cell despite being unable to determine the nature of the symptoms.  Instead of transporting him to the emergency room, she sent him back to his cell and ordered a psychological evaluation;

b)  She thereafter left for the evening without providing a follow up plan to the medical unit or custody staff.  The only medical care available through the night was a registered nurse.  Both custody and medical staff were of the belief that since Robinson had cleared him to go back to his cell, his symptoms were not serious;

Law Offices of
Geri Lynn Green LC

SECOND *AMENDED* COMPLAINT FOR VIOLATION OF CIVIL RIGHTS, AMERICANS WITH DISABILITY ACT, AND COMMON LAW CLAIMS [42 U.S.C. § 1983] DEMAND FOR JURY TRIAL
51

    c)     Despite his progressive symptoms, including continued undiagnosed abdominal pain, shaking and seizures, vomiting blood, and multiple requests for medical attention, jail staff refused to send Sams to the hospital for diagnostic testing pursuant to Main Jail custom and practice;

    d)     CHS medical staff indicated that Sams was begging for medical attention, had cold skin, was perspiring, with high respiratory rate and low body temperature - known indicators of shock;

    e)     Custody staff eventually took Sams to the jail medical unit where he saw a nurse, but was provided no treatment.  He was put into a medical unit cell for observation through the night where he died a few hours later, on June 15, 2006, due to a duodenal ulcer - a treatable medical condition.

287.   Medical staff failed to send Sams to an appropriate facility for diagnostic testing and treatment despite their inability to rule out the need for surgery.  Pursuant to COUNTY policy, nursing staff was not authorized to send Sams to the hospital, so were left to observe him die.

288.   The failure to review the medical records pursuant to COUNTY policy, resulted in the failure to realize that Sams was experiencing shock.

289.   On August 24, 2006, Sacramento Sierra Medical Society Peer Review Committee, part of the COUNTY's quality assurance program reported that: the JAIL medical staff had failed to provide medical care commensurate with the community standard stating:

"Community standard for abdominal pain is to PROVE that it is not surgical. It is not generally community standard to rely on exam alone to do this (as a primary care provider) -especially in a patient in this much distress.. . . community standard would have been to consider an urgent imaging study (was he dissecting a AAA for example?) or at very least have a surgeon examine him before leaving him for the night- back in general population cell."
As a result, the reviewer Bonnie Gieschen, M.D. concluded:

290.   "My opinion is that treatment of this patient did not meet community standard and that this death was preventable, certainly when the first MD was evaluating him. It is also quite likely had his shock been recognized by nurse and MD 2 and urgent transfer made for aggressive treatment/surgery he would have survived."

Law Offices of
Geri  Lynn Green LC

SECOND *AMENDED* COMPLAINT FOR VIOLATION OF CIVIL RIGHTS, AMERICANS WITH DISABILITY ACT, AND COMMON LAW CLAIMS [42 U.S.C. § 1983] DEMAND FOR JURY TRIAL
52

291.    The COUNTY has failed to take steps to remedy these reported failures.

292.    On November 28, 2006, the COUNTY was put on notice of the events that led up to the preventable death of inmate Sams through a government tort claim filed by his mother, Ms. Marilee Ann Hewitt.

293.    Following the William Sams' death, the then Medical Director S. Hand, MD, encouraged CHS physicians to follow the more appropriate practice of "when in doubt, send them out".

294.    Despite this effort, the COUNTY continues to not send out inmates for necessary emergency procedures and testing, the moving force behind the substantial injury to Mr. TANDEL from his incarcerations in 2007 and 2010.

295.    On May 31, 2007, Hewett v. County of Sacramento, 2:07-CV-01037-GEB-DAD was filed alleging the facts detailed above related to the preventable death of inmate William Sams.  This lawsuit named the COUNTY and McGINNESS as well as the then Medical Director Sandra Hand, MD and various individual doctors as defendants.  That case involved significant discovery which put all parties on notice of the systemic failings rising to constitutional proportions – institutionalized in the JAIL's medical delivery system.  Indeed, that case involved the very same failed policies and practices that led to the injury here a year later in 2007 and again in 2010.  The Hewitt case settled - the COUNTY officials approved a settlement in the seven figures.

296.    **In 2008, the Sacramento Board of Supervisors requested that an audit** of the sheriff's jail system be performed by the Sacramento County Office of Inspector General.  The purpose of this audit was to independently evaluate core facets of jail operations, focusing on causal factors of remedial strategies linked to inmate overpopulation.  Published in September 2009, and directed to McGINNESS the auditors found, that some two years later, the Brann recommendations had not been implemented - line-level staffing was precipitously low and inmate overpopulation was acute.

297.    That situation has only worsened as reported in the June 22, 2010 Sacramento County Sheriff's Department Jail Staffing Study, by the Sacramento County Office of Inspector General.

Law Offices of
Geri Lynn Green LC

SECOND *AMENDED* COMPLAINT FOR VIOLATION OF CIVIL RIGHTS, AMERICANS WITH DISABILITY ACT, AND COMMON LAW CLAIMS [42 U.S.C. § 1983] DEMAND FOR JURY TRIAL
53

298.    Mr. TANDEL filed a second lawsuit on February 02, 2011, consolidated herein, outlining how the COUNTY's unconstitutional policies and denial of medical care caused an exacerbation of a neurological disorder to go undetected and untreated, and ultimately resulted in his permanent paralysis and loss of bodily functions.   COUNTY, McGINNESS and BOYLAN were named in and answered that lawsuit.

299.    The COUNTY was on notice of Mr. TANDEL's severe and obvious medical condition through the actions of his attorneys Geri Green, Dennise Henderson, and Robert Saria, who repeatedly contacted unknown jail personnel and/or their attorneys about TANDEL's deteriorating condition and his specific medical needs throughout his 2010 incarceration.

300.    During Mr. TANDEL's 2010 incarceration, his family members visited him in jail and spoke with jail officials repeatedly, informing them of TANDEL's medical needs, his medical decline, and the denial of medical care that was occurring in the main jail.

301.    It is alleged on information and belief, that on January 6, 2012, inmate Mark Scott died while in the custody of the Main Jail.   According to a letter and taped interview of the inmate in the neighboring cell, Scott's cellmate sought medical assistance for Scott by pushing the "call button" in his cell. These requests for medical attention were ignored, and the cellmate was told by floor officers to stop pushing the intercom button.   It is alleged on information and belief that it was a result of the COUNTY's longstanding and unconstitutional custom of ignoring inmate call button requests for medical care that Mr. Scott did not receive necessary medical care and suffered a preventable death.

**JOHN MCGINNESS**

302.    As Sacramento County Sheriff, Defendant MCGINNESS, by law, was in charge of the Main Jail facility's operations. McGINNESS was aware of the deficiencies in the jail through the findings of the 2005-2006 Sacramento Grand Jury investigation related to the overcrowding and understaffing of the jail and the overall deficiencies in the main jail medical care delivery system.   The COUNTY's response to each of the findings of the Grand Jury indicates it was copied to McGINNESS directly.

Law Offices of
Geri Lynn Green LC

SECOND *AMENDED* COMPLAINT FOR VIOLATION OF CIVIL RIGHTS, AMERICANS WITH DISABILITY ACT, AND COMMON LAW
CLAIMS [42 U.S.C. § 1983] DEMAND FOR JURY TRIAL
54

303.    Sheriff McGINNESS worked closely with the Brann auditors in response to the Grand Jury findings, and on October 02, 2006, responded directly to the resulting Brann Report recommendations - acknowledging the jail was understaffed and overcrowded.

304.    McGINNESS was personally named in the Tandel I and Hewett complaints detailed above, putting him on notice of the COUNTY policies and practices of denying and delaying medical care to inmates resulting in substantial risks to their health and safety.

305.    McGINNESS was informed through Counsel on March 23, 2010 that TANDEL was being booked into the Main Jail.  He was aware of the limitations of his facility to provide adequate care for this inmate with a known neurological condition requiring specialized medical care and treatment as detailed above.

306.    Accordingly, Sheriff McGINNESS was aware of the risk of harm to TANDEL and allowing him to be detained in the jail anyway - both in 2007 and again in 2010.

