UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

SANDIPKUMAR TANDEL,

          Plaintiff,

   v.

COUNTY OF SACRAMENTO, et al.,

          Defendants.

No.  2:11-cv-00353-MCE-AC

**MEMORANDUM AND ORDER**

Plaintiff Sandipkumar Tandel ("Plaintiff") seeks redress for several federal and state law claims against various named Defendants, including the County of Sacramento ("County"), Sheriff of Sacramento County John McGinness ("McGinness"), Undersheriff and Jail Captain Michael Iwasa ("Iwasa"), Chief of Sacramento County Jail Correctional Health Services Ann Marie Boylan ("Boylan"), Interim Medical Director of Sacramento County Jail Correctional Health Services Asa Hambly, M.D. ("Hambly"), Medical Director of Sacramento County Jail Michael Sotak, M.D. ("Sotak"), Director of Nursing Shelly Jordan ("Jordan"), Susan Kroner, R.N. ("Kroner"), Agnes R. Felicano , N.P. ("Felicano"), James Austin, N.P. ("Austin"), Richard L. Bauer, M.D. ("Bauer"), Gregory Sokolov, M.D. ("Sokolov"), Keelin Garvey, M.D. ("Garvey"), Glayol Sahba, M.D. ("Sahba"), Chris Smith, M.D. ("Smith"), Hank Carl, R.N. ("Carl"), Sergeant Tracie Keillor ("Keillor"), Deputy

1  Pablito Gaddis ("Gaddis"), Deputy John Wilson ("Wilson"), Deputy Stephanie Jacoby

2  ("Jacoby"), and Deputy Mark Medeiros ("Medeiros").

3      Plaintiff alleges that Defendants violated Plaintiff's civil rights during his detentions

4  at the Sacramento County Main Jail from February 7, 2007, to May 20, 2007, and from

5  March 23, 2010, to May 10, 2010.  Plaintiff further alleges a claim under the Americans

6  with Disabilities Act, as well as state common law claims, as a result of the treatment he

7  received during the two aforementioned incarcerations.

8      Plaintiff originally filed two separate cases—one relating to the alleged 2007

9  incidents, and the second pertaining to his subsequent 2010 incarceration.  On May 4,

10  2011, this Court granted Defendants' Motion to Consolidate the two cases. ECF No. 26.

11  Defendants moved to dismiss certain portions of both actions, and those motions were

12  granted in part and denied in part by orders filed on February 21, 2012, and

13  February 23, 2012.  ECF Nos. 68, 69.  Plaintiff was accorded leave to amend and was

14  directed to file a single, unitary complaint encompassing both incarcerations.  In his

15  resulting Consolidated Second Amended Complaint ("CSAC"), Plaintiff seeks general

16  and special damages, punitive damages, damages for future lost earnings and lost

17  earning capacity, other proven losses, attorneys' fees and costs, and declaratory relief.

18  ECF No. 73

19      Presently before the Court is the Motion for Judgment on the Pleadings as to

20  Defendants Austin, Iwasa, Jacoby, Medeiros and Jordan.  Defs. Austin, Iwasa, Jacoby,

21  Medeiros and Jordan's Mot. for J. on the Pleadings ("Motion"), filed September 5, 2013,

22  ECF No. 112.  For the reasons set forth below, the Motion is granted in part and denied

23  in part.[1]

24  ///

25  ///

26  ///

27  _____

[1] Because oral argument will not be of material assistance, the Court orders this matter submitted
28  on the briefs.  E.D. Cal. Local Rule 230(g).

1

## BACKGROUND[2]

2

3       On February 7, 2007, Plaintiff was arrested and incarcerated at the Sacramento

4   County Main Jail ("the Jail") as a pre-trial detainee.  On April 27, 2007, Plaintiff suffered a

5   head injury as a result of an altercation at the Jail.  Plaintiff was sent to the Emergency

6   Room at the Doctor's Center in Sacramento, where Plaintiff's injury was treated by

7   cleaning and suturing the wound and vaccinating Plaintiff for Tetanus.  That same day

8   Plaintiff was sent back to the Jail with instructions to remove the sutures in five days,

9   leaving the wound open to air and keeping the wound clean.  Upon Plaintiff's return to

10   the Jail, he was seen by the Jail's medical personnel who evaluated Plaintiff, noted the

11   treatment and vaccination, and referred the matter to a doctor.  Plaintiff informed Jail

12   medical personnel that he had a headache.

13       After returning to the Jail, Plaintiff was placed into Administrative Segregation,

14   where he remained for approximately two weeks.  Plaintiff alleges that the unit where he

15   was housed was an indirect supervision unit and that, if he wanted to communicate with

16   the staff, he had to push the call button in his cell.  Plaintiff claims that many of his calls

17   went unanswered, and that when the calls were answered, he was told "we are working

18   on it" and to "stop using the call button," and finally to "stop complaining."  Eventually,

19   the Jail staff stopped answering Plaintiff's calls altogether.  Plaintiff further alleges that,

20   without running water in his cell and regular showers, he could not keep his wound clean

21   as prescribed.

22       After being moved back to a regular cell, Plaintiff claims he immediately requested

23   medical care.  Defendant Carl saw Plaintiff on May 13, 2007.  Plaintiff informed

24   Defendant Carl that he had been suffering from headaches for the past four days.

25   Defendant Carl consulted with Defendant Smith who ordered the stitches removed and

26   gave Motrin to Plaintiff.

27

28
_____

[2] The following facts are taken from Plaintiff's CSAC, unless otherwise noted.

3

On or about May 14, 2007, Plaintiff again sought medical attention, complaining of headaches, sensitivity to light, and a nasal drip.  Plaintiff was examined by a nurse, Defendant Austin, and was returned to his cell.  On or about May 17, 2007, Plaintiff collapsed while taking a shower because he lost control of his legs.  Defendant Gaddis responded to Plaintiff's request for help, but allegedly failed to use the radio to properly alert medical and custody staff of the emergency.  According to Plaintiff, Defendant Gaddis also failed to file an incident or casualty report following the incident in violation of Jail policy.

When Plaintiff was wheeled in a wheelchair for evaluation, he told Defendant Carl about his unexplained loss of use of his extremities and collapse.  Plaintiff alleges that Defendant Carl failed to conduct an adequate medical assessment and ordered Plaintiff returned to his cell, without arranging for any medical follow up.

On May 18, 2007, Plaintiff had a sudden and acute loss of vision in his left eye and started noticing that he was not able to move his lower extremities.  He also suffered from urinary retention and constipation.  Plaintiff claims he repeatedly rang the medical call button to summon help and informed the officers on duty that his legs did not work, that he could not urinate and that he was going blind, but was told to stop using the call button and that "these things would not kill him."

On May 20, 2007, at 11:44 a.m., a doctor examined Plaintiff but Plaintiff alleges he was again given an inadequate evaluation.  At 9:45 p.m., Plaintiff was seen by a different doctor.  According to Plaintiff, he informed this doctor that he suffered from vision loss, an inability to both move or control his extremities and to get up to "void or defecate," and other neurological impairments.  The doctor sent Plaintiff to a local emergency room, where he was found to have an expansive lesion in the spine and brain involvement.

