UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SANDIPKUMAR TANDEL,<br><br>          Plaintiff,<br><br>     v.<br><br>COUNTY OF SACRAMENTO, et al.,<br><br>          Defendants. | No.  2:11-cv-00353-MCE-AC<br>*(Consolidated w/ No. 2:09-cv-00842-MCE-GGH)*<br><br>**MEMORANDUM AND ORDER** |

Through this consolidated proceeding, Plaintiff Sandipkumar Tandel ("Plaintiff") alleges that his civil rights were violated during two separate detentions at the Sacramento County Main Jail from February 7, 2007 to May 20, 2007, and from March 23, 2010 to May 10, 2010.  Presently before the Court is a Motion for Summary Judgment brought on behalf of Chris Smith, M.D. (hereinafter "Dr. Smith" or "Defendant"), one of the individually named defendants in this matter.  Dr. Smith is included as a defendant only in Plaintiff's First Cause of Action, for Failure to Provide Appropriate Medical Care pursuant to 42 U.S.C. § 1983.  He moves for summary judgment as to that claims on grounds that Plaintiff has failed to demonstrate, as a

///

///

///

matter of law, the requisite deliberate indifference on his part. As set forth below, the Court agrees and Dr. Smith's Motion is GRANTED.[1]

## BACKGROUND

This is a complicated case involving numerous claims, multiple defendants, a rare disease, and two separate periods of incarceration. This particular motion, however, is made on behalf of only one defendant, Dr. Smith, and involves a single examination Dr. Smith performed on May 20, 2007. Consequently, in adjudicating Dr. Smith's request for summary judgment, the pertinent facts encompass only a small portion of the wide breadth of Plaintiff's overall claims.

On February 7, 2007, Plaintiff was arrested and incarcerated at the Sacramento County Main Jail ("the Jail") as a pre-trial detainee. Thereafter, on April 27, 2007, he suffered a head injury as a result of an altercation with two other inmates. In addition to a laceration above his right eye, Plaintiff complained of a slight headache but no dizziness, nausea, or vomiting. Defendant's Statement of Undisputed Fact ("SUF") No. 8. Plaintiff was sent to the Emergency Room at Doctor's Center in Sacramento where his wound was cleaned and sutured before a tetanus vaccination was administered. Plaintiff was thereafter sent back to the Jail with instructions to remove the sutures in five days and to keep the wound clean in the meantime.

On May 13, 2007, Plaintiff was seen by Registered Nurse Hank Carl ("Nurse Carl"). He reported that he had been experiencing headaches for the previous four days, but did not complain about his vision or pain involving his eyes. Id. at No. 13. Plaintiff's vital signs were normal and Carl's examination showed his pupils were equal and reactive to light, with full and smooth extraocular eye movements and clear speech. Id. at No. 14. Dr. Smith's first involvement in Plaintiff's care occurred that day when

---

[1] Having determined that oral argument was not of material assistance, the Court ordered this matter submitted on the briefs in accordance with E. D. Local Rule 230(g).

Nurse Carl consulted with him over the phone about Plaintiff's headaches and the need to remove his sutures. Dr. Smith ordered removal of Plaintiff's sutures and prescribed 800 milligrams of Motrin, to be taken twice a day for a period of fourteen days, to alleviate Plaintiff's headaches. Id. at No. 17. Consistent with Dr. Smith's orders, Nurse Carl removed Plaintiff's sutures that same day.

Plaintiff does not dispute that Dr. Smith's care on May 13, 2007, was within the standard of care. Id. at Nos. 105-07. That leaves Dr. Smith's examination of Plaintiff, a week later on May 20, 2007, as the only event where Dr. Smith could have displayed deliberate indifference to Plaintiff's serious medical needs.[2] On May 20th, Plaintiff told custody staff that he was in severe pain and had lost consciousness. Id. at No. 32. Plaintiff was transported to the Jail's infirmary by wheelchair and, when initially examined by Nurse Carl, stated that his legs did not work. Id. at Nos. 33-34. The results of Nurse Carl's physical and neurological examination of Plaintiff were normal, and he noted no gross injuries or other abnormalities that could account for Plaintiff's symptomatology. Id. at No. 35. Nevertheless, Nurse Carl referred Plaintiff to Dr. Smith for further evaluation. Id. at No. 37.

