1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                          EASTERN DISTRICT OF CALIFORNIA

10

11   SANDIPKUMAR TANDEL,                    No.  2:11-cv-00353-MCE-AC

12              Plaintiff,                   (Consolidated with No. 2:09-cv-00842-MCE-
                                            GGH)
13        v.

14   COUNTY OF SACRAMENTO,  et al.,
                                            **MEMORANDUM AND ORDER**
15              Defendants.

16

17

18        Through this consolidated proceeding, Plaintiff Sandipkumar Tandel ("Plaintiff")

19   alleges that his civil rights were violated during two separate detentions at the

20   Sacramento County Main Jail ("the Jail") from February 7, 2007 to May 20, 2007, and

21   from March 23, 2010 to May 10, 2010.  Presently before the Court is a Motion for

22   Summary Judgment brought on behalf of all remaining named Defendants in this action

23   except for Defendant Chris Smith, M.D., whose counsel filed a separate Motion for

24   Summary Judgment on his behalf.[1]  Moving Defendants here, the County of

25   Sacramento, Sheriff John McGuiness, Ann Marie Boylan, Michael Sotak, M.D., Susan

26   ───────────────────────
          [1] Dr. Smith's concurrently filed Motion for Summary Judgment (ECF No. 136) was granted by
27   Memorandum and Order filed March 4, 2014 (ECF No. 166).  Some of Plaintiff's factual citations in support
     of the present motion refer to evidence submitted on Dr. Smith's behalf.  References in this order to that
28   evidence will be designated as "Smith MSJ," followed by the appropriate exhibit and ECF number
     designations.

Kroner, RN, Agnes R. Felicano, NP, Glayol Sahba, M.D., Richard Bauer, M.D., and

Deputies Stephanie Jacoby, Mark Medeiros, and Mark Iwasa, allege that they are

entitled to summary judgment as to Plaintiff's claims due to the absence of any triable

issues of fact.

Plaintiff's first and second causes of action allege violations of the Fourteenth

Amendment to the United States Constitution, against both supervisory and medical

defendants, pursuant to 42 U.S.C. § 1983. Then, in his third through fifth claims, Plaintiff

asserts so-called <u>Monell</u> claims against the County of Sacramento alleging liability for

1) its custom and practice in permitting the alleged lapses in denying or delaying

Plaintiff's medical care to occur; 2) its failure to properly train custodial staff; and 3) its

failure to adequately staff and supervise custody and medical personnel.  Plaintiff

thereafter, in his seventh claim, goes on to allege violations of both the Rehabilitation Act

of 1973, 29 U.S.C. § 701, et seq. ("Rehabilitation Act") and Title II of the Americans with

Disabilities Act, 42 U.S.C. § 12101, et seq. ("ADA").  Finally, Plaintiff makes several

claims sounding in state law, including a claim for violation of California Government

Code § 845.6.[2]  As set forth below, Defendants' Motion for Summary Judgment as to

those claims is GRANTED in part and DENIED in part.[3]

///

///

---

[2] Plaintiff's remaining claims have been narrowed both through previous Rule 12(b)(6) motions as well as concessions made by Plaintiff in opposition to the present motion.  Various defendants have been dismissed voluntarily, either from the case in its entirety or from various claims.  Additionally, the Court's Memorandum and Order filed August 22, 2012 (ECF No. 93) dismissed Plaintiff's Sixth Claim for Relief, which alleged retaliation in violation of the First Amendment. Plaintiff's Opposition to this Motion agrees to dismiss the Eighth Claim for Relief, which alleged violations of California Civil Code § 52.1.  Plaintiff's Opposition also agrees to dismiss the Tenth and Eleventh Claims for Relief (alleging Negligence and Medical Negligence, respectively, against Defendant County, as well as Defendants Sotok, Bauer, and Sahba).  Finally, the Opposition agrees to dismiss Defendant Wilson from this case in its entirety.

[3] The Court notes that Defendants' Motion is specifically denominated as a request for summary judgment, and the Notice of Motion contains no reference to partial summary judgment being sought against particular claims involving the various defendants.  Nonetheless, since the body of Defendants' Opening Points and Authorities does state that Defendants "move for summary judgment and/or summary adjudication of the claims that arise from Plaintiff's Consolidated Second Amended Complaint" (1:12-13), the Court will treat this motion as alternatively requesting partial summary judgment.

**BACKGROUND**

This is a complicated case involving numerous claims, multiple defendants, a rare disease, and two separate periods of incarceration.

On February 7, 2007, Plaintiff was arrested and incarcerated at the Sacramento County Main Jail ("the Jail") as a pre-trial detainee. Thereafter, on April 27, 2007, he suffered a head injury as a result of an altercation with two other inmates. Defendants' Statement of Undisputed Fact ("SUF"), No. 56. In addition to a laceration above his right eye, Plaintiff complained of a slight headache but no dizziness, nausea, or vomiting. Id. at Nos. 63-65. Plaintiff was sent to the Doctor's Center in Sacramento, an urgent care facility, where his wound was cleaned and sutured before a tetanus vaccination was administered. Id. at No. 59. Plaintiff was thereafter sent back to the Jail with instructions to remove the sutures in five days, and to keep the wound clean in the meantime.

The day after returning from urgent care, Plaintiff complained of ongoing headaches when he was evaluated by a nurse. Two days later, on April 30, 2007, Plaintiff continued to complain of headaches when evaluated by Dr. Asa Hambly. Defendants contend, however, that Plaintiff made no complaints regarding the need for ongoing medical care during the following two weeks, from May 1, 2007 to May 12, 2007. See id. at No. 70. According to Defendants, during this period, Plaintiff failed to sign up for so-called "Nurses' Sick Call ("NSC"), the primary vehicle through which inmates could seek care for most non-urgent matters. Id. at No. 12. If Plaintiff had signed up on the NSC list, he would have been seen the following day by either a Registered Nurse or Nurse Practitioner, and potentially referred to a physician for further evaluation thereafter. Id. at No. 13. Defendants further allege that Plaintiff did not seek walk-in care, contact custody personnel about his medical issues through his cell intercom or during the hourly cells checks or security count, or take advantage of any other opportunity to inform custody or medical staff of any medical issue. See id. at No. 71. Plaintiff takes issue with Defendants' assertions in that regard, claiming that

3

between May 5, 2007 and May 16, 2007, he repeatedly attempted to complain, by use of his call button, about continuing severe head pain, inability to sleep, and the need for prescribed ointment and clean water to keep his wound disinfected.  Pl.'s Ex. 2 at ¶¶ 121-25; Ex. 25 at 66:22-67:17.[4]  Although unit housing logs were supposed to document the use of a call button for a medical emergency (Defs.' Ex. 32 at ¶ 16), the logs for the unit where Plaintiff was housed were silent as to these alleged complaints until May 13, 2013.  See Defs.' Ex. 3.

On May 13, 2007, after alerting custodial staff during an hourly cell check that he was having head pain, Plaintiff was seen by registered nurse Henry Carl.  SUF at Nos. 75, 77.  Plaintiff reported headaches for the past four days, but did not complain about his vision or pain involving his eyes.  Id. at No. 13.  Plaintiff's vital signs were normal, his speech was clear, and Carl's examination showed his pupils were equal and reactive to light, with full and smooth extraocular eye movements.  Id. at No. 78.   Nurse Carl consulted with Defendant Chris Smith, M.D., over the phone about Plaintiff's headaches and the need to remove his sutures.  Dr. Smith ordered removal of Plaintiff's sutures and prescribed 800 milligrams of Motrin, to be taken twice a day for a period of fourteen days, to alleviate Plaintiff's headaches.  Consistent with Dr. Smith's orders, Nurse Carl removed Plaintiff's sutures that same day.  Id. at Nos. 79-80.

On or about May 14, 2007, Plaintiff again sought medical attention on a walk-in basis, complaining of headaches, sensitivity to light, and a nasal drip.  Id. at No. 82. Plaintiff was examined by a nurse, Jim Austin, who found no evidence of ocular or neurological involvement, and Plaintiff was returned to his cell.  Id. at Nos. 83-84. Plaintiff's cellmate, Jose Govea, nonetheless subsequently reported that Plaintiff had been exhibiting symptoms of gait impairment and neurological deficits by May 16th, stating as follows:

---

[4] The Court notes that both sides have objected to certain evidence proffered in support of their respective positions in this matter.  Most of the evidence at issue in this regard has not been relied upon by the Court in ruling on Defendants' Motion.  The accordingly need to rule on those objections and declines to do so.  To the extent that evidence cited in this Memorandum and Order was subject to objection, those objections are overruled.