## MARK IWASA

307.    IWASA served as Undersheriff during Mr. TANDEL's 2010 incarceration, and Jail Captain during his 2007 incarceration.  He shared responsibility for the overall operation of the jail and the safety of the inmates with the Sheriff.   IWASA directly participated in the Brann auditor's investigation into the Main Jail as a result of the Grand Jury findings, prior to TANDEL's 2007 incarceration, and was therefore aware of the deficiencies in jail staffing levels, overcrowding, and the problems with the delivery of medical care. As such, he was aware of the risk of harm to TANDEL, yet failed to act to prevent that harm when he allowed him to be detained in the jail in 2007 and in 2010.

## MICHAEL SOTAK

308.    As Medical Director of Sacramento Main Jail in 2010, SOTAK was responsible for the delivery of medical care to main jail inmates during the period in 2010 that Mr. TANDEL was detained.

309.    According to COUNTY policy, medical and mental health services are discussed at least quarterly in documented meetings that include the Medical Director, who is charged with reviewing all inmate medical charts from outside providers in order to ensure the COUNTY's "Continuity of Care" policy.

310.    In addition to being medical director, SOTAK was a treating physician to TANDEL during his 2010 detention.  SOTAK was aware of the COUNTY's policy of denying patients with acute medical conditions equal access to the psychiatric facility based on their conditions. SOTAK was aware of and concurred in the inhumane decision to place TANDEL, a suicidal inmate who required catheters, naked on the floor of the medical unit for 3 days - denying him access to the psychiatric unit, denying him a wheelchair, and denying him the ability to relieve his bowels and bladder safely.    SOTAK personally participated in the constitutional deprivations alleged herein.

### ASA HAMBLY

311.    As Medical Director of Sacramento County Main Jail in 2007, HAMBLY was responsible for the delivery of medical care to main jail inmates.  HAMBLY, as medical director, was responsible for the medical care delivery system of the Main Jail.  According to COUNTY policy, medical and mental health services are discussed at least quarterly in documented meetings that include the Medical Director , and that discuss environmental factors which impact health, such as overcrowding. The Correctional Health Chief and Medical Director have overall responsibility and accountability for the quality of care and services provided.

312.    Despite the preventable death of inmate Sams in 2006, the peer review documenting the jail's deficiencies regarding that preventable death, and the 2003 IMQ report documenting the jail's overall deficiencies in medical care delivery, Dr. HAMBLY participated in the treatment of TANDEL's head injury on April 28, 2007, and allowed him to be placed into Administrative Segregation without designated medical follow-up.  As such, he failed to intervene in the ongoing deliberate indifference to TANDEL's serious medical needs despite his awareness that the jail was not a safe place for an inmate with a known head injury and headaches.

313.    HAMBLY was responsible for the supervision and training of the medical providers in the main jail in 2007, who systematically disregarded a substantial risk of harm to TANDEL, resulting in progression of his neurological condition and permanent injury.

### ANN MARIE BOYLAN

314.    BOYLAN assumed responsibility for managing the delivery of medical and mental health services to county jail inmates in January of 2007 - just months after the preventable death

of inmate Sams.   BOYLAN has publicly acknowledged "there were things that didn't happen" appropriately in the Sams case, evidencing her awareness of the events and the deficient treatment provided to Sams.

315.   Defendant BOYLAN, in her capacity as Chief of Correctional Health Services was personally named in the prior Tandel lawsuit filed in 2009, therefore was aware of the substantial risk of harm that re-incarceration in the Main Jail posed to this very inmate.

316.   BOYLAN was also informed through Counsel on March 23, 2010, that TANDEL was being booked into the Main Jail.

317.   Accordingly, BOYLAN was aware of the main jail deficiencies in providing medical care, including that the facility was not equipped to detect acute conditions such as abdominal bleeding and exacerbations of auto-immune disorders, and that medical staff routinely failed to send patients out for necessary diagnostic treatment despite being unable to determine the cause of known and dangerous symptoms.   Therefore, detention posed an excessive risk for this inmate, yet she allowed him to be housed there anyway, and the denial of medical treatment that directly led to the death of Sams in 2006 caused TANDEL severely injury during his detention in 2007, and again during his detention in 2010.

### SHELLY JORDAN

318.   Defendant Shelly JORDAN was at all relevant times herein employed by the COUNTY as Director of Nursing of CHS in the Sacramento County Jail.   JORDAN was the Director of Nursing during both of Mr. TANDEL's detentions, and held this position during 2006, when Mr. Sams suffered a preventable death in the Main Jail.

319.   JORDAN was responsible for maintaining the policies and procedures for orientation and training of nursing staff.   JORDAN was also responsible for adopting and implementing the Standardized Nursing Procedures, as well as ensuring nursing staff was properly trained and supervised with regard to utilizing these procedures.

320.   Accordingly, JORDAN was directly responsible for and failed to supervise and train CARL and KRONER on the Standardized Nursing Procedures for patients with suspected and known neurological conditions.

321.    JORDAN was aware of the deficient training from the events surrounding Sams' death in 2006, and the resulting Peer Review finding that death preventable.

### TRACIE KEILLOR

322.    Defendant TRACIE KEILLOR was a custody supervisor for floors 6, 7 and 8 of the JAIL from May 17, 2007 through May 19, 2007, and worked from 7:00 a.m. until 7:00 p.m. Her duties included monitoring the activities of the deputies under her supervision. That included walking around on the floors and interacting with the officers and inmates to oversee and ensure programs are being run, and that the inmates have access to the care and programs to which they are entitled.

323.    KEILLOR was not at her post when the May 17, 2007 incident occurred where TANDEL collapsed.  She did not become aware of the incident until she arrived on the floor and signed the log book at 1550 on May 17, 2007.  It was only then that she read the entry GADDIS had made in the housing logs reporting that TANDEL was in the shower when he became dizzy, and both of his knees gave out, immobilizing him.

324.    Concerned that she had not been notified about the event, she reported GADDIS for the failure to properly notify custody and medical.   KEILOR worked in the same capacity over the next three days, and notwithstanding her knowledge of TANDEL's dizziness and loss of function of his extremities on May 17th, 2007, she did not take action when the officers in her control failed to respond to TANDEL's urgent pleas for medical attention.

325.    On May 31, 2007, in response to the TANDEL incident and an incident a week later where GADDIS similarly failed to respond appropriately to a medical emergency of inmate Robert Smith, KEILLOR in disciplinary action provided GADDIS with MAIN JAIL training materials and advised GADDIS to familiarize himself with them- evidencing her failure to train him.

//
//
//
//
//

Law Offices of

Geri  Lynn Green LC

SECOND *AMENDED* COMPLAINT FOR VIOLATION OF CIVIL RIGHTS, AMERICANS WITH DISABILITY ACT, AND COMMON LAW CLAIMS [42 U.S.C. § 1983] DEMAND FOR JURY TRIAL

58

**First CLAIM FOR RELIEF**
**42 U.S.C. § 1983**
**Violation of the Fourteenth Amendment to the Constitution:**
**Failure to Provide Appropriate Medical Care (2007)**
**Against JOHN MCGINNESS; MICHAEL IWASA; ANN MARIE BOYLAN; ASA HAMBLY MD; JAMES AUSTIN NP; CHRIS SMITH MD; HANK CARL RN; SGT. TRACIE KIELLOR; DEP. PABLITO GADDIS; DEFENDANT DOES Custody Personnel 1-20, Medical Personnel 21-40; Supervising Custody Personnel 41-60; and Supervising Medical Personnel 61-80 in Their Individual Capacities**

326.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

327.    Each and every time Defendant CARL saw TANDEL, he consistently failed to provide appropriate medical care, treatment, evaluation, or follow up treatment plan when faced with TANDEL's obvious deteriorating neurological condition. And he in so doing, he prevented TANDEL from receiving appropriate medical care for an obvious medical need.

328.    CARL's indifference to TANDEL's medical needs is further evidenced through his intentional failure to provide TANDEL's known and relevant medical history to Dr. SMITH on May 20, 2007.

329.    On May 14, 2007, Defendant AUSTIN failed to provide care, treatment, evaluation, or a follow up treatment plan for this patient with a deteriorating neurological condition, unresolved headaches for five days following a head trauma, sinus involvement and eye pain.  He failed to take the time to review TANDEL's medical chart from the days prior, and obtain a history of the neurological symptoms and head trauma, thereby  disregarding an obvious and substantial risk of neurological disease and clear need for immediate treatment.

330.    Defendant SMITH was deliberately indifferent to TANDEL's medical needs on May 20, 2007 when he disregarded TANDEL's obvious and known medical needs and failed to refer TANDEL to an appropriate hospital facility when faced with his obvious neurological deterioration as detailed above.