///

///

///

4

On May 21, 2007, Plaintiff was admitted to the University of California, Davis, Medical Center ("UCD").  Upon admission, Plaintiff was found to have bilateral lower extremity paraparesis, vision loss, weakness in his upper extremities, constipation, renal insufficiency and neurogenic bladder, fever, and elevated white blood cell count. Because Plaintiff's medical history allegedly did not accompany him to the hospital, the UCD treating physicians were unaware of the treatment already rendered to Plaintiff, but the physicians immediately commenced procedures for Central Nervous System ("CNS") disorders.

UCD diagnosed Plaintiff with Acute Disseminated Encephalomyelitis ("ADEM"). ADEM is a neurological disorder characterized by inflammation of the brain and spinal cord caused by damage to the myelin sheath.  Vaccination for tetanus is allegedly a known cause of ADEM.  Upon further testing at Stanford University Medical Center, Plaintiff's diagnosis was ultimately adjusted to include the related neuroimmunologic disorder of the CNS known as Neuromyelitis Optica ("NMO").  NMO attacks the optic nerve and a person with NMO is at risk for multiple attacks.

In 2007, Plaintiff was released from the Jail because of the nature and severity of his condition.  Following his release, Plaintiff achieved significant medical improvement with appropriate treatment through UCD.  In 2009, Plaintiff filed a lawsuit against the County and a number of individual defendants under 42 US.C. § 1983 alleging violations of his civil rights during the 2007 detention.  See Pl.'s Second Am. Compl., Case No. 2:09-cv-0842-MEC-GGH, ECF No. 43.

Plaintiff alleges that, due to the failure to provide timely treatment, he suffered permanent and complete T6 paraplegia with bilateral, severe neuropathic pain, and neurogenic bladder and bowels.  While Plaintiff's condition improved with treatment, he claims to still remain dependent on assistance for his activities in daily living and must use a catheter and diaper.  Plaintiff alleges ongoing serious bouts of depression and emotional distress.

///

On March 23, 2010, Plaintiff was again arrested and detained as a pretrial detainee at the Jail.  At the time of his 2010 arrest, Plaintiff required a wheelchair and was unable to move from the nipple line down.  Plaintiff's medical record allegedly indicates that, during the 2010 detention, all Defendants were aware of Plaintiff's serious neurologic autoimmune disease and were aware that Plaintiff required appropriate treatment.

According to Plaintiff, Defendants were also aware that Plaintiff suffered from osteoporosis and depression with suicidal ideation.  Plaintiff alleges that, for the entirety of his 2010 incarceration, Defendants denied Plaintiff necessary medical treatment despite Plaintiff's repeated requests for such treatment.

Plaintiff alleges that he requested but was not provided enough catheters to adequately relieve his bladder; requested but was denied adequate and timely suppositories and pads; and was not provided adequate medication to control his pain.  As a result, Plaintiff allegedly routinely urinated on himself and his clothes, was left waiting for assistance in soiled clothes, did not have a bowel movement for days, and was in severe pain.  Defendant Bauer allegedly advised Plaintiff to reuse the catheters, thereby increasing the risk of infection.

On March 25, 2010, Plaintiff was allegedly placed on a suicide watch.  Plaintiff was placed on a mattress on the floor without his clothes, "unable to adequately move, unable to reach the call button, in severe pain, under-medicated, and without adequate supplies or treatment to urinate or defecate cleanly and regularly for a period of three days."  CSAC ¶ 172.  As a result, Plaintiff allegedly urinated on himself numerous times, was unable to have regular bowel movements, and developed bed sores.  Because custodial officers at the Jail allegedly routinely interfered with Plaintiff's access to medical care, Plaintiff's bed sores worsened.

On April 9, 2010, Plaintiff complained to the Jail's medical staff of burning on the tip of his penis and so staff ordered another medical prescription, a double mattress, a urine culture, and a test for sexually transmitted diseases.

6

1    On April 11, 2010, Plaintiff was in extreme pain and was screaming in agony.  Plaintiff

2    and a neighboring inmate repeatedly pressed the medical call button.  According to

3    Plaintiff, these calls for help went "ignored" by the on duty day officers, Defendants

4    Medeiros and Jacoby, except for the response of telling the inmates to "stop using the

5    call button."  CSAC ¶¶ 181, 346.  At the end of their shift, Defendants Medeiros and

6    Jacoby informed the night shift that Plaintiff had been "hitting the call button 'constantly.'"

7    CSAC ¶ 182.  The night shift began at 7:00 p.m., and Plaintiff received treatment for the

8    first time that day at 11:40 p.m.

9         By April 22, 2010, Plaintiff claimed he had been experiencing blurry vision in his

10   left eye for two weeks.  A vision exam was performed, but a necessary neurological

11   referral was not requested and instead Plaintiff was referred to be seen by a doctor at

12   some point in the future.  On April 23, 2010, Plaintiff again complained of penile burning,

13   pain in his eye, and vision problems.  At that time, Plaintiff's left eye blurriness with

14   history of ADEM was documented.  Urinalysis and blood work were requested with

15   follow-up in two weeks.  An antifungal agent was prescribed.

16        Plaintiff's pain had not been well-controlled by Norco-5, so Morphine and an

17   increase in Norco 5 were prescribed to control Plaintiff's pain.  On May 4, 2010, Plaintiff

18   reported that he had been experiencing pain, weight loss, and episodes of double vision,

19   but only physical therapy was ordered.  On May 10, 2010, Plaintiff was transferred to

20   UCD where he was diagnosed with acute right optic neuritis.

21        Plaintiff alleges that deliberate indifference on the part of Jail medical personnel

22   resulted in and/or increased the acuteness of his attack and accelerated the recurrence

23   of his disease.  This resulted, according to Plaintiff, in irreversible damage to new areas

24   of myelin, causing cumulative and permanent disfigurement and disability, as well as

25   decreasing Plaintiff's future opportunity for rehabilitation and decreasing his life

26   expectancy.

27   ///

28   ///

7

1    During both incarcerations, Defendant Jordan was the Director of Nursing of the

2   Correctional Health Services in the Sacramento County Jail ("CHS").  She was

3   responsible for maintaining policies, procedures, and training of the nursing staff.  Part of

4   this responsibility was to adopt and implement Standardized Nursing Procedures

5   ("SNPs").  Plaintiff alleges that the nurses under Defendant Jordan's supervision were

6   conducting evaluations outside their licensure.  Plaintiff further alleges that nurses are

7   only legally allowed to operate outside their licensure, when they strictly adhere "to

8   [SNPs] developed by the health facility at the direction of physicians and directors."

9   CSAC ¶ 57.  Additionally, Plaintiff alleges the SNPs were severely deficient and their

10   implementation "resulted in the deprivation of necessary medical treatment."  CSAC

11   ¶ 60.

12    Between 2003 and 2010, several reports were produced that, according to

13   Plaintiff, detailed the adequacy of the care inmates were receiving in the Jail.  These

14   various reports consistently detailed inadequate staffing from medical and custodial

15   perspectives that resulted in delays in getting inmates the proper medical care.  One of

16   these reports included the Grand Jury report of 2005-2006, in which the Sacramento

17   Bee quoted Defendant McGinness expressing the reports' findings contained "no

18   surprises."  [CSAC ¶ 278.]  The Sacramento Board of Supervisors ordered an audit by

19   Joseph A. Brann and Associates ("Brann Report").  Defendant McGinness and

20   Defendant Iwasa provided input during the course of the audit.  The Brann report

21   detailed widespread deficiencies in the Jail operations and gave numerous

22   recommendations.  Defendant McGinness publicly responded to the Brann Report

23   during the October 31, 2006 Board of Supervisors' meeting.  Based on Defendant

24   McGinness' responses, the Sacramento Sheriff's Department presented a staffing

25   analysis, which confirmed that staffing shortages created risks to inmate safety.  In 2008

26   it was determined that the Brann Report recommendations had not been implemented

27   and the overall situation in the Jail had worsened by 2010.