At the time of Dr. Smith's examination at 12:30 p.m. on May 20th, Plaintiff's only complaint was consistent with what he told Nurse Carl that morning--that his legs "didn't work." Id. at No. 38. Dr. Smith conducted a physical and neurological examination of Plaintiff that included both his upper and lower extremities. Id. at No. 40. According to his chart note, he checked Plaintiff's deep tendon reflexes in his arms at the bicep level, just below the wrist, and at the triceps, and in Plaintiff's legs above the kneecap, below the kneecap, and at the Achilles tendon. Id. at No. 41. In checking these reflexes, Dr. Smith was looking for asymmetry, hyperactive, or hypoactive reflexes which could

///

---

[2] Although Plaintiff's papers appear to suggest that Plaintiff's care on May 14, 2007 is also a factor, Plaintiff's chart does not indicate that Dr. Smith treated Plaintiff that day or made any recommendations concerning his care. At most, Smith only signed off on the care provided to Plaintiff on May 14th, which does not suffice to establish deliberate indifference on his part.

3

signal a neurological problem but which were not observed. Id. at No. 42. Dr. Smith found Plaintiff's reflexes to be strong and equal on both sides. Id. at No. 45.

Dr. Smith also checked Plaintiff for clonus, which can indicate spinal cord compromise if positive. Id. at No. 46. Clonus is a screening test where the foot is flexed and held in an extreme extension position. Dr. Smith did not observe clonus on either side of Plaintiff's feet, which was further evidence in Dr. Smith's estimation of the absence of any neurological condition affecting the brain or the spinal cord at that time. Id. at No. 48.

Dr. Smith additionally checked Plaintiff's strength by way of plantar and dorsal flexion to identify any neurological problems. He further checked Plaintiff's lower extremity muscle bulk via visual observation of Plaintiff's legs from foot to upper thigh, and neither asymmetry nor discoloration was noted. Id. at No. 50. In accordance with his custom and practice in performing physical and neurological evaluations of this nature, Dr. Smith states he also would have tested Plaintiff's motor strength by asking Plaintiff to lift his legs off of the bed and push downward against the resistance created by Dr. Smith's hand. In doing so, he was evaluating whether Plaintiff had enough strength to move his legs, which he did. Id. at No. 52.[3]

In addition to performing the physical and neurological examination summarized above, Dr. Smith also observed Plaintiff's ocular movement, speech, and hearing, and determined that Plaintiff was alert and oriented. Id. at No. 59. He found no neurological defects or other abnormalities that would cause Plaintiff's legs not to work, and

///

---

[3] Plaintiff purports to dispute these findings and others on grounds that Dr. Smith had no independent recollection of examining Plaintiff aside from his chart notes (see Smith Dep., 27:13-18; Smith Decl., ¶ 7 pertinent portions of which are attached as Def's Exs. D and Q, respectively ). That lack of recollection seems hardly surprising given the volume of inmates Dr. Smith saw in his capacity as a primary care physician in the Sacramento County Jail and the fact that he was not deposed in this matter until October 21, 2010, well over three years after the May 20, 2007 examination. Additionally, while Plaintiff also takes issue with Dr. Smith's description of the steps he would have taken as part of his regular practice and procedure in conducting a physical/neurological exam, the Court finds custom and practice highly relevant given the fact that Dr. Smith has been a practicing physician since 1981 and has worked in corrections facilities since 1990.

accordingly concluded that he saw no reason why Plaintiff could not ambulate. Id. at Nos. 60-61.

Despite this lack of any objective findings, Dr. Smith also ordered additional testing including sedimentation rate testing, which may indicate inflammation, and TSH (thyroid stimulating hormone) testing, which can indicate abnormalities of muscular function. Id. at Nos. 63-65.

Dr. Smith undertook what he thought was a careful and methodical examination of Plaintiff on May 20, 2007. Id. at No. 68. He did not personally know Plaintiff and harbored no ill feelings against him. Id. at No. 69. The May 20th visit was the first and last time Dr. Smith examined Plaintiff.