4

> "Tandel was always stumbling as he walked, but the guards
> didn't take notice.   I told the guards that Tandel needed
> medicine, but the guards said the doctor will see him.   Other
> inmates told the guard that he needed medical attention, but I
> don't know if they gave him medicine or anything!"

Pl.'s Ex. 8.

On May 17, 2007, Plaintiff collapsed while taking a shower when he lost control of his legs. SUF at No. 93.  Plaintiff claims he yelled for help for 30 minutes or more (Pl.'s Ex. 25 at129:1-14) and eventually, since he was unable to get up, had to put on his underwear, pants and shirt by "rolling around the floor." Id. at 125:17-21.  Deputy Pablito Gaddis eventually responded to Plaintiff's request for help, but allegedly failed to use the radio to properly alert medical and custody staff of the emergency.  According to Plaintiff, in violation of Jail policy, Gaddis also failed to file an incident or casualty report.  Gaddis and another deputy were admonished for failing to properly respond to, report, and log the shower incident, and Gaddis was formally disciplined for his handling and reporting of the incident.  Pl.'s Ex. 35; Ex. 17 at 126:5-15, 130:1-131:5.

After Plaintiff was taken by wheelchair for evaluation, he told Nurse Carl about his unexplained loss of use of his extremities and collapse.  SUF at Nos. 98-99.  Plaintiff alleges that Carl failed to conduct an adequate medical assessment of a patient with an apparent spinal cord injury or neurological disorder, although Carl's chart notes indicate that Plaintiff's lower extremity reflexes were positive and that Plaintiff was able to take his shoes off. Id. at Nos. 101-02.  Carl ordered Plaintiff returned to his cell, without arranging for any medical follow up.  Carl alleges that when released to return to his cell, Plaintiff walked without assistance. Id. at No. 104.  This is disputed by Tandel.

On May 18, 2007, Plaintiff had a sudden and acute loss of vision in his left eye and started noticing that he was unable to move his lower extremities.  He was also suffering from urinary retention and constipation, and found he could not control his bladder and bowels.  Pl.'s Ex. 2 at ¶¶ 32-33, 39; Smith MSJ, Ex. H, ECF No. 136-12 at 241-46; Defs.' Ex. 1 at 113-14.  According to Plaintiff, he repeatedly rang the emergency bell to summon help and informed the officers on duty that his legs did not

5

1   work, that he could not urinate, and that he was going blind, but was told to stop using

2   the call button and that "this was not going to kill me."  Pl.'s Ex 2 at ¶¶ 32-35, 39.  On

3   May 19th, after Plaintiff claims to have repeatedly used the call button to frantically

4   request help,[5] the custody officers allegedly punished the entire pod by removing

5   dayroom privileges and locking the entire pod down for the day due to what appears to

6   have been Plaintiff's excessive use of the call button for aid.  Defs.' Ex. 4 at 395; Ex. 3 at

7   337. Moreover, on May 19th, when officers finally responded, they simply told Plaintiff to

8   sign up for non-emergent NSC the following day.  Pl.'s Ex 4 at 392.

9        Then, on May 20th, Plaintiff again activated the call button in his cell, telling

10   custody staff that he was in severe pain and had lost consciousness.  SUF at No. 113.

11   Plaintiff was transported by wheelchair to the Jail's infirmary and, when initially examined

12   by Nurse Carl, stated his "legs don't work."  Id. at No. 116.  Nurse Carl's own

13   examination of Plaintiff was normal, and he noted no gross injuries or other

14   abnormalities that could account for Plaintiff's symptomatology.  Id. at Nos. 118-19.

15   Nevertheless, since this was the second time he had seen Plaintiff with virtually identical

16   complaints and physical presentation, Nurse Carl referred Plaintiff for further evaluation

17   by Dr. Smith.  Id. at No. 120.

18        At the time of Dr. Smith's examination at 12:30 p.m. on May 20th, Plaintiff's only

19   complaint, consistent with what he told Nurse Carl that morning, was that his legs "didn't

20   work."  Dr. Smith conducted a physical and neurological examination of Plaintiff that

21   included both his upper and lower extremities.  He found no neurological defects or other

22   abnormalities consistent with Plaintiff's claim that his legs did not work, and accordingly

23   concluded that there was no reason why Plaintiff could not ambulate.  Id. at Nos. 120-21.

24   He cleared him to return to his cell.  Id. at No. 122.

25        About eight hours after Dr. Smith's examination, Plaintiff was observed sitting on

26   the floor of his cell, and told custodial staff that he could not move due to constipation.

27   _____

28        [5] Plaintiff estimates he pushed his call button, screaming for help, up to 40 times.  Pl.'s Ex. 2 at ¶ 35, Pl.'s Ex. 25 at 142:6-143:6.

Id. at No. 132.  According to Plaintiff's medical chart, an examination revealed for the first time that Plaintiff had vision changes, signaling a potential neurological issue.  Id. at No. 135.  In contrast with Dr. Smith's examination earlier that day, Plaintiff's left pupil was noted to be sluggish, and his right upper extremities were noted to be weaker than those on the left.  After being notified of Plaintiff's condition by phone, the Jail's on-call physician at that time, Dr. Horowitz, ordered Plaintiff to be transferred to an outside emergency room for evaluation.  Plaintiff was thereafter taken to the U.C. Davis Medical Center for assessment.  Id. at No. 136.

At the time of his initial evaluation in the Emergency Room, Plaintiff identified "very vague" symptomatology to the examining physician, J. Douglas Kirk, M.D., including some left eye blindness along with a generalized weakness in his legs that had progressed into paralysis of the lower extremities.  The admission note describes Plaintiff's urine and bowel retention as consistent with being unable to urinate or defecate for the past three days.  Smith MSJ, Ex. H, ECF No. 136-12 at 241-46.  The lower extremity weakness, however, appeared to resolve after persistent testing of Plaintiff's strength, and the blindness in Plaintiff's left eye also resolved in the course of Dr. Kirk's initial examination.  These discrepancies caused Dr. Kirk to note inconsistencies in Plaintiff's presentation of physical signs and symptoms.  SUF at No. 139.

Plaintiff's symptomatology initially continued to baffle his attending doctors at UCD, which included infectious disease specialists, critical care specialists, and neurologists (Id. at No. 145), and it was not until the sixth day of his hospitalization  at the U.C. Davis Medical Center that Plaintiff was ultimately diagnosed with Acute Disseminated Encephalomyelitis ("ADEM").  ADEM is a neurological disorder characterized by inflammation of the brain and spinal cord caused by damage to the myelin sheath.  Vaccination for Tetanus is allegedly a known cause of ADEM.  As a result of Plaintiff's initial bout with what was believed to be ADEM, he was rendered a T4 paraplegic.  Plaintiff requires catheterization to void his bladder, and further needs stool

1   softeners, suppositories, and digital stimulation to move his bowels.  Id. at No. 150.  The

2   initial attack also damaged Plaintiff's left optic nerve and left him with decreased vision

3   on that side.  Id. at No. 151.  Plaintiff alleges that delay in receiving treatment

4   exacerbated those symptoms.

5       Ultimately, given the nature and severity of his condition, Plaintiff was released

6   from incarceration in 2007.  Although his disease process was inactive, Plaintiff

7   nonetheless suffered from chronic pain as a result of the neurological damage he

8   sustained, requiring appropriate pain medication and physical therapy.  Pl.'s Ex. 13 at

9   23:22-24:8; Defs.' Ex. 39 at 1366-68.  Plaintiff eventually became capable of managing

10   his bowels without regular accidents.  His family provided constant nursing care to

11   ensure that he was clean and not sitting or lying in his own feces, and further ensured

12   that no pressure sores were developing.  Pl.'s Ex 24 at 37:6-22; Ex. 4 at ¶¶ 14-16; Ex. 2

13   at ¶ 49).

14       In 2009, Plaintiff filed a lawsuit against the County and a number of individual

15   defendants under 42 U.S.C. § 1983 alleging his civil rights' violations during the 2007

16   detention.  (See Pl.'s Second Am. Compl., Case No. 2:09-cv-0842-MEC-GGH, ECF

17   No. 43.)

18       In 2010, Plaintiff went to the Stanford Neuroimmunology Clinic for a second

19   opinion concerning his condition.  As a result of Stanford's assessment, Plaintiff's

20   diagnosis was changed to Neuromyelitis Optica ("NMO") as opposed to ADEM.  SUF at

21   Nos. 152-53.  NMO is a recurrent autoimmune disorder in which the immune system

22   repetitively attacks and injures the central nervous system and, more specifically, the

23   optic nerves and spinal cord.  NMO is an extremely rare disease, being only about

24   1/100th as common as multiple sclerosis, a similar autoimmune disorder of the nervous

25   system.