331.    On May 17, 2007, Defendant GADDIS disregarded a substantial risk of harm to TANDEL when he delayed medical treatment for TANDEL's known and obvious man down medical emergency as detailed above.  Defendant GADDIS was deliberately indifferent to TANDEL's continued requests for medical attention on May 18, 2007 when he ignored TANDEL's requests for medical attention through the cell's emergency call button.  GADDIS'

deliberate indifference to inmate medical needs is evidenced by his continued actions to delay medical care for inmate Robert Smith one week later.

332.    Supervising defendant KEILLOR failed to properly train, control and supervise GADDIS and the deputies she supervised, to avoid delay and to respond to inmate medical emergencies.  This is evidenced by her failure to intervene in GADDIS' repeated failures to follow jail procedure, which resulted in those inmates experiencing a delay in medical treatment.

333.    KEILLOR was on duty supervising the floor TANDEL was housed May 17-May 19, 2007, during which time TANDEL laid on the floor of his cell deteriorating without access to medical care.  KEILLOR failed to intervene in her subordinates' systematic denial of medical care to TANDEL.

334.    Defendants MCGINNESS and IWASA were aware of the chronic overcrowding and understaffing of the Main Jail through the Grand Jury Reports and the Brann audit and report, as detailed above predating this incident.  Both of these defendants participated in the Brann audit, and Sheriff McGINNESS personally responded to the findings.  Despite this, both of these defendants allowed TANDEL to be housed in the main jail despite the known deficiencies and the substantial risk of harm.

335.    Defendants MCGINNESS, IWASA, BOYLAN, HAMBLY, JORDAN were all fully aware of the deficiencies in the CHS medical care delivery system, and were aware that that inmates were denied necessary medical care despite repeated requesting, the result of which had been the death of at least one inmate.  HAMBLY was a treating physician, having seen TANDEL after the head trauma. JORDAN was responsible for the supervision of the nurses, including CARL and AUSTIN as well as to ensure that they were properly trained and supervised on the SNPs.   All were aware of the deficiencies in the medical delivery system from just having experienced the death of William Sams due to almost identical deficiencies, poor policies and management.   They were all aware of the peer reviews of the Sams death as well as the impending law suit.  They were on notice of the deficiencies through the enormous number of inmate grievances, the grand jury audits and Institute for Medical Quality (IMQ) report dating back to 2003.  They knew that the medical delivery system relied too heavily on untrained nurses and SNPs.  They knew that medical records were not being maintained or reviewed by treating

Law Offices of
Geri  Lynn Green LC

SECOND *AMENDED* COMPLAINT FOR VIOLATION OF CIVIL RIGHTS, AMERICANS WITH DISABILITY ACT, AND COMMON LAW CLAIMS [42 U.S.C. § 1983] DEMAND FOR JURY TRIAL
60

clinicians.  They knew there was no follow up mechanism for inmates with undiagnosed medical issues returned to their cells.  They knew that with the heavy reliance on nurses to provide medical care coupled with the policy that required physician approval for inmates to be transported to the hospital – even with unresolved acute medical symptoms - resulted in the death of William Sams in the Jail Medical Unit just one year prior. Sams died while observed continuously by a nurse unable to get approval to send him to the hospital. Nonetheless, no changes were made to ensure the provision of medical care to acutely ill inmates.

336.    Each of these defendants was responsible for the inmate safety and medical care while incarcerated in the main jail, and each of these defendants disregarded the risk to TANDEL when they failed to adequately address these problems yet allowed TANDEL to be incarcerated there.

337.    As a proximate result of the conduct of the above individual Defendants, Plaintiff TANDEL suffered and continues to suffer personal injury and emotional distress and incurred damages for the deprivation of his constitutional rights.

338.    WHEREFORE, Plaintiff TANDEL prays for relief as set forth below.

**Second CLAIM FOR RELIEF - 2010**
**42 U.S.C. § 1983Violation of the Eighth and Fourteenth Amendments to the Constitution:**
**Failure to Provide Appropriate Medical Care**
**Against JOHN MCGINNESS; MICHAEL IWASA; ANN MARIE BOYLAN; MICHAEL SOTAK MD; SHELLY JORDAN RN; SUSAN KRONER RN; AGNES R. FELICANO NP; JAMES AUSTIN NP; RICHARD L. BAUER MD; GREGORY SOKOLOV MD; KEELIN GARVEY MD; GLAYOL SAHBA MD; HANK CARL RN; Dep. WILSON, Dep. JACOBY; Dep. MEDEIROS; and DEFENDANT DOES Custody Personnel 1-20, Medical Personnel 21-40; Supervising Custody Personnel 41-60; and Supervising Medical Personnel 61-80 in Their Individual Capacities**

339.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

340.    These individual Defendants denied TANDEL access to appropriate medical care for his condition, well knowing of his serious medical need which consisted of a combination of muscle relaxants, pain medication and management, physical therapy, muscle stimulators, massage, a soft bed, a wheelchair, and adequate and sterile supplies to ensure he relieved his

Law Offices of
Geri  Lynn Green LC

SECOND *AMENDED* COMPLAINT FOR VIOLATION OF CIVIL RIGHTS, AMERICANS WITH DISABILITY ACT, AND COMMON LAW CLAIMS [42 U.S.C. § 1983] DEMAND FOR JURY TRIAL
61

bowels and bladder effectively and safely to prevent infection.  As with any spinal cord injury, appropriate medical care also mandates that he be shifted and moved every few hours to prevent bedsores and reduce pain and stiffness. These defendants also failed to provide TANDEL with proper hospitalization for his suicidiality with his known serious medical need and ultimately denied him necessary hospitalization when he obviously suffered a subsequent attack.

341.    Auto-immune disorders such as ADEM, MS, and NMO are characterized by profound episodes, or attacks, manifesting as detectable lesion on the spine or brain, and must be detected immediately and treated aggressively with a combination of corticosteriods, plasmaphoresis and anti-inflammatory medications in order to stop the progression of the attack and prevent permanent damage to the spinal cord.

342.    Medical Defendants FELICANO, BAUER, SOKOLOV, SAHBA, AUSTIN, SOTAK, and KRONER, violated TANDEL's constitutionally protected rights by disregarding the excessive risk to his health and safety.

343.    FELICANO ordered that he provided only 4 catheters per day  and BAUER advised TANDEL reuse his catheters, disregarding the obvious excessive risk of urinary tract infection posed to a patient with neurological condition and auto-immune dysfunction (as infection triggers exacerbations of the disease by activating the immune system).

344.    BAUER knowingly failed to ensure TANDEL's pain was controlled with appropriate therapy providing failed treatment that was ineffective by history, and left TANDEL in unnecessary agony throughout his 2010 detention.  This was evidenced by the complaints and information provided from his attorneys and his family, and was known to all defendants through Defense Counsel when TANDEL was unable to complete his depositions due to the horrific and uncontrolled pain despite medications.

345.    On March 25, 2010, TANDEL was suicidal and SAHBA, SOKOLOV and SOTAK ordered/allowed TANDEL to be inhumanely left naked on the floor of the medical unit on a mattress, unable to reach the call button, cold, in severe pain, under-medicated, and without adequate supplies or treatment to urinate or defecate cleanly and regularly for 3 days.

346.    On April 11, 2010, TANDEL repeatedly used the emergency call button in his cell to request medical attention, and was ignored by DEPUTIES MEDEIROS, WILSON AND

Law Offices of
Geri  Lynn Green LC

JACOBY.   TANDEL was not admitted to medical until the following day because of the long delay – causing unnecessary pain and suffering and delaying treatment for his urinary tract infection.

347.   When TANDEL exhibited signs of urinary tract infection, a known trigger of disease exacerbation, BAUER, SAHBA, AUSTIN, KRONER, and SOTAK disregarded the excessive and obvious risk to his health when they failed to immediately act to prevent infection and an exacerbation of his disease.

348.   When TANDEL exhibited vision disturbance in combination with his other neurological symptoms and diagnosis, (obvious indicators of an attack), KRONER, AUSTIN SAHBA, SOTAK and BAUER disregarded the excessive risk to his life by not taking immediate action to ensure he was treated with steroids and anti-inflammatory medications - and sent to a facility with diagnostic capabilities to determine if lesions were present on his spine or brain.

349.   When TANDEL exhibited pressure sores, nursing staff failed to provide necessary care to prevent future sores and to allow his sores to heal – creating a risk of infection and unnecessary pain and suffering.