28   ///

1     During the 2010 incarceration, Defendant Iwasa was the undersheriff.  This meant

2 that he shared the responsibility for the overall operation of the Jail and the safety of the

3 inmates with the Sheriff, Defendant McGinness.

4

5 **PROCEDURAL HISTORY**

6     The original complaint for the 2007 incarceration was filed on March 26, 2009

7 ("2009 Suit"), and the original complaint for the 2010 incarceration was filed on

8 February 7, 2011 ("2011 Suit").  The Court consolidated these two cases on May 4,

9 2011, and simultaneously closed the 2009 suit.  Despite the Court's order, Plaintiff

10 continued to file separate complaints for the two suits.  As a result, Plaintiff filed the Third

11 Amended Complaint for the 2009 Suit on March 7, 2012, which named Defendants

12 Iwasa and Jordan as new defendants.  Plaintiff filed a Second Amended Complaint in

13 the 2011 Suit on March 12, 2012, which continued to include Defendant Austin, as he

14 was previously named a party in the original complaint for the 2011 Suit.  As a result of

15 being named in the original complaint for the 2011 Suit, Defendant Austin filed a waiver

16 of service for that suit on April 11, 2011.  Due to the previous consolidation, on

17 March 14, 2012, the Court vacated the amended complaints filed by Plaintiff on March 7,

18 2012, and March 12, 2012, and directed Plaintiff to file "a unified complaint

19 encompassing all allegations made against Defendants," within twenty days.  ECF No.

20 63.  As a result, Plaintiff filed the CSAC on April 3, 2012, which again named Defendants

21 Jordan and Iwasa in the First Claim for Relief and named Defendant Austin for the first

22 time in that claim regarding the 2007 incarceration.

23     On September 27, 2013, after this Motion had been filed, the Court ordered,

24 pursuant to the parties' stipulation, that Defendant Austin be dismissed with prejudice as

25 to the Second Claim for Relief, and that Defendants Iwasa and Jordan be dismissed with

26 prejudice as to the Tenth Claim for Relief.

27 ///

28 ///

1

**STANDARD**

2

3       Under Federal Rule of Civil Procedure 12(c), "a party may move for judgment on

4   the pleadings" after the pleadings are closed "but early enough not to delay trial."  A

5   motion for judgment on the pleadings pursuant to Rule 12(c) challenges the legal

6   sufficiency of the opposing party's pleadings.  See, e.g., Westlands Water Dist. v.

7   Bureau of Reclamation, 805 F. Supp. 1503, 1506 (E.D. Cal. 1992).

8       A motion for judgment on the pleadings should only be granted if "the moving

9   party clearly establishes on the face of the pleadings that no material issue of fact

10  remains to be resolved and that it is entitled to judgment as a matter of law.'"  Hal Roach

11  Studios, Inc. v. Richard Feiner & Co., Inc., 896 F.2d 1542, 1550 (9th Cir. 1989).

12  Judgment on the pleadings is also proper when there is either a "lack of cognizable legal

13  theory" or the "absence of sufficient facts alleged under a cognizable legal theory."

14  Balistreri v. Pacifica Police Dep't., 901 F.2d 696, 699 (9th Cir. 1988).

15      The analysis for evaluating a Rule 12(c) motion is virtually identical to the analysis

16  for a Rule 12(b)(6) motion.  Chavez v. United States, 683 F.3d 1102, 1108 (9th Cir.

17  2012); Cafasso, U.S. ex rel. v. General Dynamics CA Systems, Inc., 637 F.3d 1047,

18  1054 (9th Cir. 2011).  Rule 8(a)(2) requires only "a short and plain statement of the claim

19  showing that the pleader is entitled to relief," to "give the defendant fair notice of what

20  the … claim is and the grounds upon which it rests."  Bell Atl. Corp. v. Twombly,

21  550 U.S. 544, 555 (2007) (internal citations and quotations omitted).  In order to survive

22  a 12(c) motion, the complaint is not required to contain "detailed factual allegations," but

23  it is required to contain "more than labels and conclusions, and a formulaic recitation of

24  the elements of a cause of action" when providing the grounds of the entitled relief.  Id.

25  at 555.  A plaintiff's "factual allegations must be enough to raise a right to relief above

26  the speculative level."  Id.

27  ///

28  ///

10

1    Further, "Rule 8(a)(2) … requires a 'showing,' rather than a blanket assertion, of

2  entitlement to relief.  Without some factual allegation in the complaint, it is hard to see

3  how a claimant could satisfy the requirements of providing grounds on which the claim

4  rests." Id. at 555 n.3 (internal citations omitted).  A pleading must then contain "only

5  enough facts to state a claim to relief that is plausible on its face." Id. at 570.  If the

6  "plaintiffs. . . .  have not nudged their claims across the line from conceivable to plausible

7  their complaint must be dismissed." Id.

8    In reviewing a Rule 12(c) motion, "all factual allegations in the complaint [must be

9  accepted] as true and construe[d] . . . in the light most favorable to the non-moving

10  party." Fleming v. Pickard, 581 F.3d 922, 925 (9th Cir. 2009).  Judgment on the

11  pleadings under Rule 12(c) is warranted "only if it is clear that no relief could be granted

12  under any set of facts that could be proved consistent with the allegations."

13  Deveraturda v. Globe Aviation Sec. Servs., 454 F.3d 1043, 1046 (9th Cir. 2006) (internal

14  citations omitted).

15    Although Rule 12(c) does not mention leave to amend, courts have the discretion

16  in appropriate cases to grant a Rule 12(c) motion with leave to amend, or to simply grant

17  dismissal of the action instead of entry of judgment.  See Lonberg v. City of Riverside,

18  300 F. Supp. 2d 942, 945 (C.D. Cal. 2004); Carmen v. S.F. Unified Sch. Dist.,

19  982 F. Supp. 1396, 1401 (N.D. Cal. 1997).

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

1

**ANALYSIS**[3]

2

3       Defendants Austin, Iwasa, Jacoby, Medeiros and Jordan bring the current motion

4    for judgment on the pleadings in order to dismiss the following Defendants from the

5    following claims as a matter of law: (1) Defendants Austin, Iwasa and Jordan from the

6    First and Tenth Claims for Relief because those claims are time barred; (2) Defendants

7    Jordan, Austin, Iwasa, Jacoby and Medeiros from the Second Claim for Relief;

8    (3) Defendants Jacoby and Medeiros from the Eighth Claim for Relief; (4) Defendants

9    Jacoby and Medeiros from the Ninth Claim for Relief; and (5) Defendants Iwasa, Jordan,

10   Jacoby and Medeiros from the Tenth Claim for Relief.[4]

11      The Court will analyze this Motion in the order enumerated above.  However, as

12   stated above, the parties have stipulated, and the Court has ordered, that Defendant

13   Austin be dismissed from the Second Claim for Relief, and that Defendants Iwasa and

14   Jordan be dismissed from the Tenth Claim for Relief.  Therefore, the Court will not

15   analyze Defendants' arguments regarding those claims.  Additionally, Defendant Austin

16   was dismissed in the Court's previous order as to the Tenth Claim for Relief on

17   August 22, 2012.  Consequently, the Court will not analyze Defendants' arguments

18   regarding that claim either.  ECF No. 93.