About eight hours after Dr. Smith's examination, Plaintiff was observed sitting on the floor of his cell and told custodial staff that he could not move due to constipation. According to Plaintiff's medical chart, an examination at that point identified vision changes for the first time. Id. at No. 73. Plaintiff's left pupil was noted to be sluggish, and his right upper extremities were noted to be weaker than those on the left. This is in contrast with Dr. Smith's examination earlier that day. After being notified of Plaintiff's condition by phone, the Jail's on-call physician at that time, Dr. Horowitz, ordered Plaintiff to be transferred to an outside emergency room for evaluation. Plaintiff was thereafter taken to the U.C. Davis Medical Center for assessment. Id. at Nos. 75, 76.

At the time of his initial evaluation in the Emergency Room, Plaintiff identified "very vague" symptomatology to the examining physician, Dr. J. Douglas Kirk, including some left eye blindness along with generalized weakness in his legs, which had progressed into paralysis of the lower extremities. Id. at No. 78. The lower extremity weakness appeared to resolve, however, after persistent testing of Plaintiff's strength (Id. at No. 79), and the blindness in Plaintiff's left eye also resolved in the course of Dr. Kirk's initial examination. Id. at No. 80. These discrepancies caused Dr. Kirk to note inconsistencies in Plaintiff's presentation of physical signs and symptoms. Id. at No. 81.

///

5

After several MRIs taken between May 20, 2007 and May 24, 2007 revealed spinal cord lesions, Plaintiff was diagnosed with acute disseminated encephalomyelitis ("ADEM"). Id. at Nos. 87-90.  Then, when Plaintiff went to the Stanford Neuroimmunology Clinic several years later for a second opinion, that diagnosis was changed to Neuromyelitis Optica ("NMO") as opposed to ADEM. Id. at No. 96. NMO is a recurrent autoimmune disorder in which the immune system repetitively attacks and injures the central nervous system and, more specifically, the optic nerves and spinal cord. Id. at No. 97.  NMO is an extremely rare disease, being only about 1/100th as common as multiple sclerosis, a similar autoimmune disorder of the nervous system. Id. at No. 98.

Plaintiff's contention that Dr. Smith was deliberately indifferent in his examination rests primarily with the contention that a gait analysis was not performed.  Indeed, Plaintiff's opposition to Dr. Smith's motion for summary judgment, as included in a consolidated opposition that also addresses summary judgment requests made on behalf of twelve other defendants, consists of just three short paragraphs.  With regard to Dr. Smith, Plaintiff simply states that "[a] neurological exam for 'legs not working' must include gait analysis." Pl.'s Opp'n, 24:23-24.  According to Plaintiff, that shortcoming alone reveals Dr. Smith's indifference to Tandel's serious medical need, particularly when coupled with the fact that Tandel subsequently fell to the floor and had to be hoisted into a wheelchair. Id. at 25:3-6.  Given his professed inability to walk, Plaintiff claims that Dr. Smith should have immediately referred Plaintiff to a hospital, despite his finding that he saw no neurological defects or other abnormalities on examination.

## STANDARD

The Federal Rules of Civil Procedure provide for summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v.

1  Catrett, 477 U.S. 317, 322 (1986).  One of the principal purposes of Rule 56 is to
2  dispose of factually unsupported claims or defenses.  Celotex, 477 U.S. at 325.
3       Rule 56 also allows a court to grant summary judgment on part of a claim or
4  defense, known as partial summary judgment.  See Fed. R. Civ. P. 56(a) ("A party may
5  move for summary judgment, identifying each claim or defense—or the part of each
6  claim or defense—on which summary judgment is sought."); see also Allstate Ins. Co. v.
7  Madan, 889 F. Supp. 374, 378-79 (C.D. Cal. 1995).  The standard that applies to a
8  motion for summary adjudication or partial summary judgment is the same as that which
9  applies to a motion for summary judgment.  See Fed. R. Civ. P. 56(a); State of Cal.
10 ex rel. Cal. Dep't of Toxic Substances Control v. Campbell, 138 F.3d 772, 780 (9th Cir.
11 1998) (applying summary judgment standard to motion for summary adjudication).
12      In a summary judgment motion, the moving party always bears the initial
13 responsibility of informing the court of the basis for the motion and identifying the
14 portions in the record "which it believes demonstrate the absence of a genuine issue of
15 material fact."  Celotex, 477 U.S. at 323.  If the moving party meets its initial
16 responsibility, the burden then shifts to the opposing party to establish that a genuine
17 issue as to any material fact actually does exist.  Matsushita Elec. Indus. Co. v. Zenith
18 Radio Corp., 475 U.S. 574, 586-87 (1986); First Nat'l Bank v. Cities Serv. Co., 391 U.S.
19 253, 288-89 (1968).
20      In attempting to establish the existence or non-existence of a genuine factual
21 dispute, the party must support its assertion by