26       On March 23, 2010, Plaintiff was again arrested and detained as a pretrial

27   detainee at the Jail, this time for purchasing ammunition in violation of the terms of his

28   release.   At the time of his 2010 arrest, Plaintiff required a wheelchair and was unable to

8

1   move from the nipple line down.  Plaintiff's medical record also allegedly indicates that,

2   during the 2010 detention, all Defendants were aware of Plaintiff's serious neurologic

3   autoimmune disease and that Plaintiff required appropriate treatment.  After he was

4   booked, a nurse practitioner, Defendant Agnes Felicano, noted Plaintiff's need for

5   catheters and wrote an order for four.  She also wrote an order authorizing him to keep a

6   urinal with him at all times.  While Felicano offered Plaintiff Ultram to manage pain, he

7   refused it.  Id. at Nos. 177-181.  The following day, March 24th, Plaintiff was seen by two

8   physicians, Defendants Richard Bauer and Michael Sotak, as well as two nurses.

9   Plaintiff was ultimately given straight catheters, a suppository for bowel care, and an egg

10  crate mattress.  Id. at Nos. 182-184.

11          On March 25, 2010, Plaintiff allegedly threatened suicide and admitted that the

12  reason he purchased ammunition was to effectuate a suicide attempt in the wake of his

13  NMO diagnosis.  See id. at 185.  Defendant Gloyal Sahba, M.D., subsequently put

14  Plaintiff on a suicide watch.  Defendant Sotak conferred with Medical Director of Jail

15  Psychiatric Services, Defendant Greg Sokolov, concerning a plan to address both his

16  acute suicidality and his special medical needs.  Id. at No. 187.  Defendant contends that

17  while on suicide watch between March 27th and March 27th [??], Plaintiff not only

18  received standard psychiatric precautions and services, but also continued to receive the

19  same level of healthcare as other inmates housed in the medical unit.  Id. at Nos. 188-

20  193.  Plaintiff disagrees, and states that the Jail's psychiatric unit was unable to handle a

21  catheterized patient with his medical issues.  According to Plaintiff, Defendants Sokolov,

22  Sahba, and Sotak knowingly left Plaintiff "to lay naked, on a mattress on the floor, unable

23  to adequately move, unable to reach the call button, in severe pain, under-medicated,

24  and without adequate supplies or treatment to urinate or defecate cleanly and regularly

25  for a period of three days."  Consolidated Second Am. Compl., ECF No. 73 at ¶ 172.

26  This assertion is countered by Defendants, who claim that Plaintiff refused his morning

27  pain medication between March 25th and 29th, and was provided all necessary medical

28  supplies, including catheters.  Plaintiff nonetheless claims he urinated on himself

1   numerous times, was unable to have regular bowel movements, and developed bed

2   sores. Pl.'s Ex 2, at ¶¶ 85-86, 90-9.  Plaintiff also contends the bed sores worsened

3   because of his lack of access to medical care.  Pl.'s Ex. 6 at ¶¶ 25-27; Ex. 2 at ¶¶ 86, 91.

4         On April 7, 2010, Plaintiff was inexplicably transferred out of the medical unit and

5   into the general population section of the Jail.  Defs.' Ex. 2 at 2237.  Plaintiff claims this

6   move decreased his access to medical care during a time when his symptoms were

7   worsening.

8         On April 9, 2010, Plaintiff complained to Dr. Sabha of a burning sensation on the

9   tip of his penis during urination and pressure sores on his inner knees.  SUF at No. 200.

10   Sabha ordered an ointment to be applied to Plaintiff's knees, a double mattress, a urine

11   culture, and a test for sexually transmitted diseases.  Id. at Nos. 202-04.

12         Although Dr. Sabha purportedly increased the dosage of Plaintiff's pain

13   medication (Id. at No. 205), Plaintiff's neighboring inmate allegedly pressed the call

14   button on Plaintiff's behalf several times after hearing Plaintiff screaming in agony, but

15   custody staff never responded.  Defendant Deputies Jacoby and Medeiros, who worked

16   the day shift on April 11th, informed oncoming night shift personnel that they were

17   having problems with Plaintiff "[y]elling and screaming and causing a problem hitting the

18   button constantly . . ."  Pl.'s Ex. 28 at 70:19-71:25.  In contravention of Jail policy, no

19   entries were logged relating to these complaint or to Plaintiff's emergency intercom

20   usage.  Defs.' Ex. 5 at5380-82.

21         It is undisputed that late on the evening of April 11th, Plaintiff activated his

22   emergency intercom and complained of pain with catheterization.  SUF at No. 208.  A

23   supervising registered nurse, Charles Munn, responded when custody staff notified him

24   of Plaintiff's complaint.  Munn provided narcotic pain medication and transferred to the

25   Jail's medical unit for observation and further testing.  Id. at Nos. 211-12.  A urine dip

26   test was subsequently taken.  Id. at No. 214.  On April 13, 2010, Defendant Bauer

27   prescribed an antibiotic to Plaintiff to alleviate a urinary tract infection, and also switched

28   Plaintiff's pain medication to Norco.  Id. at Nos. 219-220.

On April 22, 2010, Plaintiff  was seen by Defendant Susan Kroner, a registered nurse.  He complained of burning pain, rated as a 9 on a scale of 1 to 10, in his left knee, and for the first time stated that for the previous two weeks he had been experiencing blurry vision involving the left eye.  Id. at Nos. 227-28.  Kroner performed a vision test, and noted that Plaintiff's vision in the right eye was better than his left.  Given that discrepancy, Kroner referred Plaintiff to be seen by a physician the following day.  Id. at No. 231.  She failed to arrange for any more immediate care.

On April 23rd, Plaintiff was again seen by Dr. Sabha.  In addition to continuing to identify penile pain, Plaintiff further reported generalized pain in his legs and back, as well as vision changes.  Id. at Nos. 234-35.  After examining Plaintiff, Sabha prescribed Flexeril for back pain, ordered follow-up urinalysis for a potentially continuing urinary tract infection, and, because of Plaintiff's vision complaints, requested referrals to an ophthalmologist and a neurologist.  Id. at Nos. 235-236.

According to Defendants, Plaintiff was also evaluated by Dr. Bauer on five occasions, between April 27, 2010 and May 4, 2010 for management of his chronic pain.  Id. at No. 237.  Over this period, Bauer changed Plaintiff's pain medication and adjusted his dosages in an attempt to better manage Plaintiff's chronic discomfort.  Id. at No. 238.

On May 4, 2010, Plaintiff was also seen by Dr. Sotak.  He complained of a double vision episode that had resolved, as well as muscle stiffness and weight loss, apparently because of Plaintiff declining to eat some of his food because of religious preferences.  Dr. Sotak prescribed high-calorie liquids, along with physical therapy.  Id. at Nos. 246-27.

On May 9, 2010, Plaintiff was seen by Dr. Bauer and reported both headaches and pain in his right eye for three days.  Because Dr. Bauer's exam showed Plaintiff's eye movements to be intact, and because Bauer believed that Plaintiff's headaches were potentially attributable to an increased morphine dosage, he discontinued MS Contin (morphine) and restarted Norco.  Id. at Nos. 251-54.  The next day, when Plaintiff's continued complaints prompted an evaluation by Dr. Sotak, Dr. Sotak observed ///

1    what appeared to be decreasing vision in Plaintiff's right eye, and referred Plaintiff for

2    emergency transfer to the U.C. Davis Medical Center.  Id. at Nos. 256-57.

3        After being admitted to the Medical Center, an MRI confirmed the presence of

4    neuritis in Plaintiff's right optic nerve.  Id. at No. 258.  Plaintiff was diagnosed with a

5    recurrence of NMO and received treatment accordingly.  Id. at No. 259.

6        Plaintiff alleges that medical Defendants' deliberate indifference resulted in and/or

7    increased the acuteness of his new attack and accelerated the recurrence of his

8    disease.  Plaintiff claims this resulted in irreversible damage to new areas of myelin,

9    causing cumulative and permanent disfigurement and disability, as well as decreasing

10   Plaintiff's future opportunity for rehabilitation and his overall life expectancy.

11

12                                **STANDARD**

13

14       The Federal Rules of Civil Procedure provide for summary judgment when "the

15   movant shows that there is no genuine dispute as to any material fact and the movant is

16   entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Celotex Corp. v.