350.   Sheriff McGINNESS and Undersheriff IWASA were aware of the pervasive problems with Main Jail overcrowding and understaffing, as well as the deficiencies in the medical delivery system within CHS as detailed above. Accordingly, despite knowledge that the Main Jail was not a safe place to house TANDEL, both of these officials allowed him to be housed there.

351.   Chief BOYLAN was the Chief of CHS during both of Mr. TANDEL's detentions, and was named as a defendant in the action stemming from the events of 2007.  BOYLAN was aware of the 2006 events that caused the preventable death of inmate Sams – specifically, that medical personnel were aware of his symptoms but unable to determine the cause, however failed to ensure he received provide care appropriate to his condition, and allowed him to die without intervention.  Despite knowledge that the facility was unequipped to safely detain TANDEL, BOYLAN allowed him to be incarcerated there and failed to intervene when medical staff failed to provide medical treatment.

Law Offices of
Geri  Lynn Green LC

SECOND *AMENDED* COMPLAINT FOR VIOLATION OF CIVIL RIGHTS, AMERICANS WITH DISABILITY ACT, AND COMMON LAW CLAIMS [42 U.S.C. § 1983] DEMAND FOR JURY TRIAL
63

352.    SOTAK was the Medical Director of the Main Jail and as such, was responsible for reviewing inmate charts from outside providers upon incarceration and ensuring adequate care is received.  Dr. SOTAK was also aware of TANDEL's medical needs through direct treatment. SOTAK was aware that the psychiatric unit of the main jail was unequipped to handle patients with medical issues, leaving suicidal patients with disabilities unable to access the psychiatric facility and programs otherwise available to patients.  Dr. SOTAK did not intervene in this unconstitutional policy, and personally concurred in the decision to house TANDEL on the floor of the medical unit for 3 days – without clothes or the ability to move or reach the call button.

353.    As a proximate and legal result of the conduct of the above individual Defendants, Plaintiff TANDEL suffered and continues to suffer personal injury and emotional distress and incurred damages for the deprivation of his constitutional rights.

354.    WHEREFORE, Plaintiff TANDEL prays for relief as set forth below.

**Third CLAIM FOR RELIEF**
**42 U.S.C. § 1983**
**Municipal Liability for a Policy, Custom or Practice**
**Causing Constitutional Violations of the Eighth and Fourteenth Amendment**
**To the Constitution of the United States**
**Against Defendant COUNTY**
**(*Monell* Claims)**

355.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

356.    The COUNTY is responsible for the actions or inactions of employees and/or agents of SCSD and CHS with regard to medical care and treatment and the development of policies and procedures and allowance of practices/customs relating to the provision of that care and treatment.

357.    At all times herein mentioned, COUNTY maintained a policy or de facto unconstitutional informal custom or practice of permitting, ignoring and condoning custody and medical personnel to delay providing adequate medical assistance to inmates with obvious and known medical needs.

Law Offices of
Geri  Lynn Green LC

SECOND *AMENDED* COMPLAINT FOR VIOLATION OF CIVIL RIGHTS, AMERICANS WITH DISABILITY ACT, AND COMMON LAW
CLAIMS [42 U.S.C. § 1983] DEMAND FOR JURY TRIAL
64

358.     The COUNTY's Main Jail has a history of returning inmates with serious undiagnosed medical conditions to their cells without follow up medical care, without determining the cause, and without necessary treatment, as evidenced by Sams and TANDEL.

359.     The COUNTY's Main Jail has a history of failing to respond to the medical needs of inmates whether directly or conveyed through the intercom system, as evidenced by inmates TANDEL and Sams requests being ignored, as evidenced by Sams and TANDEL.

360.     The COUNTY's Main Jail has a history of relying on nurses to perform medical evaluations beyond their licensure, without legally sufficient and mandated Standardized Nursing Procedures and protocols.  This is evidenced by the 2003 findings of the California Medical Association Institute for Medical Quality, which similarly found that the COUNTY's Main Jail has a history adequately train and supervise nursing staff on the use of Standardized Nursing Procedures.

361.     The COUNTY's Standardized Nursing Procedures for Neurological Conditions is constitutionally inadequate on its face as it prevents the patient from receiving adequate medical care despite symptoms of serious Central Nervous System condition.

362.     The COUNTY's Main Jail has a history of maintaining inadequate systems and procedures for the proper maintenance and use of inmate medical records, as evidenced by the reliance on loose bin files for medical charting. CHS medical personnel customarily take notes outside of the patient's chart on a blank sheet made available in the evaluation room by the jail for this purpose.  These notes are left in the 'loose file bin" also made available by the jail for this purpose.

363.     The COUNTY's Main Jail has a history of failing to transport patients to appropriate facilities for diagnostic evaluations of serious medical conditions, as evidenced by Sams and TANDEL.

364.     At all times herein mentioned, COUNTY maintained unconstitutional policies, customs, or practices which are evidenced by previous inmate grievances and complaints described herein; the Grand Jury investigation in response to medical complaints received regarding the Main Jail delivery of medical care to inmates; the Brann report.  These policies,

Law Offices of
Geri  Lynn Green LC

SECOND *AMENDED* COMPLAINT FOR VIOLATION OF CIVIL RIGHTS, AMERICANS WITH DISABILITY ACT, AND COMMON LAW CLAIMS [42 U.S.C. § 1983] DEMAND FOR JURY TRIAL
65

customs and practices fall far below any acceptable standard of care, and include but are not limited to:

    a.  Failure of medical staff to provide follow-up care when conditions are known;
    b.  Failure of custody staff to monitor inmates with known medical needs;
    c.  Practice of ignoring inmate requests for emergency care through the use of the "call button";
    d.  Failure to provide adequate medical care to inmates with serious medical needs;
    e.  Failure to have medical examinations conducted by qualified medical personnel and/or in qualified facilities;
    f.  Failure to hospitalize inmates with acute medical conditions;
    g.  Failure to provide medical records and a complete medical history prior to evaluation, including to outside hospitals rendering acute care for inmates;
    h.  Failure of custody staff to conduct proper welfare checks, respond to inmate requests for medical care without delay, and alert medical to serious medical needs of inmates.

365.     These policies, customs and practices were of sufficient duration, and were in place from at least June 2006 and were maintained until at least January 6, 2012.

### The 2007 Policies

366.     During the 2007 detention, TANDEL was denied medical care, as a result of these very policies.  The nursing staff's reliance on the defective SNP for Neurological Conditions acted to deny him necessary medical care.  The heavy reliance on nursing staff to provide evaluation and diagnosis of acute serious medical issues such as complex neurological conditions denied him necessary medical care.  The failure of medical staff to review his chart and history due to a systemic failure to maintain medical charts and transport charts to ensure continuity of care denied him necessary medical care.  The policy preventing nurses over their heads in diagnosing and evaluating complex neurological conditions from sending a patient out to a proper hospital for evaluation caused TANDEL to be deprived of constitutionally adequate care.  The failure to adequately staff the facility with custody staff to prevent fights that lead to his head injury; or provide medical care to inmates when they call for help over the intercom.  The policy to send undiagnosed inmates back to their cells without follow up treatment plans denied TANDEL constitutionally mandated care.  The policy of not transporting an inmate suffering with undiagnosed, and unresolved serious symptoms such as long term headaches after head trauma,

Law Offices of
Geri  Lynn Green LC

SECOND *AMENDED* COMPLAINT FOR VIOLATION OF CIVIL RIGHTS, AMERICANS WITH DISABILITY ACT, AND COMMON LAW
CLAIMS [42 U.S.C. § 1983] DEMAND FOR JURY TRIAL
66

unresolved neurological disorders, or undiagnosed abdominal pains – as in the case of William Sams, denied TANDEL necessary medical care.  While the medical directors maintain that the policy is "when in doubt send them out", history could not prove the policy to be farther from the truth.

367.    As a legal and proximate result of the conduct of individual Defendants pursuant to the policies, customs and practices of the COUNTY, Plaintiff TANDEL's constitutional rights were violated and he suffered and continues to suffer personal injury and emotional distress and incurred general damages for the deprivation of his constitutional rights.