19   ///

20   ///

21   ///

22   ///

23
---

24       [3] Plaintiff argues that the Defendants' entire Motion for Judgment on the Pleadings should be
     dismissed because the Court determined in its August 22, 2012 order that newly named Defendants
25   Iwasa, Jordan, Jacoby, Medeiros and Austin were properly added in the CSAC.  The Court considered this
     argument and finds that the Court's early determination was only related to the standard for substitution
     and considerations of judicial economy, and not the standards related to the issues being considered in
26   the current motion.  Thus Plaintiff's argument in this regard is rejected.

27       [4] Plaintiff argues that the affirmative defense of a time bar was not brought in Defendants' Answer
     and therefore is not allowed.  However, Affirmative Defense Nineteen in the Answer specifically asserts
     the applicable time bar defense for no service in the three-year period.  ECF No. 107 at 65.

28

1    **A.    Time Bar of First Claim for Relief as to Defendants Austin, Iwasa and Jordan[5]**

2

3    Plaintiff brings the First Claim for Relief, a violation of the Fourteenth Amendment,

4    pursuant to 42 U.S.C. § 1983.  Since § 1983 does not contain a statute of limitations

5    provision, "federal courts borrow state statutes of limitations for personal injury actions in

6    [s]ection 1983 suits."  Provencio v. Vazquez, 258 F.R.D. 626, 631 (E.D. Cal. 2009)

7    (citing Wilson v. Garcia, 471 U.S. 261, 276 (1985); Canatella v. Van De Kamp, 486 F.3d

8    1128, 1132 (9th Cir. 2007); and Maldonado v. Harris, 370 F.3d 945, 954 (9th Cir. 2004).

9    In borrowing the state statute of limitations related to this case, the Court will utilize

10   California's law regarding relating back provisions and use of fictitious names.  Merritt v.

11   County of Los Angeles, 875 F.2d 765 (9th Cir. 1989).

12   California law provides that a plaintiff may name a defendant in a complaint using

13   a fictitious name when he is ignorant of a defendant's real identity, but when the

14   defendant's true identity is ascertained he must amend the complaint accordingly.  Cal.

15   Civ. Proc. Code § 474.  California law also provides that a "summons and complaint

16   shall be served upon a defendant within three years after the action is commenced

17   against the defendant."  Id. at § 583.210(a).  Additionally, "an action is commenced at

18   the time the complaint is filed."  Id.  "When a defendant is named in the original

19   complaint by fictitious name, but is identified by his true name in an amended complaint,

20   the 'relation back' doctrine applies and the action commences as to such defendant

21   when the original complaint is filed."  Hennessey's Tavern, Inc. v. Am. Air Filter Co.,

22   204 Cal. App. 3d 1351, 1359 (1988).  Therefore, a plaintiff has three years from the time

23   the complaint is filed to identify the fictitious defendants, amend the complaint

24   accordingly and effect service on the defendants.  Norgart v. Upjohn Co., 21 Cal. 4th

25   383, 398 (1999).

26

27   [5] The initial paragraph of Defendants' Motion only references Defendants Iwasa and Jordan in the time bar affirmative defense to the first and tenth claims of relief, but in the Argument section Defendants

28   Iwasa, Jordan and Austin all seek dismissal as to those claims because the claims are time barred. Plaintiff included Defendant Austin in its opposition analysis on this issue, so the Court will do the same.

1     Here, Defendants Austin, Iwasa and Jordan were named in the original 2009

2     complaint, filed March 26, 2009, using fictitious names, which was subsequently

3     amended to reflect their real names.  Therefore, as to the first claim of relief in the

4     original 2009 complaint, the action commenced for Defendants Austin, Iwasa and Jordan

5     on March 26, 2009.

6     Plaintiff argues that the three-year time bar applicable to the First Claim for Relief,

7     as alleged against these three defendants, does not apply for two reasons.  Plaintiff first

8     argues that the CSAC is a new claim that involves new facts and circumstances, and

9     that therefore the three-year period for service started only upon the filing of the

10    amended complaint.  Second, Plaintiff asserts that even if the three-year period for the

11    first claim of relief started on March 26, 2009, Defendants' attorney received service for

12    Defendants Austin, Iwasa and Jordan prior to that deadline through the electronic filing

13    system the Court utilizes.

14

15          **1.      CSAC as a New Claim**

16

17    An amended complaint relates back to the original complaint for purposes of

18    statutes of limitations related to named parties substituted for fictitious defendants when

19    it: "(1) rests on the same general set of facts as the original complaint; and (2) refers to

20    the same accident and same injuries as the original complaint."  Barrington v. A.H.

21    Robins Co., 29 Cal. 3d 146, 151 (1985).  Under the relation-back doctrine, "when a

22    complaint is amended to allege a new cause of action based on different operative facts,

23    the new cause of action is different in nature from any cause of action contained in the

24    earlier complaint, and hence does not relate back."  Id. at 154 (emphasis added).  The

25    relation-back doctrine is not utilized to determine circumstances that excuse service

26    within the three-year period, but rather to determine "when the three-year period starts

27    on a cause of action unrelated to the original complaint."  Id. at 155 (emphasis added).

28    ///

1    In Barrington's and Hennessey's, the plaintiffs were permitted to serve previously named

2    fictitious defendants after three years from the date of the original complaint, but only

3    with respect to causes of actions that had different operative facts and injuries from the

4    original complaint.  Barrington, 29 Cal. 3d at 157; Hennessey's, 204 Cal. App. 3d at

5    1361.  Therefore, when a new cause of action that is unrelated to the facts and

6    circumstances of the original complaint is added to an amended complaint, the three-

7    year period starts for the new cause of action, but does not restart the three-year period

8    for the actions that were related to the original complaint.

9           In the case before this Court, the First Claim for Relief in the 2009 complaint deals

10   with the actions and injuries resulting from the 2007 incarceration.  After the Court

11   directed that a unified complaint be filed, the resulting CSAC contained a first claim of

12   relief that was identical in terms of its operative facts and injuries to the cause of action

13   listed in the original 2009 complaint.  Therefore, the First Claim for Relief in the CSAC

14   relates back to the original complaint filed March 26, 2009, and is not a new unrelated

15   cause of action.  This results in a three-year period for service for the First Claim for

16   Relief in the CSAC (as designated by California Code of Civil Procedure section

17   583.210(a)) beginning on March 26, 2009.  Thus this cause of action is time barred if the

18   concerned Defendants were not served within three years from March 26, 2009.

19

20                      **2.      Service Through ECF**

21

22          There is nothing in the pleadings that indicates that Plaintiff contacted Defendants

23   Iwasa and Jordan's attorney to request a waiver of service prior to the expiration of the

24   three-year deadline for service of the original complaint.  These two defendants were

25   named in the Third Amended Complaint on March 7, 2012, prior to the three-year

26   deadline, but they were not served in any way.

27   ///

28   ///

1   Plaintiff argues that the electronic filing of the amended complaint acts as service

2   to Defendants Iwasa and Jordan's attorney.  However, according to Local Rule 135(f),

3   "[s]ervice of all documents authorized to be served in accordance with

4   Fed. R. Civ. P. 5. . . shall be complete when served upon the attorney for the party, if the

5   party has appeared and is represented by an attorney."  Defendants Iwasa and Jordan

6   had not appeared before this Court in either of the actions related to Plaintiff at the time

7   the Third Amended Complaint was filed.  It is unknown to the Court, whether they were

8   even represented at that time by an attorney.  Additionally, this alleged "service" would

9   have been the initial service of process of the suit as to Defendants Iwasa and Jordan.