22
23
24
25
> citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits[,] or declarations . . . or other materials; or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

26 Fed. R. Civ. P. 56(c)(1).  The opposing party must demonstrate that the fact in
27 contention is material, i.e., a fact that might affect the outcome of the suit under the
28 governing law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 251-52 (1986);

Owens v. Local No. 169, Assoc. of W. Pulp and Paper Workers, 971 F.2d 347, 355 (9th Cir. 1987). The opposing party must also demonstrate that the dispute about a material fact "is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. In other words, the judge needs to answer the preliminary question before the evidence is left to the jury of "not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed." Id. at 251 (quoting Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)) (emphasis in original). As the Supreme Court explained, "[w]hen the moving party has carried its burden under Rule [56(a)], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586. Therefore, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Id. at 87.

In resolving a summary judgment motion, the evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. Anderson, 477 U.S. at 255. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898 (9th Cir. 1987).

## ANALYSIS

As a pretrial detainee at the time of his incarceration in 2007, Plaintiff was entitled to be free of cruel and unusual punishment under the Due Process Clause of the Fourteenth Amendment. Bell v. Wolfish, 441 U.S. 520, 537 n.16 (1979); Simmons v. Navajo County, Ariz., 609 F. 3d 1011, 1017 (9th Cir. 2010). The Due Process Clause requires that "persons in custody have the established right to not have officials remain

1  deliberately indifferent to their serious medical needs." Gibson v. County of Washoe,
2  Nev., 290 F. 3d 1175, 1187 (9th Cir. 2002) (quoting Carnell v. Grimm, 74 F. 3d 977, 979
3  (9th Cir. 1996)).  A pretrial detainee's due process right in this regard is violated when a
4  jailer fails to promptly and reasonably procure competent medical aid when the pretrial
5  detainee suffers a serious illness or injury while confined. Estelle v. Gamble, 429 U.S.
6  97, 104-105 (1976).  Deliberate indifference can be "manifested by prison doctors in
7  their response to the prisoner's needs or by prison guards in intentionally denying or
8  delaying access to medical care or intentionally interfering with the treatment once
9  prescribed." Id.  In order to establish a plausible claim for failure to provide medical
10 treatment, Plaintiff must plead sufficient facts to permit the Court to infer that (1) Plaintiff
11 had a "serious medical need" and that (2) individual Defendants were "deliberately
12 indifferent" to that need. Jett v. Penner, 439 F. 3d 1091, 1096 (9th Cir. 2006); Farmer v.
13 Brennan, 511 U.S. 825, 834, 837 (1994).

14      Plaintiff can satisfy the "serious medical need" prong by demonstrating that
15 "failure to treat [his] condition could result in further significant injury or the unnecessary
16 and wonton infliction of pain." Jett, 439 F. 3d at 1096 (internal citations and quotations
17 omitted); Clement v. Gomez, 298 F.3d 898, 904 (9th Cir. 2002).  Examples of such
18 serious medical needs include "[t]he existence of an injury that a reasonable doctor or
19 patient would find important and worthy of comment or treatment, the presence of a
20 medical condition that significantly affects an individual's daily activities, or the existence
21 of chronic and substantial pain." Lopez v. Smith, 203 F.3d 1122, 1131 (9th Cir. 2000).
22 The Court finds that Plaintiff alleges sufficient facts to make a plausible showing that his
23 medical need was serious.  At the May 20, 2007 examination, Plaintiff claimed he was
24 unable to walk.  Obviously, such a development would have affected Plaintiff's daily
25 activities to the extent that a reasonable doctor would find such symptoms noteworthy.