17   Catrett, 477 U.S. 317, 322 (1986).  One of the principal purposes of Rule 56 is to

18   dispose of factually unsupported claims or defenses.  Celotex, 477 U.S. at 325.

19       Rule 56 also allows a court to grant summary judgment on part of a claim or

20   defense, known as partial summary judgment.  See Fed. R. Civ. P. 56(a) ("A party may

21   move for summary judgment, identifying each claim or defense—or the part of each

22   claim or defense—on which summary judgment is sought."); see also Allstate Ins. Co. v.

23   Madan, 889 F. Supp. 374, 378-79 (C.D. Cal. 1995).  The standard that applies to a

24   motion for partial summary judgment is the same as that which applies to a motion for

25   summary judgment.  See Fed. R. Civ. P. 56(a); State of Cal. ex rel. Cal. Dep't of Toxic

26   Substances Control v. Campbell, 138 F.3d 772, 780 (9th Cir. 1998) (applying summary

27   judgment standard to motion for summary adjudication).

28   ///

1   In a summary judgment motion, the moving party always bears the initial

2   responsibility of informing the court of the basis for the motion and identifying the

3   portions in the record "which it believes demonstrate the absence of a genuine issue of

4   material fact."  Celotex, 477 U.S. at 323.  If the moving party meets its initial

5   responsibility, the burden then shifts to the opposing party to establish that a genuine

6   issue as to any material fact actually does exist.  Matsushita Elec. Indus. Co. v. Zenith

7   Radio Corp., 475 U.S. 574, 586-87 (1986); First Nat'l Bank v. Cities Serv. Co., 391 U.S.

8   253, 288-89 (1968).

9   In attempting to establish the existence or non-existence of a genuine factual

10   dispute, the party must support its assertion by\

11   citing to particular parts of materials in the record, including
    depositions, documents, electronically stored information,
12   affidavits[,] or declarations . . . or other materials; or showing
    that the materials cited do not establish the absence or
13   presence of a genuine dispute, or that an adverse party
    cannot produce admissible evidence to support the fact.
14

15   Fed. R. Civ. P. 56(c)(1).  The opposing party must demonstrate that the fact in

16   contention is material, i.e., a fact that might affect the outcome of the suit under the

17   governing law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 251-52 (1986);

18   Owens v. Local No. 169, Assoc. of W. Pulp and Paper Workers, 971 F.2d 347, 355 (9th

19   Cir. 1987).  The opposing party must also demonstrate that the dispute about a material

20   fact "is 'genuine,' that is, if the evidence is such that a reasonable jury could return a

21   verdict for the nonmoving party."  Anderson, 477 U.S. at 248.  In other words, the judge

22   needs to answer the preliminary question before the evidence is left to the jury of "not

23   whether there is literally no evidence, but whether there is any upon which a jury could

24   properly proceed to find a verdict for the party producing it, upon whom the onus of proof

25   is imposed."  Anderson, 477 U.S. at 251 (quoting Improvement Co. v. Munson, 81 U.S.

26   442, 448 (1871)) (emphasis in original).  As the Supreme Court explained, "[w]hen the

27   moving party has carried its burden under Rule [56(a)], its opponent must do more than

28   simply show that there is some metaphysical doubt as to the material facts."  Matsushita,

1    475 U.S. at 586.  Therefore, "[w]here the record taken as a whole could not lead a

2    rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"

3    Id. at 87.

4        In resolving a summary judgment motion, the evidence of the opposing party is to

5    be believed, and all reasonable inferences that may be drawn from the facts placed

6    before the court must be drawn in favor of the opposing party.  Anderson, 477 U.S. at

7    255.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's

8    obligation to produce a factual predicate from which the inference may be drawn.

9    Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd,

10   810 F.2d 898 (9th Cir. 1987).

11

12                                **ANALYSIS**

13

14   **A.  Individual Liability under 42 U.S.C. § 1983**

15       Under 42 U.S.C. § 1983, an individual like Plaintiff may sue "[e]very person who,

16   under color of [law] subjects" him "to the deprivation of any rights, privileges, or

17   immunities secured by the Constitution and laws."  For an inmate to bring a valid § 1983

18   claim against a prison official, Plaintiff must first "objectively show that he was deprived

19   of something serious.  Foster v. Runnels, 554 F.3d 807, 812 (9th Cir. 2009) (quoting

20   Farmer v. Brennan, 511 U.S. 825, 834 (1994)).  Then, Plaintiff must show that the

21   deprivation occurred with deliberate indifference to his health and safety.  Id.

22       Individual capacity suits "seek to impose individual liability upon a government

23   officer for actions taken under color of state law."  Hafer v. Melo, 502 U.S. 21, 25 (1991).

24   Government officials may not be held liable for the unconstitutional conduct of their

25   subordinates under a theory of respondeat superior.  Ashcroft v.Iqbal, 556 U.S. 662, 676

26   (2009).  Rather, an individual may be liable for deprivation of constitutional rights "within

27   the meaning of § 1983, if he does an affirmative act, participates in another's affirmative

28   acts, or omits to perform an act which he is legally required to do that causes the

1  deprivation of which complaint is made." Preschooler II v. Clark County Sch. Bd. of

2  Trustees, 479 F.3d 1175, 1183 (9th Cir. 2007).  Therefore, a plaintiff cannot demonstrate

3  the liability of a particular officer "without a showing of individual participation in the

4  unlawful conduct." Jones v. Williams, 297 F.3d 930, 935 (9th Cir. 2002).  Plaintiff must

5  "establish the integral participation of the officers in the alleged constitutional violation,"

6  which requires "some fundamental involvement in the conduct that allegedly caused the

7  violation." Blankenhorn v. City of Orange, 485 F.3d 463, 481 n.12 (9th Cir. 2007);

8  Jones, 297 F.3d at 935.

9       Under § 1983, government officials acting as supervisors may be liable under

10 certain circumstances.  "[W]hen a supervisor is found liable based on deliberate

11 indifference, the supervisor is being held liable for his or her own culpable action or

12 inaction, not held vicariously liable for the culpable action or inaction of his or her

13 subordinates." Starr v. Baca, 652 F.3d 1202, 1207 (9th Cir. 2011).  A defendant may be

14 held liable as a supervisor under § 1983 if there exists "either (1) his or her personal

15 involvement in the constitutional deprivation; or (2) a sufficient causal connection

16 between the supervisor's wrongful conduct and the constitutional violation." Hansen v.

17 Black, 885 F.2d 642, 646 (9th Cir. 1989); Starr, 652 F.3d at 1207.

18      A supervisor's physical presence is not required for supervisory liability. Starr,

19 652 F.3d at 1205.  Rather, the requisite causal connection between a supervisor's

20 wrongful conduct and the violation of the prisoner's Constitutional rights can be

21 established in a number of ways.  The plaintiff may show that the supervisor set in

22 motion a series of acts by others, or knowingly refused to terminate a series of acts by

23 others, which the supervisor knew or reasonably should have known would cause others

24 to inflict a constitutional injury. Dubner v. City & County of San Francisco, 266 F.3d 959,

25 968 (9th Cir. 2001); Larez v. City of Los Angeles, 946 F.2d 630, 646 (9th Cir. 1991).

26 Similarly, a supervisor's own culpable action or inaction in the training, supervision, or

27 control of his subordinates may establish supervisory liability. Starr, 652 F.3d at 1208;

28 Larez, 946 F.2d at 646.  Finally, a supervisor's acquiescence in the alleged constitutional

15

1   deprivation or conduct showing deliberate indifference toward the possibility that

2   deficient performance of the task may violate the rights of others, may establish the

3   requisite causal connection.  Starr, 652 F.3d at 1208; Menotti v. City of Seattle, 409 F.3d

4   1113, 1149 (9th Cir. 2005).

5       **1. First  Claim for Relief:  Claims brought pursuant to 42 U.S.C.
            § 1983 for Fourteenth Amendment by Defendants McGuinness and**

6       **Boylan as a Result of Plaintiff's 2007 Incarceration.**

7           As a pretrial detainee at the time of his incarceration in 2007, Plaintiff was entitled

8   to be free of cruel and unusual punishment under the Due Process Clause of the

9   Fourteenth Amendment.  Bell v. Wolfish, 441 U.S. 520, 537 n.16 (1979); Simmons v.

10  Navajo County, 609 F.3d 1011, 1017 (9th Cir. 2010).   Plaintiff's alleged deprivation of

11  that right during his 2007 incarceration forms the constitutional predicate for his First

12  Claim for Relief.

13          The Due Process Clause requires that "persons in custody have the established

14  right to not have officials remain deliberately indifferent to their serious medical needs."