368.    WHEREFORE, Plaintiff TANDEL prays for relief as set forth below.

**The 2010 Policies**

369.    The COUNTY's Main Jail has a continuing custom and practice rising to the level of a de facto policy of maintaining inadequate systems and procedures for the proper maintenance and use of inmate medical records.  Medical charts are often not retrieved prior to medical evaluation, and blank sheets are provided by the COUNTY for the purpose of taking loose notes, which are put into loose-bins to be incorporated into the chart later.  Evaluations are therefore performed without the patient's medical and treatment history and notes are lost. Despite the submission of TANDEL's medical records to the defendants through their counsel, despite TANDEL's reports to the defendants, and despite the advisement from his attorneys of his condition, his medical record does not reflect the diagnosis of NMO until May 4, 2010.   This is further evidenced through the 2003 IMQ report finding CHS medical records incomplete, confusing and difficult to locate, along with the allegations in Tandel vs. County of Sacramento Case No. 2:09-CV-00842-MCE.  It does not appear that any of TANDEL'S medical providers took into consideration the extent of his well-documented medical condition in their medical evaluations of his condition.

370.    The COUNTY had a policy, custom and practice rising to the level of a de facto policy of refusing to provide proper medication for the treatment of chronic pain. Notwithstanding the orders of its treatment provider, UC Davis, Jail Medical refused to treat TANDEL's known extreme pain with proper pain medication causing him to live in extreme torturous pain for weeks.

Law Offices of
Geri  Lynn Green LC

SECOND *AMENDED* COMPLAINT FOR VIOLATION OF CIVIL RIGHTS, AMERICANS WITH DISABILITY ACT, AND COMMON LAW CLAIMS [42 U.S.C. § 1983] DEMAND FOR JURY TRIAL
67

371.    The COUNTY had a policy, custom and practice of refusing to provide sufficient medical supplies such as catheters and suppositories for the removal of urine and fecal matter as required by TANDEL's condition in order to prevent infection and disease - resulting here in a UTI.

372.    The COUNTY had a policy, custom and practice of refusing to provide sufficient preventative care for paraplegics so as to avoid infection, kidney damage, and bed sores.

373.    The COUNTY has a policy, custom and practice of relying on Registered Nurses to practice beyond their licensure through reliance on Standardized Nursing Procedures. Diagnosis and evaluation of serious medical conditions such as neurological conditions is beyond a Registered Nurse's licensure.  In order to conduct such an evaluation, California law requires strict adherence to Standardized Nursing Procedures ("SNP") developed by the health facility at the direction of physicians and directors.  (See California Business and Professions Code Section 2725; Tandel vs. County of Sacramento Case No. 2:09-CV-00842-MCE; IMQ report findings.

374.    The SNP covering Neurological Conditions fails to set forth a procedure to evaluate a patient with a known Neurological Condition suffering from neurological symptoms.  CHS, JORDAN, BOYLAN and HAMBLY failed ensure the SNP met proper standards of care and to ensure that all nurses were properly trained and supervised on the use of SNPs – the failure to do so in this case resulted in TANDEL's permanent nerve damage.

375.    The COUNTY's Main Jail has a continuing custom and practice rising to the level of a de facto policy of failing to transport known acutely ill detainees in need of emergent care to appropriate facilities for diagnostic evaluations of serious medical conditions and treatment. Similar to the case of William Sams just a year prior to this incident where the treating physician failed to send Sams to the ER when faced with extreme and undiagnosed abdominal pain – resulting in death due to perforated duodenum, TANDEL's treating physicians at the JAIL opted to order necessary diagnostic tests on an non-urgent basis when faced with acute emergent symptoms such as progressing vision loss, in a patient known to have a serious neurological condition.  See *Tandel vs. County of Sacramento* Case No. 2:09-CV-00842-MCE; Hewitt v County of Sacramento, Case No. 2:07-CV-OI037-GEB-DAD and the peer review of the events associated with Sams death.

Law Offices of
Geri  Lynn Green LC

376.     The COUNTY's main jail custody staff has a history and longstanding practice of failing to adequately monitor inmates and alert medical personnel of serious medical needs of inmates; as well, the COUNTY has a policy and practice of delaying medical assistance to inmates, and a failure to properly observe and treat inmates, as evidenced by the Hewett and previous Tandel complaints.

377.     The COUNTY's Main Jail custody staff has a custom and practice rising to the level of a de facto policy of failing to respond to the urgent medical needs of its inmates, whether conveyed directly or through the intercom system.  Here, WILSON, JACOBY AND MEDEIROS left TANDEL screaming in agony for hours before responding to his calls for help.  This policy is evidenced in the events alleged in Tandel vs. County of Sacramento Case No. 2:09-CV-00842-MCE.

378.     The COUNTY maintains no facility to treat JAIL inmates with both serious medical conditions, such as TANDEL's and acute psychiatric conditions requiring hospitalization such as suicidiality.  This de facto policy of failing to provide proper psychiatric care to medically ill and disabled inmates resulted in TANDEL being housed on the floor of a medical unit cell in an unsanitary and inhumane manner for 3 days resulting – this treatment escalated his deterioration of his lying on the floor unable to move his legs or care for himself resulted in a urinary tract infection which ultimately caused a second NMO attack, extreme chronic pain and caused bed sores.

379.     The COUNTY has a custom and practice rising to the level of a de facto policy of allowing custody personnel to make initial medical determinations.  Deputy WILSON testified that he, as a floor officer in the non-medical housing pod, makes an independent determination as to whether an inmate's request for medical care through the emergency intercom is a valid request prior to notifying medical staff of the inmate's request.   TANDEL was left screaming in agony for hours before he was taken to medical for care – determining that his requests for care were the result of a behavioral problem not a medical problem.

380.     The Main Jail custody staff had a practice of intimidating inmates for complaining of conditions of confinement or requesting medical attention.  TANDEL was repeatedly ignored and told to stop using his call button by unknown officers during his 2007 and 2010 detentions.

Law Offices of
Geri  Lynn Green LC

TANDEL repeatedly used his call button on April 11, 2010 during a medical emergency, and officers ignored him. This policy is evidenced in the events alleged in Tandel vs. County of Sacramento Case No. 2:09-CV-00842-MCE.

381.    Defendants' policies, customs, or practices described herein were the moving force behind the violation of his constitutional rights.

382.    As a proximate and legal result, Plaintiff TANDEL suffered and continues to suffer personal injury and emotional distress and incurred general damages for the deprivation of his constitutional rights.

383.    WHEREFORE, Plaintiff TANDEL prays for relief as set forth below.

**Fourth CLAIM FOR RELIEF**
**42 U.S.C. § 1983**
**Violation of the Eighth and Fourteenth Amendment to the Constitution:**
**<u>Failure to Adequately Train</u>**
Against Defendant COUNTY
(***Monell* Claim**)

384.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein. The deficiencies in training are consistent throughout incidents.

385.    The COUNTY maintained a policy, custom, or practice of staffing the Main Jail with custody personnel who were not sufficiently trained, which was the moving force behind the violation of TANDEL's constitutional rights.

386.    Defendants knew that the policy, custom, or practice of under staffing the Main Jail with properly trained medical and custody staff would cause grievous injury to Plaintiff TANDEL in violation of his constitutional rights, based on the findings of the Grand Jury, the Brann audit, the Sheriff's Staffing analyses, and previous litigation, including *Hewitt v County of Sacramento*, Case No. 2:07-CV-OI037-GEB-DAD and Tandel vs. County of Sacramento Case No. 2:09-CV-00842-MCE-GGH.

387.    Plaintiff is informed and believes, and on that basis alleges, that COUNTY had a policy of failing to properly train custody personnel, including but not limited to the following:

388.    Failure to train on monitoring inmates, detecting the need for medical care, and responding to requests for medical care, as evidenced by custody staff making independent

Law Offices of
Geri  Lynn Green LC

SECOND *AMENDED* COMPLAINT FOR VIOLATION OF CIVIL RIGHTS, AMERICANS WITH DISABILITY ACT, AND COMMON LAW CLAIMS [42 U.S.C. § 1983] DEMAND FOR JURY TRIAL
70

determinations as to the validity of inmate medical requests prior to alerting medical personnel, and custody staff ignoring inmate medical requests and warning inmates to stop using the call button.

389.    Plaintiff is informed and believes, and on that basis alleges, that COUNTY had a policy of failing to properly train medical personnel, including but not limited to:

390.    Failure to train on proper procedures for the ordering the transport of acute inmates to appropriate medical facilities, as evidenced by Hewett and Tandel;

391.    Maintaining constitutional adequate medical charts and histories, evidenced by Hewett and Tandel and the 2003 IMQ report;

392.    Providing necessary medical care to inmates with serious medical needs, evidenced by Hewett, Tandel, the 2003 IMQ report, and the events surrounding inmate Scott.