10  Such service is governed under Rule 4 of the Federal Rules of Civil Procedure, not Rule

11  5, as dictated by Local Rule 135(f).  Therefore, Defendants could not have been served

12  via the electronic filing system through their eventual counsel with respect to the Third

13  Amended Complaint.

14  Defendant Austin was in a different situation, as he was already a party to the

15  2011 Suit and had appeared before this court in various related matters, and had waived

16  service for the original complaint in the 2011 Suit.  However, Defendant Austin was not

17  named in the First Claim for Relief for the 2009 Suit until the CSAC was filed.  The

18  CSAC was filed on April 3, 2012, after the three-year period elapsed.  This Court sees

19  no justification for extending the three-year period of service for the first claim of relief as

20  to Defendant Austin, and Plaintiff himself offers no argument in that regard.  Plaintiff was

21  aware of Defendant Austin's existence and involvement as early as February 7, 2011,

22  when the original complaint was filed in the 2011 Suit.  Plaintiff failed to include

23  Defendant Austin in the First Claim for Relief, related to the 2007 incarceration, for more

24  than a year, until finally he was included via the CSAC.

25  Based on the foregoing, the Court finds that Plaintiff did not successfully serve

26  either Iwasa, Jordan, or Austin prior to the March 26, 2012 deadline for service for the

27  First Claim for Relief.  Therefore, Defendants' Motion to Dismiss Defendants Austin,

28  Iwasa and Jordan as to that claim is GRANTED without leave to amend.

**B.      Second Claim for Relief: Claims Brought Pursuant to 42 U.S.C. § 1983 for Violations of the Eighth and Fourteenth Amendment for Failure to Provide Appropriate Medical Care. as alleged against Defendants Jordan, Iwasa, Jacoby and Medeiros in Their Individual Capacities**

In his Second Claim for Relief, Plaintiff alleges that Defendants Jordan, Iwasa, Jacoby and Medeiros failed to provide appropriate medical care to Plaintiff during his 2010 incarceration in violation of the Eighth and Fourteenth Amendments.

Under 42 U.S.C. § 1983, an individual may sue "[e]very person, who, under color of [law] subjects" him "to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws."  Individual capacity suits "seek to impose individual liability upon a government officer for actions taken under color of state law."  Hafer v. Melo, 502 U.S. 21, 25 (1991).  Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior. Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009).  Rather, an individual may be liable for deprivation of constitutional rights "within the meaning of section 1983, if he does an affirmative act, participates in another's affirmative act, or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made." Preschooler II v. Clark County Sch. Bd. of Tr., 479 F.3d 1175, 1183 (9th Cir. 2007) (internal quotations omitted).  Thus, a plaintiff cannot demonstrate that an individual officer is liable "without showing of individual participation in the unlawful conduct." Jones v. Williams, 297 F.3d 930, 935 (9th Cir. 2002).  Plaintiff must "establish the integral participation of the officers in the alleged constitutional violation," which requires "some fundamental involvement in the conduct that allegedly caused the violation."  Id. at 935 (internal quotations omitted); Blankenhorn v. City of Orange, 485 F.3d 463, 481 n.12 (9th Cir. 2007).

///

///

///

///

17

1    Government officials acting as supervisors may be liable under § 1983 under

2  certain circumstances.  "[W]hen a supervisor is found liable based on deliberate

3  indifference, the supervisor is being held liable for his or her own culpable action or

4  inaction, not held vicariously liable for the culpable action or inaction of his or her

5  subordinate."  Starr v. Baca, 652 F.3d 1202, 1207 (9th Cir. 2011).  A defendant may be

6  held liable as a supervisor under section 1983 if there exists "either (1) his or her

7  personal involvement in the constitutional deprivation; or (2) a sufficient causal

8  connection between the supervisor's wrongful conduct and the constitutional violation."

9  Hansen v. Black, 885 F.2d 642, 646 (9th Cir. 1989); Starr, 652 F.3d at 1207.

10    A supervisor's physical presence is not required for supervisory liability.  Starr,

11  652 F.3d at 1205.  Rather, the requisite causal connection between a supervisor's

12  wrongful conduct and the violation of the prisoner's Constitutional rights can be

13  established in a number of ways.  Plaintiff may show that the supervisor set in motion a

14  series of acts by others, or knowingly refused to terminate a series of acts by others,

15  which the supervisor knew or reasonably should have known would cause others to

16  inflict a constitutional injury.  Dubner v. City & County of S.F., 266 F.3d 959, 968 (9th Cir.

17  2001); Larez v. City of L.A., 946 F.2d 630, 646 (9th Cir. 1991).  Similarly, a supervisor's

18  own culpable action or inaction in the training, supervision, or control of his subordinates

19  may establish supervisory liability.  Starr, 652 F.3d at 1208; Larez, 946 F.2d at 646.

20  Finally, a supervisor's acquiescence in the alleged constitutional deprivation, or conduct

21  showing deliberate indifference toward the possibility that deficient performance of the

22  task may violate the rights of others, may establish the requisite causal connection.

23  Starr, 652 F.3d at 1208; Menotti v. City of Seattle, 409 F.3d 1113, 1149 (9th Cir. 2005).

24    As opposed to prisoner claims under the Eighth Amendment, a pretrial detainee is

25  entitled to be free of cruel and unusual punishment under the Due Process Clause of the

26  Fourteenth Amendment.[6]

27    [6] In his First Claim for Relief, Plaintiff alleges that County Defendants failed to provide appropriate
medical care during his 2007 incarceration in violation of the Fourteenth Amendment to the Constitution.  It
28  would follow that Plaintiff was a pre-trial detainee at the time these alleged violations because Plaintiff only

1    Bell v. Wolfish, 441 U.S. 520, 537 n.16 (1979); Simmons v. Navajo County, Ariz.,

2    609 F.3d 1011, 1017 (9th Cir. 2010).  The Due Process Clause requires that "persons in

3    custody have the established right to not have officials remain deliberately indifferent to

4    their serious medical needs."  Id. at 1187 (quoting Carnell v. Grimm, 74 F.3d 977, 979

5    (9th Cir. 1996)).  A pretrial detainee's due process right in this regard is violated when a

6    jailer fails to promptly and reasonably procure competent medical aid when the pretrial

7    detainee suffers a serious illness or injury while confined.  Estelle v. Gamble, 429 U.S.

8    97, 104-05 (1976).  Courts use a similar "deliberate indifference" standard for claims

9    brought under the Eighth Amendment for convicted prisoners and the Fourteenth

10   Amendment for pre-trial detainees.  See Gibson v. City of Washoe, 290 F.3d 1175,

11   1187, 1190 n.9 (9th Cir. 2002).

12          Deliberate indifference can be "manifested by prison doctors in their response to

13   the prisoner's needs or by prison guards in intentionally denying or delaying access to

14   medical care or intentionally interfering with the treatment once prescribed."  Id.  In order

15   to establish a plausible claim for failure to provide medical treatment, Plaintiff must plead

16   sufficient facts to permit the Court to infer that (1) Plaintiff had a "serious medical need,"

17   and that (2) individual Defendants were "deliberately indifferent" to that need.  Jett v.