26      The next issue for the Court is whether Dr. Smith was deliberately indifferent to
27 Plaintiff's serious medical need.  The Supreme Court, in Farmer, explained in detail the
28 contours of the "deliberate indifference" standard.  Specifically, an individual defendant

1  like Dr. Smith is not liable under the Fourteenth Amendment for his part in allegedly
2  denying necessary medical care unless he knew "of and disregard[ed] an excessive risk
3  to [Plaintiff's] health and safety." Farmer, 511 U.S. at 837; Gibson, 290 F.3d at 1187-88.
4  Deliberate indifference contains both an objective and subjective component: "the official
5  must both be aware of facts from which the inference could be drawn that a substantial
6  risk of serious harm exists, and he must also draw that inference." Farmer, 511 U.S. at
7  837. "If a person should have been aware of the risk, but was not," then the standard of
8  deliberate indifference is not satisfied "no matter how severe the risk." Gibson, 290 F.3d
9  at 1188 (citing Jeffers v. Gomez, 267 F.3d 895, 914 (9th Cir. 2001)). Plaintiff "need not
10 show that a prison official acted or failed to act believing that harm actually would befall
11 on inmate; it is enough that the official acted or failed to act despite his knowledge of a
12 substantial risk of serious harm." Farmer, 511 U.S. at 842.

13    "The indifference to medical needs must be substantial; a constitutional violation
14 is not established by negligence or 'an inadvertent failure to provide adequate medical
15 care.'" Anderson v. County of Kern, 45 F.3d 1310, 1316 (9th Cir. 1995) (quoting Estelle,
16 429 U.S. at 105-06). Generally, defendants are "deliberately indifferent to a prisoner's
17 serious medical needs when they deny, delay, or intentionally interfere with medical
18 treatment." Hallett v. Morgan, 296 F.3d 732, 744 (9th Cir. 2002); Lolli v. County of
19 Orange, 351 F. 3d 410, 419 (9th Cir. 2003). However, "[i]solated incidents of neglect do
20 not constitute deliberate indifference." Bowell v. Cal. Substance Abuse Treatment
21 Facility at Concord, No. 1:10-cv-02336, 2011WL 2224817, at *3 (E.D. Cal. June 7, 2011)
22 (citing Jett, 439 F.3d at 1096). Further, a mere delay in receiving medical treatment,
23 without more, does not constitute "deliberate indifference," unless the plaintiff can show
24 that the delay caused serious harm to the plaintiff. Wood v. Housewright, 900 F.2d
25 1332, 1335 (9th Cir. 1990).

26    Here, the allegations of deliberate indifference levied against Dr. Smith stem from
27 a single examination on May 20, 2007. Dr. Smith's examination notes that day, while
28 brief, document Plaintiff's presenting symptoms, Dr. Smith's objective findings on

examination, his assessment of Plaintiff's condition, and his plan for Plaintiff's continuing care (this was done in accordance with the standard "SOAP," an acronym denoting Subjective Complaints/Objective Findings/Assessment/Plan)).  Dr. Smith's progress note indicates that objective assessment of Plaintiff's upper and lower extremities was made.  Deep tendon reflexes were examined at numerous levels in both the arms and legs.  Those reflexes were determined to be strong and equal on both sides, and Plaintiff was reportedly able to lift his legs on request.  Significantly, too, Dr. Smith's assessment for clonus was negative, which militated against any suggestion of spinal cord compromise.  Dr. Smith also reported that Plaintiff appeared alert and oriented, with no abnormalities noted involving Plaintiff's ocular movement, his speech, or hearing.  Thus, he determined that there were no neurological abnormalities consistent with Plaintiff's claim that his "legs didn't work."  Despite the lack of any positive findings that corroborated Plaintiff's claim in that regard, Dr. Smith's treatment plan included additional testing to further investigate any potential inflammation or compromise in muscular function.  The fact that Dr. Smith both performed a physical and neurological exam, documented his findings, and recommended further assessment does not in itself point to any deliberate indifference.