15  Gibson v. County of Washoe, 290 F.3d 1175, 1187 (9th Cir. 2002) (quoting Carnell v.

16  Grimm, 74 F.3d 977, 979 (9th Cir. 1996)).  The government has an obligation to provide

17  medical care for those whom it punishes by incarceration.  Estelle v. Gamble, 429 U.S.

18  97, 103 (1976).  A pretrial detainee's due process right in this regard is violated when a

19  jailer fails to promptly and reasonably procure competent medical aid when the pretrial

20  detainee suffers a serious illness or injury while confined.  Id. at 104-05.  In order to

21  establish a plausible claim for failure to provide medical treatment, Plaintiff must plead

22  sufficient facts to permit the Court to infer that (1) Plaintiff had a "serious medical need,"

23  and that (2) individual Defendants were "deliberately indifferent" to that need.  Jett v.

24  Penner, 439 F.3d 1091, 1096 (9th Cir. 2006);  Farmer, 511 U.S. at 834.

25          Plaintiff can satisfy the "serious medical need" prong by demonstrating that

26  "failure to treat [his] condition could result in further significant injury or the unnecessary

27  and wanton infliction of pain."  Jett, 439 F. 3d at 1096 (internal citations and quotations

28  omitted); Clement v. Gomez, 298 F.3d 898, 904 (9th Cir. 2002).  Examples of such

1   serious medical needs include "[t]he existence of an injury that a reasonable doctor or

2   patient would find important and worthy of comment or treatment, the presence of a

3   medical condition that significantly affects an individual's daily activities, or the existence

4   of chronic and substantial pain."  Lopez v. Smith, 203 F.3d 1122, 1131 (9th Cir. 2000).

5          The Court finds that Plaintiff alleges sufficient facts to make a plausible showing

6   that his medical need was serious.  During both his 2007 and 2010 incarcerations,

7   Plaintiff contends he suffered from neurological issues that made him partially paralyzed

8   and unable to walk.  Obviously, such a development would have affected Plaintiff's daily

9   activities to the extent that a reasonable doctor would find such symptoms noteworthy.

10         The next issue for the Court is whether a defendant was deliberately indifferent to

11  plaintiff's serious medical need.  In Farmer, the Supreme Court explained in detail the

12  contours of the "deliberate indifference" standard.  Specifically, an individual defendant is

13  not liable under the Fourteenth Amendment for his part in allegedly denying necessary

14  medical care unless he knew "of and disregard[ed] an excessive risk to [Plaintiff's] health

15  and safety."  Farmer, 511 U.S. at 837; Gibson, 290 F.3d at 1187-88.  Deliberate

16  indifference contains both an objective and subjective component: "the official must both

17  be aware of facts from which the inference could be drawn that a substantial risk of

18  serious harm exists, and he must also draw that inference."  Farmer, 511 U.S. at 837.  "If

19  a person should have been aware of the risk, but was not," then the standard of

20  deliberate indifference is not satisfied "no matter how severe the risk."  Gibson, 290 F.3d

21  at 1188 (citing Jeffers v. Gomez, 267 F.3d 895, 914 (9th Cir. 2001)).  Plaintiff "need not

22  show that a prison official acted or failed to act believing that harm actually would befall

23  on inmate; it is enough that the official acted or failed to act despite his knowledge of a

24  substantial risk of serious harm."  Farmer, 511 U.S. at 842.

25          "The indifference to medical needs must be substantial; a constitutional violation

26  is not established by negligence or 'an inadvertent failure to provide adequate medical

27  care.'"  Anderson v. County of Kern, 45 F.3d 1310, 1316 (9th Cir. 1995) (quoting Estelle,

28  429 U.S. at 105-06).  Generally, defendants are "deliberately indifferent to a prisoner's

serious medical needs when they deny, delay, or intentionally interfere with medical

treatment."  Hallett v. Morgan, 296 F.3d 732, 744 (9th Cir. 2002); Lolli v. County of

Orange, 351 F.3d 410, 419 (9th Cir. 2003).  Significantly, inadequate staffing can create

a risk of substantial harm in a prison setting sufficient to qualify as deliberate

indifference.  See Hoptowit v. Ray, 682 F.2d 1237, 1251 (9th Cir. 1982), abrogated on

other grounds by Sandin v. Conner, 515 U.S. 472 (1995).  However, "[i]solated incidents

of neglect do not constitute deliberate indifference."  Bowell v. Cal. Substance Abuse

Treatment Facility at Concoran, 2011 WL 2224817, at *3 (E.D. Cal. 2011) (citing Jett,

439 F.3d at 1096).

Finally, deliberate indifference also contains a causal component.  Mere delay in

receiving medical treatment, without more, does not constitute "deliberate indifference,"

unless the plaintiff can show that the delay caused serious harm to the plaintiff.  Wood v.

Housewright, 900 F.2d 1332, 1335 (9th Cir. 1990).  Nevertheless, if a triable issue of fact

is demonstrated as to whether prison officials have exposed an inmate to a substantial

risk of harm so as to constitute deliberate indifference, the inmate will usually also be

able to demonstrate a triable issue of fact as to causation.  Lemire v. Cal. Dep't of Corr.

and Rehab., 726 F.3d 1062, 1080-81 (9th Cir. 2013).  Moreover, if reasonable persons

could differ on the question of causation, then "summary judgment is inappropriate and

the question should be left to a jury."  White v. Roper, 901 F.2d 1501, 1506 (9th Cir.

1990).

With these standards in mind, we now look to the two individuals against whom

Plaintiff continues to claim deliberate indifference during the course of his 2007

incarceration.

### a.  Defendant John McGinness

John McGinness was the elected Sheriff of Sacramento County throughout the

course of both of Plaintiff's incarcerations.  As Sheriff, McGuinness is ultimately

responsible for the Jail's operation.  Plaintiff alleges that McGinness was "aware of

longstanding and well-documented deficiencies in the Jail through the findings of

18

1   Sacramento Grand Jury investigations related to the overcrowding and understaffing of

2   the jail and the overall deficiencies in the main jail medical care delivery system."  Pl.'s

3   Opp'n at 32:2-7.  The Grand Jury's 2005-06 report reported pervasive understaffing of

4   medical and custody staff resulting in a denial of access to medical care.  Pl.'s Ex. 47.

5   McGinness was copied on the County's initial responses, dated August 7, 2006, thereby

6   putting him on notice of the subject deficiencies.  Pl.'s Ex. 49 at 4.  Significantly, too, in a

7   Sacramento Bee article dated July 11, 2006, McGinness described that Grand Jury's

8   report as containing "no surprises."  Pl.'s Ex. 48.

9        The County itself ordered an audit of Jail operations by Joseph A. Brann and

10   Associates.  The Brann Report similarly revealed widespread deficiencies, including an

11   unusually high percentage of grievances regarding medical care, the lack of a system

12   ensuring that inmate medical complaints were routinely reviewed, and insufficient

13   staffing levels.  See Pl.'s Opp'n at 31:9-14.

14        As indicated above, supervisory liability under 42 U.S.C. § 1983 can attach if a

15   sufficient causal connection exists between the supervisor's conduct and the

16   constitutional violation.  Lolli, 351 F.3d at 418.  That causal connection can consist of

17   inaction or acquiescence in the face of the alleged constitutional deprivation.

18   Cunningham v. Gates, 229 F.3d 1271, 1292 (9th Cir. 2000); Dubner v. City & County of

19   San Francisco, 266 F.3d 959, 968 (9th Cir. 2001).

20        Here, as enumerated above, Plaintiff claims his use of the call button to summon

21   custodial staff and request medical care was repeatedly ignored; indeed, the housing

22   logs themselves contain no mention of many of the complaints made by Plaintiff despite

23   the fact that custodial staff should have documented all such requests.  Additionally,

24   when Plaintiff collapsed in the shower on May 17, 2007, his requests for help went

25   unheeded for more than 30 minutes, and the responding deputy failed to even file an

26   incident report in contravention of Jail policy, a shortcoming that led to his formal

27   discipline.  Two days later, custodial staff went so far as to lock down Plaintiff's entire

28   pod for what is alleged to have been Plaintiff's excess use of the call button for aid.