393.    The training policies of the COUNTY Sheriff's Department were not adequate to train its custody personnel to handle the usual and recurring situations with which they must deal.

394.    The COUNTY had a training policy that 'amounts to deliberate indifference to TANDEL.

395.    Plaintiff is informed and believes, and on that basis alleges, that supervisory defendants McGINNESS, IWASA, and KEILLOR failed to properly train custody personnel, including but not limited to training on monitoring inmates to ensure access to medical care; training on detecting the need for medical care and responding appropriately and timely; training on responding to requests for medical care and not intimidating inmates to stop requesting care.

396.    The failure of the COUNTY Sheriff's Department to provide adequate training caused the deprivation of the plaintiff's rights by the systematic delay in accessing and/or the overall denial of access to medical care, from the known and unknown custody personnel described herein.

397.    The defendant's failure to train is so closely related to the deprivation of the plaintiff's rights as to be the moving force that caused the ultimate injury.

398.    COUNTY also maintained a policy, custom, or practice of staffing the Main Jail with medical personnel who were not sufficiently trained, which was the moving force behind the violation of TANDEL's constitutional rights.

Law Offices of
Geri  Lynn Green LC

SECOND *AMENDED* COMPLAINT FOR VIOLATION OF CIVIL RIGHTS, AMERICANS WITH DISABILITY ACT, AND COMMON LAW CLAIMS [42 U.S.C. § 1983] DEMAND FOR JURY TRIAL
71

399.   According to the IMQ report detailed above, in 2003 the COUNTY's training of the nursing staff on critical clinical skills was lacking, including a lack of training on responding to emergencies such as "man down" calls; providing care without documenting or following the proper SNPs;   failing to ensure medical records are accessible, complete and easy to locate; failing to ensure inmates charts accompanied them during transfer.

400.   The main jail's reliance on Standardized Nursing Procedures was questioned as the medical system was not prepared to provide training and verification of physical assessment skills to the degree necessary for compliance with this standard.  A lack of an organized system to provide ongoing monitoring of the nurses' clinical competence was determined based on medical records which indicated that the clinical skills of the nursing staff varied widely, and the health records documented sporadic care rather than a system of care.

401.   These findings evidence that the inadequate training of medical staff had been longstanding, as these inadequacies in training were evidenced in the present case.  CARL improperly believed that the procedures did not apply because TANDEL was already prescribed Motrin, therefore failed to use the Standardized Nursing Protocol when evaluating TANDEL and as a result, failed to perform the necessary testing.

402.   SMITH failed to perform an adequate evaluation for TANDEL's medical condition, and was not provided a medical history or complete chart prior to evaluating TANDEL.

403.   Both CARL and SMITH failed to send TANDEL to a hospital for appropriate testing - and instead sent him back to his cell because they were unable to determine the cause of the recurrent and progressive neurological symptoms.

404.   And TANDEL was routinely evaluated without the presence of his chart, and his medical history and chart did not accompany him to UC Davis when he was finally transferred, resulting in complications and delay in treatment.

405.   The COUNTY's failure to train medical staff is so closely related to the deprivation of the plaintiff's rights as to be the moving force that caused the ultimate injury.

406.   As a proximate and legal result of the conduct of Defendants, Plaintiff TANDEL suffered and continues to suffer personal injury and emotional distress and incurred general damages for the deprivation of his constitutional rights.

Law Offices of
Geri  Lynn Green LC

SECOND *AMENDED* COMPLAINT FOR VIOLATION OF CIVIL RIGHTS, AMERICANS WITH DISABILITY ACT, AND COMMON LAW CLAIMS [42 U.S.C. § 1983] DEMAND FOR JURY TRIAL
72

407.    Defendants' policy, custom, or practice of under staffing the Main Jail with sufficiently trained medical and custody personnel was the moving force behind the violation of his constitutional rights.

408.    As a legal and proximate result of the conduct of Defendants, Plaintiff TANDEL suffered and continues to suffer personal injury and emotional distress and incurred general damages for the deprivation of his constitutional rights.

409.    WHEREFORE, Plaintiff TANDEL prays for relief as set forth below.

### Fifth CLAIM FOR RELIEF
### 42 U.S.C. § 1983
### Violation of the Eighth and Fourteenth Amendment to the Constitution:
### Failure to Adequately Staff and Supervise
Against Defendant COUNTY
(*Monell* Claim)

410.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

411.    In both 2007 and 2010, the COUNTY maintained a policy, custom, or practice of under staffing the Main Jail with personnel and failing to properly supervise the custodial and medical staff at the Main Jail.

412.    Plaintiff is informed and believes, and on that basis alleges, that supervisory defendants MCGINNESS and IWASA were aware that the main jail was chronically understaffed, and that  the policy, custom, or practice of under staffing the Main Jail would cause grievous injury to Plaintiff TANDEL in violation of his constitutional rights.

413.    The COUNTY is responsible for maintaining appropriate staffing levels to ensure the safety of their inmates.  The COUNTY is responsible for maintaining appropriate levels of physician, nursing, pharmacy and mental health staff to ensure that safe and effective levels of health services are rendered.  The Main Jail has operated for a number of years without sufficient staffing of properly trained and supervised custody and medical personnel.  As a result, inmates suffer severe medical neglect, causing permanent injury to Mr. TANDEL during a previous detention, and again during the 2010 detention - and at times causing inmate death (See the Sams case detailed below).    Defendant COUNTY was on notice of the findings of the 2005-2006

Law Offices of
Geri  Lynn Green LC

SECOND *AMENDED* COMPLAINT FOR VIOLATION OF CIVIL RIGHTS, AMERICANS WITH DISABILITY ACT, AND COMMON LAW CLAIMS [42 U.S.C. § 1983] DEMAND FOR JURY TRIAL
73

Sacramento Grand Jury Report and the Brann report, and the Sheriff's own staffing analysis, finding the following:

    a. 30% vacancy rate in nursing staff which led to substantial delays in medical treatment to inmates;

    b. the high vacancy rate in custody personnel leading to a reliance on overtime causing shortages and burnout;

    c. Overcrowding of inmates; and

    d. The COUNTY's failure to staff the facility with custody personnel to accommodate medical runs, relying on necessary personnel leaving their posts/assignments to accommodate this function.

414. Defendants' policy, custom, or practice of under-staffing the Main Jail was the moving force behind the violation of TANDEL's constitutional rights in both incidents.

415. Further, when staff is present they are often not at their POST, evidenced when TANDEL required medical care on May 17, 2007, and floor officer GADDIS was the only officer in the pod, which resulted in a delayed response to the medical emergency.

416. Also, evidence of a failure to adequately staff with custody personnel was the failures in both 2007 and 2010 to respond to TANDEL's intercom desperate requests for medical care.

417. Further, TANDEL's requests for medical care were ignored over the following days, and on May 19, 2007, and he was told to sign up for sick-call despite the known delays of access to medical treatment through this method because of chronic shortages in nursing and physician staffing. This failure to adequately staff resulted in a delay in TANDEL receiving medical treatment.

418. Additionally, SAHBA ordered a critical neurological and ophthalmology examination on April 23, 2010, however, neither test was conducted before TANDEL was hospitalized on May 10, 2010. It is on information and belief that the Main Jail lacked sufficient qualified staffing to perform the ordered examinations in a timely manner.

419. Defendants knew that the policy, custom, or practice of under staffing the Main Jail would result in grievous injury to TANDEL in violation of his constitutional rights. (See *Hewitt v*

Law Offices of
Geri Lynn Green LC

SECOND *AMENDED* COMPLAINT FOR VIOLATION OF CIVIL RIGHTS, AMERICANS WITH DISABILITY ACT, AND COMMON LAW CLAIMS [42 U.S.C. § 1983] DEMAND FOR JURY TRIAL
74

County of Sacramento, Case No. 2:07-CV-OI037-GEB-DAD; *Tandel vs. County of Sacramento* Case No. 2:09-CV-00842-MCE-GGH; Grand Jury reports; Brann Report).

420.    Defendants maintained a policy, custom, or practice of under staffing the Main Jail with supervisory personnel and failing to properly supervise the custodial and medical staff at the Main Jail, evidenced by the long history of denials of medical care described herein.

421.    Defendants' policy, custom, or practice of under staffing the Main Jail with supervisory personnel and failing to properly supervise jail staff was the moving force behind the violation of his constitutional rights.

422.    Plaintiff is informed and believes, and on that basis alleges, that Defendants failed to supervise jail staff to ensure the monitoring of inmates, detecting the need for medical care, responding to requests for medical care and ensuring that inmates in need of medical care receive such care.