18   Penner, 439 F.3d 1091, 1096 (9th Cir. 2006); cf. Farmer v. Brennan, 511 U.S. 825, 834,

19   837 (1994).

20          Plaintiff can satisfy the "serious medical need" prong by demonstrating that

21   "failure to treat [his] condition could result in further significant injury or the unnecessary

22   and wonton infliction of pain."  Jett, 439 F.3d at 1096 (internal citations and quotations

23   omitted); Clement v. Gomez, 298 F.3d 898, 904 (9th Cir. 2002).

24   ///

25   ///

26   _____

27   invokes the Fourteenth Amendment.  In his Second Claim for Relief, however, Plaintiff alleges Defendants
     failed to provide appropriate medical care during his 2010 incarceration in violation of both the Eighth and
     Fourteenth Amendments to the Constitution.  This suggests that Plaintiff had been convicted of a crime

28   during some portion of the 2010 incarceration, although the CSAC remains unclear on that point.

1    Examples of such serious medical needs include "[t]he existence of an injury that a

2    reasonable doctor or patient would find important and worthy of comment or treatment,

3    the presence of a medical condition that significantly affects an individual's daily

4    activities, or the existence of chronic and substantial pain." Lopez v. Smith, 203 F.3d

5    1122, 1131 (9th Cir. 2000).

6         The Court finds that Plaintiff alleges sufficient facts to make a plausible showing

7    that his medical need was serious during his 2010 incarceration.  At the time of the 2010

8    incarceration, Plaintiff was paralyzed from his nipples down and required a wheel chair.

9    He was suffering from constant pain that needed to be managed through medication.

10   Additionally, he was required to use catheters up to eight times a day in order to urinate.

11   He required proper care and treatment to avoid additional neurological attacks.  Such

12   symptoms and injuries clearly affected Plaintiff's daily activities, caused him chronic and

13   substantial pain, and were injuries that a reasonable doctor or patient would find

14   important.

15        The next issue for the Court is whether individual Defendants were deliberately

16   indifferent to Plaintiff's serious medical need.  The Supreme Court in Farmer explained in

17   detail the contours of the "deliberate indifference" standard.  511 U.S. at 837.

18   Specifically, individual Defendants are not liable under the Eighth or Fourteenth

19   Amendments for their part in allegedly denying necessary medical care unless they

20   knew "of and disregard[ed] an excessive risk to [Plaintiff's] health and safety." Id.;

21   Gibson, 290 F.3d at 1187-88.  Deliberate indifference contains both an objective and

22   subjective component: "the official must both be aware of facts from which the inference

23   could be drawn that a substantial risk of serious harm exists, and he must also draw that

24   inference." Farmer, 511 U.S. at 837.  "If a person should have been aware of the risk,

25   but was not," then the standard of deliberate indifference is not satisfied "no matter how

26   severe the risk." Gibson, 290 F.3d at 1188 (citing Jeffers v. Gomez, 267 F.3d 895, 914

27   (9th Cir. 2001)).

28   ///

1   Plaintiff "need not show that a prison official acted or failed to act believing that harm

2   actually would befall an inmate; it is enough that the official acted or failed to act despite

3   his knowledge of a substantial risk of serious harm." Farmer, 511 U.S. at 842.

4        For the current motion, "[w]hether a prison official had the requisite knowledge of

5   a substantial risk is a question of fact subject to demonstration in the usual ways,

6   including inference from circumstantial evidence, . . . . and a fact finder may conclude

7   that a prison official knew of a substantial risk from the very fact that the risk was

8   obvious." Id. (internal citation omitted); see also Lolli v. County of Orange, 351 F.3d 410,

9   421 (9th Cir. 2003) ("Much like recklessness in criminal law, deliberate indifference to

10  medical needs may be shown by circumstantial evidence when the facts are sufficient to

11  demonstrate that a defendant actually knew of a risk of harm.").

12       "The indifference to medical needs must be substantial; a constitutional violation

13  is not established by negligence or 'an inadvertent failure to provide adequate medical

14  care.'" Anderson v. County of Kern, 45 F.3d 1310, 1316 (9th Cir. 1995) (quoting Estelle,

15  429 U.S. at 105-06).  Generally, defendants are "deliberately indifferent to a prisoner's

16  serious medical needs when they deny, delay, or intentionally interfere with medical

17  treatment." Hallett v. Morgan, 296 F.3d 732, 744 (9th Cir. 2002); Lolli, 351 F.3d at 419.

18  However, "[i]solated incidents of neglect do not constitute deliberate indifference."

19  Bowell v. Cal. Substance Abuse Treatment Facility at Concord, No. 1:10-cv-02336, 2011

20  WL 2224817, at *3 (E.D. Cal. June 7, 2011) (citing Jett, 439 F.3d at 1096).  The Court

21  will apply this standard to Defendants in turn below.

22

23          **1.    Defendant Jordan**

24

25       Defendant Jordan is the supervising nurse for the CHS and, as such, is

26  responsible for creating and implementing the SNPs and training the nurses to follow

27  them.  Plaintiff does not allege that Defendant Jordan was personally involved in the

28  specific acts that allegedly violated Plaintiff's constitutional rights.

21

1    Plaintiff instead argues that there was a significant causal connection between

2    Defendant Jordan's wrongful conduct and the constitutional violation.  However, nothing

3    in the pleadings indicates that Defendant Jordan either (1) set in motion acts or refused

4    to stop acts that he knew or reasonably should have known would cause a constitutional

5    injury to a prisoner; (2) took action or inaction in the training, supervision, or control of

6    her subordinates, which caused the constitutional violation; or (3) acquiesced in any

7    constitutional violation or acted with deliberate indifference toward the possibility that

8    deficient performance of a task by others might violate rights of prisoners.  Dubner,

9    266 F.3d at 968; Laurez, 946 F.2d at 646; Starr, 652 F.3d at 1208; Menotti, 409 F.3d at

10   1149.

11          Although Plaintiff alleges that the nurses were working beyond their licensure,

12   they were doing so in compliance with the applicable SNPs.  These SNPs were

13   developed and put in place by Defendant Jordan and CHS, presumably in compliance

14   with California and Business and Professions Code section 2725.

15          Defendant Jordan created and implemented the SNPs in order to provide medical

16   care to prisoners.  The SNPs directed nurses on how to evaluate and care for the

17   patients and the different steps to take.  Following the SNPs would result in evaluating

18   and caring for prisoners, and would not result in the denial, delay or intentional

19   interference with a prisoner's medical treatment.

20          Based on the pleadings, Defendant Jordan adequately trained the staff to follow

21   the implemented SNPs, as Plaintiff acknowledged that "implementation" of the SNPs by

22   the staff is what "resulted in the deprivation of necessary medical treatment."  CSAC

23   ¶ 60.  This claim suggests that the SNPs were inadequate to provide proper care for

24   someone in Plaintiff's condition.  Even if true, the fact that the SNPs were inadequate to

25   provide proper care does not rise to the level of denying, delaying, or intentionally

26   interfering with a prisoner's medical treatment, which is the conduct that constitutes

27   deliberate indifference.

28   ///

1    Additionally, Plaintiff alleges that the death of inmate Sams in 2006 put Defendant

2    Jordan on notice of the constitutional deficiencies of medical care in the Jail, and the

3    resulting peer review indicated the death was avoidable.  However, there was no

4    determination by a governing body that the medical care provided to Sams was

5    constitutionally deficient.  Nor was it determined that Sams' death resulted from a denial

6    of care rising to the level of deliberate indifference.  Rather, the peer review merely

7    stated that the medical care provided in that situation was not commensurate with the

8    community standard at the time.  CSAC ¶ 289.  These facts did not rise to the level of

9    deliberate indifference, and instead were more consistent with a simple negligent act.