   While Plaintiff insists that a gait analysis had to be made in order for Dr. Smith's neurological evaluation to fall within the applicable standard of care, that contention is a puzzling one given Plaintiff's professed inability to walk.  Plaintiff was transported to his appointment with Dr. Smith by wheelchair (SUF  No. 37), and the evidence indicates that his legs gave way when custodial staff attempted to have him stand once the examination had concluded.[4]  Performing a gait analysis under those circumstances would not appear to have been possible.  Under the circumstances, the failure to assess Plaintiff's gait simply cannot amount to deliberate indifference.

   Additionally, the fact that Dr. Smith examined Plaintiff only once does not comport with a course of conduct denoting deliberate indifference, since "isolated acts of neglect"

---

[4] See, e.g., Dep. of Gary Mendoza, Pl.'s Ex. 19, 75:16-78:24.

normally do not suffice. Hallett, 296 F.3d at 744. Moreover, while Plaintiff claims that his complaints of partial paralysis should have prompted Dr. Smith to immediately refer him to a hospital for further follow-up, the lack of objective findings in the course of Dr. Smith's examination did not point toward such a referral. Significantly, too, when Plaintiff was seen at the Emergency Room later that day, his symptoms remained both vague and inconsistent. Finally, the fact that Plaintiff was ultimately diagnosed with NMO, a rare disease occurring only about 1/100 as frequently as multiple sclerosis, makes it improbable that someone like Dr. Smith (who is not a neurologist) would necessarily have appreciated its particular symptoms. Even the physicians at U.C. Davis did not initially make the proper diagnosis. It was not until three years later, after multiple MRIs, that NMO was ultimately identified as being responsible for Plaintiff's condition. There certainly is no evidence that Dr. Smith was aware of the risk of NMO at the time he examined Plaintiff on May 20, 2007.

     It is also worth noting that little, if anything, would have changed had Dr. Smith recommended that Plaintiff be further evaluated at the hospital following his May 20, 2007 evaluation, since Plaintiff was transported to the Emergency Room at the U.C. Davis Medical Center less than twelve hours later given his worsening symptoms later that day. Consequently, any delay in treatment occasioned by Dr. Smith was a matter of only hours, and there is no evidence of any scientifically proven therapies that would have affected Plaintiff's outcome had they been performed earlier. UMF No. 103. As indicated above, mere delay in receiving medical treatment, without more, cannot constitute the requisite deliberate indifference unless plaintiff can show that the delay caused him serious harm, and Plaintiff has not done so here. See Wood, 900 F.3d at 1335.

     The law sets a high bar for establishing deliberate indifference. To meet that standard in the present case, mere negligence is not enough. Instead, Dr. Smith must have both affirmatively known that a substantial risk of harm existed in Plaintiff's case and failed to act in the face of that knowledge. Farmer, 511 U.S. at 837. There simply is

no evidence here that Dr. Smith had the required knowledge. He performed what appears to have been a thorough examination of Plaintiff and, even in the absence of objective findings, ordered additional testing. Plaintiff has not demonstrated that Dr. Smith was deliberately indifferent to Plaintiff's serious medical needs as a result of his examination of Plaintiff on May 20, 2007.

**CONCLUSION**

Based on the foregoing, the Court finds that Plaintiff cannot, as a matter of law, establish liability on the part of Defendant Christopher Smith, M.D., for failure to provide appropriate medical care pursuant to 42 U.S.C. § 1983, as asserted in Plaintiff's First Cause of Action. That is because Plaintiff has not, and cannot under the circumstances of this case, show the deliberate indifference required on Dr. Smith's part to support liability on that basis. Dr. Smith's Motion for Summary Judgment (ECF No. 136) is accordingly GRANTED, and Dr. Smith shall be dismissed as a defendant to this lawsuit.

IT IS SO ORDERED.

Dated: March 3, 2015

_____
MORRISON C. ENGLAND, JR, CHIEF JUDGE
UNITED STATES DISTRICT COURT