1    Given McGinness' prior knowledge of understaffing at the jail and the effect that it

2  had on needed medical care, as revealed by the Grand Jury's 2005-06 Report and the

3  subsequent Brann Report, as well as the fact that Plaintiff's subsequent incarceration

4  contains allegations of ongoing impediments to seeking medical assistance, this Court

5  concludes that factual issues exist that preclude summary adjudication as to Sheriff

6  McGinness for the First Claim for Relief.  These factual issues extend both to the extent

7  of McGinness' knowledge about understaffing and lack of access to medical care at the

8  Jail, and to whether those shortcomings exacerbated Plaintiff's condition.

9                    **b.  Defendant Ann Marie Boylan**

10    Defendant Ann Marie Boylan was Chief of Correctional Health Services at the Jail

11  during both of Plaintiff's incarcerations, and as such was responsible for managing the

12  delivery of medical and mental health services to county jail inmates.  She did not

13  assume that position, however, until January of 2007, less than a month before Tandel

14  was jailed on February 7, 2007.  Unlike McGinness, there is no evidence that she

15  participated in the Grand Jury investigation and subsequent 2006 Brann Report, which is

16  not surprising since that predated her tenure as Chief of Correctional Health Services.

17  Accordingly, the Court finds Plaintiff has presented no facts showing deliberate

18  indifference on Boylan's part during his 2007 incarceration.  Boylan is therefore entitled

19  to summary adjudication as to Plaintiff's First Claim for Relief.

20          **2.  Second Claim for Relief Claims Brought pursuant to 42 U.S.C. §**
              **1983 for Violations of the Eighth and Fourteenth Amendments as a**
21            **result of Plaintiff's 2010 Incarceration**

22    As indicated above, given his status as a pretrial detainee during the 2007

23  incarceration, Plaintiff's First Claim for Relief alleges a Fourteenth Amendment against

24  supervisory Defendants as a result of that incarceration.  Although Plaintiff has failed to

25  allege his conviction status during the subsequent 2010 incarceration, he alleges both

26  Eighth and Fourteenth Amendment violations against all remaining individual defendants

27  as a result of the events of 2010.  The protections afforded by the Eighth Amendment's

28  prohibition against cruel and unusual punishment inures to the benefit of post-conviction

1   prisoners.  The issue of whether the Fourteenth or the Eighth Amendment applies in

2   analyzing the viability of the Second Claim for Relief, however, is largely academic since

3   the Ninth Circuit has held that pretrial detainees' rights under the Fourteenth Amendment

4   are comparable to prisoner's rights under the Eighth Amendment.  The same deliberate

5   indifference standard applies under either scenario.  See Redman v. County of

6   San Diego, 942 F.2d 1435, 1441 n.7 (9th Cir. 1991); Frost v. Agnos, 152 F.3d 1124,

7   1128 (9th Cir. 1998).  Therefore, to state a viable claim as to the 2010 incarceration for

8   deliberate indifference, Plaintiff must also show that he had a "serious medical need"

9   and that Defendants acted with "deliberate indifference to that need."  Estelle v. Gamble,

10   429 U.S. at 105.  Therefore, the same standards discussed above with respect to the

11   First Claim for Relief apply.

12      The remaining individual defendants against who Plaintiff alleges deliberate

13   indifference during his 2010 incarceration had three different connections to Plaintiff's

14   care.  First, Drs. Bauer, Sahba and Sotok, and Nurse Kroner and Nurse Practitioner

15   Felicano, are all medical professionals and were involved in Plaintiff's care in that

16   context.  Second, Officers Jacoby and Medeiros were custodial staff.  Finally, the liability

17   of Defendants McGinness, Boylan, and Iwasa, if any, derives only from their

18   supervisorial positions.  Each of these groups of defendants will now be addressed.

19                **a.  Defendants Bauer, Sabha, Sotok, Kroner and Felicano**

20      Aside from allegedly suggesting that Plaintiff reuse the straight catheters he was

21   provided (a claim not borne out by Plaintiff's medical chart), [6] Dr. Bauer's primary

22   involvement in Plaintiff's care occurred over five visits between April 27, 2010 and May

23   4, 2010 for management of Plaintiff's chronic pain.  During this period, Dr. Bauer did not

24   refuse to provide Plaintiff with medication; to the contrary, he adjusted dosages in an

25   attempt to better manage Plaintiff's pain, and discontinued morphine use because of

26   _____

27   [6] To the contrary, on March 24, 2010, Dr. Bauer recognized Plaintiff's need for catheterization and
     ordered a so-called "Foley" catheter.  It was Plaintiff who declined that suggestion and wanted to use
     straight catheters, which were subsequently provided by Dr. Bauer.  There is no evidence supporting
28   Plaintiff's claim that Dr. Bauer told him to "reuse" the catheters.

1    concerns that it was causing Plaintiff's headaches.  While Plaintiff speculates that Dr.

2    Bauer adjusted his pain medication to help him get through his deposition on May 14,

3    2014, that hardly amounts to deliberate indifference.   Plaintiff has not met the high

4    standard for asserting deliberate indifference against Dr. Bauer.

5         Plaintiff fares no better in his claims against Drs. Sahba and Sotok, the remaining

6    two physician defendants in his Second Claim for Relief.  Plaintiff's chart indicates Dr.

7    Sahba initially saw him on March 25, 2010, after he had threatened suicide.  Although

8    Plaintiff  takes issue with the suicide precautions Dr. Sahba took, her chart note reflects

9    a concern about Plaintiff's ability to transfer from his mattress to his wheelchair and

10   indicates she followed up with two other physicians about that concern.  The fact that

11   she felt it was "too risky" under the circumstances to permit clothing and a different kind

12   of bed does not equate with deliberate indifference.  Nor does Dr. Sahba's examination

13   on April 9th, when she prescribed ointment for Plaintiff's pressure sores, and ordered

14   urinalysis and other testing to see whether Plaintiff's complaints of penile pain were

15   related to a sexually transmitted disease, suggest anything approaching deliberate

16   indifference.  Finally, when Plaintiff saw Dr. Sahba a third and final time on April 22,

17   2007, she referred him to an ophthalmologist and a neurologist given his reports of

18   continuing leg and back pain, as well as vision issues.  She also ordered follow-up

19   urinalysis.  Again, the fact that Dr. Sahba examined Plaintiff and recommended

20   treatment for what she observed does not show deliberate indifference.  The fact that

21   Dr. Sabha, and other jail medical personnel, did not immediately recognize

22   symptomatology suggesting either ADEM or NMO cannot be deliberate indifference

23   given the rarity of those conditions and the fact that neurological specialists at the U.C.

24   Davis Medical Center had difficulty in properly diagnosing Plaintiff's condition.

25       The care provided by Dr. Sotak leads the Court to the same conclusion.  Although

26   it appears that Dr. Sotak, as the Jail's Medical Director, may have generally reviewed

27   Plaintiff''s chart and concurred with the recommendation to place him on suicide watch

28   under certain precautions, he saw Plaintiff only twice.  At the time of the first visit on

1   May 4, 2010, Dr. Sotak prescribed high calorie liquids along with physical therapy in

2   response to Plaintiff's claims of weight loss (apparently exacerbated by his religious

3   preference regarding food), as well as physical therapy.[7]   Then, on May 10, 2010, when

4   Sotak observed what appeared to be decreasing vision in Plaintiff's right eye, he referred

5   Plaintiff for emergency transport to the U.C. Davis Medical Center for further evaluation.

6   Nothing about Dr. Sotak's interaction with Plaintiff suggests he was deliberately

7   indifferent.

8          With respect to Susan Kroner and Agnes Felicano, both nurses are sued in their

9   individual capacities under §1983 as a result of Plaintiff's 2010 incarceration.  All Nurse

10   Practitioner Felicano did, immediately following Plaintiff's booking in 2010, was to

11   prescribe an order for four catheters and an order authorizing him to keep a urinal with

12   him at all times.  By no means does that minimal, and seemingly innocuous, interaction

13   and treatment show deliberate indifference.  Significantly, although Plaintiff claims he

14   wanted eight catheters a day, his chart contains no complaint thereafter that four were

15   insufficient and Plaintiff testified at deposition that he was using about four on a daily

16   basis.  SUF at No. 201.  Finally, Nurse Kroner saw Plaintiff just once, on April 22, 2010,

17   when Plaintiff stated he had been experiencing blurry vision involving the left eye for the

18   previous two weeks.  According to her note, because Kroner observed that the vision in

19   Plaintiff's right eye was better than his left, she referred him to be seen by a physician

20   the following day.  While Plaintiff claims that she should have sought more immediate

21   care, there was no indication that her decision to have a doctor examine Plaintiff the

22   following day was so below the applicable standard of care so as to constitute deliberate

23   indifference.  Again, it was not deliberately indifferent for a nurse like Kroner to have

24   failed to appreciate symptoms potentially suggesting the recurrence of a rare

25   neurological disease like NMO.