423.    Defendants knew or should have known that the policy, custom, or practice of understaffing the Main Jail with supervisory personnel would cause grievous injury to Plaintiff TANDEL in violation of his constitutional rights.  (see *Hewitt v County of Sacramento*, Case No. 2:07-CV-OI037-GEB-DAD, and *Tandel vs. County of Sacramento* Case No. 2:09-CV-00842-MCE-GGH).

424.    Plaintiff TANDEL is informed and believes and on that basis alleges, that if the Main Jail had been adequately staffed and adequately supervised, he would have received more adequate supervision and medical care.

425.    As a proximate result of the conduct of Defendants, Plaintiff TANDEL suffered and continues to suffer personal injury and emotional distress and incurred general damages for the deprivation of his constitutional rights.

426.    WHEREFORE, Plaintiff TANDEL prays for relief as set forth below.

//

//

//

Law Offices of
Geri  Lynn Green LC

**Sixth CLAIM FOR RELIEF**
**42 U.S.C. Section 1983**
**Violation of the First Amendment to the Constitution:**
**Retaliation for Protesting Unconstitutional and Unlawful Jail Conditions**
**Against Defendant McGINNESS, BOYLAN, and BAUER DEFENDANT DOES**
**Custody Personnel 1-20, Medical Personnel 21-40; Supervising Custody Personnel**
**41-60; and Supervising Medical Personnel 61-80**

427.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

428.    McGINNESS and BOYLAN were on notice that TANDEL had filed a lawsuit alleging the Main Jail and them personally.

429.    These jail officials were alerted by Plaintiff's Counsel Green that TANDEL was again incarcerated in the Main Jail and had medical needs that exceeded what the jail could provide.

430.    McGINNESS and BOYLAN intentionally allowed TANDEL to remain at the jail and did not ensure that his known medical needs were met.  As a result, he suffered a predictable exacerbation of a condition.  His known medical condition involved chronic extreme pain, yet no steps were taken to continue his pain management notwithstanding his numerous complaints, the complaints by counsel or his family.

431.    McGINNESS and BOYLAN through BAUER failed to provide adequate and effective pain management with full knowledge that such action would and did cause agony and suffering, in what can only be interpreted as direct retaliation for his pending lawsuit.

432.    These Defendants aforementioned acts were in retaliation for Plaintiff TANDEL's pending lawsuit complaining of the deplorable conditions under which he and similarly situated inmates were being held at the Sacramento County Main Jail.

433.    As a proximate result of the conduct of Defendants, Plaintiff TANDEL suffered personal injury and emotional distress and incurred general damages for the deprivation of his constitutional rights.

434.    WHEREFORE, Plaintiff TANDEL prays for relief as set forth below.

Law Offices of
Geri  Lynn Green LC

SECOND *AMENDED* COMPLAINT FOR VIOLATION OF CIVIL RIGHTS, AMERICANS WITH DISABILITY ACT, AND COMMON LAW CLAIMS [42 U.S.C. § 1983] DEMAND FOR JURY TRIAL
76

### Seventh CLAIM FOR RELIEF
### Violation of Title II - ADA, Rehabilitation Act
Against Defendant COUNTY

435.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

436.    SANDIPKUMAR TANDEL  was a "qualified individual," with a known medical impairment, to wit: paraparesis, neurological condition, and neurogenic bladder and bowels, which prevented him from walking and standing, and therefore resulted in a his limited and/or substantially limited ability to care for himself and control his mental, medical or physical health condition as defined under the ADA, 42 U.S.C. § 12131 (2), under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, 28 C.F.R. §540(1)(2), 28 C.F.R. §42.540 (k), and Cal.Civ. Code §51, Cal. Gov't Code §12926.1, and qualified as an individual with a physical disability under California law, and he met the essential eligibility requirements of COUNTY to provide access to medical services for its detainee/inmates patients in the Main Jail.

437.    The Main Jail provides services and is a place of public accommodation and a covered entity for purposes of enforcement of the ADA, 42 U.S.C. §12181 (7)(F), the Rehabilitation Act, 29 U.S.C. § 794, 51 Cal. Civil Code and 12926 of Cal. Govt. Code, and Cal. Civ. Code §51 et seq., explicated by the regulations promulgated under each of these laws.

438.    The COUNTY, "engaged in the business of  . . . health care," custody for persons whose "operations" fall within the definition of "program or activity" covered by the Rehabilitation Act, 29 U.S.C. Section 749(b), and Cal. Civil Code § 51.

439.    The COUNTY is mandated to "develop an effective, integrated, comprehensive system for the delivery of all services to persons with mental disabilities and developmental disabilities . . . " and to ensure "that the personal and civil rights" of persons who are receiving services under its aegis are protected.

440.    Congress enacted the ADA upon a finding, among other things, that "society has tended to isolate and segregate individuals with disabilities" and that such forms of discrimination continue to be a "serious and pervasive social problem." 42 U.S.C. § 12101 (a)(2).

441.    The Main Jail, is mandated under the ADA not to "discriminate against [any individual] on the basis of disability in the full and equal enjoyment of the goods, services,

Law Offices of

Geri  Lynn Green LC

SECOND *AMENDED* COMPLAINT FOR VIOLATION OF CIVIL RIGHTS, AMERICANS WITH DISABILITY ACT, AND COMMON LAW CLAIMS [42 U.S.C. § 1983] DEMAND FOR JURY TRIAL
77

facilities, privileges, advantages, or accommodations of any place of public accommodation." 42 U.S.C. § 12182 (a).

442.    42 U.S.C. § 12182(b)(1)(A)(3) provides in pertinent part that "it shall be discriminatory to afford an individual or class of individuals, on the basis of a disability or disabilities of such individual or class, directly, or through contractual licensing, or other arrangements, with a good, service, facility, privilege, advantage, or accommodation that is different or separate from that provided to others" (emphasis added).

443.    The COUNTY violated the ADA and deprived TANDEL and Plaintiff of his federally and state protected rights by:

444.    a) Failing to provide wheelchairs or other types of accommodations to people suffering from the inability to ambulate, thereby denying TANDEL access to the services and programs available to non-paralyzed inmates based on his disability; and

445.    b) Denying access to Main Jail psychiatric facility for inmate/patients with acute medical needs (such as the requirement for catheters), thereby withholding psychiatric treatment by reason of disability.

446.    The individual Defendants acted recklessly to Plaintiffs' federally and State protected rights.

447.    TANDEL was denied the benefits of the services, programs, and activities of the COUNTY.  This denial of services was the result of his disability.  As a result of his disability, he required catheters and therefore was housed differently, and not allowed to utilize the psychiatric unit where suicidal patients who do not require catheters are placed.

448.    As a result of the acts and misconduct of the Defendants complained of herein, Plaintiff TANDEL suffered, is now suffering and will continue to suffer damages and injuries as alleged above and incorporated herein by reference.

449.    WHEREFORE, Plaintiff TANDEL prays for relief as set forth below.

Law Offices of
Geri  Lynn Green LC

SECOND *AMENDED* COMPLAINT FOR VIOLATION OF CIVIL RIGHTS, AMERICANS WITH DISABILITY ACT, AND COMMON LAW CLAIMS [42 U.S.C. § 1983] DEMAND FOR JURY TRIAL
78

**Eighth CLAIM FOR RELIEF**
**California Civil Code §§ 52.1**
**Against County and Officers OFFICER JACOBY, OFFICER MEDEIROS and**
**Defendant DOES 1-20 in their individual capacities**

450.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

451.    Defendants, acting within the course and scope of their employment, intimidated interfered and attempted to interfere with the TANDEL assertion of his rights under the Fourteenth Amendments to the Constitution and the California Constitution by ignoring and admonishing him for using his call button to request medical treatment.

452.    Defendants JACOBY and MEDEIROS, and the unnamed DOE defendants who similarly ignored TANDEL's pleas for medical care and who warned him to stop using his call button, attempted to intimidate him from requesting the care he desperately needed and to which he was constitutionally entitled.

453.    As a proximate and legal result of the conduct of Defendants, Plaintiff felt intimidated and threatened, and suffered damages as described in this Complaint, including actual damages within the meaning of California Civil Code §52.

454.    As a proximate result of the conduct of Defendants, Plaintiff TANDEL is entitled to an award of exemplary damages, civil penalties, and attorneys' fees as provided by California Civil Code §52.