10   According to Plaintiff, Defendant Jordan was also on notice of the other reports that

11   documented the inadequate staffing levels and widespread deficiencies within the jail

12   that impact the ability to care for prisoners.  Plaintiff relies on Star and Redman to show

13   Defendant Jordan's supervisory liability based on his inability to provide adequate

14   staffing levels.  However, the requirement that Defendant Jordan be in charge of the

15   facility's operations is ultimately not met.  Redman v. County of San Diego, 942 F.2d

16   1435, 1446-47 (9th Cir. 1991).   The pleadings do not indicate that Defendant Jordan

17   was ultimately responsible for which prisoners, or how many prisoners, are placed into

18   the Jail, nor do they adequately demonstrate that Defendant Jordan is the individual

19   ultimately responsible and capable of increasing staffing levels to an adequate level.

20   The pleadings make a bare assertion that Defendant Jordan is responsible for "ensuring

21   constitutionally sufficient staffing," but do not indicate that he has the ultimate control

22   over the budgets or staffing numbers within the facility.  CSAC ¶ 21.

23   Defendant Jordan was responsible for implementing procedures to take care of

24   prisoners and to train and supervise his staff to follow these procedures.  The current

25   pleadings confirm that Defendant Jordan's efforts to fulfill these responsibilities rise

26   above deliberate indifference to Plaintiff's serious medical needs.  Therefore, the Motion

27   to Dismiss Defendant Jordan as to the Second Claim for Relief is GRANTED, with leave

28   to amend.

1

### 2.   Defendant Iwasa

2

3      Plaintiff alleges Defendant Iwasa's liability based on deliberate indifference in his

4   supervisory capacity.  There are no allegations that Defendant Iwasa personally

5   participated in the constitutional deprivation of medical care to Plaintiff, so liability must

6   rest in a causal connection between Defendant Iwasa's wrongful actions and Plaintiff's

7   constitutional deprivation.  Hansen, 885 F.2d at 646.

8   ///

9   In Redman, the court found that a reasonable jury could find such a causal connection

10  because the plaintiff alleged that the Sheriff was ultimately in charge of the facility's

11  operations, and knew the facility was not a proper place to detain the plaintiff and posed

12  a risk of harm to him, but placed the plaintiff there anyway.  Redman, 942 F.2d at

13  1446-47.

14      The pleadings allege that Defendant Iwasa, as undersheriff, shared the ultimate

15  responsibility of the Jail operations and safety of the inmates with Defendant McGinness.

16  Additionally, Defendant Iwasa was involved with putting together the Brann Report and

17  familiar with the other reports that documented the inadequate staffing and widespread

18  deficiencies at the Jail to provide proper medical treatment.  This knowledge, combined

19  with the notification to the Jail staff and obvious nature of the needs required by

20  Plaintiff's medical condition, allegedly put Defendant Iwasa on notice that the facility was

21  an improper place to detain Plaintiff and could cause him harm.  Despite this purported

22  knowledge, Defendant Iwasa continued to detain Plaintiff within the Jail.  These facts are

23  consistent with Redman and create a possible causal connection between Plaintiff's

24  injuries and Defendant Iwasa's wrongful acts.  Therefore, the Motion to Dismiss

25  Defendant Iwasa as to the Second Claim for Relief is DENIED.

26  ///

27  ///

28  ///

1

### 3.    Defendants Jacoby and Medeiros

2

3       Plaintiff alleges Defendants Jacoby and Medeiros' liability, based on deliberate

4   indifference, stems from their personal participation in the deprivation of Plaintiff's

5   constitutional rights, on April 11, 2010.  The deprivation occurred when Defendants

6   Jacoby and Medeiros allegedly "ignored" Plaintiff's repeated calls of help for medical

7   care when he continuously pressed the medical call button throughout their shift.  CSAC

8   ¶¶ 181, 346.

9       Plaintiff was in a wheelchair and was paralyzed from the nipples down.

10   Additionally, he required catheters to empty his bladder and pain medication to control

11   his pain levels.  The pleadings adequately allege that the seriousness of Plaintiff's

12   condition and medical needs were, or should have been, apparent to all Defendants,

13   including Jacoby and Medeiros.

14       On April 11, 2010, Plaintiff claims he was screaming in pain and "constantly"

15   pushing the medical call button throughout the shift of Defendants Jacoby and Medeiros.

16   CSAC ¶ 181.  Defendants Jacoby and Medeiros reportedly responded to Plaintiff by

17   telling him to "stop using the call button."  Id.  A jury could certainly find, based on those

18   allegations, that a reasonable person in Defendants Jacoby and Medeiros' positions

19   should have inferred a substantial risk of harm to Plaintiff.  A fact finder could further

20   conclude that, under the circumstances, Defendants Jacoby and Medeiros were actually

21   aware of the potential harm, thereby satisfying both the objective and subjective

22   components of deliberate indifference.  Farmer, 511 U.S. at 837.

23       Defendants Jacoby and Medeiros argue that their actions did not constitute a

24   denial of medical care to Plaintiff, as Plaintiff was given medical care at 11:40 p.m. on

25   the day in question.  However, the facts as alleged in the pleadings indicate that for

26   Defendants Jacoby and Medeiros' entire shift, they "ignored" Plaintiff's requests for help.

27   Plaintiff did not received treatment until four and half hours after Defendants Jacoby and

28   Medeiros left.

1   These facts imply that Defendants Jacoby and Medeiros made no attempt to get Plaintiff

2   medical attention, and Plaintiff  received medical attention only because the next shift

3   ordered it.

4        A reasonable fact finder could determine that denying someone medical care for

5   an entire working shift, and ignoring constant calls for help by a person known to be at

6   substantial risk of harm and screaming in pain, goes beyond mere negligence.  Such

7   actions, or inactions, are substantial and may rise to the level of deliberate indifference.

8   Therefore, the Motion to Dismiss Defendants Jacoby and Medeiros as to the Second

9   Claim for Relief is DENIED.

10

11       **C.**     **Eighth Claim for Relief: Violation of California Civil Code § 52.1**
                  **Against Defendants Jacoby and Medeiros**
12

13       To demonstrate that Defendants Jacoby and Medeiros violated California Civil

14  Code section 52.1, Plaintiff must show they interfered or attempted to interfere with

15  Plaintiff's exercise or enjoyment of his "rights secured by the Constitution or laws of the

16  United States, or of the rights secured by the Constitution or laws of [California]" by

17  means of "threats, intimidation, or coercion."  Cal. Civ. Code § 52.1.  Simply put, this

18  section requires "an attempted or completed act of interference with a legal right,

19  accompanied by a form of coercion."  Jones v. Kmart Corp., 17 Cal. 4th 329, 334 (1998).

20       The right at issue here is Plaintiff's constitutional right to medical care as a

21  prisoner, not the act of pressing the button to signal need for that care.  Plaintiff had

22  already repeatedly pressed the button to signal the need for help, and Defendants

23  Jacoby and Medeiros acknowledge his requests in that regard when they told Plaintiff to

24  "stop using the call button."  At that point, Plaintiff's needs were known to Defendants

25  and any additional pushing of the button would not add to that fact.