26   ///

27   _____

28          [7] Plaintiff was apparently not experiencing any vision impairment at the time of this evaluation, and
Sotak believed any past impairment was a side effect of his morphine prescription.

### b.  Defendants Jacoby and Medeiros

Plaintiffs allege deliberate indifference against Deputies Stephanie Jacoby and Mark Medeiros given their conduct as housing officers on Plaintiff's ward during the day shift on April 11, 2010.  Jacoby and Medeiros allegedly ignored Plaintiff's call button requests for assistance, and further ignored a call request from Plaintiff's neighboring inmate who claims he heard Plaintiff screaming in agony.  As enumerated above, Jacoby and Medeiros allegedly informed oncoming night shift personnel that they were having problems with Plaintiff "[y]elling and screaming and causing a problem hitting the button constantly . . . "  Pl.'s Ex. 28 at 70:19-71:25.  Moreover, the housing logs document none of this although they were required to do so pursuant to Jail policy.  Defs.' Ex. 5 at 5380-82.  While Jacoby and Medeiros simply claim they were not informed of any medical need on April 11, 2014, there is evidence to the contrary, and that evidence must be presumed true for purposes of summary judgment.   If Jacoby and Medeiros repeatedly ignored not only Plaintiff's repeated calls for help, but also similar calls made by a neighboring inmate, those repeated failures raise, at the very least, triable issues of fact that preclude summary judgment on their behalf.  Deliberate indifference may be manifested not only by prisoner doctors in their response to prisoner's needs, but also by prison guards "in intentionally denying or delaying access to medical care. . ."  Estelle, 429 U.S. at 104-105.

### c.  Defendants McGinness, Boylan and Iwasa

In arguing for summary adjudication as to the Section 1983 deliberate indifference claim against McGinness, Defendants state there "simply is no connection between any alleged injury [arising from the 2010 incarceration] and Sheriff McGinness."  Defs.' Mot. at 20:7-8.  The Court disagrees.  As discussed above with regard to the 2007 incarceration, there is evidence that McGinness was aware of longstanding and well-documented deficiencies in the Jail related to understaffing at the Jail that resulted in a denial of access to medical care.  The Sacramento County Grand Jury's 2005-06 Report identified problems in that regard, and a subsequent independent audit of Jail operations

1   confirmed those problems.  Moreover, the same deficiencies continued to be brought to

2   McGinness' attention following Plaintiff's 2007 incarceration.  A September 2009 audit by

3   the Sacramento County Office of Inspector General similarly revealed that line-level

4   staffing was low and inmate overpopulation was acute.  Pl.'s Ex. 53.  Defendants'

5   request for summary adjudication as to the Second Claim for Relief against McGinness,

6   which stems from the 2010 incarceration, fails for the same reasons the First Claim for

7   Relief survives against McGinness.

8        With respect to Defendant Ann Marie Boylan, the Chief of Correctional Health

9   Services at the Jail, there is no evidence that Boylan trained or supervised custodial staff

10  or had any role in promulgating policies or procedures relating to the operation of the

11  custodial staff at the jail.  Nor has Plaintiff  identified any evidence connecting Boylan

12  with the actions of the remaining custodial defendants involved in the 2010 incarceration,

13  Jacoby and Medeiros.

14       Mark Iwasa, the final individually named defendant to the Second Claim for Relief,

15  served as Undersheriff and Jail Captain during the 2010 incarceration.  Defendants urge

16  the Court to grant summary adjudication as to Iwasa on grounds that Plaintiff has

17  advanced no evidence to support his allegation that Iwasa was aware of and

18  disregarded widespread deficiencies in the delivery of health care at the Jail in 2010.

19  The only specific allegation levied against Iwasa is that both he and Iwasa "worked

20  closely with the Brann auditors in response to the 2005-06 Grand Jury findings," citing

21  Plaintiff's Exhibit 53.  That exhibit contains virtually no reference to Iwasa, however,

22  beyond a statement that the consultants had "unrestricted access" to Iwasa and four

23  others during the preparation of their report.  Id.  This is not sufficient to create a triable

24  issue with respect to Iwasa's liability under the Second Claim for Relief.

     **B.  Third through Fifth Claims for Relief:  Claims Brought against Defendant**
25       **County pursuant to 42 U.S.C. § 1983**

26

27       Plaintiff's Third Claim for Relief alleges that the County had a policy, practice, or

28  custom of denying, delaying and interfering with inmate access to medical care.  Under

§ 1983, a municipal entity like Sacramento County may be found liable under such a theory if it facilitates a constitutional violation by "execution of a . . . policy or custom, whether by its lawmakers or by those whose edicts or acts may fairly be said to represent official capacity." Monell v. N.Y. City Dep't of Social Services, 436 U.S. 658, 694 (1978). The case law, however, carefully delineates so called Monell liability, which makes such an entity responsible for its own illegal acts, from vicarious liability for the conduct of its employees under § 1983, which does not attach Connick v. Thompson, 131 S. Ct. 1350, 1359 (2011) (quoting Pembaur v. Cincinnati, 475 U.S. 469, 479 (1986)). Here, to constitute deliberate indifference, the County's shortcomings must be "obvious," with inadequacy "so likely to result in violation of constitutional rights that the policymakers . . . can reasonably be said to have been deliberately indifferent . . . ." City of Canton v. Harris, 489 U.S. 378, 390 (1989). Moreover, even if no explicit policy is identified, a plaintiff may still establish municipal liability upon a showing that there is a permanent and well-settled practice by the municipality that gave rise to the alleged constitutional violation. See City of St. Louis v. Praprotnik, 485 U.S. 112, 127 (1988).

At a very minimum, there is evidence here that Jail staff repeatedly, during both Plaintiff's 2007 and 2010 incarcerations, failed to timely respond to Plaintiff's requests for medical aid. Plaintiff claims he repeatedly depressed his call button for medical aid between May 5, 2007 and May 16, 2007, with virtually no response. The Jail's logs, however, do not document a single complaint until May 13, 2007. Then, on May 17, 2007, after Plaintiff collapsed while taking a shower when he lost control of his legs, he claims he yelled for more than 30 minutes before help finally arrived. The next day, when he repeatedly rang the emergency button for help on grounds that he could neither walk, urinate, or see properly, Plaintiff alleges he was told to stop using the call button. The next day, after Plaintiff claims he repeatedly used the call button to frantically request help, Plaintiff alleges that custodial officers punished the entire pod for Plaintiff's overuse of that button for aid.

///

1    Similar problems persisted in 2010, when Plaintiff was reincarcerated.  On

2    April 11, 2010, as indicated above, Defendants Jacoby and Medeiros are alleged to

3    have repeatedly ignored Plaintiff's call button requests for help, even when told by

4    another inmate that Plaintiff needed assistance.  Additionally, when Plaintiff was placed

5    on suicide watch, he claims he was left to lay naked on a mattress and, in the absence

6    either regular assistance or access to a call button, urinated on himself, could not

7    defecate properly, and developed bed sores.

8    Given the persistence of these problems over two incarcerations three years

9    apart, this Court believes that Plaintiff has identified a triable issue of fact with respect to

10   the County's custom and practice liability.  Also significant in this determination is the

11   fact that the County was on explicit notice, through the 2005-06 Grand Jury Report, the

12   subsequent Brann Report, and an additional 2008 audit by the Sacramento County

13   office of Inspector General, that custodial staffing was insufficient to the point that a

14   denial of access to medical care resulted.  Consequently, the Third Claim for Relief,

15   which alleges custom and practice Monell liability, survives summary judgment.