455.    WHEREFORE, Plaintiff TANDEL prays for relief as set forth below.

**Ninth CLAIM FOR RELIEF**
**California Government Code § 845.6**
Against COUNTY and Officers OFFICER JACOBY, OFFICER MEDEIROS and DOES
Defendants 1-20 in their individual capacities

456.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

457.    Pursuant to Cal. Gov. Code § 845.6, OFFICER JACOBY, OFFICER MEDEIROS and unknown DOE Defendants had a duty to monitor, check, and respond to the persons under their custody, supervision and control.

Law Offices of
Geri  Lynn Green LC

SECOND *AMENDED* COMPLAINT FOR VIOLATION OF CIVIL RIGHTS, AMERICANS WITH DISABILITY ACT, AND COMMON LAW
CLAIMS [42 U.S.C. § 1983] DEMAND FOR JURY TRIAL
79

458.    These defendants knew or had reason to know that Plaintiff TANDEL was in need of immediate medical care, because TANDEL was using his emergency call button and requesting care.  Despite this these defendants failed to take reasonable action to summon medical care.

459.    As a result of Defendants breach of said duty to take reasonable action to summon such medical care to Plaintiff TANDEL, he has suffered damages as set forth herein.

460.    WHEREFORE, Plaintiff TANDEL prays for relief as set forth below.

**Tenth CLAIM FOR RELIEF**
**Negligence**
**Against JOHN MCGINNESS; MICHAEL IWASA; ANN MARIE BOYLAN; MICHAEL SOTAK MD; SHELLY JORDAN; SUSAN KRONER RN; AGNES R. FELICANO NP; JAMES AUSTIN, NP; RICHARD L. BAUER. MD; GREGORY SOKOLOV MD; KEELIN GARVEY MD; GLAYOL SAHBA, MD; Dep. WILSON, Dep. JACOBY; Dep. MEDEIROS; and DEFENDANT DOES Custody Personnel 1-20, Medical Personnel 21-40; Supervising Custody Personnel 41-60; and Supervising Medical Personnel 61-80 in their individual capacities**

461.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

462.    While TANDEL was under the sole and exclusive care of Defendants, Defendants, acting within the scope and course of their employment with their employees and agents, negligently, carelessly and unskillfully cared for, attended, handled, controlled and failed to supervise, monitor and attend to TANDEL and/or failed to refer him to medical care providers, negligently failed to provide physician's care and carelessly failed to detect and monitor his condition, and negligently, carelessly and unskillfully failed to possess and exercise that degree of skill and knowledge ordinarily possessed and exercised by others in the same profession and in the same locality as Defendants.

463.    Defendants and each of them failed to supervise, train and monitor their subordinates, to maintain proper supervision, classification and staffing and to timely refer TANDEL for medical and/or hospital care.

464.    Plaintiff further alleges that the supervisory Defendant personnel failed to conduct appropriate investigatory procedures to determine the need to obtain medical care for TANDEL

Law Offices of
Geri  Lynn Green LC

SECOND *AMENDED* COMPLAINT FOR VIOLATION OF CIVIL RIGHTS, AMERICANS WITH DISABILITY ACT, AND COMMON LAW
CLAIMS [42 U.S.C. § 1983] DEMAND FOR JURY TRIAL
80

1   while in the Defendants' care, custody and control, and failed to have proper investigation and

2   reports of allegations of subordinate's wrongful conduct.

3   465.   Defendants knew or had reason to know that Plaintiff TANDEL was in need of

4   immediate medical care, and on-going follow-up medical care, and failed to take reasonable

5   action to procure such medical care.

6   466.   As a result of Defendants breach of said duty to take reasonable action to summon

7   such medical care to Plaintiff TANDEL, he has suffered damages as set forth herein.

8   **Eleven CLAIM FOR RELIEF**
    **Medical Negligence**

9   **Against COUNTY, MICHAEL SOTAK MD; RICHARD L. BAUER. MD; GREGORY**
    **SOKOLOV MD; KEELIN GARVEY MD; GLAYOL SAHBA, MD; Medical Personnel 21-40**

10  467.   While TANDEL was under the care of Defendants,  Defendants, and each of them,

11  acting   within   the scope   and course  of their employment, negligently, carelessly   and

12  unskillfully cared for, attended,  handled,  controlled , failed to supervise,  monitor,  failed to

13  follow-up, and abandoned   TANDEL. Defendants further failed  to refer  him to specialist

14  psychiatric care providers, negligently  failed to provide psychiatric and psychological care, and

15  carelessly  failed to detect,   monitor,  and follow-up on TANDEL's deteriorating psychological

16  condition,  thus negligently, carelessly,  and unskillfully failing  to possess  and exercise  that

17  degree   of skill and knowledge   ordinarily possessed  and exercised  by others  in the same

18  profession  and in the same locality as Defendants.

19  468.   TANDEL presented to these defendants with ADEM and later adjusted to NMO.

20  All providers were well aware of his medical needs.

21  469.   Despite each of their knowledge  of his medical condition and serious medical

22  needs, each defendant assumed the care of TANDEL and failed to provide him appropriate care

23  ofr refer TANDEL to an appropriate medical facility for proper care and treatment.

24  470.   As a direct  and legal result  of the aforesaid  negligence, carelessness, and

25  unskillfulness of defendants,  and each of them,  TANDEL's medical condition did not receive

26  timely, appropriate, and indicated  assessment, intervention, and treatment,  and his deteriorating

27  condition  resulted further spinal cord damage thereby  causing  damage in an amount  according

28  to proof.

Law Offices of
Geri  Lynn Green LC

SECOND *AMENDED* COMPLAINT FOR VIOLATION OF CIVIL RIGHTS, AMERICANS WITH DISABILITY ACT, AND COMMON LAW
CLAIMS [42 U.S.C. § 1983] DEMAND FOR JURY TRIAL
81

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief as follows:

1.      For general damages in the sum of $10,000,000 (ten million dollars);

2.      For special damages according to proof;

3.      For punitive damages against the appropriate defendants;

4.      For damages for future lost earnings and lost earning capacity according to proof;

6.      For other losses in an amount according to proof;

7.      For costs of suit;

8.      For attorneys' fees and costs pursuant to 42 U.S.C. § 1988, 42 U.S.C. §12205, 29 U.S.C. § 794a (b), ADA 42 U.S.C. § 12131 (2); and Cal. Civil Code §52 and 52.1; and as otherwise authorized by statute or law;

9.      For declaratory relief as the court deems appropriate including revision of the COUNTY JAIL policies related to the handling and restraining of disabled and high risk prisoners, policies related to use of Safety Cells, ensure medical and custody staffing levels maintained at constitutional standards, ensure a meaningful grievance and review process, ensure sufficient and effective supervision and oversight over jail operations;

10.      For violation of Cal. Civil Code Section 51.7 pursuant to Cal. Civil Code Section 52(b), punitive damages against *Defendant deputy sheriffs,* $25,000.00 for each offense and reasonable attorney fees; and;

11.      For such other relief as the Court deems proper.

Respectfully Submitted,

DATED: March 10, 2012                    LAW OFFICES OF GERI LYNN GREEN, LC


                                         By:      __/s_____
                                                  GERI LYNN GREEN
                                                  Attorney for Plaintiff
                                                  SANDIPKUMAR TANDEL

DATED: March 10, 2012                    LAW OFFICES OF DENNISE S. HENDERSON


                                         By:      __/s_____
                                                  DENNISE S. HENDERSON
                                                  Attorney for Plaintiff
                                                  SANDIPKUMAR TANDEL

1

## JURY DEMAND

2      Plaintiff hereby demands a jury trial in this action.

3   DATED: March 10, 2012              LAW OFFICES OF GERI LYNN GREEN, LC

4

5                                      By:    __/s_____

6                                             GERI LYNN GREEN
                                              Attorney for Plaintiff
7                                             SANDIPKUMAR TANDEL

8   DATED: March 10, 2012              LAW OFFICES OF DENNISE S. HENDERSON

9

10                                     By:    __/s_____
                                              DENNISE S. HENDERSON
11                                            Attorney for Plaintiff
                                              SANDIPKUMAR TANDEL

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Law Offices of
Geri  Lynn Green LC

SECOND *AMENDED* COMPLAINT FOR VIOLATION OF CIVIL RIGHTS, AMERICANS WITH DISABILITY ACT, AND COMMON LAW
CLAIMS [42 U.S.C. § 1983] DEMAND FOR JURY TRIAL
83