26       The attempt to interfere with Plaintiff's rights to medical care was Defendants

27  Jacoby and Medeiros' refusal to summon care in response to Plaintiff's requests.

28  ///

1   This denial of medical care was not accomplished through any threats, intimidation, or

2   coercion, but rather through Defendants Jacoby and Medeiros simply ignoring the

3   requests.  That deprivation of rights is covered by the Second Claim for Relief, for

4   deliberate indifference, as already discussed above.

5        Defendants Jacoby and Medeiros' alleged order that Plaintiff stop using the

6   button also does not rise to the level of an attempt to prevent others from assisting

7   Plaintiff by means of threat, intimidation or coercion.  First, Defendants Jacoby and

8   Medeiros were the ones on duty responsible for responding to the calls.  Given that fact,

9   there really was no one else at that point for Plaintiff to notify.  Second, the pleadings do

10  not indicate that the statement to stop using the call button rose to the level of a threat of

11  some kind to prevent Plaintiff from pressing the button once the day shift was over.  The

12  pleadings only indicate a simple statement by Defendants Jacoby and Medeiros to stop

13  pushing the button, not an admonishment to never push the button again with some

14  implied penalty if Plaintiff did not comply.  Lastly, even if it could be construed that

15  Defendants were attempting to stop Plaintiff from pushing the button into the next shift, it

16  was not to prevent the next shift from being aware that Plaintiff needed medical

17  attention.  In fact, Defendants Jacoby and Medeiros informed the next shift that Plaintiff

18  pushed the button constantly that day, thus informing the next shift of Plaintiff's requests.

19       The pleadings fail to demonstrate that Defendants Jacoby and Medeiros used

20  threats, intimidation, or coercion to interfere or attempt to interfere with Plaintiff's rights

21  as protected by the constitution or laws of the United States or California.  Therefore, the

22  Motion to Dismiss Defendants Jacoby and Medeiros as to the Eighth Claim for Relief is

23  GRANTED, with leave to amend.

24  ///

25  ///

26  ///

27  ///

28  ///

1

2

**D.      Ninth Claim for Relief: Violation of California Government Code**
**§ 845.6 Against Defendants Jacoby and Medeiros**

3      For Plaintiff to demonstrate that Defendants Jacoby and Medeiros violated

4   California Government Code section 845.6, he must show Defendants Jacoby and

5   Medeiros: (1) knew or had reason to know of Plaintiff's need for immediate medical care,

6   and (2) failed to reasonably summon such care. Cal. Gov. Code § 845.6; Jett v. Penner,

7   439 F.3d 1091, 1099 (9th Cir. 2006).

8      As detailed above, Defendants Jacoby and Medeiros were aware of Plaintiff's

9   medical condition and ongoing needs.  Plaintiff's medical condition, combined with his

10   constant pushing of the medical call button and his purported screams of agony, are

11   enough to demonstrate that Defendants Jacoby and Medeiros had reason to know that

12   Plaintiff was in need of immediate medical help on April 11, 2010.  The question is

13   whether Defendants Jacoby and Medeiros reasonably summoned such care.

14      Defendants argue that care was eventually provided to Plaintiff at 11:40 p.m. on

15   April 11, 2010, and that Plaintiff has not proved that Defendants did not summon medical

16   care.  However, Plaintiff alleges that Defendants Jacoby and Medeiros ignored his

17   requests for medical attention for the entirety of their shift, and only informed the next

18   shift that Plaintiff had been pushing the call button.  Medical care was not provided to

19   Plaintiff until nearly four and half hours after Defendants Jacoby and Medeiros left their

20   shift.

21      Based on the pleadings, it can be inferred that Defendants Jacoby and Medeiros

22   made no attempts during their shift to summon medical care and that medical care was

23   only summoned by the night shift after Defendants Jacoby and Medeiros left.  A fact

24   finder could reasonably determine that, by ignoring Plaintiff's calls for medical care and

25   only telling the night shift that Plaintiff pushed the button, Defendants Jacoby and

26   Medeiros unreasonably failed to summon medical care.  Therefore, the Motion to

27   Dismiss Defendants Jacoby and Medeiros as to the Ninth Claim for Relief is DENIED.

28   ///

1
2

**E.     Tenth Claim for Relief: Negligence Against Defendants Jacoby and Medeiros**

3       The Tort Claims Act establishes the general rule that "public employees are liable

4   for their torts except as otherwise provided by statute." Caldwell v. Montoya, 10 Cal. 4th

5   972, 980 (1995).  Here, Plaintiff asserts a claim of relief based on negligence against

6   Defendants Jacoby and Medeiros.  There is no statute that generally prohibits a claim of

7   negligence by a prisoner against the guards.  However, California Government Code

8   section 845.6 applies to prisoners' claims arising from a public employee's failure to

9   provide medical care. Lawson v. Superior Court, 180 Cal. App. 4th 1372, 1383 (2010).

10      A public employee is not "liable for injury proximately caused by the failure of the

11  employee to furnish or obtain medical care for a prisoner in his custody," unless "the

12  employee knows or has reason to know that the prisoner is in need of immediate

13  medical care and he fails to take reasonable action to summon such medical care." Cal.

14  Gov. Code § 845.6.  Therefore, public "employees are immune from claims based on

15  injuries to prisoners caused by a failure to provide medical care, except when an

16  employee, acting within the scope of his employment, fails to provide medical care to a

17  prisoner and has reason to know that need for medical care is immediate." Lawson,

18  180 Cal. App. 4th at 1384.

19      Plaintiff's claim of negligence against Defendants Jacoby and Medeiros appears

20  to rely on their duty to provide Plaintiff with needed medical care.  The pleadings do not

21  assert a duty or breach by Defendants Jacoby and Medeiros, other than the events of

22  April 11, 2010, where Plaintiff alleges that Defendants denied medical care to Plaintiff

23  when he requested it.  Consequently, California Government Code section 845.6

24  applies, as Plaintiff is a prisoner and the duty involved is the obligation to provide

25  needed medical care. Because it is section 845.6, and not principles sounding in

26  negligence, that apply to this claim, the more general negligence claim fails.  Therefore,

27  the Motion to Dismiss Defendants Jacoby and Medeiros as to the Tenth Claim for Relief

28  is GRANTED, with leave to amend.

**CONCLUSION**

For the reasons stated above Defendants Austin, Iwasa, Jacoby, Medeiros, and Jordan's Motion for Judgment on the Pleadings (ECF No. 112) is granted in part and denied in part as follows:

1. With respect to Defendants Austin, Jordan and Iwasa as to the First Claim for Relief, the Motion is GRANTED without leave to amend because the claim is time barred;

2. With respect to Defendants Jordan, Iwasa, Jacoby and Medeiros as to the Second Claim for Relief, the Motion is GRANTED as to Defendant Jordan with leave to amend, and DENIED as to Defendants Iwasa, Jacoby and Medeiros;

3. With respect to Defendants Jacoby and Medeiros as to the Eighth Claim for Relief, the Motion is GRANTED with leave to amend;

4. With respect to Defendants Jacoby and Medeiros as to the Ninth Claim for Relief, the Motion is DENIED; and

5. With respect to Defendants Jacoby and Medeiros as to the Tenth Claim for Relief, the Motion is GRANTED with leave to amend.

IT IS SO ORDERED.

Dated:  January 16, 2014

MORRISON C. ENGLAND, JR., CHIEF JUDGE
UNITED STATES DISTRICT COURT