16   Plaintiff's Fourth Claim for Relief alleges the County is liable for deliberate

17   indifference to his serious medical needs in both 2007 and 2010 because of its failure to

18   properly train Jail staff.  In order to establish liability for failure to train, Plaintiff must

19   show a training policy that amounts to deliberate indifference and must further establish

20   that injury could have been avoided had proper training been provided.  Blankenhorn,

21   485 F.3d at 484.  Significantly, too, "absent evidence of a 'program-wide inadequacy in

22   training,' any shortfall in a single employee's training 'can only be classified as

23   negligence on the part of the municipal defendant – a much lower standard of fault than

24   deliberate indifference.  Id. at 484-85 (quoting Alexander v. City & County of

25   San Francisco, 29 F.3d 1355, 1367 (9th Cir. 1994)).  Here, Defendant County claims that

26   Plaintiff has failed to show a pattern or failure to train its custodial staff, and further

27   alleges that there is no evidence to link any such training inadequacy to Plaintiff's

28   alleged injuries in 2007 and 2010

1     Plaintiff's opposition, in attempting to shore up its <u>Monell</u> claims against

2   Defendant County, identifies only "policies, practices and procedures that violated

3   [Plaintiff's] constitutional right to medical care." Pl.'s Opp'n at 28: 24-27.   While Plaintiff

4   cites eleven separate alleged areas of inadequacy in this regard (<u>see id.</u> at 29-30), there

5   is not a single allegation that any of the purported violations stem from a lack of training.

6   Indeed, other than identifying the standard for municipal liability based on failure to train,

7   Plaintiff's opposition contains no mention of training whatsoever.   As such, Plaintiff has

8   failed to show any triable issue of fact with respect to municipal liability based on failure

9   to train and Defendant County is entitled to summary adjudication as to the Fourth Claim

10   for Relief.

11     Plaintiff's Fifth Claim for Relief, however, for failure to adequately staff and/or

12   supervise, does not suffer from the same shortcoming.   As already discussed above,

13   Plaintiff has identified numerous instances, in both 2007 and 2010, of custodial staff

14   failing to respond to Plaintiff's medical needs, even in the wake of reports and

15   investigations putting Defendant on clear notice of staffing insufficiencies.   That is

16   enough to withstand summary judgment as to the Fifth Claim.

17
     ### C. Seventh Claim for Relief:  Claims against Defendant County pursuant to the ADA and the Rehabilitation Act
18

19     To establish a claim under Title II of the ADA, Plaintiff must show (1) that he is an

20   individual with a disability; (2) is otherwise qualified to receive the services and benefits

21   of the public entity's care; and (3) was denied access to those benefits as a result of his

22   disability.  <u>Simmons</u>, 609 F.3d at 1021.  Jails fall squarely with the statutory definition of

23   "public entity" for purposes of liability under the ADA.  42 U.S.C. § 12131(1)(B); <u>Pa. Dep't</u>

24   <u>of Corr. v. Yeskey</u>, 524 U.S. 206, 210 (1998).  In addition, the medical services that

25   prisons provide are deemed "benefits" under the ADA.  <u>Armstrong v. Schwarzenegger</u>,

26   622 F.3d 1058, 1068 (9th Cir. 2010).

27     Similarly, to establish a violation of Section 504 of the Rehabilitation Act, Plaintiff

28   must show that he was denied benefits or services solely because of his handicap, and

1  that the program providing the benefit or services receives federal financial assistance.

2  Lovell v. Chandler, 303 F.3d 1039, 1052 (9th Cir. 2002).

3      Plaintiff claims he can meet the requirements for liability under both the ADA and

4  the Rehabilitation Act because he was "denied proper psychiatric and medical care," and

5  did not provide assistance necessary for him to engage in the activities of daily living

6  ("ADLs") with respect to sanitation, eating, and showering.  He further alleges that the

7  manner in which he was placed on suicide watch (without clothing and with no ability to

8  urinate or defecate) violated the ADA and the Rehabilitation Act.

9      Plaintiff's unsupported factual allegation that he was denied proper medical care

10  is not enough to create a triable issue of fact with respect to either the ADA or the

11  Rehabilitation Act.  Inadequate treatment or lack of treatment for Plaintiff's medical

12  condition does not in itself suffice to create liability under either statutory scheme.  See

13  Bryant v. Madigan, 84 F.3d 246, 249 (7th Cir. 1996) ("The ADA does not create a

14  remedy for medical malpractice."); Luna v. Cal. Health Care Servs., 2011 WL 6936399 at

15  *5 (E.D. Cal. 2011) ("Plaintiff's allegations of inadequate medical care do not state a

16  claim under the ADA").  Instead, under both the ADA and the Rehabilitation Act, Plaintiff

17  must establish that he was denied services, programs, or activities because of his

18  disability.  He has made no showing, as he must, that he was "denied access to medical

19  supplies or treated differently by reason of his disability.  Marlor v. Madison County,

20  50 F. App'x 872, 873 (9th Cir. 2002 ) (emphasis in original).  Plaintiff's allegations that he

21  did not receive enough  assistance relates to the adequacy of the care he received, not

22  to the denial of services solely because of his disability.  Additionally, the fact that

23  psychiatric staff found it necessary to put Plaintiff on suicide watch under specified

24  conditions that made it difficult for Plaintiff to meet his sanitary needs does not mean

25  Plaintiff received the care he did based solely on his physical disability.

26      In sum, Plaintiff has failed to make the requisite factual showing under either the

27  ADA or the Rehabilitation Act, and as such has failed to state a viable claim under either

28  ///

1   statutory scheme.  Defendant County is accordingly entitled to summary adjudication as

2   to the Seventh Claim for Relief.

3   **D.  Ninth Claim for Relief:  Claims for Violation of California Government**
    **Code § 845.6**

4

5        To establish liability under California Government Code § 845.6, Plaintiff "must

6   establish three elements:  (1) the public employee knew or had reason to know of the

7   need (2) for immediate medical care, and (3) failed to summon such care."  Jett,

8   439 F.3d at 1099.  The employing public entity may also incur liability for its employee's

9   failure in this regard.  Castaneda v. Dep't of Corr. and Rehab., 212 Cal. App. 4th 1051,

10  1063 (2013).  Liability under § 845.6, however, is limited to "serious and obvious medical

11  conditions requiring immediate care."  Lawson v. Superior Court, 180 Cal. App. 4th 1372,

12  1385 (2010).

13       Plaintiff names both the County of Sacramento and Deputies Jacoby and

14  Medeiros as defendants to his Ninth Claim.  He claims that Jacoby and Medeiros were

15  aware of Tandel's serious medical need and failed to summon medical care.  For the

16  reasons already outlined with respect to the § 1983 deliberate indifference liability of

17  Defendants Jacoby and Medeiros as individuals, the same issues that precluded

18  summary judgment as to that claim also prohibit summary adjudication with respect to

19  Defendants' § 845.6 liability.  There is evidence that Plaintiff repeatedly depressed his

20  call button without success, and that another inmate housed adjacent to Plaintiff's cell

21  also tried unsuccessfully to summon help after he reportedly heard Plaintiff scream in

22  agony.  Those two pieces of evidence, taken together, are enough to preclude summary

23  judgment with regard to California Government Code § 845.6.

24

25                                **CONCLUSION**

26

27       Based on the foregoing, Defendants' Motion for Summary Judgment (ECF

28  No. 135) is GRANTED in part and DENIED in part as follows:

1.   Defendants' request for summary adjudication as to First Claim for Relief, is GRANTED as to Defendant Anne Marie Boylan, but DENIED as to Defendant John McGinness;

2.   Defendants' request for summary adjudication as to the Second Claim for Relief is GRANTED as to Defendants Bauer, Sabha, Sotok, Kroner, Felicano, Boylan and Iwasa, but DENIED as to Defendants Jacoby and Medeiros;

3.   Defendant County's request for summary adjudication as to the Third, Fifth and Ninth Claims for Relief is DENIED;

4.   Defendant County's request for summary adjudication as to the Fourth and Seventh Claims for Relief is GRANTED;

5.   Given Plaintiff's consent, Defendant County's request for summary adjudication as to the Eighth Claim for Relief is GRANTED;

6.   Given Plaintiff's consent, Defendants County of Sacramento, Sotok, Bauer and Sahba are dismissed as Defendants from the Tenth and Eleventh Claims for Relief;

7.   Because Plaintiff has failed to oppose Defendants' request that the Tenth and Eleventh Claims for Relief, to the extent they continue to be alleged against any other defendant, be dismissed in their entirety, summary adjudication as to the Tenth and Eleventh Claims is GRANTED; and

8.   Given Plaintiff's consent, Defendant John Wilson is dismissed from this action.

IT IS SO ORDERED.

Dated:  March 20, 2015

MORRISON C. ENGLAND, JR., CHIEF JUDGE
UNITED STATES DISTRICT COURT